IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

TROY BRITT,

                     Plaintiff,         Civil Action No.
                                       9:17-CV-0234 (MAD/DEP)
     v.

ANNE CARBERRY, *et al.*,

                     Defendants.

_____

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

TROY BRITT, *Pro Se*
781 E. 135th Street
Bronx, NY 10454

FOR DEFENDANTS:

HON. LETITIA JAMES            KYLE W. STURGESS, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

    This is a civil rights action brought by *pro se* plaintiff Troy Britt, a

former New York State prison inmate, against several individuals

employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983. As narrowed by a series of decisions of this court, plaintiff's claims include his assertion that certain medical personnel were deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment rights, while other corrections personnel violated his due process rights under the Fourteenth Amendment in connection with a disciplinary hearing held in July of 2016.

Now that discovery is complete, defendants have moved for the entry of summary judgment dismissing plaintiff's remaining causes of action, both on the merits and, in connection with his medical indifference claims, based upon his alleged failure to exhaust available remedies before commencing suit. For the reasons set forth below, I recommend that defendants' motion be granted.

I.    <u>BACKGROUND</u>[1]

Prior to December 2016, plaintiff was held in the custody of the

DOCCS. *See generally* <u>Dkt. No. 73-2 at 145-49</u>. Although he was confined

to several different facilities during his incarceration, at the times relevant

to his claims, plaintiff was housed at the Ogdensburg Correctional Facility

---

[1]    Defendants' motion papers properly included a statement of undisputed material facts, as required under Local 7.1(a)(3) of this court. <u>Dkt. No. 73-1</u>. In his opposition papers, plaintiff failed to respond to defendants' statement.

By its terms, Local Rule 7.1 provides, in part, that "<u>[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>" N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases involving a non-moving party's failure to properly respond to a Local Rule 7.1(a)(3) Statement. *See, e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).

*Pro se* litigants are undeniably entitled to some measure of deference when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). That deference, however, does not extend to relieving *pro se* plaintiffs of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Plaintiff was expressly warned twice regarding the consequences of a failure to properly respond to defendants' Local Rule 7.1(a)(3) Statement. <u>Dkt. No. 73 at 3</u>; <u>Dkt. No. 76 at 1</u>. Based upon plaintiff's response in opposition to defendants' motion—which either consents to defendants' Local Rule 7.1(a)(3) Statement or simply fails to respond to it—I will deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g.*, *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.); *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

("Ogdensburg"), located in Ogdensburg, New York, the Riverview

Correctional Facility ("Riverview"), also located in Ogdensburg, New York,

or Upstate Correctional Facility ("Upstate"), located in Malone, New York.

*Id.* at 148-49.

A.    Plaintiff's Medical Treatment

On February 20, 2015, plaintiff was transferred to Ogdensburg. Dkt.

No. 73-2 at 57, 148. Upon his intake at that facility, plaintiff was evaluated

by medical staff who documented his medical history, including a history of

chronically low blood platelets requiring periodic blood work, and his vital

signs. Dkt. No. 74-1 at 33. At that time, plaintiff was not experiencing any

symptoms consistent with cellulitis.[2]  Dkt. No. 73-2 at 136.

On July 30, 2015, plaintiff requested that he be seen at emergency

sick call due to redness and itchiness in his lower right leg. Dkt. No. 73-2

at 131-32; Dkt. No. 74 at 2; Dkt. No. 74-1 at 30. Plaintiff was examined by

defendant Dr. Mark Chalom ("Dr. Chalom"), a physician at Ogdensburg,

who believed that his complaints were likely due to cellulitis. Dkt. No. 73-2

---

[2]      "Cellulitis is 'an acute, diffuse, spreading edematous, suppurative inflammation of the deep subcutaneous tissues, and sometimes muscle, sometimes with abscess formation.' " *Nelson v. Dougherty*, No. 10-CV-1568, 2012 WL 4026682, at *1 (N.D.N.Y. Aug. 13, 2012) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 330 (31st ed. 2007)).

4

at 132; Dkt. No. 74 at 2-3; Dkt. No. 74-1 at 30. Dr. Chalom prescribed plaintiff a ten-day course of Bactrim, noted that he had easy access to hydrocortisone cream, and directed him to follow up in two weeks for a reassessment. Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30; *see also* Dkt. No. 50 at 10.

Plaintiff, however, did not follow up again until January 26, 2016, when he presented to sick call complaining of pain, warmth, and redness in his right leg. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. At that time, plaintiff did not appear to be in significant distress, and his vital signs were noted to be within normal ranges. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. On this occasion, Dr. Chalom prescribed plaintiff a course of doxycycline. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28.

In a declaration submitted in support of defendants' motion, Dr. Chalom states that he did not provide any further medical treatment to plaintiff; a claim that is supported by plaintiff's ambulatory health records ("AHR"). Dkt. No. 74 at 3-4; *see generally* Dkt. No. 74-1. At various times during this action, plaintiff has suggested that Dr. Chalom provided additional treatment to him in July of 2016. *See, e.g.*, Dkt. No. 73-2 at 86; Dkt. No. 77 at 4 ("Dr. Chalom . . . failed to still treat the [c]ellulitis-like infection."). During his deposition, however, plaintiff clarified that Dr.

Chalom did not provide any further medical treatment following the January 26, 2016 sick call, but instead testified that Dr. Chalom visited him at Riverview in July of 2016 to discuss his cellulitis. *Compare* Dkt. No. 73-2 at 86 ("[Dr. Chalom] visited me at Riverview in the isolation room."), 137 *with* Dkt. No. 74 at 4 (observing that plaintiff received treated from Dr. Seidman upon intake at Riverview). Accordingly, Dr. Chalom's treatment of plaintiff's complaints is limited to the July 30, 2015 and January 26, 2016 sick calls.

B.    The June 29, 2016 Incident

On June 29, 2016, plaintiff requested emergency sick call through his dormitory officer, and he was taken to the infirmary. Dkt. No. 73-2 at 74. Plaintiff claimed that he went to "use the bathroom and felt light headed and passed out," slumping against a nearby wall for approximately thirty seconds. Dkt. No. 73-7 at 18; *see also* Dkt. No. 73-2 at 73-76. Plaintiff was examined by defendant Terri Penn ("Nurse Penn"), a registered nurse employed by the DOCCS and stationed at Ogdensburg, who documented plaintiff's injuries, including a right eyebrow laceration, scratched elbow, and a patch of inflamed, warm red skin on his lower right leg, the latter of which she believed to be consistent with cellulitis. Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3.

6

Plaintiff was then interviewed by Sergeant Costello ("Sgt. Costello"), who concluded that plaintiff's injuries, as well as the evasive answers he provided under questioning, were consistent with his having been involved in an altercation. Dkt. No. 73-7 at 3, 13-14; Dkt. No. 73-2 at 79. As a result, Sgt. Costello issued plaintiff an inmate misbehavior report ("MBR"), charging him with fighting, violent conduct, and lying. Dkt. No. 73-7 at 9; see also Dkt. No. 73-2 at 65; see generally 7 N.Y.C.R.R. § 270.2. According to the MBR,

> [u]pon closer inspection of [plaintiff's] injuries[,] it was clear that they were consistent with being involved in a fight. [Plaintiff] denied being involved in any type of altercation and continued to state that he fell while in the bathroom. [Plaintiff] was uncooperative and refused to answer questions about who was in the area at the time of the incident, refusing to identify other inmates. [Plaintiff] appeared very nervous and was inconsistent with his answers when I questioned him about w[h]ere he fell and how he landed.

Dkt. No. 73-7 at 9.

Upon learning that plaintiff would be transferred to an isolation room at Riverview as a result of the MBR, Nurse Penn contacted medical staff regarding plaintiff's history of cellulitis. Dkt. No. 73-9 at 3. When plaintiff was examined upon his intake at Riverview, medical staff at that facility documented "recurrent cellulitis" on his right lower leg. Dkt. No. 74-1 at 25-

7

26. Plaintiff was ultimately prescribed a course of Augmentin, an antibiotic, which resolved the issue. Dkt. No. 73-2 at 137-38; Dkt. No. 74-1 at 37.

     C.    The July 2016 Tier III Disciplinary Hearing

On June 30, 2016, after plaintiff was served with the charges stemming from the MBR, plaintiff selected defendant Sergeant Thomas McKinley ("Sgt. McKinley"), as an employee assistant to help him in marshaling materials for his defense. Dkt. No. 73-2 at 156, 158; *see generally* Dkt. No. 73-8. According to an assistance form executed by plaintiff and Sgt. McKinley, plaintiff requested testimony from Inmates Drepaul and Green, as well as his medical records. Dkt. No. 73-8 at 6; *see also* Dkt. No. 73-2 at 94-96; Dkt. No. 73-8 at 3. Plaintiff alleges, however, that he also requested a copy of the dormitory logbook, a copy of DOCCS Directive 4932,[3] "and any other documentary evidence," but that those items were not noted by Sgt. McKinley on the executed assistance form. Dkt. No. 73-2 at 97-98, 107.

Sgt. McKinley relayed the requests reflected on the assistance form to Ogdensburg's tier hearing office. Dkt. No. 73-8 at 3; *see also* Dkt. No.

---

[3]    DOCCS Directive 4932 refers to the procedures for implementing standards of inmate behavior, *see* 7 N.Y.C.R.R. § 250 *et seq.*, including the requirements for an MBR. *See* 7 N.Y.C.R.R. § 251-3.1.

73-8 at 6. Sgt. McKinley was "informed that the [p]laintiff would be shown relevant medical documents at the hearing[,]" but plaintiff claims, however, that he was not provided with those records at the hearing. *Compare* Dkt. No. 73-8 at 3; Dkt. No. 73-7 at 4-5, *with* Dkt. No. 73-2 at 106-07. Plaintiff concedes that he did not object to any purported lack of medical records during the hearing. Dkt. No. 73-2 at 106-07.

When Inmate Drepaul was approached to testify, he refused and indicated, "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Despite a clear expression that he did not wish to testify, plaintiff alleges that efforts should have been made to inquire further regarding Inmate Drepaul's refusal. Dkt. No. 73-2 at 103-04.

On July 1, 2016, a Tier III disciplinary hearing was commenced before defendant Anne Carberry, superintendent of administration at Riverview.[4] Dkt. No. 73-7 at 1-2. Although Inmate Green was called to testify at the hearing, he refused, stating that "he wanted no involvement"

---

[4]     The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

9

in the disciplinary proceeding because "he was in the yard at the time."

Dkt. No. 73-2 at 102-03.

In addition to Inmate Green, defendant Carberry heard testimony from plaintiff, Sgt. Costello, and Nurse Penn. Dkt. No. 73-2 at 101-02, 105; Dkt. No. 73-7 at 11, 28. At the conclusion of the hearing, defendant Carberry determined that plaintiff was guilty as charged. Dkt. No. 73-7 at 2. Plaintiff was sentenced to ninety days of disciplinary confinement in a special housing unit ("SHU"), coupled with a corresponding loss of commissary, telephone, and package privileges. Dkt. No. 73-7 at 28-29. Plaintiff served the first sixteen days of his disciplinary sentence at Riverview, before serving the remainder of the disciplinary sentence at Upstate. Dkt. No. 73-2 at 56, 121-22, 148-49

In November of 2016, plaintiff brought a proceeding in Supreme Court, Albany County, pursuant to Article 78 of the New York Civil Practice Law and Rules, challenging the disciplinary determination. Dkt. No. 73-2 at 162-178. During that proceeding, personnel from the DOCCS learned that the tape from the hearing was "profoundly distorted," precluding the production of a reliable hearing transcript. Dkt. No. 73-6 at 3. In the face of an incomplete hearing record, on January 23, 2017, the determination of guilt was administratively reversed and expunged from plaintiff's

10

disciplinary record. Dkt. No. 73-6 at 5. Thereafter, on April 3, 2017, Denise

A. Hartman, Acting Supreme Court Justice, dismissed the petition. Dkt.

No. 73-2 at 181-82.

     D.     Plaintiff's Grievance Efforts

     According to plaintiff, when he entered Ogdensburg, he underwent

an orientation, which included information regarding the DOCCS inmate

grievance procedure. Dkt. No. 73-2 at 58-59. During his deposition,

plaintiff expressed a general understanding of how the DOCCS grievance

procedure operated, including that most grievances must be filed within

twenty-one calendar days of an alleged occurrence. Dkt. No. 73-2 at 59.

     According to plaintiff, he filed three grievances with respect to the

medical treatment provided to him. The first grievance was filed in October

2015, while he was confined at Ogdensburg. Dkt. No. 73-2 at 60-63. When

plaintiff did not receive a response to that grievance, he followed up by

sending a letter to the DOCCS Deputy Chief Medical Officer, Carl J.

Koenigsmann. Dkt. No. 73-2 at 60-63. Plaintiff maintains that a second

grievance, also submitted while he was confined to Ogdensburg, was filed

in January of 2016. Dkt. No. 73-2 at 63. Plaintiff did not receive a

response, and he did not follow up. Dkt. No. 73-2 at 64. In contrast to

plaintiff's allegation, however, Courtney Armstrong, the Inmate Grievance

Program Supervisor for Ogdensburg, indicates that a search of her records failed to uncover any medical grievances filed by plaintiff from 2015 through mid-2016. Dkt. No. 73-3 at 3.

Plaintiff claims that while he was confined to the SHU at Riverview he filed a third grievance on July 7, 2016 by handing the grievance to officers in the SHU to mail on his behalf. Dkt. No. 73-2 at 64; *see also* Dkt. No. 50 at 3. Once again, plaintiff did not receive a response, and he did not appeal. Dkt. No. 73-2 at 64. Similarly, in contrast to plaintiff's allegation, Cassie Bayne, the Inmate Grievance Program Supervisor for Riverview, indicates that a search of her records failed to uncover any medical grievances filed by plaintiff in June or July of 2016. Dkt. No. 73-4 at 2.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about March 1, 2017. Dkt. No. 1. On March 3, 2017, District Judge Mae A. D'Agostino issued an order, directing that the action be administratively closed and denying plaintiff's application to proceed *in forma pauperis* ("IFP") as incomplete. Dkt. No. 4. On March 13, 2017, plaintiff filed a second, completed application for IFP status, together with an inmate authorization form. Dkt. Nos. 6, 7. As a result, on April 12, 2017, Judge D'Agostino reopened the action and

issued a decision and order granting plaintiff's IFP application. Dkt. Nos. 8, 9. In that same decision and order, in accordance with 28 U.S.C. §§ 1915(e) and 1915A, Judge D'Agostino directed defendant Carberry to respond to plaintiff's Fourteenth Amendment due process claims, concluded that plaintiff's Fourteenth Amendment claims against the John Doe defendant survived *sua sponte* review, and dismissed certain claims and defendants without prejudice for the failure to state a claim upon which relief could be granted. *See generally* Dkt. No. 9.

After two prior motions by plaintiff for leave to amend his complaint were denied, on June 15, 2017, plaintiff filed a third motion for leave to amend the complaint. Dkt. Nos. 11, 16, 17, 20, 21. Over defendant Carberry's opposition, *see* Dkt. No. 22, plaintiff's motion was granted only with respect to Eighth Amendment deliberate indifference claims against Dr. Chalom and Nurse Penn. Dkt. No. 24.

Following the filing of defendants' answer, *see* Dkt. No. 35, plaintiff filed a fourth motion for leave to file an amended complaint. Dkt. No. 41. Over defendants' opposition, *see* Dkt. No. 42, plaintiff's motion was granted in part and denied in part. Dkt. No. 49. Judge D'Agostino undertook a review of plaintiff's second amended complaint ("SAC") pursuant to sections 1915(e) and 1915A, and concluded that pleading be

13

accepted only to the extent that it asserts claims against defendants Carberry, McKinley, Dr. Chalom, and Nurse Penn, Dkt. Nos. 49, 50. Plaintiff's fifth motion for leave to file an amended complaint, which defendants opposed, was denied by the court on June 25, 2018. Dkt. Nos. 64, 65, 68.

Discovery now closed, defendants now move seeking the entry of summary judgment, dismissing plaintiff's claims. Dkt. Nos. 73, 74, 75. On October 19, 2018, plaintiff responded in opposition to defendants' motion, Dkt. No. 77, and defendants have since filed a reply in further support of their motion, Dkt. No. 78. Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477

U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.

2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Exhaustion of Available Administrative Remedies

In support of their motion for summary judgment, defendants argue that plaintiff's medical indifference claim should be dismissed because he failed to fully exhaust his administrative remedies prior to commencing this action. Dkt. No. 73-11 at 11-14. Plaintiff does not specifically address this contention in his opposition papers. *See generally* Dkt. No. 77.

1.    Legal Standard

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at

1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[5]

In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison

---

[5] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The

IGP requires that an inmate first file a grievance with "the clerk" within

twenty-one days of the alleged occurrence giving rise to his complaint. 7

N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility

where the inmate is housed even if it pertains to another facility." *Id.*

Representatives of the inmate grievance resolution committee ("IGRC")[6]

have up to sixteen days after the grievance is filed to informally resolve the

issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution,

then the full IGRC conducts a hearing within sixteen days after receipt of

the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's

superintendent within seven days after receipt of the IGRC's written

decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a

written decision within a certain number of days after receipt of the

grievant's appeal.[7]  7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC,

---

[6]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

[7]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

Where an inmate's grievance complains of employee harassment, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. 7 N.Y.C.R.R. § 701.8(b), (c). The superintendent then has twenty-five days from the date of its receipt to render a decision. 7 N.Y.C.R.R. § 701.8(f). An inmate may appeal the superintendent's decision to the CORC within seven days of its receipt. 7 N.Y.C.R.R. § 701.8(h).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and

doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availab[ility] of administrative remedies." (alteration in original) (internal quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (internal quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[8]  *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what

---

[8]    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. The Court explained that "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

2.    Analysis

Plaintiff, who has been in and out of DOCCS custody since 1995, is not unfamiliar with the IGP. Dkt. No. 73-2 at 146-49. During his deposition, he expressed a general understanding of how the grievance process operates, including that in most cases, a grievance must be filed within twenty-one days of the alleged occurrence giving rise to a complaint. Dkt. No. 73-2 at 58-60; *see generally* 7 N.Y.C.R.R. § 701.5(a)(1). Moreover, since 2005, plaintiff fully exhausted six unrelated grievances, evincing his understanding and familiarity with the IGP Dkt. No. 73-5 at 6-7.

Plaintiff contends that he submitted three grievances in connection

with the medical treatment he received from Dr. Chalom and Nurse Penn. Dkt. No. 73-2 at 59-60. Plaintiff asserts that he filed his first medical grievance in October 2015 by presenting it to the grievance office at Ogdensburg. Dkt. No. 73-2 at 60-61. That grievance, which was filed more than two months following the medical treatment he received on July 30, 2015, Dkt. No. 74-1 at 30, was untimely, and therefore insufficient to exhaust his administrative remedies. 7 N.Y.C.R.R. § 701.5(a)(1); *see, e.g.*, *Adams v. O'Hara*, No. 16-CV-0527, 2019 WL 652409, at *7 (N.D.N.Y. Feb. 15, 2019) (Suddaby, C.J.) ("Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies."); *Girard v. Cuttle*, No. 15-CV-0187, 2018 WL 4190140, at *5 (Aug. 10, 2018) (Stewart, M.J.) ("An untimely grievance does not satisfy the exhaustion requirement."), *report and recommendation adopted by* 2018 WL 4190140 (N.D.N.Y. Aug. 31, 2018) (Mordue, J.).[9]  Although plaintiff wrote a letter to Carl J. Koenigsmann, Dkt. No. 73-2 at 61-62, a prison official outside of the grievance chain of command, this too was insufficient to properly exhaust his administrative remedies. *See Louis-Charles v. Barker*, No. 16-CV-

---

[9]    All unpublished opinions are appended for the convenience of the *pro se* plaintiff.

1417, 2018 WL 4299982, at *2 (N.D.N.Y. Sept. 10. 2018) (D'Agostino, J. *adopting report and recommendation of* Hummel, M.J.) (citing *Geer v. Chapman*, No. 15-CV-952, 2016 WL 6091699, *5 (Sept. 26, 2016) (Baxter, M.J.), *report and recommendation adopted by* 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (Sharpe, J.)); *see also Macias*, 495 F.3d at 44-45.

Plaintiff asserts that he submitted a second grievance to the grievance office at Ogdensburg at an unspecified point in January 2016. Dkt. No. 73-2 at 63. While this is not necessarily clear from the record, it appears that this second grievance followed plaintiff's sick call on January 26, 2016. Dkt. No. 74-1 at 28, 30. Although this grievance was undoubtedly timely, during his deposition, plaintiff claimed that he did not receive a response, and has conceded that he did not follow up or file an appeal. Dkt. No. 73-2 at 63-64.

In addition, plaintiff claims that on July 7, 2016, he filed a third grievance concerning his medical treatment by handing the grievance to officers while he was confined in the SHU at Riverview. Dkt. No. 73-2 at 64. Much like the second grievance, however, plaintiff claims that he did not receive a response, did not follow up, and did not appeal.[10]  Dkt. No.

---

[10]     Plaintiff alleges in his SAC that he "filed a timely administrative appeal" to the

[73-2 at 64](#).

Although there is no disputed issue of material fact that plaintiff failed to exhaust his administrative remedies with respect to the three grievances, whether those remedies remained available to him—in particular with respect to the timely second and third grievances—requires closer examination. Following the Second Circuit's decision in *Williams*, several courts—including this court—have concluded that where a grievance is both *unfiled* and *unanswered*, "the process to appeal . . . is prohibitively opaque, such that no inmate could actually make use of it." *Williams*, 829 F.3d at 126; *see also id.* ("In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed."); *see, e.g.*, *Hurst v. Mollnow*, No. 16-CV-1062, 2018 WL 4178226, at *10 (Jul. 20, 2018) (Dancks, M.J.) ("Therefore, '[a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]' "), *report and recommendation adopted by* 2018 WL 4153926 (N.D.N.Y. Aug. 30,

---

CORC on July 17, 2016. *See, e.g.*, [Dkt. No. 50 at 3](#). Upon questioning at his deposition, however, plaintiff conceded that he was referring to an appeal regarding his disciplinary hearing. [Dkt. No. 73-2 at 68-69](#); *see* [Dkt. No. 73-2](#) 160 ("Appeal Form to Commissioner"). Nonetheless, if plaintiff filed a grievance on July 7, 2016, and then an appeal to the CORC a mere ten days later, plaintiff would have effectively bypassed several steps of the IGP, negating any contention that he properly exhausted the remedies available under the program.

2018) (Hurd, J.); *Berman v. Drunkin*, No. 13-CV-0136, 2017 WL 1215814, at *8 (Mar. 10, 2017) (Stewart, M.J.) ("*Williams* holds that 'the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it.' "), *report and recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017) (Kahn, J.); *Coleman v. Racette*, No. 15-CV-40, 2017 WL 2579084, at *5 (Jan. 17, 2017) (Baxter, M.J.) ("The court notes, however, that if a grievance is lost or destroyed before it is received by the IGRC and assigned a number, it would be difficult to 'appeal' a grievance 'to the next step.' "), *report and recommendation adopted by* 2017 WL 2589366 (N.D.N.Y. Jun. 14, 2017) (McAvoy, J.); *Juarbe v. Carnegie*, No. 15-CV-1485, 2016 WL 8732798 (Oct. 7, 2016) (Peebles, M.J), *report and recommendation adopted by* 2016 WL 8732798 (N.D.N.Y. Nov. 25, 2016) (D'Agostino, J.).

Complicating matters, however, is a recent summary order from the Second Circuit in *Cicio v. Wenderlich*, 714 F. App'x 96 (2d Cir. 2018). In summarizing the evidence contained in the record in that case, the Second Circuit observed:

> [Plaintiff] claims that . . . he filed a written grievance to the Inmate Grievance Resolution Committee ("IGRC") . . . . However, an IGRC supervisor filed a

> declaration in the [d]istrict [c]ourt stating that he
> could find no record of [the plaintiff's] grievance. In
> any event, the parties agree that [the plaintiff] never
> received a response to his grievance.

*Id.* at 97. The Second Circuit concluded that the plaintiff's situation was not

so opaque that it became "incapable of use" because "[w]hen a prisoner

has filed a grievance, but receives no response, the regulations provide a

right of appeal." *Id.* at 97-98 (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g))

("[M]atters not decided within the time limits may be appealed to the next

step.").

In so holding, the Second Circuit compared and distinguished the

plaintiff's situation from that of the plaintiff in *Williams*. In particular, the

inmate in *Cicio* alleged that he filed a grievance directly with IGRC,

whereas the inmate in *Williams* provided his grievance to a prison guard to

file on his behalf. *Compare Cicio*, 714 F. App'x. at 97-98 ("The parties

agree that Cicio received no response to the grievance he purportedly

filed."), *with Williams*, 829 F.3d at 126 ((finding that appellate process was

too opaque in circumstances where inmate alleged that a prison guard did

not file his grievance and the inmate had since been transferred); *see,*

*e.g.*, *Pizarro v. Ponte*, No. 17-CV-4412, 2019 WL 568875, at *5 (S.D.N.Y.

Feb. 11, 2019) ("Failing to pursue a grievance for which no response is

26

received is not excused."); *Ramos v. New York*, No. 17-CV-0259, 2018

WL 7133696, at \*4 (Dec. 27, 2018) (Hummel, M.J.) (collecting cases),

*report and recommendation adopted by* 2019 WL 330869 (N.D.N.Y. Jan.

25, 2019) (Sannes, J.).

On the spectrum between *Cicio* and *Williams*, plaintiff's situation

regarding the filing of his second and third grievances falls somewhere in

the middle. Plaintiff alleges that he handed the second grievance to the

grievance office, and the third grievance to a prison guard, yet he failed to

provide a copy of either grievance for the court's consideration. *Cf.*

*Ramos*, 2018 WL 7133696, at \*4 ("Plaintiff proffers a copy of the alleged

grievance[.]"). Nonetheless, plaintiff claims that he did not receive a

response to either grievance, and simultaneously concedes that he made

no attempt to follow up or otherwise appeal to the superintendent. At the

same time, there is no allegation that the staff at either facility discarded or

otherwise interfered with plaintiff's grievances. Nonetheless, the IGP

supervisors at both Ogdensburg and Riverview submitted declarations

stating they could find no record of plaintiff's grievances in their respective

offices. Dkt. Nos. 73-3, 73-4. Plaintiff's third grievance, arising out of his

medical treatment at Ogdensburg on June 29, 2016, is complicated by his

immediate transfer to Riverview and further transfer to Upstate. Dkt. No.

73-2 at 147-49.

Although I am able to easily conclude that plaintiff's first, untimely grievance was insufficient to exhaust his administrative remedies, I cannot reach the same conclusion with respect to the second and third grievances, although I acknowledge that it is a somewhat nebulous issue in light of the decisions in *Cicio* and *Williams*, as well as the specific facts of this case. Accordingly, I recommend that defendants' motion for summary judgment based upon an alleged failure to exhaust available administrative remedies be granted with respect to only the medical treatment rendered by Dr. Chalom on July 30, 2015, but that the motion otherwise be denied on this procedural basis.

C.    Deliberate Indifference Claim

Defendants argue plaintiff's medical indifference claims must still be dismissed because there is no genuine issue of material fact to be resolved and, based upon the uncontested facts, plaintiff cannot establish either prong of the medical-indifference inquiry. Dkt. No. 73-11 at 14-17; Dkt. No. 78 at 6-8. In opposition, plaintiff argues that Dr. Chalom and Nurse Penn provided him with inadequate medical treatment. *See generally* Dkt. No. 77.

1.    Standard

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (internal quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged

deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252,

262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

    2.   <u>Analysis</u>

      In this case, while plaintiff occasionally frames his allegations as a complete deprivation of medical treatment, it is clear that his claims arise out of a disagreement over the medical treatment that he received while he was confined. *See generally* Dkts. No. 50, 77. Plaintiff's disagreement, without more, "does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *accord, Fuller v. Lantz*, 549 F. App'x 18, 21 (2d Cir. 2013); see also *Estelle*, 429 U.S. at 107

(concluding that a medical professional's decision regarding which diagnostic techniques or forms of treatment are indicated "is a classic example of a matter for medical judgment" and does not give rise to a constitutional claim). At times, however, plaintiff's claims fall closer to an allegation that he was denied adequate medical care, which requires a narrower inquiry into seriousness. *See Salahuddin*, 467 F.3d at 279.

Addressing first the objective element of the governing test, I note that the record evidence demonstrates plaintiff was provided with treatment on each of the three occasions that he complained regarding his lower right leg. Dkt. No. 74-1 at 25-26, 28, 30. Although plaintiff's filings make frequent reference to suffering from "serious bacteria," methicillin-resistant Staphylococcus aureus ("MRSA"), and/or a "deadly infection," *see* Dkt. No. 50 at 3; Dkt. No. 77 at 8, plaintiff's medical records reflect that while he suffered from recurring cellulitis, that condition did not cause him any acute distress and merely manifested itself in redness and itchiness in plaintiff's lower right leg. Dkt. No. 74-1 at 25-26, 28, 30. Plaintiff's medical records simply do not support any claim that the pain he suffered as a result of the cellulitis, even if chronic, was severe. Based upon these circumstances, it is doubtful that a reasonable factfinder could conclude that plaintiff's cellulitis was sufficiently severe as to support the objective

requirement of the controlling test.

I note, moreover, that to the extent that a reasonable factfinder could conclude that plaintiff's condition was sufficiently severe as to support the objective requirement of the controlling test—for example, by causing him to pass out in the bathroom on June 29, 2016, as he claimed—I nonetheless find that no reasonable factfinder could conclude that defendants' treatment was inadequate or, to the extent it could be construed as inadequate, the inadequacy that was sufficiently serious. In *Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986), the Second Circuit observed that a "correctional facility is not a health spa, but a prison in which convicted felons are incarcerated." *Id.* at 215; *see also Clay v. D'Silva*, No. 09-CV-1245, 2011 WL 1135937, *3 (N.D.N.Y. Mar. 25, 2011) (Suddaby, C.J.). Accordingly, the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what treatment should be administered to an inmate is a "classic example of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107; *see also Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998).

Plaintiff's claims against Dr. Chalom are based upon, *inter alia*, his desire to be referred to a specialist, prescribed physical therapy, and sent for diagnostic testing. Dkt. No. 77 at 10; *see also* Dkt. No. 50 at 10. Following Dr. Chalom's first examination, the physician prescribed plaintiff a ten-day course of Bactrim, noted that he had easy access to hydrocortisone cream, and directed him to follow up in two weeks for a reassessment.[11] Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30; *see also* Dkt. No. 50 at 10. When plaintiff presented nearly six months later complaining of similar symptoms, Dr. Chalom prescribed a course of doxycycline. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. There is nothing in the record now before the court to suggest that Dr. Chalom's decision to prescribe certain medications was anything other than an appropriate exercise of his discretion to determine the method of care and treatment to provide to plaintiff. *See Estelle*, 429 U.S. at 107.

Plaintiff's claims against Nurse Penn are based upon her purported failure to treat him for cellulitis.[12] Dkt. No. 73-2 at 76; *see also* Dkt. No. 50

---

[11]    Any claims against Dr. Chalom based upon this examination are procedurally barred. *See ante*, at 21-27.

[12]    As a registered nurse, Nurse Penn is not authorized to "make definitive diagnoses, write prescriptions (beyond dispensing over-the-counter drugs such as anti-inflammatories or aspirin), or make ultimate determinations about the need for medical devices (such as hearing aids or orthopedic inserts), or consultation with medical specialists." Dkt. No. 73-9 at 2; *see generally* N.Y. Education Law § 6902(1). Such

at 9. Plaintiff concedes, however, that when Nurse Penn examined him on June 29, 2016, she cleaned his lacerations with alcohol, and observed that he required further medical attention from a doctor. Dkt. No. 73-7 at 18; *see generally* Dkt. No. 73-9. Upon plaintiff's transfer to Riverview a mere two hours later, Nurse Penn contacted medical staff at the facility to explain that plaintiff had a history of cellulitis. Dkt. No. 73-9 at 3; Dkt. No. 74-1 at 26 ("Also reported is . . . 'recurrent cellulitis[.]' "). Plaintiff concedes that he was examined by a doctor at Riverview that same day, and that he received a prescription for Augmentin, which completely resolved his complaints. Dkt. No. 73-2 at 137-38; *see also* Dkt. No. 74-1 at 25-26. The record before the court indicates that Nurse Penn appropriately exercised her judgement to determine the method of care and treatment to be provided to plaintiff, within the scope of her authority as a registered nurse. *See Estelle*, 429 U.S. at 107.

Even assuming that plaintiff could satisfy the objective prong, I conclude that no reasonable factfinder could conclude that Dr. Chalom or Nurse Penn acted with the requisite deliberate indifference. The record reflects that on every occasion that plaintiff was seen, his concerns were

---

determinations are made by the DOCCS doctors or outside specialists. Dkt. No. 73-9 at 2.

addressed, albeit apparently not to his liking. Nothing in the record now before the court suggests that defendants turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

Based on the evidence of record, I conclude that no reasonable factfinder could find, objectively, that defendants deprived plaintiff of adequate medical care or that, subjectively, any of them exhibited deliberate indifference to plaintiff's serious medical needs. Accordingly, I recommend that plaintiff's Eighth Amendment deliberate medical indifference claims be dismissed in their entirety.

D.    Plaintiff's Procedural Due Process Claim

In support of their motion for summary judgment, defendants argue that there is no genuine issue of material fact that plaintiff's ninety-day disciplinary confinement did not constitute an atypical and significant hardship. Dkt. No. 73-11 at 18-19; Dkt. No. 78 at 10-11. Defendants further argue that even if he was deprived of a cognizable liberty interest, plaintiff was afforded sufficient process. Dkt. No. 73-11 at 19-24; Dkt. No. 78 at 9-10. In his opposition to defendants' motion, plaintiff fails to address defendants' liberty interest argument, but contends that he was deprived of procedural due process in connection with the Tier III disciplinary hearing

held at Riverview in July of 2016. *See generally* Dkt. No. 77.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1.  Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest deprivation in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y.

Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must first determine whether the conditions of plaintiff's ninety-day SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[13] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

In cases such as this involving a period of restrictive confinement of less than 101 days, and where the confinement occurs under ordinary

---

[13]    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey*, 197 F.3d at 585.

conditions found in a typical SHU setting, the disciplinary punishment does not rise to the level of an atypical and significant hardship.[14] *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Id.* (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)).

For example, in *Palmer v. Richards*, 364 F.3d 60 (2d Cir. 2004), the Second Circuit denied the prison officials' motion for summary judgment because even though the inmate's SHU confinement was only seventy-seven days, he was deprived of his personal effects, and was kept completely "out of communication from his family." *Id.* at 66. The Second Circuit agreed that "at least based on the record as it stands now, [the

---

[14]    On the other hand, the Second Circuit has suggested that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

inmate] should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh' to violate a liberty interest despite the 'comparative shortness' of his confinement." *Id.* at 66 (quoting *Palmer v. Goss*, No. 02-CV-5804, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003), ); *see also Davis*, 576 F.3d at 134 (holding that a more detailed factual record was required to determine whether unsanitary conditions of forty-one-day administrative confinement, in which plaintiff was denied books, commissary privileges, and his one hour of exercise per day, entitled plaintiff to due process).

Here, plaintiff was held in disciplinary SHU confinement for ninety days, the first sixteen days of which were served at Riverview, with the remainder being served at Upstate. Dkt. No. 73-2 at 147-49. According to plaintiff, during the sixteen-day period at Riverview, he was subjected to a light in his cell that was illuminated from 6:00 a.m. until 11:00 p.m.; showers that were dirty with mildew on the walls and floors; and rats and roaches running freely through his cell. Dkt. No. 50 at 18; Dkt. No. 73-2 at 121-25. Although plaintiff did not have issues with the illumination of his cell and dirty showers for the remainder of his SHU confinement at Upstate, there continued to be rodent issues at that facility. Dkt. No. 73-2

at 121-25. Plaintiff alleged that as a result of these conditions, he lost weight, was unable to sleep and developed "severe migraines, dizziness . . . extreme fatigue[,] and hallucinations[.]" Dkt. No. 50 at 18; *see also* Dkt. No. 73-2 at 126.

Although plaintiff testified regarding the actual conditions of his confinement, "the record lacks any evidence of the conditions for other inmates in administrative confinement, or in the general prison population." *Davis*, 576 F.3d at 135. A detailed factual record containing information as to the actual conditions in both administrative segregation and for the general population is necessary for the court to make the type of comparison required by the Second Circuit. Because this evidence is lacking in the current record, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his ninety-day disciplinary SHU confinement. *See Davis*, 576 F.3d at 135. For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally-significant liberty interest during the course of his ninety-day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

2.    Procedural Safeguards

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

a.    Inadequate Notice and Vague MBR

Plaintiff maintains that his due process rights were violated when defendant Carberry provided inadequate notice of the disciplinary hearing

42

and relied upon a vague MBR. *See generally* Dkt. No. 50.

"Due process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing." *Sira v. Morton*, 380 F.3d 57, 70 (2d Cir. 2004) (citing *Wolff*, 418 U.S. at 564; *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999)). Plaintiff acknowledges, however, that he received the challenged MBR within the prescribed time. He was served with the charges against him at 7:40 a.m. on June 30, 2016, *see* Dkt. No. 73-2 at 156, and the disciplinary hearing commenced twenty-seven hours later— at 10:40 a.m. the following day. *See* Dkt No. 73-2 at 100-01; Dkt. No. 73-7 at 11.

To the extent that plaintiff's allegations and submissions can be construed as challenging the MBR as being too general to provide meaningful notice of the misconduct at issue, that claim must fail. Due process does not mandate "notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct." *Sira*, 380 F.3d at 72. Rather, due process requires notice with "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.* The MBR at issue satisfies this standard. *See, e.g.*, *Samuels*

43

*v. Selsky*, 166 F. App'x. 552, 554-55 (2d. Cir. 2006). The MBR is neither vague nor conclusory, and it provides plaintiff with notice of the "specific facts" underlying the accusations against him. Dkt. No. 73-7 at 9. In particular, in the MBR, Sgt. Costello noted that plaintiff was uncooperative, refused to identify inmates in the area, provided inconsistent answers, and appeared to have suffered injuries that were consistent with having been involved in an altercation. *Id.*; *see, e.g.*, *McAllister v. Call*, No. 10-CV-610, 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 24, 2014) (Scullin, J., *adopting report and recommendation of* Hummel, M.J.). Sgt. Costello then concluded in the MBR that "[b]ased on my experience, [plaintiff] sustained several injuries as a result of being involved in a fight[,] and then lied about falling in the bathroom as an attempt to conceal what actually took place and to avoid [an MBR.]" Dkt. No. 73-7 at 9.

Accordingly, I conclude that plaintiff was provided with adequate notice of the disciplinary hearing, as well as notice of the "specific facts" underlying the accusations against him.

### b.    Employee Assistance

"Although inmates are not entitled to retained or appointed counsel in prison disciplinary hearings, '[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and

presenting a defense when he is faced with disciplinary charges.' " *Moore v. Peters*, 92 F. Supp. 3d 109, 125-26 (W.D.N.Y. 2015) (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). Because, however, "[a]n inmate's right to assistance with his disciplinary hearing is limited[,]" *Neree v. O'Hara*, No. 09-CV-802, 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (Baxter, M.J.), "[t]he assistant 'need only perform what the plaintiff would have done but need not go beyond the inmate's instructions.' " *Grant v. Fischer*, No. 14-CV-1382, 2017 WL 1180866, at *2 (N.D.N.Y. Mar. 29, 2017) (D'Agostino, J. *adopting report and recommendation of* Stewart, M.J.), *aff'd*, No. 17-1283-PR, 2019 WL 190512 (2d Cir. Jan. 15, 2019); *see also Lewis v. Johnson*, No. 08-CV-482, 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5. 2010). "[A]ny violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (quoting *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009)).

Here, because plaintiff was confined to an isolation room while at Riverview, he was entitled to assistance in marshaling evidence and presenting a defense. According to the assistance form that was executed by plaintiff and Sgt. McKinley, the assigned employee assistant, plaintiff requested testimony from Inmates Drepaul and Green, as well as his

medical records. Dkt. No. 73-8 at 6; *see also* Dkt. No. 73-2 at 94-96; Dkt. No. 73-8 at 3. Sgt. McKinley then relayed those requests to the tier hearing office at Ogdensburg. Dkt. No. 73-8 at 3, 6. Sgt. McKinley was informed by prison personnel that plaintiff would be able to review the medical records at the hearing, and efforts were made to secure the testimony of plaintiff's requested witnesses. Sgt. McKinley was not required to undertake additional efforts and "go beyond the inmate's instructions." *Grant*, 2017 WL 1180866, at *2 (quoting *Moore*, 92 F. Supp. 3d at 126).

Plaintiff alleges that he also requested information that was not reflected on the executed assistance form, including a copy of the dormitory logbook, a copy of DOCCS Directive 4932, "and any other documentary evidence[.]" Dkt. No. 73-2 at 97-98, 107. Even assuming that this is true, there is no evidence that the failure to provide plaintiff with this information would have impacted the outcome of the hearing. Thus, viewing the evidence in the light most favorable to the plaintiff, any alleged failure by Sgt. McKinley to perform his duties as an assistant amounts to harmless error not warranting denial of summary judgment. *See, e.g.*, *Young v. Polizzi*, No. 16-CV-0660, 2018 WL 3949967, at *8 (Jul. 11, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL

46

3949942 (N.D.N.Y. Aug. 16, 2018) (Scullin, J.); *Hernandez v. Selsky*, 572 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (concluding that because the plaintiff failed to show how outcome of hearing would have been, any alleged inadequate assistance was harmless error not warranting denial of summary judgment).

### c.    Denial of Plaintiff's Witnesses

In his SAC, plaintiff alleged that defendant Carberry refused to call certain witnesses and that in denying those witnesses, "she never stated that the denial was based on institutional safety concerns, or that plaintiff's alibi-witness testimony was irrelevant or redundant." Dkt. No. 50 at 5. To that end, "[d]isciplinary hearing officers . . . have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff*, 418 U.S. at 566-67).

In this case, however, there is nothing in the present record to indicate that defendant Carberry "denied" plaintiff's requested witnesses. Instead, the undisputed record reveals that plaintiff requested testimony from two inmates, Drepaul and Green. Dkt. No. 73-8 at 6. When inmate Drepaul was approached to testify, he refused and indicated "I didn't see

anything. I don't want to testify." Dkt. No. 73-7 at 16. Inmate Green, on the other hand appeared for the hearing, but also refused to testify and stated that "he wanted no involvement" in the hearing because "he was in the yard at the time." Dkt. No. 73-2 at 102-03. As a result, plaintiff's claim that defendant Carberry denied his witness is flatly contradicted by the record before the court, and her purported failure to call a witness, who refused to testify, fails to offend procedural due process. *See, e.g., Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018) (Sharpe, J.); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844 , 2014 WL 4627120, at *7 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses.").

### d.    Impartiality of the Hearing Officer

Lastly, plaintiff alleges that defendant Carberry was biased. *See, e.g.*, Dkt. No. 50 at 9. The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to . . . an impartial hearing officer." *Allen v. Cuomo*, 100

F.3d 253, 259 (2d Cir. 1996). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). "A hearing officer may satisfy the standard of impartiality if there is *'some evidence* in the record'* to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (emphasis in original) (quoting *Hill*, 472 U.S. at 455); *see also Francis*, 891 F.2d at 45 (responding to the plaintiff's allegations that the hearing officer's bias allowed for "*no* chance to prevail at the [disciplinary] hearing]" by concluding that "it is axiomatic that a prison disciplinary hearing in which the result is arbitrarily and adversely predetermined violates [an inmate's] right [to be free from arbitrary governmental action]" (emphasis in original)).

49

Here, there is no record evidence from which a reasonable factfinder could conclude that defendant Carberry was biased against plaintiff or that she predetermined the outcome of the disciplinary hearing. Although DOCCS personnel subsequently learned that the hearing tape was profoundly distorted, precluding the production of a transcript of the proceeding, the record as a whole reflects that defendant Carberry heard testimony from plaintiff, Sgt. Costello, Nurse Penn, as well as the inmate witness that plaintiff requested. Dkt. No. 73-7 at 11. In addition, plaintiff was afforded the opportunity to question Sgt. Costello. Dkt. No. 73-2 at 105.

Plaintiff's bare assertions with respect to defendant Carberry's alleged bias are unsupported by the record and, accordingly, are insufficient to give rise to a dispute of material fact. *See Francis*, 891 F.2d at 47 ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]"); *Boose v. Schneider*, 14-CV-0518, 2016 WL 8732644 (N.D.N.Y. Feb. 19, 2016) (Peebles, M.J.), *report and recommendation adopted*, 2016 WL 1175224 (N.D.N.Y. Mar. 24, 2016) (D'Agostino, J.).

Accordingly, because no reasonable factfinder could conclude that

plaintiff's due process rights were violated, I recommend that defendants'

motion be granted.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

The record currently before the court demonstrates that although

plaintiff did not receive his preferred course of medical treatment, it is

undisputed that plaintiff received timely and appropriate medical treatment

that was tailored to address his medical condition. The record similarly

indicates that there is no disputed issue of genuine material fact and that

plaintiff received due process in connection with his disciplinary hearing.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment

([Dkt. No. 73](#)) be GRANTED and plaintiff's second amended complaint

([Dkt. No. 50](#)) be dismissed in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this

report.[15]  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

---

[15]      If you are proceeding *pro se* and are served with this report and
recommendation by mail, three additional days will be added to the fourteen-day
period, meaning that you have seventeen days from the date the report and
recommendation/order was mailed to you to serve and file objections. Fed. R. Civ. P.
6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     March 22, 2019
           Syracuse, New York

---

holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 53 of 329
Abdur-Raheem v. Caffery, Not Reported in F.Supp.3d (2015)
2015 WL 667528

2015 WL 667528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jalil ABDUR–RAHEEM, Plaintiff,

v.

T. CAFFERY and Albert Prack, Defendants.

No. 13–CV–6315 (JPO).
|
Signed Feb. 17, 2015.

*OPINION AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Jalil Abdur–Raheem ("Abdur–Raheem"), proceeding *pro se* while incarcerated at a correctional facility in New York, alleges that Defendants Terry Caffery ("Caffery") and Albert Prack ("Prack") (collectively, "Defendants") deprived him of his constitutional rights in violation of 42 U.S.C. § 1983. Specifically, Abdur–Raheem alleges violations of the Fourth, Eighth, and Fourteenth Amendments. Defendants move to dismiss the complaint for failure to state a claim. For the reasons that follow, Defendants' motion is granted.

## I. Background

### A. Factual Background [1]
In January 2011, Abdur–Raheem was a prisoner at New York State's Green Haven Correctional Facility ("Green Haven"), and worked as a porter in the Family Reunion Program ("FRP"), where his duties included cleaning the FRP trailers. (Dkt. No. 1 ("Compl."), Ex. A ("N.Y.S.Decision").) Defendant Caffery was a Tier III hearing officer at Green Haven. (Compl. at 5.) Defendant Prack was the Director of Special Housing/ Inmate Disciplinary Program for the New York State Department of Corrections and Community Supervision ("DOCCS"). (*Id.* Ex. B.)

On January 27, 2011, Abdur–Raheem cleaned the trailer where one of his own FRP visits was to be held and brought a few personal items into the trailer. (Compl. at 5; N.Y.S. Decision.) Soon thereafter, a corrections officer who worked in the FRP office noticed that two cartridges of film were missing from the office, and, after a search, discovered one cartridge hidden between the mattresses of the bed in the trailer in which Abdur–Raheem was to have his FRP visit. (N.Y.S.Decision.) Abdur–Raheem was immediately placed in the Special Housing Unit, or "SHU." (Compl. at 5.)

Abdur–Raheem was charged in a prison misbehavior report with smuggling, stealing, and violating FRP guidelines. (N.Y.S.Decision.) On February 14, 2011, he was found guilty of the charges following a Tier III disciplinary hearing before Defendant Caffery. (*Id.;* Compl. at 5; Compl. Ex. B.) Caffery sentenced Abdur–Raheem to six months in the S.H.U. The punishment included loss of packages, commissary, and phone privileges for the full six-month period. (Compl. at 5.) It appears from the complaint that Abdur–Raheem may have been released early on April 4, 2011. (*Id.*) In any event, Caffery's determination was affirmed on administrative appeal. (N.Y.S.Decision.)

Abdur–Raheem subsequently initiated a proceeding in New York state court pursuant to CPLR Article 78, contending that his right to call witnesses had been infringed at the Tier III hearing when Caffery failed to make a personal inquiry concerning the reason Abdur–Raheem's witness refused to testify. (N.Y.S.Decision.) The witness, a fellow inmate, was the other porter in the FRP program who had access to the FRP trailers. (*Id.*) He had initially agreed to testify, but later refused. (*Id.*) At the hearing, Caffery informed Abdur–Raheem of the inmate's refusal to testify and indicated that two officers had spoken to the inmate about his refusal. (*Id.*) In addition, Caffery gave Abdur–Raheem a copy of the inmate refusal form, which indicated that the requested witness did not "have knowledge of any photos" and "did not want to be involve[d]." (*Id.*)

**\*2** On September 13, 2012, the Appellate Division, Third Department annulled the disciplinary determination. (*Id.*) [2] The court held that under New York law, Caffery was required to conduct a "personal inquiry" into the witness's reason for refusing to testify "unless a genuine reason for the refusal [was] apparent from the record and [Caffery] made a sufficient inquiry into the facts surrounding the refusal to ascertain its authenticity." (*Id.*) The court held, first, that the witness's desire not to

be involved, as indicated on the inmate refusal form, was not a legitimate basis for an inmate's refusal to testify, and second, that "[e]ven if the refusal form were construed to contain a justifiable reason based upon a lack of knowledge," there was no evidence that Caffery had spoken with the officers who obtained the refusal form to establish this reason as authentic. (*Id.*) Therefore, Caffery's obligation to conduct a personal inquiry was not excused by the refusal form. (*Id.*) The court concluded that Abdur–Raheem "was denied his regulatory right to call witnesses," and the matter was "remitted for a new hearing." (*Id.*)

On September 20, 2012, Prack sent a letter to Abdur–Raheem advising him "on behalf of the Commissioner" that his prison disciplinary determination had been "reviewed and administratively reversed," and that rehearing was "not warranted." (Compl.Ex.B.)

Abdur–Raheem sues Caffery and Prack in their official and individual capacities under 42 U.S.C. § 1983. He alleges that Caffery violated his Fourth, Eighth, and Fourteenth Amendment rights when he failed to personally inquire as to why the witness refused to testify, and that Prack "unconstitutionally left [him] confined to S.H.U. from Jan[uary] 27, 2011, until April 4, 2011." (Compl. at 5.) He seeks damages of $150 for each day in SHU, $.32 per hour for the wages he lost as a result of being held in SHU, and punitive damages of $2,500. (*Id.* at 5–6.) [3] Caffery and Prack move to dismiss the complaint for failure to state a claim.

## B. Procedural History

The complaint was filed on July 8, 2013. (Dkt. No. 1.) On September 24, 2013, the Court *sua sponte* dismissed Abdur–Raheem's official-capacity claims against the Defendants on the ground that, as state agents, Caffery and Prack have Eleventh Amendment immunity from suit for damages in their official capacities. [4] (Dkt. No. 7.) On March 12, 2014, Defendants moved to dismiss the complaint. (Dkt. No. 18.) Abdur–Raheem subsequently received two extensions of time to respond to the Motion to Dismiss (Dkt. Nos. 22 & 25), after which he applied for the appointment of counsel (Dkt. No. 29). The Court denied his application, but *sua sponte* granted him a third extension of time within which to respond to the Motion to Dismiss, to December 20, 2014. (Dkt. No. 30.) Abdur–Raheem failed to meet this deadline, and the

Court warned him that the Motion would be considered unopposed if he did not deliver his opposition to prison authorities by February 1, 2015. (Dkt. No. 31.) The Motion to Dismiss remains unopposed.

## II. Legal Standard

**\*3** On a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 475 (2d Cir.2009) (internal quotation marks omitted). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "This standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Vaughn v. Air Line Pilots Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir.2010) (quoting *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted)).

In determining whether a plaintiff has pleaded facts sufficient to survive a motion to dismiss, a court will not consider mere conclusory allegations that lack a factual basis. *Hayden v. Paterson,* 594 F.3d 150, 160–61 (2d Cir.2010). A plaintiff's complaint "must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.,* 768 F.3d 247, 254 (2d Cir.2014) (quoting *Iqbal,* 556 U.S. at 680) (alterations and internal quotation marks omitted).

In assessing the sufficiency of the complaint, a court may consider "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations and internal quotation marks omitted). "Integral" documents are those "either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)). In order for a document to be "integral," however, a plaintiff must actually have relied on its terms and effect in drafting the complaint; mere possession or notice is not enough. *Id.*

Finally, Abdur–Raheem's *pro se* complaint is subject to more lenient standards than a complaint filed by a represented party. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks omitted); *see also* Fed. Rule Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

### III. Discussion

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must " 'show that [an] official, acting under color of state law, caused the deprivation of a federal right.' " *Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005) (quoting *Graham,* 473 U.S. at 166 (1985)). There is no dispute here that Caffery and Prack, employees of the DOCCS, were acting under color of state law. The parties dispute the second element, that is, whether Abdur–Raheem has stated a plausible claim that Caffery or Prack deprived him of a right guaranteed by the United States Constitution. Abdur–Raheem alleges violations of his Fourth, Eighth, and Fourteenth Amendment rights.

### A. Fourth Amendment Claim Against Caffery

**\*4** Abdur–Raheem merely lists "4th Amend[ment] violations" in the complaint as part of the list of claims against Caffery, without elaboration. (Compl. at 5.) He states no facts from which the Court can infer the Fourth Amendment violations to which he refers. Accordingly, this claim is dismissed. [5]

### B. Eighth Amendment Claim Against Caffery

Abdur–Raheem alleges that his Eighth Amendment rights were violated when he was placed in the SHU. (*Id.*) "In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). A prison official has a culpable state of mind if he "participated directly in the alleged event, ... learned of the inmate's complaint and failed to remedy

it, ... created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Id.*

Abdur–Raheem has not plausibly pleaded either of these elements. As to his detention in the SHU, he states only that he lost his privileges with respect to receiving packages, the commissary, and phone calls. Even assuming that Abdur–Raheem's SHU confinement lasted for the full six-month period, these allegations are not sufficient to give rise to an Eighth Amendment violation. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 748–49 (S.D.N.Y.2002) (holding that "allegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, and other normal incidents of SHU confinement," which lasted ten months, were "not violations of the Eighth Amendment"). And he makes no allegation as to Caffery's culpable state of mind in sentencing him to six months in the SHU. Accordingly, Abdur–Raheem's Eighth Amendment claim is dismissed. [6]

### C. Fourteenth Amendment Claim against Caffery

Abdur–Raheem's Fourteenth Amendment claim against Caffery is a procedural due process claim. To state such a claim, Abdur–Raheem must allege that he has a protected liberty interest and that he was deprived of sufficient process to protect that interest. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995). Abdur–Raheem argues that Caffery deprived him of due process when he sentenced him to the SHU without inquiring into the requested witness's reason for refusing to testify at the Tier III hearing. (Compl. at 5.)

*Liberty or Property Interest:* A prisoner's liberty interest is implicated by SHU confinement only if the confinement "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998).

**\*5** "Although the Second Circuit has explicitly declined to create a 'bright line rule that a certain period of

SHU confinement automatically fails to implicate due process rights,' it has established 'guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed.' " *Zappula v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at *6 (S.D.N.Y. Apr. 5, 2013) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). For example, "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64–65 (internal quotation marks omitted). Confinement of 305 days or more has been deemed to be an "atypical and a significant hardship." *Bunting v. Nagy,* 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)). In contrast, typical punitive segregation conditions imposed for 101 days or fewer "generally do not constitute 'atypical' conditions of confinement." *Id.* (quoting *Sealey v.. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). However, "[i]n the absence of a detailed factual record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in [punitive segregation] was exceedingly short—less than ... 30 days ...—and there was no indication that the plaintiff endured unusual ... conditions." *Palmer,* 364 F.3d at 65–66.

It is unclear from the complaint whether Abdur–Raheem spent 67 days or six months (180 days) in the SHU. Either way, he spent more than 30 days in the SHU, and therefore development of a detailed record of the SHU conditions he was subject to is advisable before the Court will dismiss this claim for failure to plead a protected liberty interest. The factual record before the Court is far from detailed; Abdur–Raheem states only that the SHU sanction "included loss of packages, commissary, [and] phone privileges." (Compl. at 5 .) The Court will therefore not dismiss Abdur–Raheem's procedural due process claim on this ground. Rather, the Court assumes without deciding that Abdur–Raheem's SHU confinement implicates a protected liberty interest, and asks whether he was given sufficient process.

*Process:* "A prisoner may not properly be deprived of a cognizable liberty interest without due process of law." *Gaston,* 249 F.3d at 163. Due process requires that a prisoner be provided, at minimum, with "advance written warning of the charges against him, the opportunity to call witnesses, and a written final decision on the hearing

describing how the state reached its determination." *Odom v. Kerns,* No. 99 Civ. 10668(KMK)(MHD), 2008 WL 2463890, at *9 (S.D.N.Y. June 18, 2008) (citing *Wolff v. McDonnell,* 418 U .S. 539, 563–67 (1974)); *see also Ponte v. Real,* 471 U.S. 491, 495 (1985) ("Chief among the due process minima outlined in *Wolff* was the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board."). Abdur–Raheem challenges only the second of these requirements; he alleges that his right to call witnesses was infringed when Caffery failed to make a personal inquiry into Abdur–Raheem's witness's refusal to testify. (Compl. at 5.)

**\*6** A prisoner does not have an absolute right to call witnesses on his behalf in a prison disciplinary proceeding. An "unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff,* 418 U.S. at 566. Accordingly, "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators.... [W]e must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.* Some legitimate reasons for refusing a prisoner's request to call a witness include "irrelevance, lack of necessity, [and] the hazards presented in individual cases." *Odom,* 2008 WL 2463890, at *9 (quoting *Wolff,* 418 U.S. at 566) (internal quotation marks omitted).

"Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him. [Therefore,] if a prison official ... reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights." *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). Courts in this and neighboring districts have consistently held that a prison hearing officer's failure to call a fellow inmate who refuses to testify does not violate due process. *See Odom,* 2008 WL 2463890, at *10 ("A witness's refusal to testify is a rational reason for denying Plaintiff's request to call witnesses."); *Jamison v. Fischer,* No. 11 Civ. 4697(RJS), 2013 WL 5231457, at *3 & n. 4 (S.D.N.Y. July 11, 2013) (holding that a hearing officer could have reasonably concluded that it would be futile to call witnesses where those witnesses submitted witness refusal sheets, and that therefore the fact that these witnesses were not made

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 57 of 329
Abdur-Raheem v. Caffery, Not Reported in F.Supp.3d (2015)
2015 WL 667528

to testify did not deprive the plaintiff of due process); *Turner v. Grant,* No. 98 Civ. 706A, 2000 WL 362032, at *5 (W.D.N.Y. Mar. 29, 2000) (holding that a hearing officer did not violate the plaintiff's due process rights in failing to call a witness who refused to testify); *Merced v. Moylan,* No. 9:05 Civ. 1426 (FJS/RFT), 2007 WL 3171800, at *9 (N.D.N.Y. Oct. 29, 2007) ("A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile.").

Moreover, "[t]here is no indication in Second Circuit or Supreme Court case law that a hearing officer must make an independent evaluation of the basis for the refusal to testify." *Greene v. Coughlin,* No. 93 Civ. 2805(DLC), 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (holding that a Tier III hearing officer does not violate a prisoner's due process rights when he fails to investigate the reasons for an inmate refusing to testify); *Jamison,* 2013 WL 5231457, at *3 (same); *Dumpson v. Rourke,* No. 96 Civ. 621(RSP), 1997 WL 610652, at *1 (N.D.N.Y. Sept. 28, 2006) (same). While failure to make such an independent evaluation violates state regulations, it does not violate the complaining prisoner's federal constitutional rights. *See Martinez v. Minogue,* No. 9:06 Civ. 546, 2008 WL 4241746, at *5–6 (N.D.N.Y. Sept. 11, 2008).

**\*7** To be sure, a prison official who refuses to call a requested witness has a constitutional obligation to explain to the prisoner-defendant why the witness was not allowed to testify. *Ponte,* 471 U.S. at 497; *Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). The reasons need not be in writing, and may be provided at the disciplinary hearing itself or by presenting testimony in court when there is a later constitutional challenge to the hearing. *Ponte,* 471 U.S. at 497.

Under this precedent, Caffery did not violate Abdur–Raheem's due process rights when he proceeded without the testimony of Abdur–Raheem's proposed witness. That witness had indicated, by way of an inmate refusal form, that he would not testify. Further, while Caffery may have had an obligation under New York law to further investigate the inmate's refusal to testify, he did not have an obligation under the Due Process Clause to do so. Rather, he was constitutionally required only to explain to Abdur–Raheem why the witness was not called. Caffery fulfilled this obligation when he gave Abdur–Raheem a copy of the inmate refusal form at the Tier III hearing, which indicated that the inmate had refused to testify because he did not have knowledge of the event and did not want to be involved. Accordingly, Abdur–Raheem's Fourteenth Amendment procedural due process claim against Caffery is dismissed.

### D. Claim Against Prack

The complaint also names Prack, who was the Director of the DOCCS Special Housing/Inmate Disciplinary Program when Abdur–Raheem was confined in the SHU. (Compl. at 5; *id.* Ex. B.) The complaint alleges only that Prack left Abdur–Raheem "unconstitutionally ... confined to S.H.U. from Jan[uary] 27, 2011, until April 4, 2011." (*Id.* at 5.) [7] Abdur–Raheem's claim against Prack is best read as stemming from his claims against Caffery: because Caffery unconstitutionally sentenced him to the SHU, Abdur–Raheem alleges, Prack's keeping him there was unconstitutional as well. Accordingly, because Abdur–Raheem has failed to state a claim against Caffery, he has failed to state a claim against Prack. [8]

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED. The Clerk of Court is directed to close the motion at docket number 18 and to close the case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 667528

---

Footnotes

1   The following facts, taken from the complaint and attached exhibits, are assumed true for the purpose of resolving the motion to dismiss. *Goonewardena v. New York,* 475 F.Supp.2d 310, 320 (S.D.N.Y.2007).

2   *Abdur–Raheem v. Prack,* 98 A.D.3d 1152 (N.Y.App. Div.3d Dep't 2012).

2015 WL 667528

3    Abdur–Raheem's favorable Article 78 determination does not foreclose this subsequent § 1983 action for damages, since damages are unavailable to compensate a party in an Article 78 proceeding for civil rights violations. *Davidson v. Capuano,* 792 F.2d 275, 278–80 (2d Cir.1986).

4    Accordingly, this Opinion addresses only the claims against the Defendants in their individual capacities.

5    The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

6    The Court notes that there is no evidence that Abdur–Raheem exhausted his Eighth Amendment claim as required to bring a prison condition claim under § 1983. *See* 42 U.S.C. § 1997e(a); *Baskerville v. Blot,* 224 F.Supp.2d 723, 729 (S.D.N.Y.2002) (detailing New York state's three-step inmate grievance process available to prisoners to exhaust their administrative remedies). The defense of failure to exhaust, however, is an affirmative defense; a defendant must prove its factual basis. *Jones v. Bock,* 549 U.S. 199, 216 (2007). Caffery has made no effort to do so here.

7    Although not pleaded in the complaint, the Defendants state that Prack was responsible for affirming Caffery's decision on administrative appeal, before it was reversed in the Article 78 proceeding. (Dkt. No. 20 at 2.) This is perhaps what Abdur–Raheem intends by his allegation that Prack left him "unconstitutionally ... confined to S.H.U." In any event, whether Prack passively left him in the SHU or affirmed Caffery's holding against him on administrative appeal, Abdur–Raheem has failed to state a claim against Prack.

8    Abdur–Raheem's claim against Prack could also be liberally construed as faulting Prack for placing Abdur–Raheem in the SHU on January 27, 2011, 18 days before Abdur–Raheem was given any kind of hearing. This claim fails. Absent any indication that Abdur–Raheem endured unusual prison conditions, 18 days in the SHU is insufficient to allege interference with a liberty interest such that the protections of procedural due process apply. *See Palmer,* 364 F.3d at 6566; *see also Arce v. Walker,* 139 F.3d 329, 335–37 (2d Cir.1998) (18 days in SHU).

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 652409
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, III, Plaintiff,

v.

David O'HARA, Corr. Officer, Auburn Corr.
Fac.; K. Kirkwood, Corr. Officer, Auburn Corr.
Fac.; C. Curtis, Corr. Officer, Auburn Corr.
Fac.; L. Seery, Corr. Officer, Auburn Corr.
Fac.; P. Dilallo, Corr. Officer, Auburn Corr.
Fac.; and S. Walshvelo, Corr. Serg., Auburn
Corr. Fac., a/k/a S. Walshevo, Defendants.

9:16-CV-0527 (GTS/ATB)
|
Signed 02/15/2019

**Attorneys and Law Firms**

OF COUNSEL: NOLAN J. LAFLER, ESQ., BLITMAN
& KING LLP, 443 North Franklin Street, Franklin
Center, Suite 300, Syracuse, NY 13204-1415, Pro Bono
Counsel for Plaintiff.

HON. LETITIA A. JAMES, OF COUNSEL: DENISE
P. BUCKLEY, ESQ., KONSTANDINOS D. LERIS,
ESQ., Assistants Attorney General, Attorney General for
the State of New York, The Capitol, Albany, NY 12224,
Counsel for Defendants.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** The trial in this prisoner civil rights action, filed
*pro se* by Robert Adams, III ("Plaintiff") pursuant
to 42 U.S.C. § 1983, began with an evidentiary
hearing before the undersigned on February 12, 2019,
regarding the affirmative defense of the six above-
captioned correctional employees ("Defendants") that
Plaintiff failed to exhaust his available administrative
remedies, before filing this action on May 4, 2016,
as required by the Prison Litigation Reform Act. At
the hearing, documentary evidence was admitted, and
testimony was taken of Plaintiff as well as Defendants'
three witness (Auburn Correctional Facility Lieutenant
Timothy C. Abate, Auburn Correctional Facility Inmate

Grievance Program Supervisor Cheryl Parmiter, and New
York State Department of Corrections and Community
Supervisor Inmate Grievance Program Assistant Director
Rachael Seguin), whom Plaintiff was able to cross-
examine through *pro bono* trial counsel. At the conclusion
of the hearing, the Court indicated that a written decision
would follow. This is that written decision. For the reasons
stated below, Plaintiff's Second Amended Complaint is
dismissed because of his failure to exhaust his available
administrative remedies before filing this action.

**I. RELEVANT LEGAL STANDARD**
The Prison Litigation Reform Act of 1995 ("PLRA")
requires that prisoners who bring suit in federal court must
first exhaust their available administrative remedies: "No
action shall be brought with respect to prison conditions
under § 1983 ... by a prisoner confined in any jail, prison,
or other correctional facility until such administrative
remedies as are available are exhausted." 42 U.S.C. §
1997e.

The PLRA was enacted "to reduce the quantity and
improve the quality of prisoner suits" by "afford[ing]
corrections officials time and opportunity to address
complaints internally before allowing the initiation
of a federal case." *Porter v. Nussle*, 534 U.S. 516,
524-25 (2002). In this regard, exhaustion serves two
main purposes. First, it protects "administrative agency
authority" by giving the agency "an opportunity to
correct its own mistakes with respect to the programs
it administers before it is haled into federal court, and
it discourages disregard of the agency's procedures."
*Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second,
exhaustion promotes efficiency because (a) "[c]laims
generally can be resolved much more quickly and
economically in proceedings before an agency than in
litigation in federal court," and (b) "even where a
controversy survives administrative review, exhaustion
of the administrative procedure may produce a useful record
for subsequent judicial consideration." *Woodford*, 548
U.S. at 89. "[T]he PLRA's exhaustion requirement applies
to all inmate suits about prison life, whether they involve
general circumstances or particular episodes, and whether
they allege excessive force or some other wrong." *Porter*,
534 U.S. at 532.

In accordance with the PLRA, the New York State
Department of Corrections and Community Supervision
("DOCCS") has made available a well-established inmate

grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [1]

**\*2** **First**, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing.

Second, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal.

Third, a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by correction officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint in one of three ways: "in-house," by the New York State Office of the Inspector General, or by the New York State Police's Bureau of Criminal Investigation. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar special procedure is provided for

claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

These procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can–and must–be appealed to the next level, including CORC, to complete the grievance process. [4]

**\*3** It is important to note that, where an inmate does not know that an unprocessed grievance (i.e., a grievance that has not been assigned a grievance number) may technically be appealed, he need not appeal that unprocessed grievance, because the regulatory scheme advising him of that right is too opaque. *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (finding that, "even if Williams technically could have appealed his [unprocesseed] grievance, we conclude that the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use' [it pursuant to *Ross v. Blake*, 136 S. Ct. 1850 (2016) ]").

It is also important to note that DOCCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

"An individual decision or disposition of any current or subsequent program or procedure having a written

appeal mechanism which extends review to outside the facility shall be considered non-grievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. This is because certain exceptions exist to the exhaustion requirement.

In particularly, in 2004, in *Hemphill v. State of New York*, the Second Circuit held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004), *accord, Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

**\*4** However, in 2016, in *Ross v. Blake*, the Supreme Court abrogated *Hemphill*'s third prong and effectively enveloped its second prong within its first prong. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). More specifically,

under *Ross*, any inquiry that previously would have been considered under the second or third prongs of *Hemphill* is now considered entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *Ross*, 136 S. Ct. at 1858. This is because, the Supreme Court explained, the PLRA "contains its own, textual exception to mandatory exhaustion." *Id.* In particular, 42 U.S.C. § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. *Id.* In the PLRA context, the Supreme Court determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (quotation marks omitted).

To guide courts in this new analysis, the Supreme Court has identified three kinds of circumstances in which an administrative remedy, "although officially on the books," is not "available." *Ross*, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of providing that a prisoner has failed to exhaust his available administrative remedies. [5] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by persuading the Court of either exhaustion or unavailability. [6] As a result, practically speaking, while

2019 WL 652409

the burden of proving this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

## II. ANALYSIS

According to Plaintiff, he made three attempts to exhaust his available administrative remedies regarding the claims at issue in this action: (1) he filed a grievance at Auburn Correctional Facility ("Auburn C.F."); (2) he sent a letter of complaint to the New York State Office of the Inspector General ("Inspector General"); and (3) he filed a grievance at Southport Correctional Facility ("Southport C.F."). (Hrg. Tr.) [7]

### A. Plaintiff's First Attempt: Filing a Grievance at Auburn C.F.

 **\*5** The Court begins by finding that, if a correctional sergeant ripped up Plaintiff's grievance in front of him and threatened him not to further pursue the grievance as Plaintiff testified, sufficient grounds would exist to deem his administrative remedies to have been effectively rendered unavailable (despite his having continued to complain through avenues other than the grievance process at Auburn C.F.). This is because the unavailability inquiry is an objective one, [8] which survives the Supreme Court's decision in *Ross*. [9]

However, after carefully considering the matter, the Court finds that Plaintiff has failed to offer any credible evidence that, while he was at Auburn C.F. between January 20 and January 22, 2015, he submitted a grievance that a correctional employee either ripped up or threatened him not to continue to pursue. (*See generally* Hrg. Tr.) In finding that Plaintiff's hearing testimony lacks credibility, the Court relies on the following eight facts: (1) Plaintiff's unconvincing demeanor and body language (including, but not limited to, his demeanor, tone of voice, facial expressions, and eye contact or lack thereof) during his testimony; [10] (2) the fact that Plaintiff contradicted himself by initially testifying at the hearing that he did not "actually observe" (but only "heard") the correction officer who picked up his grievance and then later testifying that he *did* see, and indeed made eye contact with, that correction officer (which is consistent with his prior deposition testimony); [11] (3) the inconsistency between Plaintiff's testimony that he had "[a]t least twice" filed grievances at Auburn C.F. "on the standard

form for inmate grievances" (other than the grievance he purportedly submitted regarding the events of this litigation) and the unchallenged hearing testimony of IGP Supervisor Parmiter that Plaintiff *never* filed a grievance at Auburn C.F. (as well as Plaintiff's apparent stipulation that he never filed a grievance at Auburn C.F.); [12] (4) the inconsistency between Plaintiff's hearing testimony that an unidentified sergeant ripped up his first grievance about the assault (which stopped Plaintiff from filing another grievance at Auburn C.F.) and Plaintiff's assertion (in his letter of June 1, 2015) that the interception of his grievance about the assault occurred "on two separate occasions, by S.H.U. Supervisors"; [13] (5) the inconsistency between Plaintiff's hearing testimony that complaining about the individual who had threatened him would have been like "throwing a ball in the dark" because Plaintiff "wasn't able to identify [him]" [14] and the fact that Plaintiff knew the individual's (a) rank ("sergeant"), (b) hair color ("brown"), (c) approximate height ("5-10 to 6 foot"), (d) approximate weight ("two [hundred pounds] and some change, 220"), and most importantly (e) his *job assignment* (as the admitted supervisor of the correction officers who had allegedly assaulted Plaintiff); [15] (6) the fact that it is difficult to believe that Plaintiff would not have even *tried* to avail himself of the opportunity to place his sealed grievance directly through a slot into the locked mailbag (beyond the reach of correctional employees until it reaches the grievance office), given his belief that "keep[ing] everything inside quiet, on the hush" is "what they do up there [in S.H.U.] ... they want total control"; [16] (7) the fact that it is difficult to believe that a correctional sergeant would take off his name tag (which in itself would subject him to discipline) and then stand before an inmate's cell in SHU and tear up the inmate's grievance, knowing that the act would be captured on video and that the video would be retained for a period of two weeks (and even longer if the inmate complained of the incident, in which case the video would be saved to a DVD); [17] and (8) the fact that it is difficult to believe that Plaintiff would write to the Inspector General on January 22, 2015, complaining about the intimidation he experienced two days before by Correction Officer "K. Deford" (who purportedly banged on Plaintiff's cell in the Mental Health Unit and stated, *inter alia*, "There's more where that came from. We're not finished w[ith] you yet") without mentioning that a sergeant purportedly ripped up Plaintiff's grievance earlier in the day on January 22. [18]

**B. Plaintiff's Second Attempt: Sending a Letter of Complaint Directly to the Inspector General**

**\*6** Setting aside (for the sake of brevity) the fact that Plaintiff never obtained a referral from the superintendent before complaining to the Inspector General, no record evidence exists either that Plaintiff received a finding of substantiation by the Inspector General or that he appealed to CORC any finding of unsubstantiation by the Inspector General. (Hrg. Tr. at 15-17, 24-27, 29, 32-35 [Plf.'s Hrg. Testimony]; Hrg. Tr. at 58 [Seguin's Hrg. Testimony]; Hrg. Ex. D-1 [Record of Plf.'s Appeals to CORC]; D-5, at 129-32 [Plf.'s Depo. Tr.]; Hrg. Ex. P-1 [Plf.'s Letter to IG dated Jan. 22, 2015]; Dkt. No. 89, at ¶¶ 147-49 [Plf.'s Verified Second Am. Compl.].)

As this Court has previously explained, "There is no exhaustion where an inmate complains directly to the Inspector General (i.e., instead of complaining to the superintendent and having the complaint referred to the Inspector General pursuant to 7 N.Y.C.R.R. § 701.8[d] ), the Inspector General renders a finding of unsubstantiation, and the inmate fails to appeal that finding to CORC." *Smith v. Kelly*, 985 F. Supp.2d 275, 285 (N.D.N.Y. 2013) (Suddaby, J.) (collecting cases), *accord, McPherson v. Rogers*, 12-CV-0766, 2014 WL 675830, at \*7 (N.D.N.Y. Feb. 21, 2014) (report-recommendation of Peebles, M.J., adopted by Hurd, J.).

This is especially true after the Supreme Court's June 6, 2016, decision in *Ross. See, e.g., Kearney v. Gebo*, 15-CV-0253, 2017 WL 61951, at \*6 (N.D.N.Y. Jan. 4, 2017) ("As discussed above, however, the Supreme Court recently rejected the Second Circuit's 'special circumstances' exception to the PLRA's exhaustion requirement. Therefore, Plaintiff's complaint to the Inspector General, which does not constitute complete and proper exhaustion under New York's grievance scheme, cannot excuse his failure to exhaust."), *aff'd*, 713 F. App'x 39 (2d Cir. 2017) ("Kearney's pursuit of alternative relief from the Inspector General's Office and Commission of Correction did not render the ordinary inmate grievance procedures unavailable to him, such that he is excused from complying with those ordinary procedures. Their pendency did not preclude him from filing a grievance. Nor do any assurances Kearney received that these offices were considering his complaint warrant a finding that prison administrators thwarted Kearney from pursuing the ordinary grievance

procedures through machination, misrepresentation, or intimidation.") (internal quotation marks omitted).

Analyzed through the framework set forth by *Ross*, here, the pending nature of the Inspector General's investigation in no way precluded Plaintiff from filing a grievance. *See Kearney v. Gebo*, 713 F. App'x 39, 42 (2d Cir. 2017) ("[The pendency of] Kearney's pursuit of alternative relief from the Inspector General's Office and Commission of Correction ... did not preclude him from filing a grievance."). Nor did any assurance that Plaintiff received that the Inspector General was considering his complaint warrant a finding that prison administrators thwarted Plaintiff from pursuing the ordinary grievance procedures "through machination, misrepresentation, or intimidation." *See Kearney*, 713 F. App'x at 42 ("Nor do any assurances Kearney received that these offices were considering his complaint warrant a finding that prison administrators thwarted Kearney from pursuing the ordinary grievance procedures through machination, misrepresentation, or intimidation.") (internal quotation marks omitted). To the contrary, Plaintiff swears that, after interviewing Plaintiff for an hour, the Inspector General's investigator instructed Plaintiff to contact the Inspector General if he experienced further issues or retaliation. (Hrg. Tr. at 15-17, 24-27, 29, 32-35 [Plf.'s Hrg. Testimony]; Dkt. No. 89, at ¶¶ 147-49 [Plf.'s Verified Second Am. Compl.].)

**C. Plaintiff's Third Attempt: Filing a Grievance at Southport C.F.**

**\*7** The grievance that Plaintiff filed at Southport C.F. was rejected as untimely, and there was no subsequent finding of mitigating circumstances to excuse that untimeliness. (Hrg. Tr. at 19-20 [Plf.'s Hrg. Testimony]; Hrg. Ex. D-5, at 138-39 [Plf.'s Depo. Tr.]; Hrg. Ex. P-2 [Plf.'s Letter to Southport C.F. IGP Supervisor dated June 1, 2015]; Hrg. Ex. P-3 [Southport C.F. IGP Supervisor's Letter to Plf. dated June 2, 2015]; Hrg. Ex. D-1 [Record of Plf.'s Appeals to CORC].)

Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies. *See Cole v. Miraflor*, 02-CV-9981, 2006 WL 457817, at \*5 (S.D.N.Y. Feb. 23, 2006) ("Contrary to Cole's claim that administrative remedies were no longer available to him because DOCS did not find mitigating circumstances to excuse his late grievance, ... the very

fact that DOCS' policies provide for the filing of late grievances where there are mitigating circumstances, demonstrates that administrative remedies were available to Plaintiff."), *aff'd*, 305 F. App'x 781 (2d Cir. 2009); *Galberth v. Durkin*, 14-CV-0115, 2016 WL 11480153, at *7 (N.D.N.Y. Apr. 21, 2016) (Baxter, M.J.) ("An inmate has not exhausted his administrative remedies when he has requested permission to file an untimely appeal and been denied by CORC due to an unpersuasive showing of mitigating circumstances."), *adopted*, 2016 WL 3910270 (N.D.N.Y. July 14, 2016) (Sannes, J.); *Burns v. Zwillinger*, 02-CV-5802, 2005 WL 323744, at *3 (S.D.N.Y. Feb. 9, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher*, 339 F.Supp.2d 592, 595 (S.D.N.Y. 2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") (collecting cases).

As explained by the Court,

> If exhaustion were permissible under such circumstances, every inmate could exhaust his available administrative remedies without fulfilling the functions of the exhaustion requirement: affording corrections officials the time and opportunity to quickly and economically correct its own mistakes internally, and producing a useful record for litigation, before allowing the initiation of a federal case.

*Smith v. Kelly*, 985 F. Supp.2d 275, 290-91 (N.D.N.Y. 2013) (Suddaby, J.); *see also Murray v. Palmer*, 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (report-recommendation of Lowe, M.J., adopted by Hurd, J.) ("If the rule were to the contrary, then, as a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement.").

### D. Conclusion

None of Plaintiff's three attempts to exhaust his available administrative remedies was sufficient under the PLRA, *Ross* and *Hemphill*. As for Plaintiff's first attempt (on which he appeared to rely most strongly at the hearing), simply stated, the Court agrees with Defendants that, after Plaintiff learned that his hasty complaint directly to the Inspector General had not been substantiated, and after he learned that he would not be able to file a timely grievance at Southport C.F., he fabricated the story that his grievance had been destroyed and he had been threatened while at Auburn C.F. (Hrg. Tr. at 31.) The Court is not convinced by Plaintiff's contradictory and incredible hearing testimony.

**\*8  ACCORDINGLY**, it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 89) is **DISMISSED in its entirety with prejudice**[19] for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Slip Copy, 2019 WL 652409

---

Footnotes

1    *See also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. March 31, 2010) [citation omitted].

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2   The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3   *See Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *2 & n.3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight*, 05-CV-0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight*, No. 09-3641, Mandate [2d Cir. filed Jan. 15, 2010].)

4   7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray,* 2010 WL 1235591, at *2 & n.4 [collecting cases]; *cf.* 7 N.Y.C.R.R. § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC.").

5   *Id.* at *4 [citation omitted].

6   *Id.* at *4 & n.17 [citing cases]; *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir. 2004) (noting that special circumstances must be "plausibly alleged, ... justify[ing] the prisoner's failure to comply with administrative procedural requirements"); *Grant v. Kopp,* 17-CV-1224, 2019 WL 368378, at *4 (N.D.N.Y. Jan. 3, 2019) (Peebles, M.J.) ("I conclude that although the burden of proof on this affirmative defense remains with the defendant at all times, the plaintiff can be required to produce evidence in order to defeat it.") (citing cases), *adopted,* 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019) (Sharpe, J.).

7   The Court notes that Defendants' Answers timely asserted this affirmative defense. (Dkt. No. 101, at ¶ 18 [Defs.' Answer]; Dkt. No. 102, at ¶ 17 [Def. Walshvelo's Answer].)

8   *See Hemphill v. New York,* 380 F.3d 680, 688 (2d Cir. 2004) ("The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available.... Moreover, it should be pointed out that threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts.").

9   *See, e.g., Davis v. Doe,* 16-CV-0994, 2017 WL 8640829, at *4 (N.D.N.Y. Dec. 29, 2017) (Stewart, M.J.) (continuing to apply objective test after *Ross* ), *adopted,* 2018 WL 1582230 (N.D.N.Y. March 27, 2018) (D'Agostino, J.); *accord, Allen v. Graham,* 16-CV-0047, 2017 WL 9511168, at *6 (N.D.N.Y. Sept. 26, 2017) (Baxter, M.J.), *adopted,* 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017) (Suddaby, C.J.); *White v. Dishaw,* 14-CV-0002, 2017 WL 4325770, at *3 (N.D.N.Y. June 20, 2017) (Stewart, M.J.), *adopted,* 2017 WL 4326074 (N.D.N.Y. Sept. 27, 2017) (Sharpe, J.); *Cole v. N.Y.S. Dep't of Corr. and Cmty. Supervision,* 14-CV-0539, 2016 WL 5394752, at *10 (N.D.N.Y. Aug. 25, 2016) (Peebles, M.J.), *adopted,* 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (Sannes, J.).

10   *Cf. Donato v. Plainview-Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 634 (2d Cir. 1996) ("[W]e must accord great deference to the trial court's findings regarding credibility because the trial judge is in the best position to evaluate a witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.").

11   (*Compare* Hrg. Tr. at 10, 21 [Plf.'s Hrg. Testimony] *with* Hrg. Tr. at 10, 22-23, 31-32 [Plf.'s Hrg. Testimony] *and* Hrg. Ex. D-5, at 127 [Plf.'s Depo. Tr.].)

12   (*Compare* Hrg. Tr. at 7-8 [Plf.'s Hrg. Testimony] *with* Hrg. Tr. at 55 [Parmiter Hrg. Testimony] *and* Hrg. Tr. at 4 [Tr. of Parties' Stipulations, in which Plaintiff's counsel stated, "We also understood that there was going to be testimony from the defense that the internal grievance files at Auburn were searched and that no record of a grievance from the plaintiff was located. We can stipulate to that issue as well."].)

13   (*Compare* Hrg. Tr. at 6-7, 24, 33 [Plf.'s Hrg. Testimony] *with* Hrg. Ex. P-2 [Plf.'s Letter to Southport C.F. IGP Supervisor dated June 1, 2015].)

14   (Hrg. Tr. at 32 [Plf.'s Hrg. Testimony].)

15   (Hrg. Tr. at 11-14 [Plf.'s Hrg. Testimony, stating, *inter alia*, that the sergeant referred to the offending corrections officers as "my officers"]; Dkt. No. 138, Attach. 4, at ¶ 3 [Plf.'s Sworn Statement, identifying the individual as "the SHU Block Sgt." and stating that he referred to the offending correction officers as "my officers"]; Dkt. No. 138, Attach. 3, at ¶ 18 [Plf.'s Sworn Statement, identifying the individual as "the SHU Block Sgt."].)

16   (Hrg. Tr. at 41-44, 38, 50 [Abate's Hrg. Testimony]; Hrg. Tr. at 33 [Plf.'s Hrg. Testimony].) The Court notes that, despite Lieutenant Abate's (somewhat vague) indication that a prisoner had to "hand[ ] [his grievance] to an officer," a fair reading of Lieutenant Abate's hearing testimony leads the Court to believe that, had he wanted to, Plaintiff could have "directly place[d]" his grievance "into the mailbag." (Hrg. Tr. at 42, 44, 50 [Abate's Hrg. Testimony].)

17   (Hrg. Tr. at 11-14, 32 [Plf.'s Hrg. Testimony]; Hrg. Tr. at 39-41, 45-47 [Abate's Hrg. Testimony].)

2019 WL 652409

18    (Hrg. Tr. at 28-31, 33-34 [Plf.'s Hrg. Testimony]; Hrg. Ex. P-1, at 7 [attaching page "5" of Plf.'s Letter to IG dated Jan. 22, 2015].)

19    The Court notes that this dismissal is with prejudice because "it is not possible for Plaintiff to obtain a waiver to file a late appeal to CORC." *Nickelson v. Annucci*, 15-CV-0227, 2019 WL 396003, at *1 & n.2 (N.D.N.Y. Jan. 31, 2019) (Suddaby, J.) (citing 7 N.Y.C.R.R. § 701.6[g] [2007] and *Murray v. Goord*, 03-CV-1010, 2008 WL 2522324, at *19 [N.D.N.Y. June 20, 2008] ); *see also Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2003) ("[T]he broader dictum that dismissal for failure to exhaust 'should' be without prejudice would extend too far if applied to cases where exhaustion was required but administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust."); *McCoy v. Goord*, 255 F. Supp.2d 233, 252 (S.D.N.Y. 2003) ("[W]here a plaintiff is effectively barred from administrative exhaustion–such as when the time for administrative exhaustion has expired and the inmate has been denied a waiver to file a late grievance–courts have not hesitated to dismiss with prejudice.").

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3911414
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.

Jeffrey ALLRED, Plaintiff,
v.
Captain KNOWLES, Hearing
Officer Sgt. Noto, Defendants.

No. 06–CV–0456Sr.
|
Oct. 5, 2010.

**Attorneys and Law Firms**

Jeffrey Allred, Queensvillage, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo,
NY, for Defendants.

***DECISION AND ORDER***

H. KENNETH SCHROEDER, JR., United States
Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have
consented to the assignment of this case to the undersigned
to conduct all proceedings in this case, including entry of
final judgment. Dkt. # 14.

Plaintiff, Jeffrey Allred, filed this *pro se* action seeking
relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff
alleges that while an inmate at the Gowanda Correctional
Facility ("Gowanda") his rights pursuant to the First,
Eighth, and Fourteenth Amendments to the United States
Constitution were violated. *Id.* Currently before the Court
is defendants' motion for summary judgment. Dkt. #
18. For the following reasons, defendants' motion for
summary judgment is granted and the plaintiff's complaint
is dismissed in all respects.

***BACKGROUND***

Plaintiff filed this action on July 11, 2006, against
defendants, Michael Knowles and Louis Noto, pursuant
to 42 U.S.C. § 1983, seeking monetary damages. *Id.* The
action arises from a misbehavior report issued on or about
July 27, 2003 by defendant Noto against plaintiff and
the resulting Tier III disciplinary hearing conducted by
defendant Knowles. *Id.* Specifically, the complaint alleges
the issuance of a false misbehavior report, retaliation and
violation of plaintiff's due process rights. *Id.*

At the time of the events alleged in the complaint, plaintiff
was an inmate in the care and custody of the New
State Department of Correctional Services ("DOCS")
housed at Gowanda. Dkt. # 1, p. 2; Dkt. # 20, p. 1.
Defendant Knowles was a Captain at Gowanda and his
duties included, from time to time, conducting inmate
disciplinary hearings. Dkt. # 1, pp. 3–4; Dkt. # 21, pp.
1–2. Sergeant Noto was a DOCS Sergeant on plaintiff's
housing unit at Gowanda. Dkt. # 1, p. 4; Dkt. # 22, pp.
1–2.

On July 22, 2003, at approximately 8:30 p.m.,
Correctional Officer Millich discovered several marijuana
cigarettes during a search of inmate Meja's cell. Dkt.
# 22, p. 3. Consequently, defendant Noto initiated an
investigation into the matter. Dkt. # 1, p. 8; Dkt. # 22,
p. 3. Defendant Noto maintained that Meja told him that
he had purchased the marijuana cigarettes from plaintiff.
Dkt. # 22, p. 3. Based on Meja's identification of plaintiff
and information allegedly received from confidential
informant(s)—who identified plaintiff as a drug dealer
and indicated that the sale in question occurred between
7:00 and 8:00 p.m. on July 22, 2003 in the prison yard
—defendant Noto issued a misbehavior report charging
plaintiff with violating Inmate Rule 113.25. Dkt. # 1,
pp. 22 and 25; Dkt. # 22, p. 3. Inmate Rule 113.25
provides that "an inmate shall not make, possess, sell or
exchange any narcotic, narcotic paraphernalia, controlled
substance or marijuana. An inmate shall not conspire with
any person to introduce such items into the facility." Dkt.
# 22, p. 2; *see also* 7 NYCRR § 270.2(14)(xv).

On July 28, 2003, a Tier III disciplinary hearing was
conducted before defendant Knowles. Dkt. # 1, p. 23;
Dkt. # 21, p. 2. At the hearing, plaintiff testified in his
own defense that he was at a Nation of Islam ("NOI")/
Black studies program during the period of the alleged
drug sale in the prison yard. Dkt. # 1, p. 24; Dkt. #
21, p .6. Plaintiff called two other inmates, Ford and

2010 WL 3911414

Williams, as alibi witnesses. Dkt. # 1, p. 29; Dkt. # 21, p. 7. Ford and Williams attended the NOI/Black studies program with plaintiff, but could not verify the time plaintiff left. Dkt. # 21, pp. 7 and 16. The sign-out sheet for the NOI/Black studies class did not indicate the time plaintiff left, although it indicated that both Ford and Williams left at 7:00 p.m. *Id.* Plaintiff did not sign back into his housing unit until 8:10 p.m. and no one was able to verify his whereabouts after 7:00 p.m. Dkt. # 21, p. 17. Defendant Knowles interviewed the confidential informant(s) outside the presence of plaintiff and found them to be credible witnesses. Dkt. # 21, pp. 7–8. The confidential informant(s) identified plaintiff as a drug dealer and indicated that the sale of the drugs to Meja occurred between 7:00–8:00 p.m. in the prison yard. *Id.* Meja also testified at the hearing, and recanted his initial identification of plaintiff as the person who sold him drugs. Dkt. # 1, p. 26; Dkt. # 21, p. 11. When asked by defendant Knowles why he initially told defendant Noto that plaintiff was the individual who sold him drugs, Meja answered that he did so because he wanted defendant Noto to "leave [him] alone." Dkt. # 24, Ex. D, p 5. In response, defendant Knowles asked Meja to confirm, by answering in either the affirmative or the negative, if he initially identified plaintiff as the individual who sold him drugs, to which Meja answered in the affirmative. *Id.*

**\*2** On August 3, 2003, at the close of the disciplinary hearing, defendant Knowles entered a guilty finding against plaintiff. Dkt. # 24, Ex. C. Based on the Hearing Disposition Report completed by defendant Knowles, he based his guilt determination on the following evidence: defendant Noto's misbehavior report and his testimony that Meja initially identified plaintiff as the individual who sold Meja drugs in the yard; and the testimony of the confidential informant(s). *Id.* Defendant Knowles imposed a penalty of 12 months of confinement in special housing unit ("SHU") and a loss of privileges between the period August 22, 2003 and August 22, 2004.

### *DISCUSSION AND ANALYSIS*

#### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*Fed.R.Civ.P. 56(c).* "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the appropriate statute. The non-moving party must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to *Fed.R.Civ.P. 56(e),* affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**Due Process Claim**

**\*3** Plaintiff alleges that defendants deprived him of his constitutional right to procedural due process. Dkt. # 1, p. 42. This allegation appears to be based on the following: (1) that he was not afforded all of the procedural safeguards set forth in *Wolff v. McDonnell*[1] during the Tier III disciplinary hearing; and (2) that defendant Knowles was not an impartial hearing officer.

To prevail on a procedural due process claim under § 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.,* quoting *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 U.S. Dist. LEXIS 18103, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003), *aff'd,*

*Palmer,* 364 F.3d 60; *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4½ month period, Sims was sentenced to SHU for a total of nearly 3½ years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003) (quoting *Tookes v. Artuz,* No. 00CIV4969, 2002 U.S. Dist. LEXIS 12540, 2002 WL 1484391 (S.D.N.Y. July 11, 2002)) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"). Here, following the Tier III disciplinary hearing, defendant Knowles imposed a penalty of 12 months of confinement in SHU and a loss of privileges between the period August 22, 2003 and August 22, 2004. Thus, there can be no dispute that plaintiff has demonstrated a protected liberty interest. The issue that remains and that which will be addressed below, is whether plaintiff was deprived of that protected liberty interest without due process. Defendants maintain that plaintiff was not. Dkt. # 21, p. 2; Dkt. # 22, p. 7.

**\*4** In *Wolff,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff,* 418 U.S. at 563–66. Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety; and a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken. *Id*. Additionally, the findings must be supported by some evidence in the record. *Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, contrary to plaintiff's contention, he was afforded all of the procedural safeguards set forth in *Wolff.* Dkt. # 24, p 4–5. Plaintiff was provided with a copy of defendant Noto's misbehavior report before the hearing, giving him advance notice of the charge against him.[2] Dkt. # 1, p. 22; Dkt. # 21, p. 5. Plaintiff had the opportunity

Case 9:17-cv-00234-MAD-DEP Document 87 Filed 03/22/19 Page 70 of 329
Allred v. Knowles, Not Reported in F.Supp.2d (2010)
2010 WL 3911414

to call witnesses and present evidence. Dkt. # 1, pp. 26, 29; Dkt. # 21, pp. 6, 8. Plaintiff was also provided with a written statement of the guilty finding and the evidence relied on for the disposition. Dkt. # 21, p. 12. The guilty disposition was supported by evidence in the form of defendant Noto's notes; defendant Noto's misbehavior report and testimony; and the testimony of the confidential informant(s), particularly because plaintiff's alibi was uncorroborated. *Id.* at pp. 10–11. Thus, plaintiff's claim that he was deprived of procedural due process fails as a matter of law.

**Impartial Hearing Officer**

Plaintiff contends, in particular, that his due process rights were violated because defendant Knowles was not an impartial hearing officer. *See* Dkt. # 1, p. 6–8. Plaintiff points to the following to support his allegation: (1) that defendant Knowles was involved in both the Tier III hearing and in the investigation into plaintiff's drug sale; (2) that defendant Knowles instructed Meja to respond affirmatively at the hearing that plaintiff had sold Meja drugs although Meja testified at the hearing that he did not know plaintiff; and (3) that defendant Knowles rejected his alibi and confused the time of the drug sale at issue. Dkt. # 1, pp. 28, 39; Dkt. # 24, p. 6.

Indeed, as plaintiff correctly contends, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at 570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

**\*5** It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,*

100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is *"some evidence* in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis added).

In this case, there is ample evidence to support defendant Knowles' guilty finding: defendant Noto's misbehavior report and his testimony that Meja originally identified plaintiff as the individual who sold him drugs; and the testimony of the confidential informant(s); which was considered outside the presence of plaintiff. Dkt. # 21, pp. 8–9.

Notably, plaintiff's only defense at the Tier III hearing was that he had been at an NOI/Black studies program at the time of the drug sale, which took place allegedly between 7:00–8:00 p.m. Dkt. # 21, p. 7. However, inmates Ford and Williams could not verify plaintiff's alibi defense. *Id.* Because plaintiff did not sign back into his cell area until 8:10 p.m., defendant Knowles determined that there was ample time for plaintiff to sell the drugs in the yard during the period of his unexplained absence. Dkt. # 21, pp. 7, 16–18.

Plaintiff further contends that defendant Knowles violated his constitutional right to due process by failing to adhere to the state guidelines for conducting prison disciplinary hearings (set forth in Title 7 of the NYCRR §§ 253.1(b), 254.1 [3] ) because, he alleges, that defendant Knowles conducted the Tier III hearing and was also involved in the investigation of plaintiff's drug sale. Dkt. # 24, p 6.

This argument fails because violations of state law that do not deprive the plaintiff of a right "secured by the Constitution and laws" are insufficient to support a claim under § 1983. *See Baker v. McCollan,* 443 U.S. 137, 139–40, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004); *Blouin v. Spitzer,* 356 F.3d 348, 362 (2d Cir.2004). State procedural protections do not give rise to substantive federal rights. *See Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures."). Moreover, "[s]tate procedures designed to protect substantive liberty interests entitled to protection under the federal constitution do not

Allred v. Knowles, Not Reported in F.Supp.2d (2010)

2010 WL 3911414

themselves give rise to additional substantive liberty interests." *Blouin,* 356 F.3d at 363. It is "federal law, not state regulations, [that] determines the procedures necessary to protect that liberty interest ." *Id.* (citing *Watson v. City of New York,* 92 F.3d 31, 38 (2d Cir.1996)). Therefore, "the only relevant inquiry was whether the constitutional [procedures] were met, not whether state procedures were followed." *Shakur,* 391 F.3d at 119 (citing *Holcomb,* 337 F.3d at 224). As set forth above, plaintiff's constitutional rights were not violated during the Tier III hearing. Plaintiff's exclusive reliance on defendants' alleged violations of 7 NYCRR §§ 253.1(b) and 254.1 is insufficient to support his claim under § 1983. *See Shakur,* 391 F.3d at 119; *Holcomb,* 337 F.3d at 224; *Ramsey v. Goord,* 661 F.Supp.2d 370, 391–92 (W.D.N.Y.2009).

**\*6** Accordingly, since plaintiff received all of the process he was due in the course of the Tier III disciplinary hearing, defendants' motion for summary judgment on plaintiff's due process claim is granted.

**Retaliation Claim**

Plaintiff alleges that, in retaliation for attending a Nation of Islam ("NOI")/Black Studies course and/or for his affiliation therewith, defendant Noto filed a false misbehavior report and gave false testimony and that defendant Knowles found him guilty. Dkt. # 1, p. 43.

"In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for 'adverse action' taken against him by defendants." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App.

LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

**\*7** Here, even assuming plaintiff's affiliation with the NOI/Black studies program was constitutionally protected conduct, he cannot show that his affiliation therewith was a substantial motivating factor for the filing of the misbehavior report and the subsequent finding of guilt concerning the report. Defendant Knowles declares that he "did not even recall plaintiff prior to the hearing he conducted," and had no involvement whatsoever in any NOI activities. Dkt. # 21, p. 22. Similarly, defendant Noto declares that he had no knowledge of plaintiff's participation in the NOI/Black Studies program, and, up until the time of the instant litigation, "did not know that plaintiff attended such a course or was a member of the NOI." Dkt. # 22, p. 6. To this extent, plaintiff cannot demonstrate that his affiliation with the NOI/Black studies program was a motivating factor in defendants' actions. Since plaintiff cannot establish any plausible connection between NOI/Black studies

participation and the misbehavior report and the guilty finding, his retaliation claim fails as a matter of law.

Assuming, *arguendo,* that plaintiff could show that the disciplinary actions were motivated by retaliatory animus (an assumption that has no basis in the record before this Court), plaintiff's retaliation claims would fail because defendants can easily show that they would have taken the same disciplinary actions even in the absence of the protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). The record shows that there was sufficient evidence, based on defendant Noto's investigation, to have charged plaintiff with a drug sale. Further, there was ample evidence at the Tier III disciplinary hearing for defendant Knowles to find plaintiff guilty of the drug sale charge. This is so particularly in the context of prison administration where courts must be cautious to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is granted.

*CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is granted. Dkt. # 18. The Clerk of the Court is directed to enter judgment in favor of the defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*8 SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3911414

Footnotes

1    418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1975).
2    Plaintiff concedes this fact. However, he suggests that he was deprived of his due process rights under the standard set forth in *Wolff* because defendant Knowles found him guilty of drug possession, rather than sale of a narcotic substance, which he was charged with in the misbehavior report. Dkt. # 24, p 5. However, inmate Rule 113.25, which plaintiff was charged with in the misbehavior report and found guilty of at the close of the Tier III hearing, encompasses possession **and** sale of a narcotic. Dkt. # 21, pp. 5 and 19.
3    7 NYCRR § 253.1 gives superintendents the discretion to designate DOCS employees to conduct disciplinary hearings. Pursuant to § 253.1(b), "[n]o person who has participated in any investigation of the acts shall be a hearing officer at a hearing relating to those acts, nor shall any person who has prepared or caused to be prepared the misbehavior report on which a hearing is held, act as the hearing officer on that charge." Section § 254.1 of 7 NYCRR precludes a person who was a witness to or who investigated an incident that is the subject of a disciplinary proceeding from acting as a hearing officer relating to that incident.

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 118598
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,

v.

Thomas A. COUGHLIN, III, Commissioner
NYS DOCS; William Brunet, Seargent; SGT.
Davis; SGT. Emery; J. Baker, C.O.; W. Smith,
C.O.; M. Hamilton, C.O.; Mushen, C.O.; Supt.
Barkley; Nurse L. Lipscum; Thomas Farns,
C.O.; Walter Lincoln, C.O., Defendants.

No. 94–CV–985(LEK)(DRH).
|
Feb. 6, 2001.

*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions for relief from judgment and for recusal of the undersigned. For the reasons set forth below, Plaintiff's motions are denied.

# I. BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), commenced the present 42 U.S.C. § 1983 action alleging violations of his Constitutional Rights on August 5, 1994. On July 18, 1993, while Plaintiff was incarcerated at Riverview Correctional Facility, defendant Baker alleges that she witnessed Plaintiff exposing himself to her in the recreation yard. Plaintiff was then taken from the yard to the infirmary by defendants Baker, Smith, and Hamilton. In his Amended Complaint, Defendant alleges, in relevant part, that he was there repeatedly assaulted by defendants Davis, Smith, Mushen, and Hamilton while defendants Liscum, Baker, and Emery stood by and watched in violation of his Eighth Amendment rights. Plaintiff then alleges that he was escorted to the prison's special housing unit ("S.H.U.") and received further physical mistreatment from defendants Emery, Mushen, Hamilton, Smith, Farns, and Lincoln.

Plaintiff also alleges that his due process rights under the Fourteenth Amendment were violated by the disciplinary proceeding resulting from the incident, which was conducted by defendant Brunet. Finally, Plaintiff alleges that defendant Barkley participated in the violation of these rights by failing to address Plaintiff's grievances and by designating a biased hearing officer, defendant Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and Barkley ("Defendants") filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an affirmation in opposition to Defendants' motion on June 23, 1999 and a letter response on July 6, 1999. By an Order dated October 25, 1999, this Court granted Defendants' motion for summary judgment and dismissed Plaintiff's case against them in its entirety. [1] Plaintiff's current motions for relief from judgment and recusal were filed on November 12, 1999 and March 23, 1999, respectively.

# II. ANALYSIS

A. Relief from Judgment

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the

2001 WL 118598

availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

### 1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

### 2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

> [t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See*

*Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).

Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *5–*6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at *3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at **1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539

(1974); and (3) defendant Brunet is protected by qualified immunity in any event.[2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

#### a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

#### i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the

plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec. 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

 **\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/ Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with which to compare Plaintiff's conditions of confinement

to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

*Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to

2001 WL 118598

suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. Process Due

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' " *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority."

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 78 of 329
Alvarez v. Coughlin, Not Reported in F.Supp.2d (2001)
2001 WL 118598

*Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at [*]6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness in the question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with "reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses was clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at [*]6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably

be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000); *Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at [\*\*]2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at [\*\*]2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible." ' *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a

review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

### III. CONCLUSION

**\*9** ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2001 WL 118598

### Footnotes

1    Also still pending before the Court is a motion for summary judgment filed by Plaintiff September 1, 1998. The motion was originally dismissed by the Court's Order adopting the Report–Recommendation of United States Magistrate Judge David R. Homer, which held that the motion was untimely and, in the alternative, that it failed on the merits. Then, by an Order dated June 1, 1999, the Court vacated its previous order and held that Plaintiff's motion would be addressed on the merits, along with Defendants' motion for summary judgment. However, Judge Homer's Report–Recommendation did address the merits of Plaintiff's motion. The Court has undertaken a de novo review of the record and has determined that Plaintiff's motion should be dismissed for the reasons discussed in the Report–Recommendation.

2    Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U .S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 80 of 329

2017 WL 1215814
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Barry BERMAN, Plaintiff,
v.
Charles DURKIN, et al., Defendants.

Civ. No. 9:13-CV-0136 (LEK/DJS)
|
Signed 03/10/2017

**Attorneys and Law Firms**

BARRY BERMAN, 20 Glenn Cove Rise, Rochester,
New York 14617, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
JOSHUA E. McMAHON, ESQ., Assistant Attorney
General, Attorney General of the State of New York,
The Capitol, Albany, New York 12224, Attorney for
Defendants.

**REPORT-RECOMMENDATION and ORDER**

Daniel J. Stewart, U.S. Magistrate Judge

**\*1** *Pro se* Plaintiff Barry Berman commenced this civil
rights action on February 1, 2013. Dkt. No. 1, Compl.
The following claims remain: (1) an Eighth Amendment
excessive force claim against Defendants Correction
Officer ("C.O.") Devereaux, Sergeant ("Sgt.") King, and
John Does ## 1-3 and # 5 arising from an alleged assault
on May 27, 2010; (2) an Eighth Amendment excessive
force claim and a First Amendment retaliation claim
against Defendants C.O. Mitchell and Sgt. Durkin arising
from an alleged assault on June 13, 2010 that occurred
in retaliation when Plaintiff reported the May 27, 2010
incident; and (3) Eighth Amendment deliberate medical
indifference claims against Defendant Drs. Ramineni and
Mannava. *See* Dkt. No. 127, Am. Compl.

Presently before the Court is Defendants' Motion for
Summary Judgment. Dkt. No. 190, Defs.' Mot. Summ. J.
Defendants argue that: (1) Plaintiff's claims against the
unidentified John Doe Defendants should be dismissed;
(2) Plaintiff failed to exhaust his administrative remedies
with respect to his claims arising from the incidents alleged

to have occurred on May 27, 2010 and June 13, 2010;
and (3) Defendants are entitled to summary judgment on
each of Plaintiff's claims. *Id.* Despite being granted two
extensions of time to file a response, Plaintiff has not filed
a response. Dkt. Nos. 194 & 198. For the reasons that
follow, the Court recommends that Defendants' Motion
be **granted in part and denied in part**.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to
any material fact and the movant is entitled to judgment
as a matter of law." The moving party bears the burden
to demonstrate through "pleadings, depositions, answers
to interrogatories, and admissions on file, together with
[ ] affidavits, if any," that there is no genuine issue of
material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d
Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,
323 (1986)).

To defeat a motion for summary judgment, the non-
movant must set out specific facts showing that there
is a genuine issue for trial, and cannot rest merely
on allegations or denials of the facts submitted by the
movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*,
344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations
or denials are ordinarily not sufficient to defeat a motion
for summary judgment when the moving party has set
out a documentary case."); *Rexnord Holdings, Inc. v.
Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that
end, sworn statements are "more than mere conclusory
allegations subject to disregard ... they are specific and
detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements
is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d
at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d
Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d
Cir. 1995)). "A verified complaint is to be treated as an
affidavit for summary judgment purposes, and therefore
will be considered in determining whether material issues
of fact exist." *Colon v. Coughlin*, 58 F.3d at 872.

**\*2** When considering a motion for summary judgment,
the court must resolve all ambiguities and draw all
reasonable inferences in favor of the non-movant. *Nora
Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736,

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 81 of 329

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3); *see also* N.D.N.Y.L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion."). "If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden [of production], 'summary judgment must be denied *even if no opposing evidentiary matter is presented.*' " *Amaker v. Foley*, 247 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). "An unopposed summary judgment motion may also fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.' " *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)). "In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014).

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)

(3). Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5, 8-9 (2d Cir. 1995). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that the court may in its discretion opt to conduct a review of the entire record even where one of the parties has failed to file a 7.1 statement. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Jackson v. Fed. Exp.*, 766 F.3d at 194 (noting that "the court may rely on other evidence in the record even if uncited" in determining the undisputed material facts). Due to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record to ascertain the undisputed material facts. The Court will cite to the facts as set forth in Defendants' Rule 7.1 Statement of Facts only when properly supported by the record. Dkt. No. 190-16, Defs.' Rule 7.1. Statement of Material Facts ("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

## II. MAY 27, 2010 AND JUNE 13, 2010 EXCESSIVE FORCE INCIDENTS

### A. Background

**\*3** The Court here summarizes Plaintiff's allegations and sets forth the undisputed material facts regarding the alleged assaults that occurred on May 27 and June 13, 2010, when he was incarcerated at Clinton Correctional Facility ("Clinton").

On May 27, 2010, Plaintiff was going to the yard when he was stopped by Defendant C.O. Devereaux for a pat frisk. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 15. Plaintiff stated that there was nothing in his pockets, but alleges that he forgot that he was carrying a pencil. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 16. As C.O. Devereaux searched

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Plaintiff, he reached into Plaintiff's right front pocket and pricked his finger on the pencil. Defs.' SMF at ¶ 38. Plaintiff alleges that he returned to his cell and that C.O. Devereaux later came and discussed the incident. Am. Compl. at ¶ 17. Plaintiff apologized and explained that he was taking medication and C.O. Devereaux stated that he would meet with his supervisor regarding whether to issue a misbehavior report. *Id.*

Approximately ten minutes after his conversation with C.O. Devereaux, Plaintiff claims that C.O. Devereaux, Defendant Sgt. King, and John Does ## 1-3 came and ordered him to exit his cell. *Id.* at ¶ 18. The Defendants ordered Plaintiff to face and grab the cell bars, which Plaintiff did. *Id.* at ¶ 19. Plaintiff was then punched repeatedly in his head, sides, and back. *Id.* Plaintiff collapsed, but was ordered to get up, and when he did, was again punched repeatedly in his head, sides, and back. *Id.* at ¶¶ 21-23. Plaintiff attempted to look at one of the John Doe Defendant's name tags, but was ordered to look away. *Id.* at ¶ 23. The Defendants warned Plaintiff that if he reported the assault, they would return and "it would be worse." *Id.* at ¶ 24. No Unusual Incident Report was filed regarding the alleged assault. Defs.' SMF at ¶ 45. Defendants C.O. Devereaux and Sgt. King deny that they assaulted Plaintiff on any occasion. *Id.* at ¶¶ 51-52. [1]

On May 28, 2010, the following day, Plaintiff went to sick call. Am. Compl. at ¶ 25. Plaintiff claims that he was accompanied by C.O. Bushey who threatened him not to report the assault. *Id.* Plaintiff complained of pain on his right side and stated that he had fallen down some stairs. Dkt. No. 190-1, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. A, [2] at p. 413. No bruising or marks were noted and Plaintiff was observed getting onto and off of the exam table without signs of pain or discomfort. *Id.*

As a result of the pat frisk conducted by C.O. Devereaux, Plaintiff was issued a misbehavior report, which charged him with making false statements, refusing a direct order, and refusing a search or frisk. Defs.' SMF at ¶ 40. A Tier II Disciplinary Hearing was held on June 1, 2010. *Id.* at ¶ 41. Plaintiff testified at the hearing, but was found guilty of the charges and assessed with fifteen days loss of recreation, phone, packages, and commissary. *Id.* at ¶ 43. Plaintiff appealed the determination and it was affirmed. Dkt. No. 190-3, McMahon Decl., Ex. B, [3] at p. 23.

*4 On June 8, 2010, Plaintiff sent a complaint concerning the alleged assault to the New York Inspector General ("IG"). McMahon Decl., Ex. D, [4] at pp. DEF000511-000514. In his Amended Complaint, Plaintiff alleges that Defendant Sgt. Durkin acquired a copy of the letter to the IG and attempted to instigate other inmates to retaliate against Plaintiff for being a "snitch." Am. Compl. at ¶ 29. Plaintiff claims that on June 13, 2010, Defendants Sgt. Durkin and C.O. Mitchell came to his cell and escorted him to a room at the front of the block. *Id.* at ¶ 30. Sgt. Durkin then told Plaintiff that he was going to ask him questions about his letter to the IG and that whenever he gave a wrong answer, C.O. Mitchell would punch him in the face. *Id.* Sgt. Durkin proceeded to ask Plaintiff questions and C.O. Mitchell punched Plaintiff at least ten times in the face. *Id.*

Defendants then escorted Plaintiff to Sgt. Durkin's office. *Id.* at ¶ 31. Prior to entering the office, Sgt. Durkin ordered Plaintiff to face and grab the bars in order to be searched. *Id.* While Plaintiff was holding the bars, C.O. Mitchell repeatedly punched Plaintiff in his head, back, and sides. *Id.* Plaintiff was then taken into the office and further questioned. *Id.* at ¶ 32. The Defendants accused Plaintiff of having contraband tattoo guns and threatened him not to report the incident. *Id.* at ¶¶ 33 & 35. Again, no Unusual Incident Report was filed regarding this alleged assault. Defs.' SMF at ¶ 45. Plaintiff was not taken to medical following the incident and next went to sick call on June 24, 2010, where he again did not report any assault by staff. *Id.* at ¶ 36. Plaintiff alleges that, on June 17, 2010, photographs were taken of the "visible injuries" to his face. [5] Am. Compl. at ¶ 38.

Following the alleged incidents on May 27 and June 13, Plaintiff alleges that Sgt. Durkin continued to harass and threaten him. Plaintiff alleges that Sgt. Durkin moved Plaintiff's cell twice and confiscated some of his legal papers, envelopes, and toilet paper. *Id.* at ¶¶ 46, 48, & 52. Sgt. Durkin allegedly threatened Plaintiff to not talk about the incidents. *Id.* at ¶ 47. Plaintiff also claims that Sgt. Durkin stated that he planned to "set [P]laintiff up" by submitting a memo identifying Plaintiff as a drug dealer. *Id.* at ¶ 49. Plaintiff alleges that he suffered lasting abdominal pain following the alleged assaults. *Id.* at ¶ 71.

**B. John Doe Defendants**

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 83 of 329

Defendants first move to dismiss Plaintiff's claims against the unidentified John Doe Defendants, who allegedly participated in the May 27, 2010 assault. Dkt. No. 190-15, Defs.' Mem. of Law at pp. 2-3. In the District Court's initial review pursuant to 28 U.S.C. §§ 1915(e) (2)(B) and 1915A(b), Plaintiff was advised that he must "take reasonable steps through discovery to ascertain the identity of any Doe Defendants and, if appropriate, file a motion to amend his Amended Complaint ... to add any such individual." Dkt. No. 17 at p. 11. Through discovery, Plaintiff was able to identify "John Doe # 4" as Sgt. King, but was unable to identify any of the other Doe Defendants. See Dkt. No. 112 at pp. 28-29. "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." Delrosario v. City of New York, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010). Dismissal of an unidentified Doe Defendant is appropriate pursuant to FED. R. CIV. P. 41(b), which permits a court to dismiss an action for failure to prosecute or to comply with a court order, and FED. R. CIV. P. 4(m), under which a court must dismiss, absent a showing of "good cause," claims against a defendant who is not served within ninety days of the filing of the complaint. See Cusamano v. Sobek, 604 F. Supp. 2d 416, 501-02 (N.D.N.Y. 2009). Therefore, because discovery is closed and Plaintiff has not identified Defendant John Does ## 1-3 and John Doe # 5, the Court recommends that Plaintiff's claims against those Defendants be **dismissed**.

### C. Exhaustion

**\*5** Defendants argue that Plaintiff's claims arising from the May 27, 2010 and June 13, 2010 incidents should be dismissed on the ground that he failed to exhaust his administrative remedies.

### 1. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has

held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. Id. at 524; Ross v. Blake, 136 S. Ct. 1850, 1856 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. Howard v. Goord, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).[6]

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." Id. at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. Id. at § 701.6(g). The IGRC reviews and investigates the formal complaints and then issues a written determination. Id. at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. Id. at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. Id. at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. Bridgeforth v. Bartlett, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, inter alia, Porter v. Nussle, 534 U.S. at 524); see also Neal v. Goord, 267 F.3d 116, 121 (2d Cir. 2001), overruled on other grounds by Porter v. Nussle, 534 U.S. 516.

In addition to the formal grievance procedure described above, the regulations provide for an expedited grievance procedure for claims of employee "harassment." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. Pursuant to this expedited procedure, the inmate may first report

2017 WL 1215814

the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

**\*6** If the superintendent determines that the allegations do not represent a bona fide case of harassment, the allegations are automatically routed to the IGRC for resolution according to the formal three-step grievance procedure outlined above. *Id.* at § 701.8(c). If the superintendent finds that the allegations do represent a bona fide case of harassment, then he must either initiate an in-facility investigation by higher ranking personnel, or request an investigation by the IG's Office, and if criminal activity is involved, the superintendent may request an investigation by the New York State Police Bureau of Criminal Investigations. *Id.* at §§ 701.8(d); *see also Perez v. Blot, 195 F. Supp. 2d 539, 542-43 (S.D.N.Y. 2002)* (describing the grievance system).

The superintendent must render a decision within twenty-five calendar days of receipt of the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(f). If the superintendent fails to respond within this required time-frame, the inmate may appeal his grievance to CORC by filing a notice of decision to appeal with the inmate grievance clerk. *Id.* at § 701.8(g). If the inmate receives a response from the superintendent and wishes to appeal to CORC, he must file a notice of decision to appeal with the inmate grievance clerk within seven calendar days of receipt of the response. *Id.* at § 701.8(h).

In sum, the expedited procedure set forth above allows inmates to bypass filing a formal grievance by instead "reporting" the incident. *See Perez v. Blot, 195 F. Supp. 2d at 544.* Such a process is wholly consistent with the underlying concern of employee harassment.

### 2. Plaintiff's Failure to Exhaust Administrative Remedies

The record establishes that Plaintiff did not file grievances with the IGP at Clinton relative to his claims arising from the May 27, 2010 and June 13, 2010 incidents. In the records provided by Defendants, it appears that the Clinton IGP received seven grievances filed by Plaintiff, all of which concerned Plaintiff's medical problems. *See*

McMahon Decl., Ex. B. These seven grievances do not complain of the alleged assaults or of injuries that Plaintiff incurred in such assaults. *See id.* Plaintiff only appealed five of these grievances to CORC. *See* Dkt. No. 190-19, Decl. of Jeffery Hale, dated Aug. 17, 2016, Ex. B.

Normally, the absence of records of an appeal to CORC would be sufficient to establish Plaintiff's failure to exhaust his administrative remedies. However, in addition to the seven grievances received by the Clinton IGP, the record contains numerous other letters sent by Plaintiff, which require further discussion. These letters include the following:

- Two letters addressed to legal aid attorneys, dated June 3, 2010 and June 6, 2010, in which Plaintiff complains of the May 27 assault and numerous other assaults allegedly occurring in Clinton. McMahon Decl., Ex. D, at pp. DEF000491-495 & DEF000497-499.

- Three letters addressed to Superintendent LaValley and Deputy Superintendent Racette, dated July 11, 2010, July 12, 2010, and July 13, 2010, requesting protective custody on account of fear of assaults by staff. *Id.* at pp. DEF000528-529 & DEF000538-539.

- A letter addressed to the IG's office, dated June 8, 2010, complaining of the May 27 assault. *Id.* at pp. DEF000511-514.

- Grievance letters addressed to the supervisor of the IGP, dated June 4, 2010 and June 30, 2010, complaining, respectively, of the May 27 and June 13 assaults. *Id.* at pp. DEF000533-536. These letters are notated as "received" in the upper right corners, but are not stamped as received by the IGP and do not have assigned grievance numbers. *Id.*

- A letter addressed to Superintendent LaValley, dated July 6, 2010, claiming that Plaintiff's grievances were not being processed. *Id.* at p. DEF000545.

**\*7** The record also includes Grievance No. MS-20123-10, which was filed on July 28, 2010 at Mid-State. Hale Decl., Ex. C. In MS-20123-10, Plaintiff claims that he filed grievances following the May 27 and June 13 incidents that were never processed. *Id.* at p. DEF000611. MS-20123-10 was denied because there were no grievances on record at Clinton alleging staff misconduct. Hale Decl., Ex. C at p. DEF000610. Additionally, in his Amended

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00234-MAD-DEP Document 87 Filed 03/22/19 Page 85 of 329

2017 WL 1215814

Complaint, Plaintiff alleges, in conclusory terms, that grievances filed against corrections officers at Clinton would not be processed; Plaintiff claims that he attempted to file several grievances that were either not processed or accepted. Am. Compl. at ¶¶ 58 & 61.

Many of the letters noted above—in particular, the letters addressed to the Superintendent requesting protective custody and raising other complaints and the letter requesting investigation by the IG's office—are insufficient to satisfy the exhaustion requirement. Generally, "the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Muhammad v. Pico*, 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Grey v. Sparhawk*, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint ... made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures."). Thus, Plaintiff's informal complaints outside of the grievance process, even if they might have had the effect of providing notice of his claims, are insufficient to exhaust his administrative remedies.

However, a different conclusion follows from the two grievances addressed to the IGP and MS-20123-10. Together, this record evidence indicates (1) that Plaintiff attempted to raise his assault complaints by filing grievances with the IGP, (2) that Clinton staff notated/stamped the grievances as "received," and (3) that his grievances were never processed or filed with the IGP. This record evidence creates an issue of fact as to whether administrative remedies were available to Plaintiff. Specifically, although both grievances are notated as "received," it is unclear how or if they were processed. Were these grievances simply not processed? Or were they treated as harassment grievances and investigated by the Superintendent's office (the June 4 grievance is stamped as received by the Superintendent's office)? Notably, Defendants do not provide an affidavit of either the inmate grievance supervisor at Clinton or any other individual with personal knowledge of how these grievances were processed. As the Court describes below,

the failure to resolve such questions creates an issue of fact as to whether administrative remedies were available to Plaintiff.

Defendants' argument as to the unfiled grievances is that even if the grievances were never processed, Plaintiff was nonetheless obligated under DOCCS regulations to appeal and complete the grievance process when he did not receive a response. *See* Defs.' Mem. of Law at p. 8 (citing *Goodson v. Silver*, 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012)). This, however, is no longer an accurate statement of the law after the Second Circuit's decision in *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016).

*Williams* was issued following the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which the Supreme Court clarified the circumstances in which a failure to exhaust may be excused. As the *Ross* Court stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." 136 S. Ct. at 1858. The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

**\*8** In *Williams*, after the district court granted the defendants' motion to dismiss on non-exhaustion, the Second Circuit considered whether administrative remedies had actually been "available" to the plaintiff, applying the "unavailability" inquiry outlined in *Ross*.[7] *Williams v. Priatno*, 829 F.3d at 123. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and he alleged that it was never filed by the correction officer to whom he had given it. *Id.* It was undisputed that he never appealed the grievance. *Id.*

The defendants argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126 (emphasis added); *see also Juarbe v. Carnegie*, 2016 U.S. Dist. LEXIS 140241, at *19 n.13 (N.D.N.Y. Oct. 7, 2016) (explaining that *Williams* appears to draw a distinction between an "unfiled and unanswered" grievance and a simply "unanswered" grievance, insofar as the regulations provide that an inmate may appeal an unanswered grievance), *report and recommendation adopted by*, 2016 U.S. Dist. LEXIS 162262, 2016 WL 6901277 (N.D.N.Y. Nov. 23, 2016).

Returning to the case at hand, the Court finds that the record, viewed in the light most favorable to Plaintiff, suggests that Plaintiff's grievances were unfiled and unanswered, creating an issue of fact as to the availability of administrative remedies under *Williams*. Defendants' failure to provide an affidavit explaining how Plaintiff's grievances were processed is insufficient to carry their burden of proving the affirmative defense on the present record. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's claims arising from the May 27 and June 13 incidents be **denied**. If this recommendation be accepted, the Court recommends that an exhaustion hearing be scheduled prior to any trial of this case.

## D. Whether Summary Judgment is Appropriate on Plaintiff's Excessive Force Claims

Under the Eighth Amendment's prohibition on "cruel and unusual punishment," "inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials." *Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir. 1993) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In the context of an inmate's excessive force claim, the core inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 302-21 (1986)). To assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) an objective component focusing "on the harm done in light of contemporary standards of decency," and (2) a subjective component showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. at 8 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

**\*9** With respect to the objective component, the inmate must establish that the conduct alleged is "sufficiently serious" to reach constitutional dimensions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This inquiry is "context specific, turning upon contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d at 263. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident." *Hudson v. McMillian*, 503 U.S. at 9 (citation omitted). Nonetheless, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The Eighth Amendment's prohibition of 'cruel and unusual punishment' necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to a conscience of mankind.' " *Id.* at 9-10 (quoting *Whitley v. Albers*, 475 U.S. at 327). In this regard, "[t]he extent of injury may ... provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." *Id.* at 38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7.

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 87 of 329

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

To determine whether defendants acted maliciously or wantonly at the subjective prong, a court must consider:

> the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Romano v. Howarth*, 998 F.2d 101 at 105 (citing *Hudson v. McMillian*, 503 U.S. at 7). As stated by the Second Circuit, "*Hudson* simply makes clear that excessive force is defined as force not applied in a 'good faith effort to maintain or restore discipline.' " *Blyden v. Mancusi*, 186 F.3d at 263 (quoting *Hudson v. McMillian*, 503 U.S. at 7).

In this case, Plaintiff asserts excessive force claims arising out of the May 27, 2010 and June 13, 2010 incidents. On both occasions, Plaintiff alleges that he was "repeatedly" punched, without provocation, in his head, back, and sides. *See* Am. Compl. at ¶¶ 21 & 30. The basis of Defendants' Motion is that (1) under *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), no reasonable jury could credit Plaintiff's version of events and (2) Plaintiff's medical records establish that he suffered only minor injuries and therefore, Defendants, at most, applied *de minimis* force. Defs.' Mem. of Law at pp. 10-13. For the reasons stated below, the Court recommends that Defendants' Motion be **denied**.

Defendants argue that Plaintiff's allegations are not credible because: (1) he did not seek medical attention immediately following the May 27 incident; (2) he did not mention an assault when he was seen at sick call on May 28, June 1, and June 7, but instead claimed that he had fallen down stairs; (3) he did not request medical attention immediately following the June 13 incident and was not seen in sick call until June 24, and he again did not report that he had been assaulted; (4) Plaintiff testified at the Tier II Disciplinary Hearing for the May 27 misbehavior report but did not mention the assault; and (5) the IG's investigation of Plaintiff's allegations found that they could not be proven. *Id.* Defendants rely on *Jeffreys*, where the Second Circuit held that "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff' ... without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d at 554 (citation omitted).

The Court does not agree that the "rare circumstance" described in *Jeffreys* applies here. Although it is correct that Plaintiff's claims are almost exclusively based on his own allegations in his verified Amended Complaint, in order for *Jeffreys* to apply, Plaintiff's accounts must be "contradictory and incomplete." *Id.* at 554. In *Jeffreys*, for example, the plaintiff claimed that several police officers had beaten him and thrown him from a third story window. *Id.* at 551. However, before he filed his federal action, he had confessed on at least three occasions that he had jumped out of the window. *Id.* at 552. Furthermore, he was unable to identify or even describe any of the officers who allegedly participated in the attack. *Id.* Here, by contrast, Plaintiff's account of the events has been entirely consistent; there are no significant discrepancies between the allegations in the verified Amended Complaint and Plaintiff's claims in his grievances and other complaint letters. *Compare* Am. Compl. at ¶¶ 15-35 *with* McMahon Decl., Ex. D, at pp. DEF000492-493, DEF000498, DEF000511-512, & DEF000533-536. Defendants do not identify any contradictory account or explain how Plaintiff's account is incomplete.

**\*10** Instead of pointing to any inconsistencies in Plaintiff's account, Defendants focus on evidence in the record that undermines Plaintiff's account—namely, the minimal medical evidence. However, the "narrow exception" in *Jeffreys* applies where the plaintiff's account is "so lacking in credibility that no reasonable juror could find for the plaintiff." *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007). Although the minimal medical evidence may tend to undercut Plaintiff's credibility, it does not render it so thoroughly unbelievable that the Court should reject it as a matter of law. Defendants ignore certain allegations and record evidence that the Court must consider in viewing the evidence in the light most favorable to Plaintiff. First, Plaintiff claims that he was threatened not to report the assaults and was accompanied by a corrections officer to sick call. Am. Compl. at ¶¶ 24-26 & 35. He alleges that he reported

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 88 of 329

that he injured himself falling down the stairs in order to avoid retaliation. *Id.* at ¶ 26. Second, Plaintiff's medical records show that he reported pain in his ribs, consistent with his allegations of the assaults, for several weeks. *See* Hale Decl., Ex. C at pp. DEF000627-628 & DEF000633. Plaintiff also received x-rays of his ribs on May 28, 2010, *id.* at p. DEF000624, although he claims that the x-rays were of the wrong area, *id.* at p. DEF000611. Thus, the medical records provide some corroboration for Plaintiff's version of the events. Furthermore, even in the absence of medical evidence, "[c]ourts in this district have not required that injuries caused by the alleged use of excessive force be corroborated by medical records." *Ninortey v. Shova*, 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008).

Considering all of the evidence, [8] the Court finds that Plaintiff's account of the events is not so implausible that it may be rejected as a matter of law. The evidence pointed to by Defendants essentially goes to Plaintiff's credibility, and "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

Defendants next argue that even if the Court accepts Plaintiff's allegations at true, his medical records establish that he suffered, at most, minor and temporary injuries and therefore any forced applied was necessarily *de minimis*. Defs.' Mem. of Law at pp. 13-14. Defendants' contention fails because while "[t]he extent of injury may ... provide some indication of the amount of force applied ... it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. at 37-38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7. Here, Plaintiff's alleges more than a *de minimis* application of force: namely, that Defendants "repeatedly" punched him in his head, ribs, and back in order to cause him harm on two occasions. Am. Compl. at ¶¶ 22 & 30-31. Plaintiff's medical records document that he complained of pain in his ribs consistent with his excessive force allegations for several weeks following the assaults. The medical records do not disclose injuries that are so minor that the Court can conclude that Defendants applied *de minimis* force.

Accordingly, for the foregoing reasons, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's excessive force claims be **denied**.

## E. Whether Summary Judgment is Appropriate on Plaintiff's Retaliation Claim

Defendants also move for summary judgment on Plaintiff's retaliation claim against Defendants Sgt. Durkin and C.O. Mitchell. To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). Briefly stated, Plaintiff's retaliation claim is that (1) he engaged in a protected conduct by sending a complaint letter to the IG's office and (2) after Sgt. Durkin obtained a copy of the letter, he and C.O. Mitchell assaulted Plaintiff. *See* Am. Compl. at ¶¶ 29-35. Defendants argue that summary judgment is appropriate on Plaintiff's retaliation claim on the same ground that they argued for summary judgment on his excessive force claim: that is, "no reasonable jury could conclude that Plaintiff was subjected to the adverse action." Defs.' Mem. of Law at p. 15. Since the Court has found a disputed issue of fact on whether Plaintiff was subjected to excessive force, the Court therefore recommends that Defendants' Motion also be **denied** as to Plaintiff's retaliation claim.

## III. PLAINTIFF'S MEDICAL INDIFFERENCE CLAIMS

### A. Legal Standard

**\*11** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06).

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 89 of 329

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

## B. Analysis

**\*12** The basis of Plaintiff's Eighth Amendment claims against Defendants Dr. Ramineni and Dr. Mannava is that he was denied adequate medical treatment for his complaints of headaches, fungus on his hands and feet, sinus problems, abdominal pain, back pain, left shoulder pain, right elbow pain, high cholesterol, and a wart on his right finger. Am. Compl. at ¶¶ 96 & 111-17. The record, however, documents that Plaintiff received extensive treatment for his medical conditions. Between July 16, 2010 and June 14, 2013, Plaintiff was seen by medical personnel at Mid-State approximately 250 times. Defs.' SMF at ¶ 55. Based on the voluminous medical records provided by Defendants, and for the reasons set forth below, the Court recommends that summary judgment be **granted** on Plaintiff's deliberate medical indifference claims.

### 1. Shoulder Pain

Plaintiff repeatedly complained of left shoulder pain, which was incident to acromioplasty surgery that he had five years earlier. *See* Ramineni Decl. at ¶ 22 (citing dates on which Plaintiff complained of shoulder pain at pp. DEF000362, DEF000365, DEF000366, DEF000390, DEF000391, DEF000392, DEF000393, DEF000394, DEF000396, DEF000397, DEF000434, DEF000436, and DEF000438). "[C]hronic pain can be a serious medical condition." *Price v. Reilly*, 697 F. Supp. 2d 344, 363

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 90 of 329

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

(E.D.N.Y. 2010) (citing *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003)). Furthermore, courts have found allegations of "severe pain" and "reduced mobility" in the shoulder sufficient to raise issues of fact as to whether a "shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard." *Sereika v. Patel*, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006). However, based on its review of the record, the Court finds that there is nothing that suggests that Plaintiff's shoulder injury was a sufficiently serious condition to satisfy the objective prong of the Eighth Amendment analysis. Even if Plaintiff was able to show that his shoulder injury was sufficiently serious, he is also unable to show that Defendants deprived him of adequate care in response to his complaints of shoulder pain.

Despite Plaintiff's complaints of pain, on examination Plaintiff did not have an "obvious deformity" or "muscle wasting", *id.* at p. DEF000394 and was noted to have a good range of motion in his shoulder, *id.* at p. DEF000378. For treatment, Dr. Ramineni prescribed Motrin 600mg three times daily and referred Plaintiff to physical therapy. Pl.'s AHR at p. DEF000397. In his evaluation for physical therapy, Plaintiff's physical therapist assessed him with "residual [rotator cuff] weakness from old injury" and "possible AC [joint] separation." Pl.'s AHR at p. DEF000438. The physical therapist opined that Plaintiff did not have "much potential for significant improvement" due to "heavy muscle build and workout lifestyle." *Id.* at p. DEF000438. Plaintiff attended two sessions of physical therapy, but did not tolerate the exercises and reported increasing pain. *Id.* at pp. DEF000433-434. Although he did not the tolerate physical therapy, *id.* at p. DEF000433, Plaintiff continued to lift weights throughout the relevant time period on a daily basis, *see id.* at pp. DEF000378, DEF000392, & DEF000438. Dr. Ramineni determined that there was no indication to refer Plaintiff to an orthopedic specialist. *See id.* at pp. DEF000390 & DEF000394. Throughout Plaintiff's complaints, Dr. Ramineni "found nothing other than discomfort arising from earlier surgery or resulting from his continued weight lifting." Ramineni Decl. at ¶ 31. Dr. Ramineni attests that shoulder pain is common following acromioplasty surgery. *Id.* at ¶ 23.

Here, even viewed in the light most favorable to Plaintiff, the record does not suggest that Plaintiff's shoulder injury was "a condition of urgency that [could] result in

degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. The record documents that Plaintiff retained a normal range of motion in his shoulder and was able to lift weights on a daily basis. There is no evidence that Plaintiff suffered "severe pain." Dr. Ramineni determined that Plaintiff was experiencing normal discomfort incident to acromioplasty surgery. Under the objective prong, "an assertion of pain sensation alone, unaccompanied by any large medical complications, does not amount to a serious medical need." *Evan v. Manos*, 336 F. Supp. 2d 255, 260 (W.D.N.Y. 2004) (citation omitted). Furthermore, even if Plaintiff's shoulder pain was a serious medical need, the record establishes that the treatment Defendants provided him—over-the-counter pain medication and a referral to physical therapy—was adequate. Plaintiff's claim that he should have been referred to an orthopedic specialist, *see* Am. Compl. at ¶ 112, is insufficient to establish that Defendants acted with deliberate indifference. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *See Chance v. Armstrong*, 143 F.3d at 703; *see also Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.").

**\*13** The record also contains complaints of an injury Plaintiff sustained to his right shoulder lifting weights. Pl.'s AHR at p. DEF000366. Dr. Ramineni determined that it was a muscle strain and x-rays were taken that showed minor degenerative changes in Plaintiff's acromioclavicular joint. *Id.* at pp. DEF000317 & DEF000365. A month after the injury, Plaintiff was noted to be in no significant discomfort. *Id.* at p. DEF000362. Based on this record, there is nothing that suggests that Plaintiff's injury to his right shoulder was a sufficiently serious injury.

*2. Sinusitis*

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 91 of 329

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Plaintiff repeatedly complained of nasal and sinus congestion, which caused difficulty breathing, pain, and bleeding. *See* Ramineni Decl. at ¶ 45 (citing dates on which Plaintiff complained of sinus problems at Pl.'s AHR at pp. DEF000292, DEF000370, DEF000371, DEF000380, DEF000385, & DEF000394); Mannava Decl. at ¶¶ 16, 22, & 28. Plaintiff had sinus surgery in the past and Dr. Ramineni observed that Plaintiff had thickening of the sinus lining on a past x-ray. Pl.'s AHR at p. DEF000394.

Plaintiff's medical records establish that he cannot show that his sinus problems were a serious medical need or that he was deprived of adequate care. Throughout his incarceration at Mid-State, Plaintiff was provided with over-the-counter NACL nasal spray and prescriptions for Nasacort AQ and Claritin for sinus irritation and allergies. Ramineni Decl. at ¶¶ 13 & 43; Mannava Decl. at ¶ 16. On occasions when he complained of sinus infections, Plaintiff was prescribed Augmentin 875mg twice daily. Pl.'s AHR at pp. DEF000292 and DEF000394. Plaintiff was examined for complaints of difficulty breathing, but his nasal passages were found to be normal and without inflammation. *Id.* at pp. DEF000380 & DEF000385. Plaintiff also once claimed that he was bleeding from his nose, but Dr. Ramineni did not observe any blood or yellow discharge. *Id.* at p. DEF000380. On August 9, 2011, x-rays were taken that showed no evidence of sinusitis; Plaintiff had some post-surgical changes in the mandible, some soft tissue swelling over the nasal region, but no convincing air fluid level indicative of sinusitis. *Id.* at p. DEF000319.

Even viewed in the light most favorable to Plaintiff, Plaintiff's nasal congestion does not amount to a condition that could "result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. Furthermore, the record demonstrates that Defendants appropriately responded to Plaintiff's complaints of sinus problems, providing over-the-counter nasal sprays, prescription allergy medication, antibiotics for sinus infections, and referring him for x-rays. Plaintiff's claim that Defendants should have referred him to an Ear, Nose, and Throat specialist, *see* Am. Compl. at ¶ 113, amounts to a mere dispute over the proper course of treatment and is insufficient to establish that Defendants acted with deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703.

### 3. Headaches

In late 2012, Plaintiff began complaining of headaches and other symptoms that he believed were indicative of a stroke, including numbness, the feeling of "pins and needles" in his left arm, pain in his left biceps extending to his armpit and chest, and slowness of gait and confusion. *See* Pl.'s AHR at p. DEF000282. In his Amended Complaint, Plaintiff alleges that his headaches were "severe," occurred "almost daily," and interfered with his daily activities. Am. Compl. at ¶¶ 77, 90, & 100.

Contrary to Plaintiff's claims that Defendants ignored a possible stroke, the record shows that Defendants evaluated Plaintiff's symptoms and found no symptoms indicative of a stroke. Plaintiff first expressed that he thought he suffered a stroke on September 12, 2012. Pl.'s AHR at p. DEF000285. He stated that he had a headache for four days and his arm felt "weird and trembly" *Id.* The nurse noted that Plaintiff did not appear to be in acute distress, had a normal gait, spoke clearly, and had actively been going to the law library and gym. *Id.* Plaintiff saw Dr. Ramineni two days later, who noted that Plaintiff had a normal gait and was fully oriented. *Id.* Dr. Ramineni found no evidence that Plaintiff had suffered a stroke or that he was at an elevated risk of suffering one. Ramineni Decl. at ¶ 73. Plaintiff raised similar complaints to Dr. Mannava three months later, who similarly found no symptoms indicative of a stroke. Mannava Decl. at ¶¶ 21 & 24. Specifically, Plaintiff denied nausea, vomiting, burning, tingling, and weakness in his extremities; was alert and fully oriented; had no tenderness or masses on his head; his pupils equally reacted to light; he could move his extremities well with good strength; and had no sensory or motor deficits. *Id.* at ¶ 21. Dr. Mannava ordered blood tests, which came back normal. *Id.* at ¶¶ 21-22. With respect to his numbness in his left arm, an electromyogram was completed on November 28, 2012, which showed mild C7 radiculopathy, chronic C5 radiculopathy, and early, mild neuropathy of the median nerve. *Id.* at ¶ 20. Thus, Plaintiff's concern that he had suffered a stroke was unfounded and provides no basis for an Eighth Amendment claim.

**\*14** As to Plaintiff's headaches, the record contains numerous complaints of chronic and severe headaches beginning in September 2012. *See generally* Pl.'s AHR at pp. DEF000252-285. Painful and debilitating headaches

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 92 of 329

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

may constitute an objectively serious medical need. *See Peterson v. Miller*, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007). However, even assuming for the purposes of this Motion that Plaintiff's headaches were a sufficiently serious condition, Plaintiff is unable to show that Defendants denied him adequate treatment. Based on his assessment that Plaintiff's headaches were either tension headaches or psychogenic, Dr. Mannava directed Plaintiff to take ibuprofen for his headaches. Mannava Decl. at ¶¶ 14, 21-22, 25, & 29. Dr. Mannava also referred Plaintiff for an eye exam as a result of which new glasses were ordered. Pl.'s AHR at pp. DEF000257 & DEF000265. The record therefore demonstrates that Defendants reasonably responded to Plaintiff's complaints of headaches. *See Peterson v. Miller*, 2007 WL 2071743, at *10 (finding that migraine headaches were appropriately treated with pain relief medication). To the extent that Plaintiff claims that Defendants should have prescribed a stronger pain medication or ordered a CT scan, "disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment." *Wright v. Genovese*, 694 F. Supp. 2d 137, 155 (N.D.N.Y. Mar. 9, 2010).

### 4. Fungus

Plaintiff complains of a fungal infection that spread along his right hand and on his toe nails. Am. Compl. at ¶¶ 94 & 106. Plaintiff claims that the infection "consumed" a fingernail and caused his fingers to bleed. *Id.* Plaintiff claims the fungus caused him severe pain and exposed him to the risk of other infections. *Id.* at ¶ 111. The medical records contradict Plaintiff's claims that his fungal infection was a serious medical condition, and further demonstrate that Defendants provided adequate treatment and were not deliberately indifferent towards the condition.

Plaintiff complained twice to Dr. Ramineni of a fungal infection on his toenail, but on examination, Dr. Ramineni determined that it was a dystrophic nail, and no intervention was necessary. Pl.'s AHR at pp. DEF000306 & DEF000400. Plaintiff also complained of fungus on his fingernails and was given an over-the-counter fungal cream. *Id.* at p. DEF000305. Plaintiff complained to Dr. Mannava of "scaling and pimply" skin on his feet and

right hand and deformed toenails and a right finger nail. *Id.* at p. DEF000279. Dr. Mannava assessed Plaintiff with onychomycosis and athlete's foot, but referred him for a dermatology consult before determining a treatment plan. *Id.* The dermatology consult confirmed the diagnoses of dystrophic finger and toenails and onychomycosis. *Id.* at p. DEF000271. Dr. Mannava put in a request for a prescription for Lamisil 250mg daily, but the request was denied because the treatment was considered "cosmetic." *Id.* at pp. DEF000268 & DEF000271. Plaintiff continued to complain that the fungus on his hands was spreading, but no changes were observed. *Id.* at pp. DEF000254 & DEF000264. A nurse noted that Plaintiff was complaining about the "same small areas" that he had previously complained of, and that the condition was neither "acute" or "consuming." *Id.* at p. DEF000264. Later, a nurse noted peeling skin on Plaintiff's palm, but no fungus. *Id.* at p. DEF000254.

Based on these records, there is nothing that suggests that Plaintiff's fungal infections were an objectively serious medical need. *See Thompson v. Carlsen*, 2010 WL 3584409, at *6 (N.D.N.Y. Aug. 16, 2010) (finding that "dry, cracked, and itchy skin" did not amount to an objectively serious medical condition); *Scott v. Laux*, 2008 WL 4371778, at *5 (N.D.N.Y. Sept. 18, 2008) ("Fungal infections of the feet have not been found to constitute serious medical needs in federal court."). Furthermore, the records evidence that Defendants provided appropriate treatment and were not deliberately indifferent towards Plaintiff's fungal infections.

### 5. Abdominal Pain

Plaintiff made repeated complaints of right abdominal pain. Pl.'s AHR at pp. DEF000380, DEF000389, DEF000390, DEF000395, DEF000400, & DEF000402. On different occasions, Plaintiff expressed concern that the pain indicated problems with his liver, pancreas, and gall bladder. *Id.*

**\*15** However, the record shows that Plaintiff's concern about his abdominal pain was unfounded. On repeated examinations, Plaintiff's abdomen was soft, non-tender, and without any masses. *Id.* at pp. DEF000380, DEF000390, DEF000400, & DEF000402. Plaintiff had multiple negative liver function tests and a negative Hepatitis C test. *Id.* at pp. DEF000390 & DEF000389.

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 93 of 329

Thus, there was no objective evidence to support Plaintiff's complaints of abdominal pain. *See* Ramineni Decl. at ¶ 42. In January 2011, after Plaintiff made undocumented complaints of vomiting and doubling over in pain, Pl.'s AHR at p. DEF000389, he was admitted to the infirmary for observation for one week, during which time he was not observed to have any episodes of abdominal pain, vomiting, or nausea, *id.* at p. DEF000346. On this record, there is nothing indicating that Plaintiff's abdominal pain was an objectively serious medical condition. *See Thomas v. Nassau Cty. Correctional Ctr.*, 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003) ("[S]ubjective complaints of pain are not sufficient to satisfy [the objective prong]."). Furthermore, Plaintiff cannot show that Defendants failed to adequately respond to his complaints, as they conducted physical examinations and ordered Hepatitis C and liver function tests.

### 6. Right Elbow Pain

Throughout the Summer of 2012, Plaintiff complained of pain in his right elbow, which he believed to be bursitis. Pl.'s AHR at pp. DEF000288, DEF000290, DEF000293, DEF000297, DEF000298, & DEF000299. Plaintiff repeatedly requested that his elbow be drained or that he receive a cortisone shot, and, on August 17, 2012, requested surgery. *Id.* at pp. DEF000288 & DEF000297.

The record again does not evidence that Plaintiff's elbow pain was an objectively serious medical condition, or that Defendants failed to adequately respond to his complaints. During his examinations, Dr. Ramineni observed that Plaintiff's elbow moved normally and without discomfort and that there was no bursal swelling. Ramineni Decl. at ¶ 56. His assessment was that Plaintiff had mild musculoskeletal pain. Pl.'s AHR at p. DEF000298. He found no indication for intervention since there was no evidence of bursitis. *Id.* at p. DEF000297. He did, however, note a small bony projection on Plaintiff's elbow and ordered x-rays. *Id.* at pp. DEF000290 & DEF000297. The x-rays showed a small spur on the olecranon that Dr. Ramineni determined was clinically insignificant. *Id.* at p. DEF000298. Dr. Ramineni recommended that Plaintiff use an elbow brace if he continued to experience pain. *Id.* Thus, there is nothing in the record that demonstrates that Plaintiff's elbow pain was a condition that could result

in "degeneration or extreme pain." Nor does the record suggest that Defendants failed to appropriately respond to Plaintiff's complaints.

### 7. Plaintiff's Remaining Medical Conditions

In his Amended Complaint, Plaintiff also complains of back pain, a wart on his finger, and high cholesterol. However, a review of the record shows that none of these conditions amounted to an objectively serious medical condition.

Plaintiff complained to Dr. Ramineni of his back pain on a single occasion; Dr. Ramineni noted that x-rays of Plaintiff's spine showed minimal changes, that Plaintiff's gait was normal, and that there was no tingling in Plaintiff's legs. Pl.'s AHR at p. DEF000402. Dr. Ramineni recommended that Plaintiff take NSAIDs as needed and complete back exercises to strengthen the area. *Id.* While severe back pain can amount to a serious medical need, nothing in the record suggests that Plaintiff's back caused him extreme pain. *See Nelson v. Rodas*, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002).

Plaintiff's complaints of a wart on his finger are similarly insufficient. Plaintiff complained of a wart on his right index finger on several occasions. Pl.'s AHR at pp. DEF000293, DEF000300, DEF000301, DEF000310, DEF000357, & DEF000359. Dr. Ramineni observed a pinhead sized wart, which did not have the characteristics of a true wart. *Id.* at pp. DEF000357 & DEF000359. He prescribed Plaintiff Condylox gel for treatment. *Id.* at pp. DEF000301 & DEF000357. The record does not suggest that Plaintiff's wart was a serious medical condition. *See Whitfeld v. O'Connell*, 2010 WL 1010060, at *8 (S.D.N.Y. Mar. 18, 2010) ("Warts do not constitute a serious medical need under the Eighth Amendment.").

**\*16** Finally, as to Plaintiff's high cholesterol, it is undisputed that Plaintiff's prescriptions for Lipitor 60mg and Lopid 600mg twice daily were continued when he arrived at Mid-State. Ramineni Decl. at ¶ 13. Lab work was ordered on July 28, 2010, in order that Plaintiff's medications could be adjusted if he was not within the target cholesterol range. Pl.'s AHR at p. DEF000403. On July 14, 2011, Dr. Ramineni noted that results of Plaintiff's cholesterol lab work and ordered that Plaintiff's Lipitor be increased and that Plaintiff be placed on a low

2017 WL 1215814

cholesterol diet. *See id.* at pp. DEF000365, DEF000370, & DEF000374. Thus, Plaintiff's high cholesterol is insufficient to give rise to an Eighth Amendment claim.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 190) be **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Defendants Dr. Ramineni and Dr. Mannava who should be dismissed as Defendants to this action; and **GRANTED** as to the Doe Defendants who should also be dismissed as Defendants to this action; and **DENIED** in all other respects; and it is further

**RECOMMENDED**, that if the Court's recommendations are accepted, that this matter be deemed trial ready and

an exhaustion hearing should be scheduled prior to such trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1215814

Footnotes

1    Defendants' Motion papers do not include affidavits of the correctional officer Defendants, but rather contain unsworn statements taken during investigation of Plaintiff's allegations. *See* Dkt. No. 190-5, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. D, at pp. DEF000473-486.
2    Exhibit A to the McMahon Declaration is at Docket Number 190-2.
3    Exhibit B to the McMahon Declaration is at Docket Number 190-3.
4    Exhibit D to the McMahon Declaration is at Docket Numbers 190-5, 190-6, 190-7, and 190-8.
5    These photographs are not in the record.
6    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir. 1999). Defendants properly raised the affirmative defense in their Answer. *See* Dkt. Nos. 143 at ¶ 14 & 170 at ¶ 14.
7    The Circuit recognized that *Ross* "supplant[ed]" the inquiry which had been set forth in *Hemphill v. New York,* 380 F.3d 680 (2d Cir. 2004), excusing the failure to exhaust when: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange,* 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York,* 380 F.3d at 686).
8    The Court again notes that Defendants have not offered affidavits from any of the officers accused of using excessive force contradicting Plaintiff's version of events. The only evidence offered by Defendants are unsworn statements. McMahon Decl., Ex. D at pp. DEF000473-486. Under *Jeffreys,* the defendant "still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys v. City of New York,* 426 F.3d at 554.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1207834

2017 WL 1207834
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Barry BERMAN, Plaintiff,
v.
Charles DURKIN, et al., Defendants.

9:13-CV-0136 (LEK/DJS)
|
Signed 03/31/2017

**Attorneys and Law Firms**

Barry Berman, Rochester, NY, pro se.

Joshua E. McMahon, Maria E. Lisi-Murray, New York State Attorney General, Albany, NY, for Defendants.

## ORDER

Lawrence E. Kahn, U.S. District Judge

**\*1** This matter comes before the Court following a Report-Recommendation filed on March 10, 2017, by the Honorable Daniel J. Stewart, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 200 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07, 306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25,

2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

No objections were filed in the allotted time period. Docket. Thus, the Court has reviewed the Report-Recommendation for clear error and has found none.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 200) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 190) is **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against defendants Dr. Ramineni and Dr. Mannava and as to the claims against the Doe Defendants, and **DENIED** in all other respects; and it is further

**ORDERED**, that the Clerk of the Court terminate Dr. Ramineni, Dr. Mannava, and the Doe Defendants from this action; and it is further

**ORDERED**, that this matter is trial ready and an exhaustion hearing conducted by the magistrate judge shall be held before trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1207834

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    1

Boose v. Schneider, Not Reported in Fed. Supp. (2016)
2016 WL 8732644

2016 WL 8732644
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Cornell BOOSE, [1] Plaintiff,
v.
Claude SCHNEIDER, [2] Defendant.

Civil Action No. 9:14-CV-0518 (MAD/DEP)
|
Signed 02/19/2016

**Attorneys and Law Firms**

Cornell Boose, 12-A-3355, Southport Correctional Facility, P.O. Box 2000, Pine City, NY 14871, Pro Se.

FOR DEFENDANT: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General,The Capitol, OF COUNSEL: JOHN F. MOORE, ESQ., Assistant Attorney General, Albany, NY 12224.

**REPORT AND RECOMMENDATION**

David E. Peebles, U.S. Magistrate Judge

**\*1** This is an action originally brought by *pro se* plaintiff Cornell Boose against three individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983, alleging the deprivation of his civil rights. While plaintiff's complaint originally included additional claims and named two other defendants, the only remaining cause of action is a procedural due process claim asserted against Claude Schneider, a Plant Superintendent employed by the DOCCS and stationed at the Clinton Correctional Facility ("Clinton"), where plaintiff was confined at the relevant times.

Currently pending before the court is a motion brought by defendant Schneider seeking the entry of summary judgment dismissing plaintiff's remaining claim. In support of that motion, defendant argues that the record now before the court does not support a reasonable factfinder's conclusion that plaintiff's procedural due process rights were violated during the underlying disciplinary hearing, and that, in any event, he is entitled

to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted.

I. BACKGROUND [3]
Plaintiff is a prison inmate currently in the custody of the DOCCS. *See generally* Dkt. No. 1. Although he is now incarcerated elsewhere, at the times relevant to this action, plaintiff was confined in Clinton, located in Dannemora, New York. *Id.*; Dkt. No. 28.

On February 4 or 5, 2013, plaintiff was issued a misbehavior report authored by Corrections Sergeant M. Giambruno alleging that plaintiff set a fire in the cube of a fellow inmate, identified as "Vandiver," [4] in the early morning hours of February 4, 2013. Dkt. No. 1 at 4; Dkt. No. 24-3 at 46. According to Corrections Sergeant Giambruno, he believed plaintiff set the fire based on statements given to him by confidential informants during his investigation into the matter. Dkt. No. 1 at 4; Dkt. No. 24-3 at 46; Dkt. No. 24-4 at 47. The misbehavior report charged plaintiff with assault and arson. Dkt. No. 23-4 at 46; Dkt. No. 24-4 at 36.

A disciplinary hearing was convened by defendant Schneider in connection with the misbehavior report beginning on February 11, 2013. Dkt. No. 24-4 at 35. At the outset of the hearing, defendant Schneider confirmed that plaintiff received the misbehavior report, and that plaintiff met with his inmate assistant prior to the hearing. *Id.* at 27, 36. Defendant then read the misbehavior report into the disciplinary hearing record, and plaintiff entered not-guilty pleas to both of the charges. *Id.* at 36. Before taking plaintiff's statement, defendant Schneider acknowledged plaintiff's requests for additional documents generated in connection with the investigation of the arson, including "the Unusual Incident Reports, To/From Reports, ... Medical Reports ..., [and] the Confidential Informant Reports." *Id.* at 37. While defendant Schneider explained to plaintiff that he would not be permitted access to either the confidential informant reports "because the names [of the informants] are listed on there" or the medical reports of inmate Vandiver because of the Health Insurance Portability and Accountability Act ("HIPAA"), he did provide plaintiff with a redacted copy of the unusual incident report and allowed plaintiff to question Corrections Sergeant Giambruno at the hearing. *Id.* at 38, 42-53.

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 8732644

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 97 of 329

**\*2** During the hearing, plaintiff testified in his own defense, denying the allegations that he set the fire to inmate Vandiver's bed, and insisting that he had no motive to assault or otherwise harass the victim. Dkt. No. 24-4 at 39. In addition, while defendant Schneider received testimony from inmate Vandiver outside the presence of plaintiff, plaintiff was permitted to read Vandiver's statement, which indicated that he did not know who set the fire. Id. at 33.

Three inmates testified on plaintiff's behalf at the hearing, generally serving as character witnesses for him and testifying that they had no reason to believe that plaintiff would have set the fire. Dkt. No. 24-4 at 53-58. Defendant Schneider denied plaintiff's request to have the corrections officer who was on duty in the area on the night of the fire, Corrections Officer Herbst, testify because he believed the testimony Herbst would have to offer was not relevant or necessary. Id. at 59-61; see also Dkt. No. 24-6 at 5. He also declined to permit plaintiff to call inmate Vandiver as a witness because he allowed plaintiff to read inmate Vandiver's statement reflecting that inmate Vandiver did not accuse plaintiff of setting the fire. Dkt. No. 24-4 at 58; Dkt. No. 24-6 at 5.

Following the conclusion of the disciplinary hearing, defendant Schneider found plaintiff guilty of the two charges contained in the misbehavior report, issued a written decision, and imposed sanctions that included twelve months of confinement in the facility's special housing unit ("SHU"), with a corresponding loss of privileges and recommended loss of good-time credits, and a requirement that plaintiff make restitution in the amount of $87.15. Dkt. No. 24-4 at 30-31, 63. Plaintiff's subsequent appeals of defendant Schneider's decision were denied by the Clinton Superintendent and the DOCCS Director of the Special Housing/Inmate Disciplinary Program. Dkt. No. 24-3 at 63, 108.

Plaintiff filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules ("Article 78") in Albany Supreme Court challenging defendant's disciplinary hearing determination. Id. at 6-14. On April 17, 2014, following a transfer of the matter to the New York State Supreme Court, Appellate Division, Third Department, id. at 19, 34-35, the Appellate Division issued a memorandum and judgment annulling defendant Schneider's decision based on its finding that there was "a lack of substantial evidence to support the

determination." Id. at 37-38. As a rationale for its decision, the Appellate Division specifically stated the following:

> Hearsay evidence in the form of confidential information may constitute substantial evidence to support a determination of guilt if it is sufficiently detailed to allow the Hearing Officer to independently assess its reliability and credibility. Here, the misbehavior report alleged that the authoring correction sergeant received information from several sources identifying petitioner as the culprit. However, the record contains no details of the confidential information allegedly implicating petitioner, and the confidential testimony relied upon by the Hearing Officer does not identify petitioner as the individual who started the fire. Significantly, the author of the misbehavior report did not testify as to what confidential information he was provided. In view of the absence of this information from the record, the Hearing Officer was unable to independently assess the reliability and credibility of the confidential information, as he was required to do.

**\*3** Id. at 38 (citations omitted). As a result of the Appellate Division's decision, defendant Schneider's decision was reversed and expunged from plaintiff's disciplinary record, and plaintiff's twelve months of good-time credit was restored. Dkt. No. 24-3 at 6; Dkt. No. 24-5 at 25. According to the plaintiff, he remained in SHU confinement as a result of the defendant's determination for a little less than one full year. Dkt. No. 24-5 at 55.

Plaintiff contends that, during the disciplinary hearing, defendant Schneider (1) was biased, Dkt. No. 1 at 4; (2) should have permitted him to call inmate Vandiver and Corrections Officer Herbst as witnesses at the

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 8732644

hearing, Dkt. No. 24-5 at 32-33, Dkt. No. 27 at 9; and (3) improperly withheld evidence generated during the investigation of the underlying arson from plaintiff during the hearing, *id.*

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on May 5, 2014, by the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 5. Plaintiff's complaint named Hearing Officer Schneider, Corrections Sergeant Giambruno, and a "John Doe" identified as the superintendent at Clinton as defendants. *Id.*

On November 3, 2014, District Judge Mae A. D'Agostino issued a decision and order, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, granting plaintiff's IFP application and dismissing all of the claims asserted against the named defendants, with the exception of plaintiff's due process cause of action against defendant Schneider. Dkt. No. 11.

Following the close of discovery, defendant Schneider filed the currently pending motion for summary judgment on August 24, 2015. Dkt. No. 24. Plaintiff has since responded in opposition to the motion, and defendant has filed a reply memorandum. Dkt. Nos. 27, 29. The motion is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Procedural Due Process Claim

**\*4** Plaintiff asserts a Fourteenth Amendment procedural due process claim against defendant Schneider based on allegations that Schneider was a biased hearing officer, failed to permit him access to certain documents generated during the investigation of the underlying arson, and improperly rejected his requests to call certain witnesses at his disciplinary hearing. Dkt. No. 1 at 4; Dkt. No. 24-5 at 24, 33, 48, 53-54.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 99 of 329

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 8732644

## 1. Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose upon an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[5] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison

to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

**\*5** In this instance, plaintiff alleges that, as a result of defendant Schneider's decision following the disciplinary hearing, he was held in disciplinary confinement for nearly one full year. Dkt. No. 24-5 at 55. Defendants do not dispute this fact. Because the Second Circuit has held that SHU confinement for 305 days is sufficient to satisfy this element of a procedural due process claim, and defendant appears to have conceded this point for purposes of the instant motion, Dkt. No. 24-8 at 5, I recommend a finding that plaintiff has satisfied this element and will turn to whether the record contains a genuine dispute of material fact with respect to the safeguards provided to him during his disciplinary hearing. *Colon*, 215 F.3d at 231.

## 2. Procedural Safeguards

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 100 of 329

2016 WL 8732644

evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

Here, plaintiff contends that his due process rights were violated because defendant Schneider (1) was biased, (2) failed to permit him to examine certain documents generated in connection with the investigation of the arson, and (3) denied his requests to call two witnesses at the hearing. I will address each contention separately below.

### i. Bias

The due process clause of the Fourteenth Amendment guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455); *see also Francis v. Coughlin*, 891 F.2d 43, 45 (2d Cir. 1989) (responding to the plaintiff's allegations that the hearing officer's bias allowed for "*no* chance to prevail at the [disciplinary] hearing" by concluding that "it is axiomatic that a prison disciplinary hearing in which the result is arbitrarily and adversely predetermined violates [an inmate's] right [to be free from arbitrary governmental action]" (emphasis in original)).

**\*6** Here, there is no record evidence from which a reasonable factfinder could conclude that defendant Schneider was biased against plaintiff or that he predetermined the outcome of the disciplinary hearing. As the hearing transcript reflects, defendant Schneider heard testimony from plaintiff, Corrections Sergeant Giambruno, and three inmates requested by plaintiff. *See*

Dkt. No. 24-4 at 35-64. In addition, defendant allowed plaintiff to ask Corrections Sergeant Giambruno several questions and asked a question of his own that was aimed at determining the credibility of the confidential informants on whose information Giambruno relied in accusing plaintiff of the underlying assault and arson. *Id.* at 46-53. Although defendant Schneider did not permit plaintiff access to certain documents or allow him to call certain witnesses, there is no record evidence to suggest that he did so out of bias towards plaintiff. Instead, defendant Schneider explained why plaintiff could not be permitted to view inmate Vandiver's medical records or the confidential informants' statements, *id.* at 42-43, and his justification for not calling Corrections Officer Herbst or inmate Vandiver as witnesses at the hearing, *id.* at 58-60. In addition, defendant Schneider relied on the testimony of Corrections Sergeant Giambruno and the statements of the confidential informants when rendering his decision. *Id.* at 31, 63.

Plaintiff's bare assertions with respect to defendant Schneider's bias are unsupported by the record and, accordingly, are insufficient to give rise to a dispute of material fact. *See Francis*, 891 F.2d at 47 ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]").

### ii. Access to Investigatory Documents

Plaintiff complains that his due process rights were violated when defendant Schneider denied him permission to view the unredacted unusual incident report generated following the arson, the victim's medical records, and the statements rendered by the confidential informants. Dkt. No. 27 at 9. While the Second Circuit has "held that, at a minimum, a prisoner is entitled to be confronted with the accusation, informed of the evidence against him ... and afforded a reasonable opportunity to explain his actions," this right can give way to legitimate concerns over institutional safety. *Francis*, 891 F.2d at 47-48 (quotation marks omitted). In this instance, the unredacted unusual incident report and the confidential informants' statements were withheld from plaintiff at the disciplinary hearing in light of legitimate institutional security concerns. In particular, defendant Schneider explained to plaintiff that the redacted portions of

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 101 of 329

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 8732644

the unusual incident report contained either medical information to which plaintiff was not privy based on HIPAA restrictions or confidential information that could expose the identity of the confidential informants to plaintiff. Dkt. No. 24-4 at 33, 37, 42-45. Defendant Schneider further explained to plaintiff that he was not permitted to view inmate Vandiver's medical records based on HIPAA's restrictions on disclosing medical information. *Id.* at 42. Notwithstanding these restrictions on defendant Schneider's ability to disclose to plaintiff the requested materials, he permitted plaintiff to supplement his access to the redacted unusual incident report and other available documentary evidence by questioning Corrections Sergeant Giambruno, who undertook the investigation regarding the arson. *Id.* at 45. Because I find that defendant Schneider's decisions to deny plaintiff access to the unredacted unusual incident report, confidential informants' statements, and inmate Vandiver's medical records were adequately justified by either institutional safety concerns or federal law, I recommend a finding that plaintiff was not denied procedural due process in this regard. *Compare Loret v. Selsky*, 595 F. Supp. 231, 234 (W.D.N.Y. 2009) (denying the entry of summary judgment where the defendant-hearing officer denied the plaintiff's request for a copy of a telephone conversation because the hearing officer conclusorily stated that providing the copy would " 'jeopardize[ ] ... institutional goals and safety' ").

### iii. Denial of Witnesses

Lastly, plaintiff contends that defendant Schneider's denial of his request to call inmate Vandiver and Corrections Officer Herbst as witnesses at the disciplinary hearing violated his due process rights. Dkt. No. 27 at 9. It is well-established that inmates do not have a constitutional right of confrontation in the context of a disciplinary hearing. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). Accordingly, a hearing officer is permitted to take the testimony of a witness outside the presence of an inmate. *Francis*, 891 F.2d at 48. In addition, "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff*, 418 U.S. at 566-67).

*\*7* In this instance, plaintiff sought inmate Vandiver's testimony to verify that he did not accuse plaintiff of setting the fire. Dkt. No. 24-4 at 44, 58. Defendant Schneider, however, declined to call that individual as a witness because plaintiff was provided an opportunity to review inmate Vandiver's statement, which indicated that he did not know who set his bed on fire. *Id.* at 33, 58. Thus, defendant Schneider determined that inmate Vandiver's testimony was unnecessary. *Id.* at 58; *see also* Dkt. No. 24-5 at 53-54.

Turning to Corrections Officer Herbst, plaintiff sought his testimony in order to ask him whether he witnessed the fire and to have him serve as an additional character witness. Dkt. No. 24-4 at 59; Dkt. No. 24-5 at 53-54. In denying plaintiff's request to call Corrections Officer Herbst, defendant Schneider explained that he found Correction Sergeant Giambruno's testimony enlightening with respect to whether Corrections Officer Herbst witnessed the incident and did not need his testimony regarding plaintiff's character as three other witnesses testified as to plaintiff's character. *Id.* at 59-60. In concluding that the testimony of Corrections Officer Herbst would be irrelevant and inmate Vandiver's testimony was not necessary, defendant Schneider acted well within his discretion. *See, e.g., Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) ("[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.").

In sum, for all the reasons discussed above, I recommend a finding that plaintiff's allegations regarding the violation of his due process rights are unfounded, and that no reasonable factfinder could conclude plaintiff was deprived of due process by defendant Schneider during the course of his disciplinary hearing. Accordingly, defendant's motion for summary judgment should be granted.

### IV. SUMMARY AND RECOMMENDATION

Plaintiff contends that he was deprived of procedural due process with respect to a disciplinary hearing that occurred at Clinton in February 2013. The record before the court, however, does not disclose any dispute of material fact regarding the issues raised in plaintiff's remaining claim. Based upon that record, no reasonable factfinder could conclude that defendant Schneider (1) was biased, (2) improperly refused to provide certain documentary evidence to plaintiff, or (3)

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 8732644

improperly denied plaintiff's request to call two witnesses. Accordingly, it is hereby respectfully

RECOMMENDED that defendant Schneider's motion for summary judgment (Dkt. No. 24) be GRANTED and that plaintiff's complaint (Dkt. No. 1) be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8732644

Footnotes

1    In the caption of his complaint, as well as the portion listing the parties to the action, plaintiff identifies himself as Boose Cornell. Dkt. No. 1 at 1. The signature on plaintiff's complaint, however, as well as plaintiff's papers in opposition to defendants' pending motion, reflect that his name is Cornell Boose. *Id.* at 6; Dkt. No. 27 at 1, 5.

2    The defendant was sued as C. Schneider. Dkt. No. 1 at 1. The clerk of the court is respectfully directed to adjust the court's records to reflect that the correct spelling of this individual's last name is "Schneider." Dkt. No. 24-6 at 1.

3    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

4    This individual is variously referred to in the record evidence as "Vandiver," Dkt. No. 24-3 at 46, "Van Deviver," *id.* at 58, "Vanderburgh," *id.* at 65, and "Van de Viver," *id.* at 67; *see also* Dkt. No. 24-5 at 32. For the sake of consistency, I have referred to this individual as "inmate Vandiver" in this report.

5    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 103 of 329

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 1175224

2016 WL 1175224
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Cornell BOOSE, Plaintiff,
v.
Claude SCHNEIDER, Defendant.

9:14-cv-518
|
Signed 03/24/2016

**Attorneys and Law Firms**

CORNELL BOOSE, 12-A-3355, Southport Correctional Facility, P.O. Box 2000, Pine City, New York 14871, Plaintiff, pro se.

OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, The Capitol, OF COUNSEL: JOHN F. MOORE, AAG, Albany, New York 12224, Attorneys for Defendant.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge.

## I. INTRODUCTION

**\*1** Currently before the Court is Magistrate Judge Peebles' February 19, 2016 Report and Recommendation, to which Plaintiff has filed timely objections. See Dkt. Nos. 31, 32.

## II. BACKGROUND

In a complaint dated May 5, 2014, Plaintiff alleged that three individuals employed by the New York State Department of Corrections and Community Supervision violated his civil rights during his incarceration at the Clinton Correctional Facility. See Dkt. No. 1. On November 3, 2014, this Court issued a Decision and Order finding that only Plaintiff's procedural due process claim asserted against Defendant Claude Schneider ("Defendant") survived *sua sponte* review under 28 U.S.C. § 1915A. See Dkt. No. 11.

Generally, the complaint alleges that several of Defendant's actions in connection to a prison disciplinary hearing violated Plaintiff's due process rights. See Dkt. No. 31 at 3-4. The disciplinary hearing concerned an incident in which Plaintiff was issued a misbehavior report for allegedly lighting a fire in the cube of a fellow inmate, identified as Vandiver. [1] *See id.* at 3. Plaintiff contends that Defendant's actions during the disciplinary hearing violated his due process rights for three separate reasons: (1) Defendant was biased, (2) Plaintiff should have been permitted to call inmate Vandiver and Corrections Officer ("C.O.") Herbst, who was on duty the night of the incident, as witnesses during the hearing, and (3) Defendant improperly withheld evidence from Plaintiff during his investigation to prepare for his hearing. *See id.* at 7.

On August 24, 2015, Defendant filed a motion for summary judgment seeking to dismiss Plaintiff's remaining cause of action. See Dkt. No. 24. In a February 19, 2016 Report and Recommendation, Magistrate Judge Peebles recommended that the Court grant Defendant's motion. *See* Dkt. No. 31. Specifically, Magistrate Judge Peebles found that "no reasonable factfinder could conclude that [Defendant] (1) was biased, (2) improperly refused to provide certain documentary evidence to plaintiff, or (3) improperly denied plaintiff's request to call two witnesses." *Id.* at 21-22.

Plaintiff filed objections to this Report and Recommendation on February 29, 2016. *See* Dkt. No. 32. Plaintiff's objections raise two issues; first that Defendant was biased and made a prejudged decision at the disciplinary hearing, such that "Plaintiff was thus denied a fair chance to prevail at the disciplinary hearing." *Id.* at 2. Second, Plaintiff contends that Defendant failed to provide an adequate explanation as to why he did not allow C.O. Herbst to testify as a witness. *Id.* at 3. Plaintiff also generally restates the summary judgment standard and re-argues the same points raised in the other objections and in his opposition to Defendant's motion for summary judgment. *Id.* at 4-5.

## III. DISCUSSION

### A. Standard of Review

**\*2** When a party files specific objections to a magistrate judge's report and recommendation, the district court

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 1175224

makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Report and Recommendation**

Plaintiff's first objection, that Defendant was biased and prejudged his decision in the disciplinary proceeding, is generally a restatement of the arguments made in opposition to summary judgment. Plaintiff's second objection, that Defendant did not provide a sufficient explanation as to why Plaintiff was not allowed to interview C.O. Herbst or call him as a witness, liberally construed, presents a specific objection that Magistrate Judge Peebles failed to sufficiently address all aspects of Defendant's denial of Plaintiff's request to interview or call an eyewitness. *See* Dkt. No. 32 at 3-4. Thus, the Court will review this last portion of Magistrate Judge Peebles' Report and Recommendation *de novo*, while reviewing the rest for clear error.

To prevail on a section 1983 due process claim arising out of a disciplinary hearing, an inmate plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000). Initially, Magistrate Judge Peebles correctly determined that Plaintiff possessed an actual liberty interest in this case because he demonstrated "(1) that the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Dkt. No. 31 at 11 (quoting *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995)). Magistrate Judge Peebles identified that New York State's regulatory scheme has created a liberty interest in an inmate remaining free from increased disciplinary confinement, *see LaBounty v. Coombe*, No. 95 CIV 2617, 2011 WL 1658245, *6 (S.D.N.Y. Dec. 26, 2001), and that restrictive confinement for a period of

more than 305 days may rise to the level of an atypical hardship, *see Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000). As Plaintiff was confined within New York State and penalized by nearly a year of solitary confinement in the special housing unit ("SHU"), *see* Dkt. No. 24-5 at 55, Magistrate Judge Peebles correctly determined that Plaintiff possessed a liberty interest in a disciplinary hearing for purposes of his due process claim. *See* Dkt. No. 31 at 13-14.

Next, Magistrate Judge Peebles considered each of the three bases that Plaintiff alleged constituted a violation of his due process rights. Regarding Plaintiff's allegations of Defendant's bias, Magistrate Judge Peebles found that, despite Defendant's decision to "not permit [P]laintiff access to certain documents or allow him to call certain witnesses, there is no record evidence to suggest that he did so out of bias towards [P]laintiff." *Id.* at 17. Rather, Defendant provided reasonable explanations for each of the allegedly biased decisions that he made, i.e. that the documentary evidence contained sensitive personal information, that releasing the identity of confidential informants would jeopardize the safety of the facility, and that C.O. Herbst's and inmate Vandiver's testimony would be irrelevant or redundant to reports in the record or the testimony of other witnesses. *Id.* (citing Dkt. No. 24-4 at 42-43, 58-60). To succeed on a claim that a hearing officer was biased and prejudged decisions on an inmate's violation hearings, a plaintiff must provide "more than conclusory allegations of bias and prejudgment" to defeat a well supported motion for summary judgment. *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989). In light of Plaintiff's lack of evidence supporting his bias claim, coupled with Defendant's reasonable explanations for each of his decisions, Magistrate Judge Peebles' conclusion that there was no dispute of material fact concerning Defendant's bias was not clearly erroneous. *See* Dkt. No. 31 at 17.

**\*3** Magistrate Judge Peebles next addressed whether Defendant's denial of Plaintiff's request to view the unredacted unusual incident report, the victim's medical records, and the confidential informants' statements violated Plaintiff's due process rights. *See id.* at 17-19. While an inmate is entitled to be "'confronted with the accusations [and] informed of the evidence against him[,]'" a hearing officer may deny the inmate access to certain evidence so long as the record reflects "*some* explanation of the basis for a hearing officer's denial of the inmate's

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

2016 WL 1175224

request for certain witnesses or items of evidence." *Loret v. Selsky*, 595 F. Supp. 2d 231, 234 (W.D.N.Y. 2009) (quotation omitted). Here, Magistrate Judge Peebles highlighted Defendant's explanations for why Plaintiff was not allowed access to each of these pieces of evidence. See Dkt. No. 31 at 18. Specifically, the redacted portions of the unusual incident report contained medical information protected by HIPAA or information that could expose the identity of the confidential informants and inmate Vandiver's medical records were confidentially protected under HIPAA. *See id.* (citing Dkt. No. 24-4 at 33, 37, 42-45). Thus, Magistrate Judge Peebles correctly concluded that Defendant provided a reasonable and sufficient explanation as to why Plaintiff was not allowed access to all of the documentary evidence that he requested for his hearing, such that the denial did not violate Plaintiff's due process rights. *See id.* at 19.

Lastly, the Report and Recommendation discusses the issue of Defendant's denial of Plaintiff's request to call inmate Vandiver and C.O. Herbst as witnesses at the disciplinary hearing. *See id.* at 19-21. Plaintiff sought the testimony of Vandiver to prove that he had not accused Plaintiff of setting the fire. *See id.* at 20. Defendant refused to allow Vandiver to be called as a witness, but did allow Plaintiff to review and read Vandiver's statement into the record, which indicated that he did not know who set his bed on fire. *Id.* Thus, Plaintiff was able to get the same evidence out of Vandiver's written statement that would have been gained by calling him as a witness during the hearing, i.e. that he did not specifically accuse Plaintiff of starting the fire. Defendant denied Vandiver as a witness because he determined that any potential testimony on this topic would be redundant to the written statement. *Id.* Thus, the exclusion of this witness' testimony was based on reasonable grounds and Magistrate Judge Peebles' correctly determined that this action did not violate Plaintiff's due process rights. *See id.* at 21.

Plaintiff submitted a specific objection to the issue of Defendant's denial of Plaintiff's request to interview or call C.O. Herbst as a witness, thus, the Court will review this section *de novo. See* Dkt. No. 32 at 3. Plaintiff's objection asserts that Defendant's explanation of "I believe officer Herbst was not relevant or necessary for testimony" was not a sufficient explanation for why Plaintiff was denied the opportunity to call C.O. Herbst as a witness. *Id.* While an inmate "at a disciplinary hearing should be permitted to call witnesses and present documentary

evidence in his defense[,]" *Fox v. Couglin*, 893 F.2d 475, 478 (2d Cir. 1990), "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report & recommendation by* Lowe, M.J.) (citing *Wolff v. McDonnell*, 418 U.S. 539, 566-67 (1974)). A hearing officer who denies an inmate's request for a witness at a disciplinary hearing must provide "reasons [that] are logically related to preventing undue hazards to 'institutional safety or correctional goals'" for the basis of that decision. *Ponte v. Real*, 471 U.S. 491, 497 (1985).

In this case, Plaintiff initially requested C.O. Herbst's testimony as a character witness, *see* Dkt. No. 24-4 at 59, and later sought to question C.O. Herbst as to whether he witnessed anything on the night of the incident, *see* Dkt. No. 32 at 3. Defendant denied the initial request because C.O. Herbst's testimony as a character witness would be redundant because Plaintiff already had three such witnesses. *See* Dkt. No. 24-4 at 59; Dkt. No. 24-3 at 59. In denying Plaintiff's request to interview C.O. Herbst about the night of the incident, Defendant stated that Correction Sergeant Giambruno was the officer who conducted the investigation of the fire, including interviewing the confidential informants, and that C.O. Herbst played no role in this investigation. Dkt. No. 24-4 at 59. Moreover, Plaintiff was unable to provide any evidence that C.O. Herbst witnessed the incident or had any information concerning the testimony or identity of the confidential informants. *Id.*

**\*4** Plaintiff cites *Fox v. Coughlin*, 893 F.2d 475 (2d Cir. 1990) and *Ayers v. Ryan*, 152 F.3d 77 (2d Cir. 1998) to support his argument that Defendant's explanation of why C.O. Herbst could not be called as a witness was insufficient and in violation of Plaintiff's due process rights. *See* Dkt. No. 32 at 3. In *Fox*, the Second Circuit held that a hearing officer's decision not to interview two officers requested by an inmate to be called as witnesses was a violation of the inmate's due process rights. *Fox*, 893 F.2d at 478. There, the inmate was physically restrained by three officers after getting into a physical altercation. *Id.* at 476. One of the officers completed a written report after the incident, which the other two "signed off" on. *Id.* At the inmate's disciplinary hearing, the hearing officer called the reporting officer as a witness but refused to call the remaining two officers, stating that their testimony

Boose v. Schneider, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 106 of 329

2016 WL 1175224

would be "redundant" since they signed off on the report. *Id.* at 477. The Second Circuit held that this explanation was insufficient because the hearing officer had no way to know whether the remaining officer's testimony would be "redundant" since no one interviewed the officers to establish what their testimony would be, and the action of merely signing off on the written report could not prove how the officers would ultimately testify regarding the incident. *Id.* at 478.

Defendant's explanation in this case as to why C.O. Herbst was not called as a witness is significantly more compelling than that in *Fox*. Here, there is no indication that C.O. Herbst witnessed the incident giving rise to Plaintiff's hearing, whereas in *Fox* the uncalled officers were direct participants in the inmate's altercation. Moreover, C.O. Herbst took no part in the investigation or interviewing of witnesses in this case, whereas the officers in *Fox* actively engaged in the investigation and signed off on the written report. Significantly, the inmate misbehavior report in this case was completed by Sergeant Giambruno and makes no mention of C.O. Herbst being present or having any knowledge of the incident. *See* Dkt. No. 24-6 at 8.

The Second Circuit's decision in *Ayers* is even more distinguishable from the case at hand. There, the hearing officer stated that a requested witness was not called "as a result of an apparent oversight on [his] part" and that the officer was "not aware of whether [the witness] was available or if his testimony was relevant" due to his oversight. *Ayers*, 152 F.3d at 81. In this case, rather than being the product of oversight, Defendant deliberately decided to not call C.O. Herbst as a witness for the numerous reasons discussed herein. Accordingly, the Court finds that Defendant's rationale that C.O. Herbst's testimony was not relevant or necessary was appropriate given the circumstances of this case and, thus,

was a reasonably-supported decision. *See Ponte v. Real*, 471 U.S. 491, 499 (1985) (noting that the burden is upon the hearing official to prove the rationality of his decision). Therefore, Defendant's denial of Plaintiff's request to call C.O. Herbst as a witness at the disciplinary hearing was not a violation of Plaintiff's due process rights.

## IV. CONCLUSION

After carefully reviewing the parties' submissions, Magistrate Judge Peebles' February 19, 2016 Report and Recommendation and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Peebles' February 19, 2016 Report and Recommendation (Dkt. No. 31) is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 24) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1175224

---

Footnotes

1    The Court assumes the parties' familiarity with the expanded factual background of this case contained in Magistrate Judge Peebles' February 19, 2016 Report and Recommendation.

---

**End of Document**                                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6068414
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ecson CAIMITE, Plaintiff,

v.

D. VENETTOZZI et al., Defendants.

9:17-cv-919 (GLS/CFH)
|
Signed 11/20/2018

**Attorneys and Law Firms**

FOR PLAINTIFF: ECSON CAIMITE, Plaintiff Pro Se, 01-A-2313, Greene Correctional Facility, P.O. Box 975, Coxsackie, New York 12051.

FOR DEFENDANTS: HON. BARBARA D. UNDERWOOD, OF COUNSEL: MATTHEW P. REED, Assistant Attorney General, New York Attorney General, The Capitol, Albany, NY 12224.

**ORDER**

Gary L. Sharpe, U.S. District Judge

 *1 The above-captioned matter comes to this court following a Report-Recommendation and Order by Magistrate Judge Christian F. Hummel duly filed on October 29, 2018. (Dkt. No. 28.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Report-Recommendation and Order for clear error, it is hereby

ORDERED that the Report-Recommendation and Order (Dkt. No. 28) is **ADOPTED** in its entirety; and it is further

ORDERED that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED** in part and **DENIED** in part as follows:

> **GRANTED** as to the following claims, which are **DISMISSED**: (1) plaintiff's Fourteenth Amendment due process claim against defendants E.F. Corbett and D. Venettozzi; (2) plaintiff's Eighth Amendment conditions of confinement claim against all defendants; and (3) plaintiff's state law claims; and

**DENIED** in all other respects, leaving only plaintiff's Fourteenth Amendment due process claim against defendants J.A. Esgrow and A. Rodriguez; and it is further

ORDERED that the Clerk is directed to terminate Corbett and Venettozzi from this action; and

ORDERED that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 6068414

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1135937
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Daniel CLAY, Plaintiff,

v.

Dr. Mary D'SILVA, Director of Dental
Services, New York State Department
of Correctional Services, Defendant.

No. 9:09–CV–1245 (GTS/DRH).
|
March 25, 2011.

**Attorneys and Law Firms**

Daniel Clay, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, James Seaman, Esq., Assistant Attorney General, Albany, NY, for Defendant.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Daniel Clay ("Plaintiff") against New York State Department of Correctional Services Director of Dental Services Dr. Mary D' Silva ("Defendant"), are (1) Defendant's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6) ( Dkt. No. 12), and (2) United States Magistrate Judge David R. Homer's Report–Recommendation recommending that Defendant's motion be granted (Dkt. No. 21). Plaintiff has not submitted any Objections to the Report–Recommendation, and the time in which to do so has expired. For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety; Defendant's motion is granted; and Plaintiff's Complaint is dismissed.

**I. RELEVANT BACKGROUND**
Plaintiff filed his Complaint in this action on November 6, 2009. (Dkt. Nos.1, 9.) The factual allegations of

Plaintiff's Complaint are accurately recited in Magistrate Judge Homer's Report–Recommendation. (Dkt. No. 21, at 2–3.) The Court will not repeat that recitation in this Decision and Order, which is intended primarily for review by the parties. The Court will note only that, generally, construed with the utmost of liberality, Plaintiff's Complaint alleges that, between October 2006 and November 2009, while he was incarcerated at Clinton Correctional Facility ("Clinton C.F.") in Dannemora, New York, Defendant violated his constitutional rights by causing him to experience unnecessary pain due to delayed dental treatment. (*See generally* Dkt. No. 1 [Plf .'s Compl.]; Dkt. No. 9 [Exs. to Plf.'s Compl.].). More specifically, Plaintiff alleges that, during the time period in question, (1) he experienced unnecessary pain while waiting for the removal of three tooth fragments that remained in his gums following the extraction of one of his teeth on October 11, 2006, and (2) that the delays and pain he experienced was due to Defendant's failure to fulfill her duty to make sure there are a sufficient number of dentists at Clinton C.F. to treat the dental needs of the large population of inmates incarcerated there. (*Id.*) Based on these factual allegations, Plaintiff asserts a claim for deliberate indifference to his serious medical needs, in violation of the Eighth Amendment. (*Id.*)

On March 10, 2010, Defendant filed a motion to dismiss the action for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b) (6). (Dkt. No. 12.) Generally, in support of her motion, Defendant asserts the following three arguments: (1) Plaintiff has failed to allege facts plausibly suggesting a claim for deliberate indifference to his serious medical needs because, *inter alia,* (a) he has failed to allege facts plausibly suggesting that Defendant acted with a sufficiently culpable state of mind during the time in question, and (b) indeed, Plaintiff alleges that there were three dentists at Clinton C.F. during the time in question; (2) Plaintiff has failed to allege facts plausibly suggesting a causal connection between anything Defendant did or did not do (regarding the staffing of dentists at Clinton C.F.) and the scheduling delays that Plaintiff allegedly experienced, which were caused by office staff; and (3) based on the factual allegations asserted in Plaintiff's Complaint, Defendant is protected from liability as a matter of law by the doctrine of qualified immunity. (*Id.*)

**\*2** On April 28, 2010, after being granted an extension of time in which to do so, Plaintiff filed a response in

opposition to Defendants' motion. (Dkt. Nos.15, 16.) Construed with the utmost of special liberality, Plaintiff's response challenges each of the three arguments asserted by Defendants. (*Id.*) Among other things, Plaintiff argues that (1) the third dentist arrived at Clinton C.F. only a "few months" before he filed his Complaint in this action; and (2) a memorandum from "S. Garman, ADSP" at Clinton C.F. dated October 18, 2007, refers to "the vacancy rate of Dental personnel statement and ... [the need] to help recruit and retain Dental professionals," plausibly suggesting a causal connection between anything Defendant did or did not do (regarding the staffing of dentists at Clinton C.F.) and the scheduling delays that Plaintiff allegedly experienced. (*Id.*)

On February 1, 2011, Magistrate Judge Homer issued a Report–Recommendation recommending that Defendant's motion be granted and that Plaintiff's Complaint be dismissed. (Dkt. No. 21.) Generally, in support of his recommendation, Magistrate Judge Homer found that Plaintiff had failed to allege facts plausibly suggesting that Defendant was deliberately indifferent to his serious medical needs. (*Id.*) Familiarity with the remaining grounds of Magistrate Judge Homer's Report–Recommendation is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b) (1)(C). [1] When only general objections are made a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).* [2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory

Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion to Dismiss

Magistrate Judge Homer correctly recited the legal standard governing a motion to dismiss for failure to state a claim upon which relief can be granted. (Dkt. No. 21.) As a result, this standard is incorporated by reference in this Decision and Order. The Court would add only one point.

**\*3** While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [3] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [4] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson v. Onondaga County,* 549 F. Supp .2d 204, 214 & n. 28 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation of Lowe, M.J., on *de novo* review) [citations omitted].

## III. ANALYSIS

Plaintiff has not filed objections to the Report–Recommendation. As a result, the Court need only review the Report–Recommendation for clear error.

After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report–Recommendation, the Court concludes that Magistrate Judge Homer's thorough Report–Recommendation is correct in all respects. (Dkt. No. 21.) Magistrate Judge Homer employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, the Court accepts and adopts the Report–Recommendation in its entirety for the reasons stated therein. (*Id.*) Among these reasons are the following: (1) Plaintiff has not alleged facts plausibly suggesting that he was actually harmed by any under-

staffing of dentists at Clinton C.F. during the time in question (given that, as the body Plaintiff's Complaint alleges, he received repeated dental care from two different dentists during the majority of the time in question); and (2) even if he has alleged such facts, he has not alleged facts plausibly suggesting that complete dental staffing was possible (given that, as asserted in the Clinton C.F. internal memorandum attached to Plaintiff's Complaint, there was a shortage in the supply of dentists statewide). (*Id.*)

The court would add only four points. First, the Report–Recommendation would survive even a *de novo* review.

Second, the repeated dental care that Plaintiff received from three dentists (i.e., Drs. P.J. Kullman, Tahir R. Farooki, and R. Oliveira) at Clinton C.F. during the time in question included two x-ray examinations and three oral surgeries. (*See generally* Dkt. No. 1.) Plaintiff's claim is essentially a complaint regarding the perfection and speed with which those dentists provided him dental care. As the Second Circuit has explained:

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for dental care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks.... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of

medical attention that judges would wish to have for themselves....

**\*4** *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotation marks and citations omitted].

Third, while Plaintiff has submitted a Clinton C.F. internal memorandum indicating that the medical department at Clinton C.F. had a problem with the recruitment and retention of dental staff (due to a shortage in the supply of dentists statewide), that internal memorandum—which does not indicate it was sent to Defendant, or the source of a communication with Defendant—does not plausibly suggest that Defendant knew, or reasonably should have known, that Clinton C.F. did not have enough dentists to fulfill its obligations under the Eighth Amendment. (Dkt. No. 9, at 43–45 [Ex. L to Plf.'s Compl.].)

Fourth, the Court notes that, under the circumstances, it need not afford Plaintiff an opportunity to amend his Complaint before dismissal. Affording a *pro se* civil rights plaintiff an opportunity to amend his complaint before dismissal is not required where (1) the plaintiff has already been afforded the opportunity to amend, [5] or (2) the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. [6] Here, it is arguable that Plaintiff has already been afforded the opportunity to amend, through the Court's extra-liberal construction of his papers in response to Defendant's motion as effectively amending the allegations of his Complaint (for example, his allegation, in his response papers, that the third dentist at Clinton C.F. arrived there only "a few months" before he filed his Complaint). In any event, even if that extra-liberal construction did not constitute an opportunity to amend, the Court finds that, even when construed with the utmost of special liberality, Plaintiff's claims are fatally plagued by defects that are substantive rather than merely formal, such that any amendment would be futile.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 21) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 12) is **GRANTED,** and Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1135937

Footnotes

1   On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g .,* *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

2   *See also* *Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

3   *See* *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) [citing cases].

4   *See* *Vega,* 610 F.Supp.2d at 196, n. 10 [citing cases].

5   *Shuler v. Brown,* 07–CV–0937, 2009 WL 790973, at *5 & n. 25 (N.D.N.Y. March 23, 2009) (McAvoy, J., adopting Report–Recommendation by Lowe, M.J.) ("Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint."), *accord,* *Smith v. Fischer,* 07–CV–1264, 2009 WL 632890, at *5 & n. 20 (N.D.N.Y. March 9, 2009) (Hurd, J., adopting Report–Recommendation by Lowe, M.J.); *Abascal v. Hilton,* 04–CV–1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan.130 2008) (Kahn, J., adopting, on de novo review, Report–Recommendation by Lowe, M.J.); *see also* *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once); *cf. Foman v. Davis,* 371 U.S. 178, 182 (1962) (denial of leave to amend not abuse of discretion movant has repeatedly failed to cure deficiencies in pleading).

6   As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord,* *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also* *Foman v.. Davis,* 371 U.S. 178, 182 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied"). This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355 at *1.

---

Coleman v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 2579084

2017 WL 2579084
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

9:15-CV-40 (TJM/ATB)
|
Signed 01/17/2017

**Attorneys and Law Firms**

TOWAUN COLEMAN, Plaintiff, pro se.

NICOLE E. HAIMSON, Asst. Attorney General for Defendants.

### REPORT-RECOMMENDATION

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge. Presently before the court is defendant Nolan's [1] motion for summary judgment pursuant to Fed. R. Civ. P. 56, arguing only that plaintiff has failed to exhaust his administrative remedies as to his allegations of excessive force, as this is the only remaining claim in this action. (Dkt. No. 50). Plaintiff has responded in opposition to the motion. (Dkt. No. 52). For the following reasons, this court agrees with plaintiff and will recommend denial of the defendant's motion.

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v.

Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Salahuddin, 467 F.3d at 272.

### II. Relevant Facts

The amended complaint alleges that, on December 4, 2014, plaintiff was "assaulted," while asleep in his cell, by defendant L. Nolan. (Amended Complaint ("AC") at 8, Dkt. No. 19). Plaintiff states that he felt a very sharp pain in his lower right leg and ankle area. He awoke to see defendant Nolan putting away his baton. Plaintiff commented that Nolan should not be putting his "hands" on plaintiff, and asked Nolan his name so that plaintiff could "report" him. Defendant Nolan allegedly told plaintiff to " 'write whatever the fuck you want,' " " 'you see what writing just got you,' " and " 'keep on writing and see how far that gets you.' " [2] (Id.)

**\*2** Plaintiff alleges that this incident constitutes excessive force by defendant Nolan. Plaintiff also claimed that the assault was in retaliation for plaintiff's grievances. The retaliation claim was dismissed as a result of the prior motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). [3] The only issue remaining is whether defendant Nolan used excessive force on plaintiff on December 4, 2014, when he allegedly struck plaintiff in the leg with his baton.

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

Coleman v. Racette, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 113 of 329

2017 WL 2579084

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*3** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ⸺ U.S. ⸺, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at \*2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, ⸺ U.S. at ⸺, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*—availability and estoppel—are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ⸺ U.S. at ⸺, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321 at \*2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ⸺ U.S. at ⸺, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ⸺ U.S. at ⸺, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority

Coleman v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 2579084

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 114 of 329

to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

**B. Application**

Defendant argues that plaintiff never brought a grievance complaining about defendant Nolan's alleged use of excessive force on December 4, 2014. In support of this motion, defendant has filed the declarations of Jeffrey Hale, the Assistant Director of the Inmate Grievance Program ("IGP") for the Department of Corrections and Community Supervision ("DOCCS"), and of Christine Gregory, the IGP Supervisor at Clinton Correctional Facility ("CCF"). (Hale Decl., Gregory Decl.) (Dkt. Nos. 50-4, 50-5). Jeffrey Hale states that the DOCCS records reflect that plaintiff was incarcerated at CCF at the time of the alleged incident until March 25, 2016, and that during the entire time, CCF had a "fully functioning inmate grievance process available" to which all inmates had access. (Hale Decl. ¶ 11). Jeffrey Hale states that he examined the CORC records for "determinations upon grievance appeals brought by [plaintiff]." (Hale Decl. ¶ 10). A copy of the computer print-out listing this information is attached as Exhibit A to the Hale Declaration. The records show that plaintiff filed one grievance appeal to the CORC, and this appeal was filed while he was incarcerated at Auburn Correctional Facility in December of 2010. (Hale Decl. ¶ 12 & Ex. A). No appeals to the CORC were filed by plaintiff as the result of grievances filed at CCF. (*Id.*)

In her declaration, Christine Gregory asserts that she supervises the IGP program and maintains its records in the regular course of business. (Gregory Decl. ¶¶ 2, 10). Ms. Gregory also searched the records maintained by DOCCS of inmate grievances filed at CCF. (Gregory Decl. ¶ 4). Ms. Gregory's search of the relevant documents showed that plaintiff filed a total of seven (7) grievances while he was housed at CCF. (Gregory Decl. ¶ 12). He filed three (3) grievances in 2014; three (3) grievances in 2015; and one (1) grievance in 2016. (*Id.*) None of these grievances were filed at CCF between December 2014 and January 2015. (*Id.*) Ms. Gregory also states that none of these grievances concern the December 4, 2014 incident.

(*Id.*) Ms. Gregory has attached the computer print-out from which she obtained this information. (*Id.* ¶ 12 & Ex. A—Inmate Grievance Summary).

**\*4** The information submitted by Ms. Gregory shows that plaintiff's last grievance in 2014 was filed in June of 2014, and plaintiff did not file any other grievances until April 29, 2015, in which he alleged "Verbal Harassment by CO."[4] (*Id.* Ex. A). His next grievance was dated July 1, 2015 and was entitled "Allegs [sic] Assaulted by Security." (*Id.*) Ms. Gregory concluded that "plaintiff never submitted any grievances against Defendant Nolan concerning an alleged excessive force incident on December 4, 2014," rendering plaintiff's excessive force claim unexhausted. (Gregory Decl. ¶ 13).

However, plaintiff alleges that he wrote a grievance on December 5, 2014, and gave it to another inmate to put in the facility mailbox. (AC at 9, Pl.'s Dep. 108, 110).[5] Plaintiff stated that the grievance included declarations from two inmates who witnessed the incident. (AC at 9). During his deposition, plaintiff testified that he later made a Freedom of Information Law request[6] for a copy of his grievance just to make sure the IGRC received a copy.[7] However, he was told that no such grievance existed. (AC Ex. R-1 at 13 & V-1).

Plaintiff alleges that he "resubmitted" the grievance on December 30, 2014, but he never received a response. (AC at 9, Pl.'s Dep. at 108, 110). Plaintiff attached, to his amended complaint, a copy of the grievance, dated December 4, 2014 and the two inmate declarations. (AC Ex. R-1 at 1-8). The "resubmitted" grievance contains a cover-letter, addressed to the IGRC, stating that plaintiff had been informed through his FOIL request that the IGRC never received his December 5, 2014 grievance, and plaintiff was "re-submitting [his] initial grievance regarding retaliatory treatment/ assault." (AC Ex. R-1 at 9-11). This purported grievance clearly addresses the alleged assault by defendant Nolan. (*Id.*)

The court notes that this was not the first time that plaintiff "resubmitted" a grievance. The Amended Complaint also contains the copy of an unrelated grievance that plaintiff stated he was "resubmitting," after being told that the initial grievance was not received. (AC Ex. L-1). The resubmission letter for this unrelated grievance is dated June 30, 2014, and there is a notation at

Coleman v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 2579084

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 115 of 329

the top of the letter, that the grievance was "consolidated" with CL65724-14." (*Id.*) This grievance apparently was filed after plaintiff resubmitted it because it was assigned a number, and it does appear on the Inmate Grievance Summary submitted by Ms. Gregory. (Gregory Decl. Ex. A).

Plaintiff does not challenge the defendant's assertion that no grievance was "filed" regarding the alleged assault by defendant Nolan. Rather, plaintiff argues that his ability to file the grievance was impeded because plaintiff attempted to file the grievance twice, but the IGRC never received either grievance.

Defendant references prior authority from this district for the proposition that "an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." (Def.' Mem. of Law at 10) (citing *Rosado v. Fessetto*, No. 9:09-CV-67 (DNH/ATB), 2010 WL 3808813, at *7, 2010 U.S. Dist. LEXIS 108238, at *19 (N.D.N.Y. Aug. 4, 2010) (Rep't-Rec.), *adopted*, 2010 WL 3809991, 2010 U.S. Dist. LEXIS 99073 (N.D.N.Y. Sept. 20, 2010)). At the time I wrote the Report-Recommendation in *Rosado*, this was a correct statement of the law. However, *Ross, supra* has changed the law with respect to exhaustion of administrative remedies. [8] Now, the only relevant inquiry in an exhaustion case is whether the administrative remedies were "available" to the inmate. 136 S. Ct. at 1859-60. If prison administrators "thwart" inmates from taking advantage of the grievance process through "machination, misrepresentation, or intimidation," the administrative remedies are "unavailable," and the inmate is excused from the exhaustion requirement, regardless of which "official" prevented plaintiff from filing the grievance. *Id.* at 1860.

**\*5** In any event, plaintiff is not making a "general claim" that his grievance was lost or destroyed. He has submitted a great deal of documentary evidence in an effort to show that he was prevented from filing a grievance through no fault of his own. He has filed exhibits consisting of his original grievance, a resubmitted grievance, letters to superior officers reporting problems with filing grievances. He also claims that CCF has had problems in the past with the receipt and filing of inmate grievances. (Dkt. No. 52-4 at 7) (Agenda from a 2009 Inmate Liaison Committee Meeting at CCF where the grievance issue was discussed).

In *Moreau v. Peterson*, No. 15-2534-pr, slip op. at 3 & n.1 (2d Cir. Jan. 12, 2017), the Second Circuit affirmed a dismissal of civil rights claims for failure to exhaust, even though the plaintiff claimed that he was prevented from doing so, because his argument was "inconsistent with the fact that he filed grievances for other claims in the same time period, and those grievances were processed fully." *Id.* at 3 n.1. A review of the District Court's opinion in *Moreau* shows that plaintiff provided "no evidence" of filing grievances related to the claims in question, all of which occurred after the last grievance that was attached to the complaint. *Moreau v. Peterson*, No. 7:14-CV-201, 2015 WL 4272024, at *7 (S.D.N.Y. July 13, 2015).

This case is distinguishable from *Moreau* and from cases decided prior to *Ross*. Plaintiff has produced evidence indicating that he did write a grievance on December 4, 2010, and that he attempted to submit it twice without success and without response from the IGRC. On January 23, 2015, plaintiff wrote a letter to Superintendent Racette complaining about "grievances disappearing." (Pl's Ex. U-1, Dkt. No. 52-8 at CM/ECF pp. 3-6). The letter was very specific and complained about the grievance program. On January 28, 2015, Superintendent Racette responded to plaintiff stating that "[y]our recent communication has been referred to S. Brown, Deputy Superintendent—Security, for review and appropriate action." (*Id.* Ex. V-2, Dkt. No. 52-8 at CM/ECF p.7). Plaintiff's deposition testimony is consistent with these allegations and the accompanying documents he has submitted in response to the defense motion. (Pl.'s Dep. at 115).

Plaintiff stated that "[o]nce again I FOILed for a copy of that grievance to see if they actually received it and, once again, I got back the response that they didn't receive it. So, I then wrote a letter to the superintendent in regards to that whole situation." (Pl.'s Dep. at 115-16).

Defense counsel asked why plaintiff did not appeal to the Superintendent. The regulations provide that an inmate may appeal a grievance to the "next step" if he does not receive a timely response. 7 N.Y.C.R.R. § 701.6(g)(2), 701.8(g). The court notes, however, that if a grievance is lost or destroyed before it is received by the IGRC and assigned a number, it would be difficult to "appeal" a grievance "to the next step." The regulations, allowing an inmate to appeal to the "next step" if he does not

Coleman v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 2579084

receive a timely response, envision a situation in which the grievance is filed, but no response is received in the time allotted by the regulations. *See Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016) ("On their face, the regulations only contemplate appeals of grievances that were actually filed.... Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.")

This case is very similar to *Williams*. Plaintiff in this case would not have been able to file a formal "appeal," because his grievance was never filed with the IGRC or assigned a number. Plaintiff stated that he appealed by writing the January 23, 2015 letter. (*Id.* at 116). Plaintiff's letter to the Superintendent was a logical step for him to take after two of his grievances were not received by the IGRC. The Superintendent responded that he was referring plaintiff's complaint for investigation. Plaintiff had no reason to believe the he was required to take another step after the Superintendent's letter. There is no evidence that plaintiff received a formal response after the promised investigation.

**\*6** Defendants argue that plaintiff was able to file a subsequent grievance complaining about defendant Nolan's alleged verbal harassment in April of 2015 and another grievance about assault by staff in July of 2015, in addition to mailing other letters. However, the court notes that both of these grievances were filed after plaintiff complained to the Superintendent, and after his complaint was referred for investigation. This case represents more than a plaintiff claiming, without support, that his grievances disappeared. After *Ross*, this court cannot find that defendant has established on the existing record, that there is no material question of fact with respect to the exhaustion of plaintiff's remedies, and I will recommend denying defendant's motion for summary judgment based on failure to exhaust administrative remedies.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 50) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2579084

---

Footnotes

1    Defendant Nolan is the only remaining defendant.

2    Plaintiff's amended complaint contains additional facts that he believed led up to this assault. (AC *generally*). On December 7, 2015, I issued an Order and Report-Recommendation following a motion to dismiss, filed by defendant Nolan and former defendant Racette. (Dkt. No. 34). Included in my Order and Report-Recommendation is a detailed description of the facts as stated by plaintiff in his amended complaint. (Dkt. No. 34 at 2-7). The District Court approved the Recommendation in its entirety on January 4, 2016. (Dkt. No. 38). The court assumes familiarity with the facts as stated in the Report-Recommendation. Defendant has filed a number of exhibits, including plaintiff's deposition. (Dkt. No. 50, Exs. A-C). I will discuss the facts contained in the defendant's current exhibits, but have not included a complete recitation of the amended complaint. I will only discuss the original facts as necessary to the resolution of this motion for summary judgment.

3    (Dkt. No. 34 at 14-16). Defendant Nolan did not move to dismiss plaintiff's claim of excessive force in the motion to dismiss. (Dkt. No. 34 at 1 n.3 & 15 n.13).

4    The court notes that the claim of verbal harassment was also against defendant Nolan. (Dkt. No. 52-9 Ex. Z-3) (Pl.'s appeal to the CORC).

5    Plaintiff's deposition is attached as Exhibit A to the Declaration of AAG Haimson. (Dkt. No. 50-7). The court will cite to the deposition as "(Pl.'s Dep.)."

6    It appears that the FOIL request was made on December 22, 2014. (Pl.'s Dep. at 111).

**Coleman v. Racette, Not Reported in Fed. Supp. (2017)**

2017 WL 2579084

7    Plaintiff's theory for submitting a FOIL request was that, if the IGRC had received his grievance, they would be able to send him a copy, and this would be a way to confirm receipt of the grievance. (Pl.'s Dep. at 109).

8    Defense counsel recognizes this in a footnote. (Def.'s Mem. of Law at 12 n.2).

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                              6

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 118 of 329

Coleman v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 2589366

2017 WL 2589366
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

9:15-CV-40
|
Signed 06/14/2017

**Attorneys and Law Firms**

Towaun Coleman, Stormville, NY, pro se.

Nicole E. Haimson, New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to Magistrate Judge Baxter's January 17, 2017 Report-Recommendation [dkt. # 53] have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ADOPTS** the Report-Recommendation [dkt. #53] for the reasons stated therein. The defendants' motion for summary judgment [dkt. # 50] is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2589366

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1264122
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.

No. 99-CV-611 NPMGLS.
|
Aug. 22, 2000.

**Attorneys and Law Firms**

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681 et seq. ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to
the record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's]
Statement of Material Facts. The non-

movant's response shall mirror the
movant's Statement of Material Facts
by admitting and/or denying each of
the movant's assertions in matching
numbered paragraphs. Each denial
shall set forth a specific citation to the
record where the factual issue arises....
*Any facts set forth in the [movant's]
Statement of material Facts shall be
deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed
an eleven page, twenty-nine paragraph Statement of
Material Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of
law which failed to admit or deny the specific assertions
set forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here,
the opposing party has failed to comply with the Rule.
*See, e.g., Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-
Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999);
*Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185
F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v.
Stewart and Stevenson Operations, Inc.,* 1998 WL 903629,
at *1 n. 1 (N.D.N.Y.1998); *Costello v.. Norton,* 1998 WL
743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien
& Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2
(N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

Elgamil v. Syracuse University, Not Reported in F.Supp.2d (2000)

2000 WL 1264122

## BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the

exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer.[2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

**\*3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new

advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [3] as mentioned, Clawson, not Roopnarine, authored the exam question.

 **\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was

submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

> [t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden

of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v.*

2000 WL 1264122

*New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and

inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382,

at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment"). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

**B. Actual Knowledge / Deliberate Indifference**

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d] the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to

occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all. [6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University. [7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced

the grading of her third research methods exam. [8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim. [9]

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1264122

---

Footnotes

1    Amended January 1, 1999.

2  Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

3  Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

4  Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

5  In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, ——, 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

6  Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

7  As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

8  As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

9  Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 127 of 329

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

2016 WL 6091699

2016 WL 6091699
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Pakenauth GEER, Plaintiff,
v.
Officer CHAPMAN, et al., Defendants.

9:15-CV-952 (GLS/ATB)
|
Signed 09/26/2016

**Attorneys and Law Firms**

PAKENAUTH GEER, Plaintiff pro se.

MICHAEL G. McCARTIN, Asst. Attorney General for
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
LOCAL RULES N.D.N.Y. 72.3(c). Plaintiff originally
filed this action in the Eastern District of New York,
against several defendants, alleging violations of his
constitutional rights. (Dkt. No. 1, 4). On June 29, 2015,
the Honorable Carol Bagley Amon, Chief Judge in the
Eastern District of New York found that the complaint
did not state a claim for various reasons. [1] (Dkt. No. 5).
Chief Judge Amon dismissed without prejudice to plaintiff
filing an amended complaint only with respect to his First
Amendment retaliation claim. (*Id.*)

On July 22, 2015, the Pro Se Office in the Eastern
District of New York received plaintiff's proposed
amended complaint. (Dkt. No. 6). The proposed
amended complaint alleged that plaintiff's typewriter
was "smashed" by defendants Chapman, McFarren, and
McMillan. (Dkt. No. 6 at 1). On July 29, 2015, after
reviewing the complaint for sufficiency, Chief Judge
Amon transferred plaintiff's amended complaint to the
Northern District of New York. (Dkt. No. 8). Chief Judge
Amon found that "[s]pecifically, he claims that defendant
corrections officers, who he alleges are employed at
Washington Correctional Facility, took adverse action

against him because he has filed lawsuits against other
officers and prison officials. (*Id.* at 1). Chief Judge Amon
also found that the events of which plaintiff complained
took place in the Northern District of New York. (*Id.* at
2). Thus, venue was improper in the Eastern District, and
the case was transferred to the Northern District of New
York "in the interest of justice." (*Id.* at 1-3).

On July 30, 2015, prior to the transfer, [2] plaintiff filed
a motion to amend the amended complaint. (Dkt. No.
9). On October 14, 2015, the Honorable Gary L. Sharpe,
reviewed plaintiff's submissions, including the first
amended complaint and plaintiff's newly filed motion to
amend. (Dkt. No. 14). Judge Sharpe interpreted plaintiff's
first amended complaint as alleging 1) harassment; 2)
wrongful destruction of personal property; 3) First
Amendment retaliation; and 4) First Amendment denial
of access to courts. (Dkt. No. 14 at 5).

Judge Sharpe dismissed plaintiff's first, second, and fourth
claims. (Dkt. No. 14 at 6-11). Plaintiff's first and second
claims were denied on the merits and on the basis of
res judicata because plaintiff brought the same claims in
a previously dismissed Northern District of New York
action. *Geer v. McFarren*, No. 9:14-CV-0589, Dkt. No. 1.
Judge Sharpe noted that plaintiff brought his retaliation
claim in 14-CV-589, but that claim had been dismissed
"without prejudice." (Dkt. No. 14 at 7, n.7). Judge Sharpe
denied plaintiff's motion to amend. (*Id.* at 11-12). Thus,
the only remaining claim in this action is that defendants
Chapman, McFarren, and McMillan destroyed plaintiff's
typewriter in retaliation for plaintiff filing lawsuits against
other corrections officers and prison officials as stated in
the first amended complaint (Dkt. No. 6). [3] (Dkt. No. 14
at 9).

**\*2** Presently before the court is the defendants' motion
for summary judgment pursuant to Fed. R. Civ. P.
56. (Dkt. No. 23). Plaintiff has not responded to the
motion, notwithstanding two notices from the court of
his response deadline. [4] (Dkt. Nos. 24, 25). For the
following reasons, this court agrees with defendants and
will recommend dismissal of the amended complaint.

### DISCUSSION

**I. Facts**

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

2016 WL 6091699

Plaintiff alleges that on April 26, 2014, Officers Chapman and McMillan "ordered" Officer McFarren to smash plaintiff's typewriter at the end of Officer McFarren's "count." (Amended Complaint ("AC") at 1). Plaintiff claims that this "order" was issued because plaintiff "filed lawsuits against many officers and officials." (*Id.*) The second page of the amended complaint appears to be a June 13, 2014 letter that plaintiff wrote to Attorney General ("AG") Eric Schneiderman, in which plaintiff mentions that the defendants broke his typewriter, [5] but essentially complains about subsequent events. Plaintiff states that he ordered another typewriter, which allegedly arrived at the facility on June 13, 2014. [6] However, in his letter to AG Schneiderman, plaintiff claims that unnamed officials refused to allow him to pick up the package, even after he was notified of its arrival. (*Id.*)

## II. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints

2016 WL 6091699

through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

**\*4** Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ___ U.S. ____, 136 S. Ct. 1850, 1857) (2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at \*2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, ___ U.S. at ____, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ___ U.S. at ____, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See Riles*, 2016 WL 4572321 at \*2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ___ U.S. at ____, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ___ U.S. at ____, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

**B. Application**

Defendants argue that plaintiff has failed to exhaust his administrative remedies with respect to his First Amendment retaliation claim. Defendants state that plaintiff failed to grieve the retaliation claim through the DOCCS three-level grievance mechanism. (Def.s' Mem of Law at 3-7). Defendants have filed the declaration of Karen Bellamy, the Director of the Inmate Grievance Program for the Department of Corrections and Community Supervision ("DOCCS"). (Bellamy Decl. ¶ 1) (Dkt. No. 23-2). Director Bellamy states that she has searched the CORC records to determine whether plaintiff ever filed a grievance appeal to the CORC relating to the destruction of plaintiff's typewriter at Washington in April of 2014. (Bellamy Decl. ¶ 2). Director Bellamy declares that there are no such appeals. (*Id.*) She has attached as Exhibit A to her declaration a computer print-out listing the one CORC appeal filed by plaintiff, which is not related to the retaliation issue that he raises in this amended complaint. (Bellamy Decl. ¶ 3 & Ex A). According to the computer print-out, on June 21, 2013, plaintiff filed a grievance complaining that his legal mail was not sent out. (Bellamy Decl. Ex. A at 1). The CORC appeal was decided on January 22, 2014. (*Id.*) It is the only grievance appeal brought by plaintiff that appears on the CORC list of closed cases. (*Id.*)

**\*5** Plaintiff was deposed on February 12, 2016 at Washington Correctional Facility. (Pl.'s Dep.) (Dkt. No. 23-5). At his deposition, plaintiff testified that he wrote letters to the grievance committee, the Attorney General, and the Superintendent, but that was "the extent" of his exhaustion. (Pl.'s Dep. at 44-45). Plaintiff testified that he did not write to anyone else because a previous grievance was denied, and when he wrote to the CORC, "they sent

Case 9:17-cv-00234-MAD-DEP Document 87 Filed 03/22/19 Page 130 of 329

**Geer v. Chapman, Not Reported in Fed. Supp. (2016)**
2016 WL 6091699

me back to them so I say I have wasted my time." (*Id.* at 46). Defense counsel asked:

> Q. You are describing a situation in which you wrote to the Central Office?
>
> A. Yes.
>
> Q. But that was about a different matter not about the typewriter?
>
> A. Yes. I didn't write to them about this, because it's going to be the same. They're going to say I have to put it through a grievance and I have to put it through the superintendent and they don't answer. They won't answer.

(Pl.'s Dep. at 46). It is clear that plaintiff did not file a grievance [7] or appeal it properly because he did not think that he was going to get results, because he filed a previous grievance that was denied. He believed that doing so would be a "waste of time." He believed that he would not get an answer, but had no basis for that statement. The fact that his legal mail grievance was denied at the CORC level did not justify plaintiff's failure to exhaust his retaliation grievance or any other grievance that he may have had. It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies. *See Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps, putting officials on "notice" are insufficient to exhaust administrative remedies); *Gizewski v. NY DOCCS*, No. 9:14-CV-124, 2016 WL 3661434, at *14 (N.D.N.Y. July 5, 2016) (notice through informal channels, including verbal complaints, is insufficient to exhaust administrative remedies).

As stated above, attached to the complaint, there is a letter that plaintiff "wrote" to the Attorney General on June 13, 2014, stating that the letter was "another" notice of intention to file a claim. (AC at 2). The letter is in reference to the subsequent typewriter incident, and also states that plaintiff has already filed a lawsuit about the broken typewriter. [8] (*Id.*)

This is not a situation in which the administrative procedure was "unavailable" as discussed in *Ross, supra*. The grievance procedure was not complex. Plaintiff was not moved from Washington until long after the incident. Plaintiff was well-aware of how to bring a proper grievance because he had at least one previous grievance that was appealed to the CORC. Finally, there is no claim that the defendants prevented him from filing a grievance regarding the incident. Plaintiff's belief that bringing a grievance would be a waste of his time because it would be denied, or his unfounded belief that "they" would not answer, is not sufficient to justify his failure to exhaust. Thus, plaintiff has failed to exhaust his administrative remedies, and the complaint may be dismissed on that basis.

**\*6 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 23) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6091699

---

**Footnotes**

1    Chief Judge Amon found that some of plaintiff's claims were barred by res judicata, and in addition, his property claims could not be brought in federal court. (Dkt. No. 5 at 3-4, 5-6). Chief Judge Amon also found that plaintiff's claim for retaliation failed to state a claim. (Dkt. No. 5 at 4-5).

2    Although the transfer order was signed on July 29, 2015 (Dkt. No. 8), the case was electronically transferred on August 5, 2015. (Dkt. No. 10).

3    The operative pleading is Dkt. No. 6.

**Geer v. Chapman, Not Reported in Fed. Supp. (2016)**

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 131 of 329

2016 WL 6091699

4    On June 23, 2016, plaintiff filed a letter, complaining that, because defense counsel had failed to include an "errata sheet" with his motion, plaintiff could not respond to the motion for summary judgment. (Dkt. No. 26). Plaintiff apparently believed that defendants were required to file such a "sheet" because an "errata sheet" was sent with the transcript of plaintiff's deposition. (Dkt. No. 26). When plaintiff received his copy of his deposition, he appears to have utilized the errata sheet to make arguments about the merits of the action while citing to specific pages of the deposition. Defense counsel responded to plaintiff's allegations, and on June 28, 2016, I issued a Text Order, informing plaintiff that defendants did produce an errata sheet with their deposition transcript. I directed the Clerk to send plaintiff a copy of the errata sheet, but denied plaintiff's "request" that defendants produce another "errata sheet" before plaintiff responded to the summary judgment motion. My June 28, 2016 Text Order was "returned undeliverable" because plaintiff had been released to the Buffalo Federal Detention Center. (Dkt. No. 29). Plaintiff ultimately filed a change of address, indicating that he had been moved to the Federal Detention Center. (Dkt. No. 30). The court sent the Text Order to plaintiff's new address, but plaintiff still failed to respond to the summary judgment motion. (Dkt. No. 31).

5    The letter states that it was "another notice of intention to file a claim, in which my typewriter are [sic] broken by officer McFarren and I've filed a lawsuit for my broken typewriter; so now I've order another typewriter from Union Supply Direct ...." (AC at 2).

6    It appears that plaintiff wrote the letter to the Attorney General on the same day that he was allegedly prevented from obtaining the new typewriter from the package room. The letter also states that the typewriter was "shipped" on June 13, 2014, which is not possible if it arrived on June 13, 2014 and plaintiff wrote the letter on June 13, 2014. However, the court finds that plaintiff may have written the incorrect date or he has interpreted "shipping" as "arriving."

7    During his deposition, plaintiff stated that, before he wrote to the Attorney General, he "wrote" to the superintendent and the grievance committee. (Pl.'s Dep. at 44). Plaintiff stated that he knew they would not respond.

8    Plaintiff may be referring to the lawsuit that he brought in 2014 regarding the broken typewriter that was mentioned by Judge Sharpe in his October 14, 2015 order in this case. *Geer v. McFarren*, No. 9:14-CV-589 (DNH/TWD). The court notes that the complaint in 14-CV-589 states that he filed a grievance with the grievance committee and the superintendent. He also alleged that he sent the complaint to the CORC, but no action was taken. As shown herein, there was no appeal to the CORC of any grievance filed by plaintiff, relating to his claims in this case.

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 132 of 329

**Geer v. Chapman, Not Reported in Fed. Supp. (2016)**

2016 WL 6090874

2016 WL 6090874
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Pakenauth GEER, Plaintiff,

v.

Officer CHAPMAN et al., Defendants.

9:15-cv-952 (GLS/ATB)
|
Signed 10/18/2016

**Attorneys and Law Firms**

FOR THE PLAINTIFF: PAKENAUTH GEER,
05-A-1952, BUFFALO FEDERAL DETENTION
FACILITY, 4250 Federal Drive, Batavia, New York
14020.

FOR THE DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney
General, The Capitol, OF COUNSEL: MICHAEL G.
MCCARTIN, Assistant Attorney General, Albany, New
York 12224.

## ORDER

Gary L. Sharpe, Senior District Judge

**\*1** The above-captioned matter comes to this court
following an Report-Recommendation by Magistrate
Judge Andrew T. Baxter, duly filed on September 26,
2016. (Dkt. No. 32.) Following fourteen days from the
service thereof, the Clerk has sent the file, including any
and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Report-Recommendation for clear error, it
is hereby

**ORDERED** that the Report-Recommendation (Dkt. No.
32) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary
judgment (Dkt. No. 23) be **GRANTED**; and it is further

**ORDERED** that the plaintiff's amended complaint, (Dkt.
No. 6), is **DISMISSED IN ITS ENTIRETY**; and it is
further

**ORDERED** that the Clerk is directed to close the case; and
it is further

**ORDERED** that the clerk of the court serve a copy of
this order upon the parties in accordance with this court's
Local Rules.

**IT IS SO ORDERED.**

October 18, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6090874

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4190140
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chauncey GIRARD, Plaintiff,
v.
CUTTLE; A. Hickey; Harold Graham; Alec
Venditti; Timothy Abate; Charles Thomas; Richard
Gilfus; Anthony Annucci; Carl Koenigsman;
Conners; and Jessica Dugan, Defendants.

Civ. No. 9:15-CV-0187 (TJM/DJS)
|
Signed 08/10/2018

**Attorneys and Law Firms**

CHAUNCEY GIRARD, 11-A-1352, Green Haven
Correctional Facility, P.O. Box 4000, Stormville, New
York 12582, pro se.

HON. BARBARA UNDERWOOD, Attorney General
of the State of New York, OF COUNSEL: JOHN
F. MOORE, ESQ., Assistant Attorney General, The
Capitol, Albany, New York 12224, Attorney for
Defendants.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** *Pro se* Plaintiff Chauncey Girard brings this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging
that Defendants violated various constitutional rights
in December 2014 and January 2015 while he was
incarcerated at Auburn Correctional Facility. Dkt. No.
83, Am. Compl. On January 30, 2018, Defendants filed
a Motion for Summary Judgment, pursuant to Federal
Rule of Civil Procedure 56(a). Dkt. No. 213. Defendants
separately filed Plaintiff's medical records in support of
their Motion. Dkt. No. 214. Additionally, Defendants
filed an Amended Memorandum in Support of their
Motion for Summary Judgment. Dkt. No. 217. Numerous
documents have been considered as Plaintiff's Opposition
to the Motion. *See* Dkt. Nos. 210, 218-220, 229, 239
& 241.[1] Defendants filed a Reply. Dkt. No. 237. For
the reasons that follow, the Court recommends **granting**
Defendants' Motion for Summary Judgment.

## I. BACKGROUND

Except where otherwise noted, the following material
facts are undisputed.[2] At all times relevant to this action
Plaintiff was an inmate in the custody of the New York
Department of Corrections and Community Supervision
("DOCCS"). *See generally* Am. Compl. The events at
issue took place in December 2014 and January 2015 at
Auburn Correctional Facility. *Id.*

On or about December 24, 2014, Plaintiff was given a
misbehavior report by Defendant C.O. Hickey regarding
an incident of December 23, 2014. Dkt. No. 213-1,
Declaration of John Moore ("Moore Decl."), Ex. 34,
Transcript of Plaintiff's May 25, 2017 Deposition ("Pl.'s
5/25/17 Dep.") at pp. 11-13; Dkt. No. 213-3, Declaration
of Defendant Dennis Hickey ("Hickey Decl.") at ¶¶ 4-7
& Ex. A; Dkt. No. 213-12, Declaration of Defendant
Brian Chuttey ("Chuttey Decl.") at ¶ 9 & Ex. A at p.
20.[3] The misbehavior report authored by Defendant
Hickey charged Plaintiff with violating rules regarding
violent conduct, assault on staff, interference, and failing
to follow a direct order. Hickey Decl., ¶¶ 4-7 & Ex. A. The
report involved allegations that Plaintiff was not following
proper procedure and failed to follow directions from
Hickey. It also alleged that Plaintiff attempted to assault
Hickey. *Id.* at ¶ 5, Ex. A. Plaintiff was then escorted to the
Special Housing Unit ("SHU") by Defendant Connors,
among others. Dkt. No. 213-6, Declaration of Theodore
Connors ("Connors Decl.") at ¶ 6.

**\*2** Upon arrival at the SHU a series of events took place
that resulted in Plaintiff being given a second misbehavior
report, this one written by Corrections Officer Baney. Pl.'s
5/25/17 Dep. at pp. 13-14, 23, 37-38; Chuttey Decl. at ¶ 12
& Ex. A at p. 21. This misbehavior report charged Plaintiff
with violent conduct, failing to follow a direct order,
interference, and failure to comply with frisk procedures.
Chuttey Decl. at ¶ 13 & Ex. A at p. 21. The second
report generally alleges that Plaintiff refused to comply
with procedures for admission to SHU. Chuttey Decl. at
¶ 14.

Plaintiff was given a third misbehavior report on
December 23, 2014, this one written by C.O. Schramm. It
alleged that Plaintiff refused staff direction to provide a

urine sample on December 23, 2014. Pl.'s 5/25/17 Dep. at pp. 14 - 17, 23, 37-38; Chuttey Decl. at ¶ 15 & Ex. at p. 22.

While Plaintiff disputes the accuracy of the allegations in these reports, he does not challenge that the reports were issued and that he was involved in use of force incidents on December 23, 2014. Indeed, he contends that during the events surrounding the issuance of the misbehavior report authored by Defendant Hickey, that Hickey, as well as Defendants Abate, Thomas, Venditti, and Gilfus used excessive force in assaulting him. Defendant Chuttey was designated to act as the hearing officer for a combined hearing to address all three misbehavior reports issued regarding events on December 23, 2014. Chuttey Decl. at ¶¶ 3-6. Following a lengthy hearing, held over several days in January 2015, Plaintiff was found guilty of all charges. Chuttey Decl. at ¶¶ 39-42. Plaintiff administratively appealed the decision and while the guilty determinations were affirmed, the penalties were modified. Pl.'s 5/25/17 Dep. at pp. 125-28.

While Plaintiff was being escorted to SHU following the December 24, 2014 incident with Defendant Hickey, he told Defendant Connors he wanted medical treatment and claimed to be having trouble breathing. Connors Decl. at ¶ 6. Defendant Connors advised Plaintiff that he would be seen by a nurse immediately upon arrival at SHU. *Id.* Plaintiff was, in fact, seen by medical staff upon his arrival at SHU. *Id.*; Dkt. No. 213-7, Declaration of Defendant Jessica Dugan ("Dugan Decl."), ¶ 5, Ex. A. [4] Plaintiff was examined by Defendant Dugan, a Registered Nurse, upon his arrival in SHU. *Id.*; Moore Decl., Ex. 33, Transcript of Plaintiff's October 24, 2016 Deposition Transcript ("Pl.'s 10/24/16 Dep.") at pp. 117-18. After examining Plaintiff, and making note of his injuries and physical complaints, Dugan referred Plaintiff to be seen by a doctor and he was examined by Dr. Cincotta within 10 minutes. Pl.'s 10/24/16 Dep. at pp. 120 & 124; Dugan Decl. at ¶¶ 6 & 9 & Ex. B at p. 2.

Plaintiff's Amended Complaint alleges causes of action for excessive force, failure to protect, retaliation, due process violations, and deliberate indifference to his serious medical needs.

## II. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ).

**\*3** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.  2

2018 WL 4190140

rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Defendants seek summary judgment dismissing the entire Amended Complaint on the ground that Plaintiff failed to exhaust available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). Dkt. No. 217, Defs.' Am. Mem. of Law, pp. 3-7. Defendants also seek summary judgment on the merits of each of Plaintiff's individual constitutional claims with the exception of the excessive force claim. *Id.* at pp. 8-30. Finally, Defendants seek summary judgment on the ground of qualified immunity. *Id.* at pp. 31-32. Defendants' arguments are considered in turn below.

### A. Failure to Exhaust Administrative Remedies

Defendants seek dismissal of the entire Amended Complaint based upon Plaintiff's failure to exhaust his available administrative remedies. Defs.' Am. Mem. of Law at p. 7. As an initial matter, the Court notes that one of Plaintiff's claims is a procedural due process claim regarding the conduct of a disciplinary hearing held by Defendant Chuttey. *See* Am. Compl. at ¶¶ 12-16. As to that claim Plaintiff "exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Grubbs v. Serrell*, 2018 WL 1175232, at *2 (N.D.N.Y. Mar. 6, 2018) (quoting *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) ); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009). The record clearly establishes that Plaintiff did file such an administrative appeal. Moore Decl., Ex. 32. That claim, therefore, is properly exhausted. Defendants' argument as to the exhaustion of the remaining claims is considered below.

**\*4** The Prison Litigation Reform Act ("PLRA") provides:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any

other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion under this statute is mandatory. *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). "Exhaustion promotes efficiency for the agency and federal courts by allowing agencies an initial opportunity to resolve claims 'much more quickly and economically' and providing courts 'a useful record for subsequent judicial consideration.' " *Thomas v. Waugh*, 2018 WL 1508563, at *5 (N.D.N.Y. Mar. 27, 2018) (quoting *Woodford*, 548 U.S. at 89). The failure to exhaust will be excused only if there was not truly an "available" means by which to exhaust the claim. *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016).

The DOCCS has a well established "three-step process that requires an inmate to: (1) file a grievance with the IGRC; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC in Albany, New York within four working days of receipt of the superintendent's written response." *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004) (citing 7 N.Y.C.R.R. § 701.7) (internal citations omitted); *see also Hooks v. Howard*, 2010 WL 1235236, at *3 (N.D.N.Y. Mar. 30, 2010). "If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies." *Rahman v. Connell*, 2015 WL 4740336, at *3 (N.D.N.Y. Aug. 10, 2015) (citing *Woodford*, 548 U.S. at 93); *see also Mitchell v. Senkowski*, 158 Fed. Appx. 346, 350 (2d Cir. 2005).

In support of their Motion, Defendants offer evidence of only two grievances filed which arguably address the claims at issue in this lawsuit and submit that neither is sufficient to satisfy the PLRA's exhaustion requirement. First is Grievance No. AUB-66523-15 filed January 6, 2015 at Auburn Correctional Facility. Dkt. No. 213-10, Declaration of Cheryl Parmiter at ¶ 7. This is the only grievance filed by Plaintiff at Auburn after the December 23rd incident. *Id.* The grievance is titled "Examination Protocol Not Followed After Injury." A review of that grievance makes clear that it relates only to Plaintiff's claims that he did not receive proper medical care. *Id.* at

Ex. B at pp. 14-15. Nurse Dugan is the only Defendant named in the grievance and it makes no reference to a claimed excessive use of force, alleged retaliation, or any other claim asserted in this litigation. *Id.* Records offered by Defendants show that the grievance proceeded through the first two stages of the grievance process, but was not appealed to CORC. *Id.* at ¶¶ 8-9; Dkt. No. 213-11, Declaration of Rachael Sequin at ¶ 7.

In opposing the Motion, however, Plaintiff offers a document which purports to show his appeal of this grievance. Dkt. No. 220-1 at p. 4. The appeal statement also mentions Officers Hickey, Venditti, and Thomas, but only in the context of contending that Nurse Dugan failed to provide proper medical care after an alleged assault by these officers. *Id.* Even if this brief statement could be read as a grievance against these officers, rather than identifying the basis for which he needed medical assistance, those allegations "were not in the originating grievance" and thus are not sufficient to exhaust those claims. *Robinson v. Rome*, 2013 WL 3328222, at *8 (N.D.N.Y. July 2, 2013); *see also Fox v. Labatte*, 2016 WL 8716662, at *4 (N.D.N.Y. Mar. 11, 2016), *report and recommendation adopted as modified*, 2016 WL 1266958 (N.D.N.Y. Mar. 31, 2016)("Plaintiff cannot circumvent the procedures set forth by the facility by submitting a backdoor appeal to CORC by raising the issue for the first time").

**\*5** As a result, the Auburn grievance, at best, could be sufficient only to exhaust Plaintiff's medical indifference claim.[5] Defendants contend that, in any event, the grievance did not exhaust any of Plaintiff's remedies because it was not appealed to CORC. Recall that Plaintiff alleges the grievance was appealed. *See* Dkt. No. 220-1 at p. 4. Under DOCCS regulations "CORC shall review each appeal, render a decision on the grievance, and transmit its decision to the facility ... within 30 calendar days from the time the appeal was received." 7 N.Y.C.R.R. § 701.5. Viewing the evidence in the light most favorable to Plaintiff, namely that he did file such an appeal, the appeal to CORC is dated January 30, 2015. Dkt. No. 220-1. The original Complaint in this case was dated February 15, 2015 and it was filed February 19, 2015. *See* Dkt. No. 1, Compl. That means "Plaintiff signed and filed his complaint in this action less than thirty days after he submitted his appeal to CORC. He thus did not give CORC an opportunity to respond to his appeal before he proceeded to federal court." *Thompson*

*v. Bellevue Hosp.*, 2011 WL 4369132, at *13 (N.D.N.Y. Aug. 29, 2011), *report and recommendation adopted as modified sub nom. Thompson v. Dep't of Corr. NYC*, 2011 WL 4369125 (N.D.N.Y. Sept. 19, 2011). That constituted a failure to exhaust. *Id.*; *Fox v. Labatte*, 2016 WL 8716662, at *3 (N.D.N.Y. Mar. 11, 2016), *report and recommendation adopted as modified*, No. 2016 WL 1266958 (N.D.N.Y. Mar. 31, 2016) (claims unexhausted when CORC grievance was filed January 26, 2015 and complaint postmarked February 6, 2015); *Klein v. Fischer*, 2015 WL 5174031, at *19 (N.D.N.Y. Sept. 2, 2015) (finding claims unexhausted when "Plaintiff[']s original Complaint ... was filed ... less than thirty days after the appeal to CORC").

Defendants also offer evidence of grievances filed in 2015 after Plaintiff had been transferred to Upstate Correctional Facility. Dkt. No. 213-9, Declaration of Donna Wilcox at Ex. A. Grievance UST-55624-15 again alleges that Plaintiff had been denied medical care allegedly needed as a result of the alleged December 2014 assault. *Id.* at ¶ 7 & Ex. B. The denial of medical care at issue in this grievance, however, concerned care at Upstate Correctional Facility, *id.*, and there are no claims in this case concerning Plaintiff's care at Upstate.

The grievance does make reference to some of the events at issue here, however. It discusses the alleged use of force and certain aspects of Plaintiff's due process claim. That grievance was first denied by the Superintendent at Upstate and then appealed to CORC. The CORC determination specifically found that any claims regarding the events at Auburn were untimely. Wilcox Decl., ¶ 10 & Ex. B. at p. 35. An untimely grievance does not satisfy the exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); *Lee v. O'Harer*, 2014 WL 7343997, at *6 n.6 (N.D.N.Y. Dec. 23, 2014); *Conklin v. Bowen*, 2014 WL 4063294, at *3 (N.D.N.Y. Aug. 14, 2014). The Upstate Grievance is also insufficient to satisfy the PLRA's exhaustion requirement.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment based on the failure to exhaust be denied as to Plaintiff's due process claim against Defendant Chuttey but granted as to all other claims.

While the failure to exhaust is a sufficient ground for granting summary judgment, the Court will also

address the additional substantive grounds raised by Defendants.[6]

## B. First Amendment Retaliation

Plaintiff claims that Defendants Graham, Hickey, Thomas, and Venditti retaliated against him in December 2014 by improperly using force, or permitting such force to be used, and interposing "fake charges" against Plaintiff. Am. Compl. at ¶¶ 2-10; Dkt. No. 220-2. Plaintiff alleges the retaliation was in response to a grievance Plaintiff filed against Defendant Thomas on March 19, 2014. Am. Compl. at ¶ 6.

**\*6** "To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action'." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) ). The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ). This is true because retaliation claims are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

Plaintiff claims that he was retaliated against because of a March 2014 grievance filed against Defendant Thomas. Am. Compl. at ¶ 6. The filing of a grievance is protected activity sufficient to establish the first element of a retaliation claim. *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003). A retaliation plaintiff must then establish a causal connection between a protected activity and an adverse action. *Holland v. Goord*, 758 F.3d at 22. But to survive dismissal Plaintiff "must advance non-conclusory allegations." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 106 (2d Cir. 2001).

### 1. Adverse Action

Hickey and Venditti presume, without conceding, that Plaintiff may be able to establish adverse action. Defs.' Am. Mem. of Law at pp. 9-10. While Defendant Thomas contends that Plaintiff cannot establish an adverse action with regard to him, Plaintiff does allege that Thomas assaulted him on December 23, 2014 in retaliation for the grievance filing. Am. Compl. at ¶ 5. An assault clearly qualifies as an adverse action in this context. *Flemming v. King*, 2016 WL 5219995, at \*5 (N.D.N.Y. June 20, 2016), *report and recommendation adopted*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016). Thomas' denial that the assault occurred, *see generally* Dkt. No. 213-5, Declaration of Charles Thomas ("Thomas Decl."), only raises a factual question that cannot be resolved at this stage of the litigation.

Defendant Graham, however, is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff offers no evidence of an adverse action on Graham's part. Plaintiff claims that Graham "[p]ut Plaintiff in harms way" by permitting Thomas to harm Plaintiff. Dkt. No. 220-2. At his deposition Plaintiff testified that Graham, as Superintendent of Auburn, had Thomas moved to cover Plaintiff's program assignment. Pl.'s 10/24/16 Dep. at p. 51. He could not articulate anything, other than Graham's overall position of authority, to support his contention that Graham had actually done so. *Id.* at pp. 51-52. He conceded that he had no personal knowledge that Graham had any role in Thomas' assignment to Plaintiff's program, *id.* at p. 52, and that he never personally spoke with Graham about this. *Id.* at p. 54. Graham specifically denies taking any action, including having any role in Thomas' work assignment, to retaliate against Plaintiff. Declaration of Harold Graham ("Graham Decl.") at ¶¶ 10-11. Given this record, Plaintiff's conclusory allegation that Graham took adverse action against him cannot withstand summary judgment. *Woods v. Miller*, 2017 WL 4181383, at \*6 (N.D.N.Y. Aug. 1, 2017), *report and recommendation adopted*, 2017 WL 4155357 (N.D.N.Y. Sept. 18, 2017) ("Plaintiff's vague allegations are insufficient to establish that Defendant[ ] took adverse action against him.")

### 2. Casual Connection

**\*7** In a summary judgment motion, the non-movant must proffer "some tangible proof" of a casual connection between the protected activity and the adverse action and the plaintiff "may not rely on conclusory assertions of retaliatory motive." *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004). "Courts assess four factors to determine whether the necessary causal link exists: '(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.' " *Pierrot v. Hahn*, 2017 WL 4221117, at *8 (N.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 4221072 (N.D.N.Y. Sept. 21, 2017) (quoting *Lunney v. Brureton*, 2007 WL 1544629, at *21 (S.D.N.Y. May 29, 2007) ).

Regarding temporal proximity:

> [t]here is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*DeLeon v. Wright*, 2012 WL 3264932, at *7 (N.D.N.Y. July 5, 2012), *report and recommendation adopted*, 2012 WL 3264929 (N.D.N.Y. Aug. 9, 2012) (quoting *Burton v. Lynch*, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) ). Here, over nine months passed between the protected activity and the alleged retaliation. Such a long gap is very attenuated and highly suggestive of a lack of causal connection. *White v. Eastman Kodak*, 2009 WL 1514659, at *10 (W.D.N.Y. May 29, 2009) ("The Court determines that in the absence of any other evidence, [nine months] is simply too long a period of time to show temporal proximity."); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006) ("actions that took place more

than nine months after the last alleged protected activity ... are too remote to establish a causal connection.")

The record contains no evidence regarding Plaintiff's past disciplinary record, but the disciplinary proceedings concerning the events at issue resulted in Plaintiff being found guilty of charges including assault on staff, interference with employee, and multiple charges of both violent conduct and refusing direct orders. Chuttey Decl. at ¶ 39. As discussed *infra* at Point III(D) these determinations are supported by ample evidence in the record. These charges arose from the alleged assault incident claimed by Plaintiff and the guilty determinations regarding those charges are strong evidence against the claim of retaliation. *Williams v. Muller*, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) ("This outcome strongly suggests the existence of proper reasons for [defendants'] actions, and raises an inference of non-retaliation.").

Finally, considering the evidence of Defendants' motivation for their actions also demonstrates that the retaliation claim cannot survive summary judgment. Hickey and Venditti both expressly deny knowing about the March grievance against Thomas. Hickey Decl. at ¶ 8; Dkt. No. 213-4, Declaration of Alec Venditti at ¶ 6. Thomas avers that he never told either about that grievance. Thomas Decl. at ¶ 6. A lack of knowledge regarding the allegedly protected activity defeats a retaliation claim. *Blake v. Elfeldt*, 2012 WL 5830694, at *8 (N.D.N.Y. Oct. 11, 2012), *report and recommendation adopted*, 2012 WL 5830718 (N.D.N.Y. Nov. 16, 2012). In response, Plaintiff offers nothing beyond purely conclusory assertions to suggest that Defendants acted in response to the grievance. He specifically denies having any independent knowledge of Hickey's motivation to retaliate against him. Pl.'s 10/24/16 Dep. at pp. 93-94. As to Venditti, Plaintiff alleges in conclusory fashion that he was part of the "beat up squad" and that he was motivated by friendship with Thomas and Hickey to assault Plaintiff. *Id.* at pp. 94-95. "Naked allegations of retaliatory motives cannot create a factual dispute capable of defeating summary judgment." *Banez v. New York Foundling Hosp.*, 2001 WL 1035142, at *6 (S.D.N.Y. Sept. 7, 2001) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ).

**\*8** For these additional reasons, it is recommended that Plaintiff's retaliation claim be dismissed. [7]

## C. Eighth Amendment Failure to Protect

Defendants next seek summary judgment as to Plaintiff's failure to protect claim against Defendant Graham. "In order to succeed on a claim of failure to protect, the inmate 'must establish both that a substantial risk to his safety actually existed and that the offending defendant knew of and consciously disregarded that risk.' " *Clark v. Gardner*, 256 F. Supp. 3d 154, 167 (N.D.N.Y. 2017). To establish this claim, then, Plaintiff must show both that he was incarcerated under conditions posing a substantial risk of serious harm and that Defendant Graham was deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Plaintiff does not appear to oppose this portion of the Motion. *See* Dkt. Nos. 220-3; 241. Nor does the record support such a claim. Generally stated, Plaintiff alleges that Graham "knew of Conflict [sic]" between Plaintiff and Defendant Thomas. Am. Compl. at ¶ 1. This knowledge allegedly resulted from grievances filed by Plaintiff against Thomas in March 2014. *Id.* at ¶ 6. Plaintiff alleges that despite this knowledge, Graham nonetheless allowed Plaintiff to be in the proximity of Thomas in December 2014 when Thomas allegedly assaulted him. *Id.* at ¶ 1. The record establishes that other than the March grievance, Graham had no information regarding any conflict between Plaintiff and Thomas. Graham Decl. at ¶ 10. Graham also indicates that he had no role in Thomas' work assignment in December 2014. *Id.* Plaintiff offers nothing but conclusory allegations to suggest that, given this evidence, Graham had any basis on which to believe that there was a threat of harm to Plaintiff from Defendant Thomas based on a grievance filed nine months earlier. Such allegations are insufficient to survive summary judgment. *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 215 (N.D.N.Y. 2015).

For these reasons Defendant Graham is entitled to summary judgment.

## D. Fourteenth Amendment Due Process

Plaintiff was issued three inmate misbehavior reports on December 23, 2014. Chuttey Decl., Ex. A at pp. 20-22. Defendant Chuttey was designated as the hearing officer for the hearings regarding these misbehavior reports.

Chuttey Decl., ¶ 4. Plaintiff claims that Chuttey violated his due process rights during the course of the hearing. Am. Compl. at ¶¶ 12-18. For the reasons which follow, Chuttey is entitled to summary judgment on these claims.

In the context of an inmate disciplinary proceeding, due process requires that the inmate be: (1) afforded advance written notice of the charges against him; (2) provided a written statement supporting the disposition and reasons for the disciplinary action taken; (3) permitted to call witnesses and present documentary evidence; (4) entitled to a fair and impartial hearing officer; and (5) found guilty only if the disposition is supported by at least "some evidence." *Wolff v. McDonnell*, 418 U.S. 539, 563–64 (1974); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (citing cases). Additionally, because Plaintiff was confined to a special housing unit prior to his disciplinary hearing, he was also entitled to an employee assistant. *Clark v. Gardner*, 256 F. Supp. 3d 154, 170 (N.D.N.Y. 2017). The record here establishes that all of these due process requirements were complied with in Plaintiff's case.

**\*9** As to some of these requirements, there is no dispute. Plaintiff testified at his deposition that he received all three of the misbehavior reports prior to the hearing held by Defendant Chuttey. Pl.'s 5/25/17 Dep. at pp. 13-16. The record also clearly establishes that Plaintiff received the assistance from two employee assistants prior to the commencement of the disciplinary hearing. *Id.* at pp. 20-21; Chuttey Decl., Ex. A at pp. 25-26. It is also clear that Plaintiff received a detailed written disposition of the charges and of the reasons for the disciplinary action taken following the hearing. Pl.'s 5/25/17 Dep. at pp. 121-23; Chuttey Decl., Ex. A at p. 17.

There was also sufficient evidence to support the determination reached by Chuttey. "The Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence." *McDonald v. Zerniak*, 2016 WL 6581289, at \*5 (N.D.N.Y. Nov. 4, 2016) (internal quotation omitted). This requires the Court to determine "whether there was reliable evidence of the inmate's guilt." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). Here, Officers Baney and Hickey testified consistent with the allegations set forth in their misbehavior reports. *See* Chuttey Decl., Ex. A at pp. 10-11 & Ex. B. at pp. 83-84 & 110-15. The

"some evidence" standard is satisfied when hearing testimony was consistent with the written misbehavior report. *See Hinton v. Prack*, 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *Kotler v. Daby*, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (same); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same). Beyond just the testimony of these two officers, however, Corrections Officer Sgt. Young and Corrections Officer Fagan, among others, provided testimony regarding the report issued by Officer Baney. Chuttey Decl., Ex. B at pp. 98-104; *see also* Ex. B, *generally*. Again, among others, Officers Venditti and Thomas testified regarding the Hickey report. *Id.* at pp. 143-48 & 161-64. Defendant Chuttey also had numerous documents and a videotape beyond the misbehavior report available to him which supported the ultimate guilty determination. *See generally* Chuttey Decl., Ex. B. As such, this is a case where "the testimony of multiple witnesses, the misbehavior report[s]" and other evidence clearly provided some evidence of Plaintiff's guilt. *Weaver v. Gutwein*, 2014 WL 906150, at *5 (N.D.N.Y. Mar. 7, 2014).

There was also some evidence to support the guilty determination regarding the misbehavior report issued by Officer Schramm. Defendant Chuttey indicated that he relied upon the misbehavior report itself and the request for urinalysis form indicating Plaintiff's refusal as evidence of Plaintiff's guilt. Chuttey Decl., Ex. B at p. 181; *see also id.*, Ex. A at pp. 22 & 38. The fact that Officer Schramm did not testify regarding the report he issued does not alter the analysis. "The [s]ome evidence standard has been held to be satisfied in cases where the hearing official relies almost entirely on an incident report written by a non-testifying officer." *Reeves v. Perdue*, 2014 WL 2177405, at *4 (N.D.N.Y. May 23, 2014) (citing cases); *Kotler v. Daby*, 2013 WL 1294282, at *13 (" 'some evidence' standard has been found to be satisfied when the hearing official relies almost solely on the incident report without interviewing the officer(s) who wrote the misbehavior report."). It is significant here that Plaintiff did not request Officer Schramm as a witness. *See* Chuttey Decl. at ¶¶ 22 & 30 & Ex. B.

**\*10** Plaintiff claims that his right to call witnesses and present documentary evidence was denied. Plaintiff requested to have fourteen individuals testify at the hearing - thirteen employees of DOCCS and one inmate. Chuttey Decl. at ¶¶ 30, 34 & 37. All but one of these witnesses did, in fact, testify at the hearing. *Id.*; *see also* Chuttey Decl., Ex. B. The only witness denied to Plaintiff was Dr. Cincotta. Defendant Chuttey denied Dr. Cincotta as a witness on the ground that he had not been present at any of the incidents underlying the misbehavior reports at issue. Chuttey Decl. at ¶ 34. During the hearing, Plaintiff indicated that he wished to have the doctor testify about the injuries he received, but admitted that he was not present for the events at issue in the hearing. Chuttey Decl., Ex. B. at pp. 62-63. A hearing officer's refusal to have medical personnel, who were not present at the underlying event, testify regarding the extent of an inmate's injuries does not offend due process. *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, 2016 WL 5394752, at *22 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016); see also *Rossi v. Goord*, 2006 WL 2811505, at *14 (N.D.N.Y. Sept. 28, 2006) (denial of testimony of individuals who did not witness relevant events not a violation of due process) (citing *Kalwasinski v. Morse*, 201 F.3d at 109). The failure to have Dr. Cincotta testify, therefore, was not a violation of due process.

Plaintiff also objects that he was denied access to an Unusual Incident Report and a videotape. While inmates have a general right to access relevant documentary evidence "this right 'does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests even when documents are relevant and obtainable.' " *Rossi v. Stevens*, 2008 WL 4452383, at *10 (S.D.N.Y. Sept. 30, 2008) (quoting *Amaker v. Coombe*, 2002 WL 523388, at *10 (S.D.N.Y. Mar. 29, 2002) ). Here, the record establishes that Plaintiff received much of the available evidence, but that he wished for more.

Defendant Chuttey made available a copy of the Unusual Incident report that was generated regarding events taking place during Plaintiff's admission to SHU. Plaintiff stated he did not want that report, but one involving his initial interactions with Defendant Hickey. Plaintiff was advised that there was a use of force report regarding that incident, but not an Unusual Incident Report. Plaintiff and the hearing officer then engaged in significant back and forth regarding the differences between the two

reports and what exactly Plaintiff was requesting access to. Chuttey Decl., Ex. B at pp. 82-89. Plaintiff was given the opportunity to review documentation and chose not to; that does not constitute a denial of due process.

Plaintiff also objects that he was not provided access to relevant videotape evidence during his hearing. Specifically, he alleges that portions of the event at issue were recorded on a hand-held video recorder and that that video was not presented at his hearing. Dkt. No. 220-4. Twice during the disciplinary hearing, Defendant Chuttey played what he advised Plaintiff was the only available video evidence for Plaintiff. Chuttey Decl. at ¶ 32; Pl.'s 5/25/17 Dep. at pp. 74-75. The Court notes that the existence of another video was heavily litigated during discovery in this case. Defendants were directed by the Court to conduct a supplemental search for the purported additional video, Dkt. No. 224, and that search was unavailing. Dkt. No. 234. Plaintiff's conclusory allegations to the contrary do not raise factual questions sufficient to defeat summary judgment. *Harris v. Aidala*, 271 Fed. Appx. 34, 36 (2d Cir. 2008) (finding allegations that DOCCS officials had additional videotape tape that was not made available to Plaintiff insufficient to defeat summary judgment). The record here establishes that the additional video evidence Plaintiff sought was not available and "where the requested documents are found to be nonexistent, the inmate suffers no constitutional deprivation." *Mohamed v. Phelix*, 2017 WL 4326660, at *12 (N.D.N.Y. June 13, 2017), *report and recommendation adopted*, 2017 WL 4326520 (N.D.N.Y. Sept. 28, 2017) (citing *Mays v. Mahoney*, 1994 WL 48831, at * 7 (S.D.N.Y. Feb. 14, 1994) ).

**\*11** Plaintiff also objects to his exclusion from his hearing at its conclusion. Given Plaintiff's disruptive conduct Chuttey removed Plaintiff from the hearing room. Chuttey Decl. at ¶ 38. At that time all testimony had concluded and Plaintiff was not present only for Chuttey reading of his disposition into the record. *Id.*; *see also* Chuttey Decl., Ex. B. at pp. 179-82. Plaintiff received a written copy of the disposition read into the record. Pl.'s 5/25/17 Dep. at pp. 121-23. Even were excluding Plaintiff error, it is clearly harmless and no basis for relief. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009); *Eleby v. Selsky*, 682 F. Supp. 2d 289, 292 (W.D.N.Y. 2010).

Finally, Plaintiff cannot establish that Chuttey was biased or lacked the necessary impartiality. The due process protection of an impartial hearing officer "requires only that the hearing officer's decision not be arbitrary." *Gibson v. Rosati*, 2017 WL 1534891, at *11 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1512371 (N.D.N.Y. Apr. 27, 2017) (citing *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) ). A disciplinary determination is not arbitrary when, as outlined above, it is supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). Apart from his exclusion from the hearing just discussed, the only other specific claim of bias is the entirely conclusory allegation that Chuttey came to Plaintiff's cell prior to the commencement of the hearing and told Plaintiff he would be found guilty and that "he had a hand that [stretches] from Clinton to Attica C.F." Am. Compl. at ¶ 12. "Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed." *Brown v. Dubois*, 2017 WL 9511165, at *3 (N.D.N.Y. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 1102746 (N.D.N.Y. Mar. 24, 2017); *see also Gillard v. Rovelli*, 2014 WL 4060025, at *13 (N.D.N.Y. Aug. 14, 2014); *Britt v. Fawcett*, 2009 WL 890631, at *6 (N.D.N.Y. Mar. 31, 2009).

Accordingly, it is recommended that summary judgment be granted to Defendant Chuttey.

### E. Eighth Amendment Medical Indifference

Plaintiff alleges that Sgt. Connors and Nurse Dugan were deliberately indifferent to his medical needs after he was allegedly assaulted on December 23, 2014. Am. Compl. at ¶¶ 7 & 11. Defendant seeks summary judgment as to this claim on the ground that Plaintiff was provided appropriate medical treatment following this incident. Defs.' Am. Mem. of Law at pp. 24-28.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (*quoting Estelle v. Gamble*, 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin* ("*Hathaway I*"), 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer* v. *Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) ). Here, a court must make two inquiries. First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) ).

**\*12** The second prong of the Eighth Amendment analysis is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (*citing Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support

an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (*quoting Hathaway v. Coughlin* ("*Hathaway II*"), 99 F.3d 550, 553 (2d Cir. 1996) ); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

For purposes of this Motion the Court presumes that there are at least questions of fact regarding the objective prong of this analysis. Medical records show that only relatively minor injuries were observed at the time Plaintiff was first seen in the Special Housing Unit. Dugan Aff., Exs. A & B. Plaintiff, however, alleges much more serious injuries. *See, e.g.*, Am. Compl. at ¶ 5 (alleging dislocated shoulder) & 11 (alleging lacerations and breathing difficulties). This dispute should not and need not be resolved on this Motion because it is clear that with respect to the subjective prong summary judgment is appropriate for Defendants.

### 1. Sgt. Connors

Plaintiff's medical claim against Sgt. Connors alleges that he was indifferent to Plaintiff's needs by taking Plaintiff directly to the Special Housing Unit rather than the medical unit on December 23, 2014. Pl.'s 10/24/16 Dep. at pp. 96-98. Sgt. Connors arrived after a use of force incident involving Plaintiff and several other officers. Connors Decl. at ¶ 6. Connors, along with others, then escorted Plaintiff to the SHU. *Id.*

In order for a prison official to be liable for medical indifference "the official must 'know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal alternations omitted) (quoting *Farmer v. Brennan*, 511 U.S. at 837). The record establishes that while Plaintiff was being escorted Sgt. Connors observed "no bleeding or other visible injuries." Connors Decl. at ¶ 6. Plaintiff did request medical treatment during the escort. *Id.*; Pl.'s 10/24/16 Dep. at p. 98. Connors knew that Plaintiff would be seen by medical staff upon arriving at the Special Housing Unit. Connors Decl. at ¶ 6. Given these facts, Connors felt

there was no need to transport Plaintiff to a medical unit first rather than SHU. *Id.*

As Connors had indicated he would be, Plaintiff was seen by several different medical professionals within minutes of arriving at the Special Housing Unit. He was examined, had x-rays performed, and was given pain medication. Dkt. No. 214. Rather than demonstrating an indifference to Plaintiff's health, this evidence, which is not refuted by Plaintiff, *see* Pl.'s 10/24/16 Dep. at pp. 113-24, shows that Connors was aware of Plaintiff's request for medical attention, considered his medical state, and acted in a manner consistent with addressing those concerns. *Butler v. Smith*, 2008 WL 4186338, at *6 (N.D.N.Y. Sept. 10, 2008) (dismissing medical indifference claim against Sergeant who was not a medical professional and had no reason to believe actions taken regarding plaintiff were inadequate). As such, Plaintiff cannot establish the subjective prong of his Eighth Amendment claim as to Defendant Connors.

### 2. Nurse Dugan

**\*13** Plaintiff alleges that Nurse Dugan was deliberately indifferent because she failed to give Plaintiff a meaningful assessment upon his admission to SHU. Am. Compl. at ¶ 11; Dkt. No. 210-2 at p. 2; Dkt. No. 241 at p. 5. There is no question that Dugan examined Plaintiff when he arrived in SHU on December 23rd. Pl.'s 10/24/16 Dep. at pp. 118-19; Dugan Aff. at ¶ 5. Plaintiff also concedes that he conducted an assessment of him on that date. Pl.'s 10/24/16 Dep. at p. 118. At that time Plaintiff complained to Dugan about pain in his left shoulder and throat. *Id.* Dugan documented both of those complaints in the medical records. Dkt. No. 214 at p. 5. She also documented left arm pain and a problem moving the left arm and shoulder. *Id.* Dugan further documented that there were no obvious deformities on the arm or shoulder and that Plaintiff had no obvious injury or redness in his throat. *Id.* Dugan then referred Plaintiff to be seen by a doctor. Dugan Decl. at ¶ 5. Within ten minutes of seeing Nurse Dugan, Plaintiff was seen in SHU by Dr. Cincotta. *Id.* at ¶ 6; Pl.'s 10/24/16 Dep. at pp. 120 & 124. The doctor examined Plaintiff and ordered x-rays of his shoulder which came back normal. Pl.'s 10/24/16 Dep. at p. 122; Dkt. No. 214 at p. 6.

The fact that Plaintiff may feel that he "did not get the level of medical attention he deserved" is insufficient to establish an Eighth Amendment claim. *Jenkins v. Trachtman*, 2017 WL 7163935, at *4 (N.D.N.Y. Dec. 22, 2017), *report and recommendation adopted*, *Jenkins v. Trachtman*, 2018 WL 626303 (N.D.N.Y. Jan. 30, 2018). Plaintiff's claims that the assessment provided by Nurse Dugan was incomplete or insufficient essentially amount to a disagreement over treatment which cannot be a basis for an Eighth Amendment claim. *Solar v. Lennox*, 2012 WL 3929936, at *19 (N.D.N.Y. July 16, 2012), *report and recommendation adopted*, 2012 WL 3929958 (N.D.N.Y. Sept. 10, 2012) (citing *Chance v. Armstrong*, 143 F.3d at 703); *Irby v. Frisnia*, 119 F. Supp. 2d 130, 132 (N.D.N.Y. 2000) (no deliberate indifference where, at most, defendant might be liable for negligence "in failing to initially diagnose [plaintiff's] injury").

Plaintiff's position that the presence of a bruising five days after the incident supports his claim that Dugan was indifferent to his needs is also without merit. There is no evidence to suggest that Plaintiff complained of such an injury when admitted to SHU. *See* Pl.'s 10/24/16 Dep. at pp. 113-124 (discussing claim against Dugan). "At worse then, [Dugan] failed to identify an injury that Plaintiff himself had not felt the effects of at the time of [Dugan's] assessment." *Harris v. Morton*, 2008 WL 596891, at *4 (N.D.N.Y. Feb. 29, 2008) (finding no deliberate indifference when injury was discovered after initial assessment).

Defendant Dugan's conduct, examining and documenting an inmate's complaints after a use of force incident and referring him for treatment is far from indifferent to Plaintiff's needs. *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, 2016 WL 5394752, at *15 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's medical indifference claims.

### F. Supervisory Claims

Plaintiff's claims against Annucci and Koenigsmann allege that they were deliberately indifferent to issues he raised through letters written to them. The basis of the deliberate indifference appears to be that those letters were

then referred to other people who in turn responded to Plaintiff. *See, e.g.,* Am. Compl. at ¶ 20; Dkt. No. 220-6. Defendants Annucci and Koenigsmann seek summary judgment on the ground that they were not personally involved in any constitutional violation. *See* Defs.' Am. Mem. of Law, pp. 28-30.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) ). A supervisory official "may not be held liable for damages merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996). Moreover, "the doctrine of *respondeat superior* cannot be applied to *section 1983* actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985) ); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

**\*14** The Second Circuit has held that the personal involvement of a supervisory official may be established if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates

> by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted). [8]

The record establishes that Plaintiff did write numerous letters to both Annucci and Koenigsmann and that those letters were generally forwarded to other DOCCS personnel with responses then being sent to Plaintiff. Dkt. No. 220-6 at pp. 3-11; Pl.'s 10/24/16 at pp. 146-48 & 162. The law is clear, however, that such actions are insufficient to establish personal involvement. "It is within the purview of a superior officer to delegate responsibility to others." *Scott v. Koenigsmann,* 2016 WL 1057051, at *7 (N.D.N.Y. Mar. 14, 2016). "Prison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint." *Vega v. Artus,* 610 F.Supp.2d 185, 199 n. 13 (N.D.N.Y. 2009); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir. 1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoner to advise him of the subordinates decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official); *Josey v. Rock,* 2013 WL 1500435, *11 (N.D.N.Y. 2013), *report and recommendation adopted,* 2013 WL 1501029 (N.D.N.Y. 2013) ("A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement"); *Walker v. Fischer,* 2011 WL 4369116, at *6 (N.D.N.Y. July 25, 2011), *report and recommendation adopted,* 2011 WL 4369096 (N.D.N.Y. Sept. 19, 2011), *aff'd,* 523 Fed. Appx. 43 (2d Cir. 2013) ("The 'mere receipt of letters from an inmate by a [supervisory official] regarding a medical claim is insufficient to constitute personal liability.' ")

**\*15** None of the other *Colon* factors are implicated here. There is no allegation that either of these supervisory Defendants were directly involved in any of the incidents at issue here, that a policy or custom of their creation was at issue, or that either of these high-ranking officials had a role in supervising any of the other Defendants in a manner that could impose liability upon them.

Accordingly, Plaintiff's claims of indifference against Annucci and Koenigsmann should be dismissed for lack of personal involvement.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 213) be **GRANTED**[9] and this case be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days[10] within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Slip Copy, 2018 WL 4190140

---

Footnotes

1    For ease of reference, Plaintiff's various filings are referred to here simply by Docket Number.

2    Under Local Rule 7.1(a)(3), on a motion for summary judgment a non-movant must respond to the movant's statement of material facts "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and "set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3). "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.* Plaintiff has not filed a responsive Rule 7.1 Statement, but makes numerous factual assertions contradicting the facts set forth by Defendants in his various submissions. In deference to Plaintiff's *pro se* status the Court has opted to review the entire summary judgment record in order to ascertain the undisputed material facts. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting court's "broad discretion to determine whether to overlook a party's failure to comply with local court rules").

3    Page references to the exhibits to the Chuttey Declaration are to those assigned by the Court's CM/ECF system.

4    Exhibits A and B to the Dugan Declaration are docketed as Docket Number 214.

5    In addition to Nurse Dugan, Sgt Connors is named as a Defendant as to this claim. Though Defendant Connors is not specifically named in the grievance, a grievance need not identify each and every potential defendant in a grievance for it to sufficiently exhaust a claim. *Jones v. Bock*, 549 U.S. 199, 219 (2007).

6    The failure to exhaust is the only basis presented in this motion for dismissal of the excessive force claim against Defendants Abate, Thomas, Hickey, Venditti, and Gilfus.

7    Defendants Hickey and Venditti offer as an additional argument in support of summary judgment that they would have taken the same action even in the absence of any protected activity and so judgment is appropriate under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Defs.' Am. Mem. of Law at pp. 14-15. Given that one part of the action allegedly taken was the excessive use of force, which is plainly unlawful, Defendants' argument in this regard is not an independent basis for relief.

8    The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) upon the categories of supervisory liability under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *See Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. Appx. 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role. *See, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340,

347 (S.D.N.Y. 2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five factor *Colon* test.

9    Because the Court recommends that summary judgment be granted based on the failure to exhaust and those merits arguments raised by Defendants, it does not reach the alternative argument regarding Defendants' entitlement to qualified immunity.

10    If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4190140
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chauncey GIRARD, Plaintiff,

v.

CUTTLE; A. Hickey; Harold Graham; Alec
Venditti; Timothy Abate; Charles Thomas; Richard
Gilfus; Anthony Annucci; Carl Koenigsman;
Conners; and Jessica Dugan, Defendants.

Civ. No. 9:15-CV-0187 (TJM/DJS)
|
Signed 08/10/2018

**Attorneys and Law Firms**

CHAUNCEY GIRARD, 11-A-1352, Green Haven
Correctional Facility, P.O. Box 4000, Stormville, New
York 12582, pro se.

HON. BARBARA UNDERWOOD, Attorney General
of the State of New York, OF COUNSEL: JOHN
F. MOORE, ESQ., Assistant Attorney General, The
Capitol, Albany, New York 12224, Attorney for
Defendants.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** *Pro se* Plaintiff Chauncey Girard brings this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging
that Defendants violated various constitutional rights
in December 2014 and January 2015 while he was
incarcerated at Auburn Correctional Facility. Dkt. No.
83, Am. Compl. On January 30, 2018, Defendants filed
a Motion for Summary Judgment, pursuant to Federal
Rule of Civil Procedure 56(a). Dkt. No. 213. Defendants
separately filed Plaintiff's medical records in support of
their Motion. Dkt. No. 214. Additionally, Defendants
filed an Amended Memorandum in Support of their
Motion for Summary Judgment. Dkt. No. 217. Numerous
documents have been considered as Plaintiff's Opposition
to the Motion. *See* Dkt. Nos. 210, 218-220, 229, 239
& 241.[1] Defendants filed a Reply. Dkt. No. 237. For
the reasons that follow, the Court recommends **granting**
Defendants' Motion for Summary Judgment.

## I. BACKGROUND

Except where otherwise noted, the following material
facts are undisputed.[2] At all times relevant to this action
Plaintiff was an inmate in the custody of the New York
Department of Corrections and Community Supervision
("DOCCS"). *See generally* Am. Compl. The events at
issue took place in December 2014 and January 2015 at
Auburn Correctional Facility. *Id.*

On or about December 24, 2014, Plaintiff was given a
misbehavior report by Defendant C.O. Hickey regarding
an incident of December 23, 2014. Dkt. No. 213-1,
Declaration of John Moore ("Moore Decl."), Ex. 34,
Transcript of Plaintiff's May 25, 2017 Deposition ("Pl.'s
5/25/17 Dep.") at pp. 11-13; Dkt. No. 213-3, Declaration
of Defendant Dennis Hickey ("Hickey Decl.") at ¶¶ 4-7
& Ex. A; Dkt. No. 213-12, Declaration of Defendant
Brian Chuttey ("Chuttey Decl.") at ¶ 9 & Ex. A at p.
20.[3] The misbehavior report authored by Defendant
Hickey charged Plaintiff with violating rules regarding
violent conduct, assault on staff, interference, and failing
to follow a direct order. Hickey Decl., ¶¶ 4-7 & Ex. A. The
report involved allegations that Plaintiff was not following
proper procedure and failed to follow directions from
Hickey. It also alleged that Plaintiff attempted to assault
Hickey. *Id.* at ¶ 5, Ex. A. Plaintiff was then escorted to the
Special Housing Unit ("SHU") by Defendant Connors,
among others. Dkt. No. 213-6, Declaration of Theodore
Connors ("Connors Decl.") at ¶ 6.

**\*2** Upon arrival at the SHU a series of events took place
that resulted in Plaintiff being given a second misbehavior
report, this one written by Corrections Officer Baney. Pl.'s
5/25/17 Dep. at pp. 13-14, 23, 37-38; Chuttey Decl. at ¶ 12
& Ex. A at p. 21. This misbehavior report charged Plaintiff
with violent conduct, failing to follow a direct order,
interference, and failure to comply with frisk procedures.
Chuttey Decl. at ¶ 13 & Ex. A at p. 21. The second
report generally alleges that Plaintiff refused to comply
with procedures for admission to SHU. Chuttey Decl. at
¶ 14.

Plaintiff was given a third misbehavior report on
December 23, 2014, this one written by C.O. Schramm. It
alleged that Plaintiff refused staff direction to provide a

urine sample on December 23, 2014. Pl.'s 5/25/17 Dep. at pp. 14 - 17, 23, 37-38; Chuttey Decl. at ¶ 15 & Ex. at p. 22.

While Plaintiff disputes the accuracy of the allegations in these reports, he does not challenge that the reports were issued and that he was involved in use of force incidents on December 23, 2014. Indeed, he contends that during the events surrounding the issuance of the misbehavior report authored by Defendant Hickey, that Hickey, as well as Defendants Abate, Thomas, Venditti, and Gilfus used excessive force in assaulting him. Defendant Chuttey was designated to act as the hearing officer for a combined hearing to address all three misbehavior reports issued regarding events on December 23, 2014. Chuttey Decl. at ¶¶ 3-6. Following a lengthy hearing, held over several days in January 2015, Plaintiff was found guilty of all charges. Chuttey Decl. at ¶¶ 39-42. Plaintiff administratively appealed the decision and while the guilty determinations were affirmed, the penalties were modified. Pl.'s 5/25/17 Dep. at pp. 125-28.

While Plaintiff was being escorted to SHU following the December 24, 2014 incident with Defendant Hickey, he told Defendant Connors he wanted medical treatment and claimed to be having trouble breathing. Connors Decl. at ¶ 6. Defendant Connors advised Plaintiff that he would be seen by a nurse immediately upon arrival at SHU. *Id.* Plaintiff was, in fact, seen by medical staff upon his arrival at SHU. *Id.*; Dkt. No. 213-7, Declaration of Defendant Jessica Dugan ("Dugan Decl."), ¶ 5, Ex. A. [4] Plaintiff was examined by Defendant Dugan, a Registered Nurse, upon his arrival in SHU. *Id.*; Moore Decl., Ex. 33, Transcript of Plaintiff's October 24, 2016 Deposition Transcript ("Pl.'s 10/24/16 Dep.") at pp. 117-18. After examining Plaintiff, and making note of his injuries and physical complaints, Dugan referred Plaintiff to be seen by a doctor and he was examined by Dr. Cincotta within 10 minutes. Pl.'s 10/24/16 Dep. at pp. 120 & 124; Dugan Decl. at ¶¶ 6 & 9 & Ex. B at p. 2.

Plaintiff's Amended Complaint alleges causes of action for excessive force, failure to protect, retaliation, due process violations, and deliberate indifference to his serious medical needs.

## II. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ).

**\*3** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Defendants seek summary judgment dismissing the entire Amended Complaint on the ground that Plaintiff failed to exhaust available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). Dkt. No. 217, Defs.' Am. Mem. of Law, pp. 3-7. Defendants also seek summary judgment on the merits of each of Plaintiff's individual constitutional claims with the exception of the excessive force claim. *Id.* at pp. 8-30. Finally, Defendants seek summary judgment on the ground of qualified immunity. *Id.* at pp. 31-32. Defendants' arguments are considered in turn below.

### A. Failure to Exhaust Administrative Remedies

Defendants seek dismissal of the entire Amended Complaint based upon Plaintiff's failure to exhaust his available administrative remedies. Defs.' Am. Mem. of Law at p. 7. As an initial matter, the Court notes that one of Plaintiff's claims is a procedural due process claim regarding the conduct of a disciplinary hearing held by Defendant Chuttey. *See* Am. Compl. at ¶¶ 12-16. As to that claim Plaintiff "exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Grubbs v. Serrell*, 2018 WL 1175232, at *2 (N.D.N.Y. Mar. 6, 2018) (quoting *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) ); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009). The record clearly establishes that Plaintiff did file such an administrative appeal. Moore Decl., Ex. 32. That claim, therefore, is properly exhausted. Defendants' argument as to the exhaustion of the remaining claims is considered below.

**\*4** The Prison Litigation Reform Act ("PLRA") provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any

other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion under this statute is mandatory. *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). "Exhaustion promotes efficiency for the agency and federal courts by allowing agencies an initial opportunity to resolve claims 'much more quickly and economically' and providing courts 'a useful record for subsequent judicial consideration.' " *Thomas v. Waugh*, 2018 WL 1508563, at *5 (N.D.N.Y. Mar. 27, 2018) (quoting *Woodford*, 548 U.S. at 89). The failure to exhaust will be excused only if there was not truly an "available" means by which to exhaust the claim. *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016).

The DOCCS has a well established "three-step process that requires an inmate to: (1) file a grievance with the IGRC; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC in Albany, New York within four working days of receipt of the superintendent's written response." *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004) (citing 7 N.Y.C.R.R. § 701.7) (internal citations omitted); *see also Hooks v. Howard*, 2010 WL 1235236, at *3 (N.D.N.Y. Mar. 30, 2010). "If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies." *Rahman v. Connell*, 2015 WL 4740336, at *3 (N.D.N.Y. Aug. 10, 2015) (citing *Woodford*, 548 U.S. at 93); *see also Mitchell v. Senkowski*, 158 Fed. Appx. 346, 350 (2d Cir. 2005).

In support of their Motion, Defendants offer evidence of only two grievances filed which arguably address the claims at issue in this lawsuit and submit that neither is sufficient to satisfy the PLRA's exhaustion requirement. First is Grievance No. AUB-66523-15 filed January 6, 2015 at Auburn Correctional Facility. Dkt. No. 213-10, Declaration of Cheryl Parmiter at ¶ 7. This is the only grievance filed by Plaintiff at Auburn after the December 23rd incident. *Id.* The grievance is titled "Examination Protocol Not Followed After Injury." A review of that grievance makes clear that it relates only to Plaintiff's claims that he did not receive proper medical care. *Id.* at

Ex. B at pp. 14-15. Nurse Dugan is the only Defendant named in the grievance and it makes no reference to a claimed excessive use of force, alleged retaliation, or any other claim asserted in this litigation. *Id.* Records offered by Defendants show that the grievance proceeded through the first two stages of the grievance process, but was not appealed to CORC. *Id.* at ¶¶ 8-9; Dkt. No. 213-11, Declaration of Rachael Sequin at ¶ 7.

In opposing the Motion, however, Plaintiff offers a document which purports to show his appeal of this grievance. Dkt. No. 220-1 at p. 4. The appeal statement also mentions Officers Hickey, Venditti, and Thomas, but only in the context of contending that Nurse Dugan failed to provide proper medical care after an alleged assault by these officers. *Id.* Even if this brief statement could be read as a grievance against these officers, rather than identifying the basis for which he needed medical assistance, those allegations "were not in the originating grievance" and thus are not sufficient to exhaust those claims. *Robinson v. Rome*, 2013 WL 3328222, at *8 (N.D.N.Y. July 2, 2013); *see also Fox v. Labatte*, 2016 WL 8716662, at *4 (N.D.N.Y. Mar. 11, 2016), *report and recommendation adopted as modified*, 2016 WL 1266958 (N.D.N.Y. Mar. 31, 2016)("Plaintiff cannot circumvent the procedures set forth by the facility by submitting a backdoor appeal to CORC by raising the issue for the first time").

**\*5** As a result, the Auburn grievance, at best, could be sufficient only to exhaust Plaintiff's medical indifference claim.[5] Defendants contend that, in any event, the grievance did not exhaust any of Plaintiff's remedies because it was not appealed to CORC. Recall that Plaintiff alleges the grievance was appealed. *See* Dkt. No. 220-1 at p. 4. Under DOCCS regulations "CORC shall review each appeal, render a decision on the grievance, and transmit its decision to the facility ... within 30 calendar days from the time the appeal was received." 7 N.Y.C.R.R. § 701.5. Viewing the evidence in the light most favorable to Plaintiff, namely that he did file such an appeal, the appeal to CORC is dated January 30, 2015. Dkt. No. 220-1. The original Complaint in this case was dated February 15, 2015 and it was filed February 19, 2015. *See* Dkt. No. 1, Compl. That means "Plaintiff signed and filed his complaint in this action less than thirty days after he submitted his appeal to CORC. He thus did not give CORC an opportunity to respond to his appeal before he proceeded to federal court." *Thompson*

*v. Bellevue Hosp.*, 2011 WL 4369132, at *13 (N.D.N.Y. Aug. 29, 2011), *report and recommendation adopted as modified sub nom. Thompson v. Dep't of Corr. NYC*, 2011 WL 4369125 (N.D.N.Y. Sept. 19, 2011). That constituted a failure to exhaust. *Id.*; *Fox v. Labatte*, 2016 WL 8716662, at *3 (N.D.N.Y. Mar. 11, 2016), *report and recommendation adopted as modified*, No. 2016 WL 1266958 (N.D.N.Y. Mar. 31, 2016) (claims unexhausted when CORC grievance was filed January 26, 2015 and complaint postmarked February 6, 2015); *Klein v. Fischer*, 2015 WL 5174031, at *19 (N.D.N.Y. Sept. 2, 2015) (finding claims unexhausted when "Plaintiff[']s original Complaint ... was filed ... less than thirty days after the appeal to CORC").

Defendants also offer evidence of grievances filed in 2015 after Plaintiff had been transferred to Upstate Correctional Facility. Dkt. No. 213-9, Declaration of Donna Wilcox at Ex. A. Grievance UST-55624-15 again alleges that Plaintiff had been denied medical care allegedly needed as a result of the alleged December 2014 assault. *Id.* at ¶ 7 & Ex. B. The denial of medical care at issue in this grievance, however, concerned care at Upstate Correctional Facility, *id.*, and there are no claims in this case concerning Plaintiff's care at Upstate.

The grievance does make reference to some of the events at issue here, however. It discusses the alleged use of force and certain aspects of Plaintiff's due process claim. That grievance was first denied by the Superintendent at Upstate and then appealed to CORC. The CORC determination specifically found that any claims regarding the events at Auburn were untimely. Wilcox Decl., ¶ 10 & Ex. B. at p. 35. An untimely grievance does not satisfy the exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); *Lee v. O'Harer*, 2014 WL 7343997, at *6 n.6 (N.D.N.Y. Dec. 23, 2014); *Conklin v. Bowen*, 2014 WL 4063294, at *3 (N.D.N.Y. Aug. 14, 2014). The Upstate Grievance is also insufficient to satisfy the PLRA's exhaustion requirement.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment based on the failure to exhaust be denied as to Plaintiff's due process claim against Defendant Chuttey but granted as to all other claims.

While the failure to exhaust is a sufficient ground for granting summary judgment, the Court will also

address the additional substantive grounds raised by Defendants.[6]

## B. First Amendment Retaliation

Plaintiff claims that Defendants Graham, Hickey, Thomas, and Venditti retaliated against him in December 2014 by improperly using force, or permitting such force to be used, and interposing "fake charges" against Plaintiff. Am. Compl. at ¶¶ 2-10; Dkt. No. 220-2. Plaintiff alleges the retaliation was in response to a grievance Plaintiff filed against Defendant Thomas on March 19, 2014. Am. Compl. at ¶ 6.

*6 "To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action'." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) ). The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ). This is true because retaliation claims are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

Plaintiff claims that he was retaliated against because of a March 2014 grievance filed against Defendant Thomas. Am. Compl. at ¶ 6. The filing of a grievance is protected activity sufficient to establish the first element of a retaliation claim. *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003). A retaliation plaintiff must then establish a causal connection between a protected activity and an adverse action. *Holland v. Goord*, 758 F.3d at 22. But to survive dismissal Plaintiff "must advance non-conclusory allegations." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 106 (2d Cir. 2001).

### 1. Adverse Action

Hickey and Venditti presume, without conceding, that Plaintiff may be able to establish adverse action. Defs.' Am. Mem. of Law at pp. 9-10. While Defendant Thomas contends that Plaintiff cannot establish an adverse action with regard to him, Plaintiff does allege that Thomas assaulted him on December 23, 2014 in retaliation for the grievance filing. Am. Compl. at ¶ 5. An assault clearly qualifies as an adverse action in this context. *Flemming v. King*, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016), *report and recommendation adopted,* 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016). Thomas' denial that the assault occurred, *see generally* Dkt. No. 213-5, Declaration of Charles Thomas ("Thomas Decl."), only raises a factual question that cannot be resolved at this stage of the litigation.

Defendant Graham, however, is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff offers no evidence of an adverse action on Graham's part. Plaintiff claims that Graham "[p]ut Plaintiff in harms way" by permitting Thomas to harm Plaintiff. Dkt. No. 220-2. At his deposition Plaintiff testified that Graham, as Superintendent of Auburn, had Thomas moved to cover Plaintiff's program assignment. Pl.'s 10/24/16 Dep. at p. 51. He could not articulate anything, other than Graham's overall position of authority, to support his contention that Graham had actually done so. *Id.* at pp. 51-52. He conceded that he had no personal knowledge that Graham had any role in Thomas' assignment to Plaintiff's program, *id.* at p. 52, and that he never personally spoke with Graham about this. *Id.* at p. 54. Graham specifically denies taking any action, including having any role in Thomas' work assignment, to retaliate against Plaintiff. Declaration of Harold Graham ("Graham Decl.") at ¶¶ 10-11. Given this record, Plaintiff's conclusory allegation that Graham took adverse action against him cannot withstand summary judgment. *Woods v. Miller*, 2017 WL 4181383, at *6 (N.D.N.Y. Aug. 1, 2017), *report and recommendation adopted,* 2017 WL 4155357 (N.D.N.Y. Sept. 18, 2017) ("Plaintiff's vague allegations are insufficient to establish that Defendant[ ] took adverse action against him.")

### 2. Casual Connection

**\*7** In a summary judgment motion, the non-movant must proffer "some tangible proof" of a casual connection between the protected activity and the adverse action and the plaintiff "may not rely on conclusory assertions of retaliatory motive." *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004). "Courts assess four factors to determine whether the necessary causal link exists: '(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.' " *Pierrot v. Hahn*, 2017 WL 4221117, at *8 (N.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 4221072 (N.D.N.Y. Sept. 21, 2017) (quoting *Lunney v. Brureton*, 2007 WL 1544629, at *21 (S.D.N.Y. May 29, 2007) ).

Regarding temporal proximity:

> [t]here is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*DeLeon v. Wright*, 2012 WL 3264932, at *7 (N.D.N.Y. July 5, 2012), *report and recommendation adopted*, 2012 WL 3264929 (N.D.N.Y. Aug. 9, 2012) (quoting *Burton v. Lynch*, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) ). Here, over nine months passed between the protected activity and the alleged retaliation. Such a long gap is very attenuated and highly suggestive of a lack of causal connection. *White v. Eastman Kodak*, 2009 WL 1514659, at *10 (W.D.N.Y. May 29, 2009) ("The Court determines that in the absence of any other evidence, [nine months] is simply too long a period of time to show temporal proximity."); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006) ("actions that took place more than nine months after the last alleged protected activity ... are too remote to establish a causal connection.")

The record contains no evidence regarding Plaintiff's past disciplinary record, but the disciplinary proceedings concerning the events at issue resulted in Plaintiff being found guilty of charges including assault on staff, interference with employee, and multiple charges of both violent conduct and refusing direct orders. Chuttey Decl. at ¶ 39. As discussed *infra* at Point III(D) these determinations are supported by ample evidence in the record. These charges arose from the alleged assault incident claimed by Plaintiff and the guilty determinations regarding those charges are strong evidence against the claim of retaliation. *Williams v. Muller*, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) ("This outcome strongly suggests the existence of proper reasons for [defendants'] actions, and raises an inference of non-retaliation.").

Finally, considering the evidence of Defendants' motivation for their actions also demonstrates that the retaliation claim cannot survive summary judgment. Hickey and Venditti both expressly deny knowing about the March grievance against Thomas. Hickey Decl. at ¶ 8; Dkt. No. 213-4, Declaration of Alec Venditti at ¶ 6. Thomas avers that he never told either about that grievance. Thomas Decl. at ¶ 6. A lack of knowledge regarding the allegedly protected activity defeats a retaliation claim. *Blake v. Elfeldt*, 2012 WL 5830694, at *8 (N.D.N.Y. Oct. 11, 2012), *report and recommendation adopted*, 2012 WL 5830718 (N.D.N.Y. Nov. 16, 2012). In response, Plaintiff offers nothing beyond purely conclusory assertions to suggest that Defendants acted in response to the grievance. He specifically denies having any independent knowledge of Hickey's motivation to retaliate against him. Pl.'s 10/24/16 Dep. at pp. 93-94. As to Venditti, Plaintiff alleges in conclusory fashion that he was part of the "beat up squad" and that he was motivated by friendship with Thomas and Hickey to assault Plaintiff. *Id.* at pp. 94-95. "Naked allegations of retaliatory motives cannot create a factual dispute capable of defeating summary judgment." *Banez v. New York Foundling Hosp.*, 2001 WL 1035142, at *6 (S.D.N.Y. Sept. 7, 2001) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ).

**\*8** For these additional reasons, it is recommended that Plaintiff's retaliation claim be dismissed. [7]

## C. Eighth Amendment Failure to Protect

Defendants next seek summary judgment as to Plaintiff's failure to protect claim against Defendant Graham. "In order to succeed on a claim of failure to protect, the inmate 'must establish both that a substantial risk to his safety actually existed and that the offending defendant knew of and consciously disregarded that risk.' " *Clark v. Gardner*, 256 F. Supp. 3d 154, 167 (N.D.N.Y. 2017). To establish this claim, then, Plaintiff must show both that he was incarcerated under conditions posing a substantial risk of serious harm and that Defendant Graham was deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Plaintiff does not appear to oppose this portion of the Motion. *See* Dkt. Nos. 220-3; 241. Nor does the record support such a claim. Generally stated, Plaintiff alleges that Graham "knew of Conflict [sic]" between Plaintiff and Defendant Thomas. Am. Compl. at ¶ 1. This knowledge allegedly resulted from grievances filed by Plaintiff against Thomas in March 2014. *Id.* at ¶ 6. Plaintiff alleges that despite this knowledge, Graham nonetheless allowed Plaintiff to be in the proximity of Thomas in December 2014 when Thomas allegedly assaulted him. *Id.* at ¶ 1. The record establishes that other than the March grievance, Graham had no information regarding any conflict between Plaintiff and Thomas. Graham Decl. at ¶ 10. Graham also indicates that he had no role in Thomas' work assignment in December 2014. *Id.* Plaintiff offers nothing but conclusory allegations to suggest that, given this evidence, Graham had any basis on which to believe that there was a threat of harm to Plaintiff from Defendant Thomas based on a grievance filed nine months earlier. Such allegations are insufficient to survive summary judgment. *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 215 (N.D.N.Y. 2015).

For these reasons Defendant Graham is entitled to summary judgment.

## D. Fourteenth Amendment Due Process

Plaintiff was issued three inmate misbehavior reports on December 23, 2014. Chuttey Decl., Ex. A at pp. 20-22. Defendant Chuttey was designated as the hearing officer for the hearings regarding these misbehavior reports.

Chuttey Decl., ¶ 4. Plaintiff claims that Chuttey violated his due process rights during the course of the hearing. Am. Compl. at ¶¶ 12-18. For the reasons which follow, Chuttey is entitled to summary judgment on these claims.

In the context of an inmate disciplinary proceeding, due process requires that the inmate be: (1) afforded advance written notice of the charges against him; (2) provided a written statement supporting the disposition and reasons for the disciplinary action taken; (3) permitted to call witnesses and present documentary evidence; (4) entitled to a fair and impartial hearing officer; and (5) found guilty only if the disposition is supported by at least "some evidence." *Wolff v. McDonnell*, 418 U.S. 539, 563–64 (1974); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (citing cases). Additionally, because Plaintiff was confined to a special housing unit prior to his disciplinary hearing, he was also entitled to an employee assistant. *Clark v. Gardner*, 256 F. Supp. 3d 154, 170 (N.D.N.Y. 2017). The record here establishes that all of these due process requirements were complied with in Plaintiff's case.

**\*9** As to some of these requirements, there is no dispute. Plaintiff testified at his deposition that he received all three of the misbehavior reports prior to the hearing held by Defendant Chuttey. Pl.'s 5/25/17 Dep. at pp. 13-16. The record also clearly establishes that Plaintiff received the assistance from two employee assistants prior to the commencement of the disciplinary hearing. *Id.* at pp. 20-21; Chuttey Decl., Ex. A at pp. 25-26. It is also clear that Plaintiff received a detailed written disposition of the charges and of the reasons for the disciplinary action taken following the hearing. Pl.'s 5/25/17 Dep. at pp. 121-23; Chuttey Decl., Ex. A at p. 17.

There was also sufficient evidence to support the determination reached by Chuttey. "The Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence." *McDonald v. Zerniak*, 2016 WL 6581289, at *5 (N.D.N.Y. Nov. 4, 2016) (internal quotation omitted). This requires the Court to determine "whether there was reliable evidence of the inmate's guilt." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). Here, Officers Baney and Hickey testified consistent with the allegations set forth in their misbehavior reports. *See* Chuttey Decl., Ex. A at pp. 10-11 & Ex. B. at pp. 83-84 & 110-15. The

"some evidence" standard is satisfied when hearing testimony was consistent with the written misbehavior report. *See Hinton v. Prack*, 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *Kotler v. Daby*, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (same); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same). Beyond just the testimony of these two officers, however, Corrections Officer Sgt. Young and Corrections Officer Fagan, among others, provided testimony regarding the report issued by Officer Baney. Chuttey Decl., Ex. B at pp. 98-104; *see also* Ex. B, *generally*. Again, among others, Officers Venditti and Thomas testified regarding the Hickey report. *Id.* at pp. 143-48 & 161-64. Defendant Chuttey also had numerous documents and a videotape beyond the misbehavior report available to him which supported the ultimate guilty determination. *See generally* Chuttey Decl., Ex. B. As such, this is a case where "the testimony of multiple witnesses, the misbehavior report[s]" and other evidence clearly provided some evidence of Plaintiff's guilt. *Weaver v. Gutwein*, 2014 WL 906150, at *5 (N.D.N.Y. Mar. 7, 2014).

There was also some evidence to support the guilty determination regarding the misbehavior report issued by Officer Schramm. Defendant Chuttey indicated that he relied upon the misbehavior report itself and the request for urinalysis form indicating Plaintiff's refusal as evidence of Plaintiff's guilt. Chuttey Decl., Ex. B at p. 181; *see also id.*, Ex. A at pp. 22 & 38. The fact that Officer Schramm did not testify regarding the report he issued does not alter the analysis. "The [s]ome evidence standard has been held to be satisfied in cases where the hearing official relies almost entirely on an incident report written by a non-testifying officer." *Reeves v. Perdue*, 2014 WL 2177405, at *4 (N.D.N.Y. May 23, 2014) (citing cases); *Kotler v. Daby*, 2013 WL 1294282, at *13 (" 'some evidence' standard has been found to be satisfied when the hearing official relies almost solely on the incident report without interviewing the officer(s) who wrote the misbehavior report."). It is significant here that Plaintiff did not request Officer Schramm as a witness. *See* Chuttey Decl. at ¶¶ 22 & 30 & Ex. B.

**\*10** Plaintiff claims that his right to call witnesses and present documentary evidence was denied. Plaintiff requested to have fourteen individuals testify at the hearing - thirteen employees of DOCCS and one inmate. Chuttey Decl. at ¶¶ 30, 34 & 37. All but one of these witnesses did, in fact, testify at the hearing. *Id.*; *see also* Chuttey Decl., Ex. B. The only witness denied to Plaintiff was Dr. Cincotta. Defendant Chuttey denied Dr. Cincotta as a witness on the ground that he had not been present at any of the incidents underlying the misbehavior reports at issue. Chuttey Decl. at ¶ 34. During the hearing, Plaintiff indicated that he wished to have the doctor testify about the injuries he received, but admitted that he was not present for the events at issue in the hearing. Chuttey Decl., Ex. B. at pp. 62-63. A hearing officer's refusal to have medical personnel, who were not present at the underlying event, testify regarding the extent of an inmate's injuries does not offend due process. *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, 2016 WL 5394752, at *22 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016); see also *Rossi v. Goord*, 2006 WL 2811505, at *14 (N.D.N.Y. Sept. 28, 2006) (denial of testimony of individuals who did not witness relevant events not a violation of due process) (citing *Kalwasinski v. Morse*, 201 F.3d at 109). The failure to have Dr. Cincotta testify, therefore, was not a violation of due process.

Plaintiff also objects that he was denied access to an Unusual Incident Report and a videotape. While inmates have a general right to access relevant documentary evidence "this right 'does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests even when documents are relevant and obtainable.' " *Rossi v. Stevens*, 2008 WL 4452383, at *10 (S.D.N.Y. Sept. 30, 2008) (quoting *Amaker v. Coombe*, 2002 WL 523388, at *10 (S.D.N.Y. Mar. 29, 2002) ). Here, the record establishes that Plaintiff received much of the available evidence, but that he wished for more.

Defendant Chuttey made available a copy of the Unusual Incident report that was generated regarding events taking place during Plaintiff's admission to SHU. Plaintiff stated he did not want that report, but one involving his initial interactions with Defendant Hickey. Plaintiff was advised that there was a use of force report regarding that incident, but not an Unusual Incident Report. Plaintiff and the hearing officer then engaged in significant back and forth regarding the differences between the two

2018 WL 4190140

reports and what exactly Plaintiff was requesting access to. Chuttey Decl., Ex. B at pp. 82-89. Plaintiff was given the opportunity to review documentation and chose not to; that does not constitute a denial of due process.

Plaintiff also objects that he was not provided access to relevant videotape evidence during his hearing. Specifically, he alleges that portions of the event at issue were recorded on a hand-held video recorder and that that video was not presented at his hearing. Dkt. No. 220-4. Twice during the disciplinary hearing, Defendant Chuttey played what he advised Plaintiff was the only available video evidence for Plaintiff. Chuttey Decl. at ¶ 32; Pl.'s 5/25/17 Dep. at pp. 74-75. The Court notes that the existence of another video was heavily litigated during discovery in this case. Defendants were directed by the Court to conduct a supplemental search for the purported additional video, Dkt. No. 224, and that search was unavailing. Dkt. No. 234. Plaintiff's conclusory allegations to the contrary do not raise factual questions sufficient to defeat summary judgment. *Harris v. Aidala*, 271 Fed. Appx. 34, 36 (2d Cir. 2008) (finding allegations that DOCCS officials had additional videotape tape that was not made available to Plaintiff insufficient to defeat summary judgment). The record here establishes that the additional video evidence Plaintiff sought was not available and "where the requested documents are found to be nonexistent, the inmate suffers no constitutional deprivation." *Mohamed v. Phelix*, 2017 WL 4326660, at *12 (N.D.N.Y. June 13, 2017), *report and recommendation adopted*, 2017 WL 4326520 (N.D.N.Y. Sept. 28, 2017) (citing *Mays v. Mahoney*, 1994 WL 48831, at *7 (S.D.N.Y. Feb. 14, 1994) ).

**\*11** Plaintiff also objects to his exclusion from his hearing at its conclusion. Given Plaintiff's disruptive conduct Chuttey removed Plaintiff from the hearing room. Chuttey Decl. at ¶ 38. At that time all testimony had concluded and Plaintiff was not present only for Chuttey reading of his disposition into the record. *Id.*; *see also* Chuttey Decl., Ex. B. at pp. 179-82. Plaintiff received a written copy of the disposition read into the record. Pl.'s 5/25/17 Dep. at pp. 121-23. Even were excluding Plaintiff error, it is clearly harmless and no basis for relief. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009); *Eleby v. Selsky*, 682 F. Supp. 2d 289, 292 (W.D.N.Y. 2010).

Finally, Plaintiff cannot establish that Chuttey was biased or lacked the necessary impartiality. The due process protection of an impartial hearing officer "requires only that the hearing officer's decision not be arbitrary." *Gibson v. Rosati*, 2017 WL 1534891, at *11 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1512371 (N.D.N.Y. Apr. 27, 2017) (citing *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) ). A disciplinary determination is not arbitrary when, as outlined above, it is supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). Apart from his exclusion from the hearing just discussed, the only other specific claim of bias is the entirely conclusory allegation that Chuttey came to Plaintiff's cell prior to the commencement of the hearing and told Plaintiff he would be found guilty and that "he had a hand that [stretches] from Clinton to Attica C.F." Am. Compl. at ¶ 12. "Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed." *Brown v. Dubois*, 2017 WL 9511165, at *3 (N.D.N.Y. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 1102746 (N.D.N.Y. Mar. 24, 2017); *see also Gillard v. Rovelli*, 2014 WL 4060025, at *13 (N.D.N.Y. Aug. 14, 2014); *Britt v. Fawcett*, 2009 WL 890631, at *6 (N.D.N.Y. Mar. 31, 2009).

Accordingly, it is recommended that summary judgment be granted to Defendant Chuttey.

### E. Eighth Amendment Medical Indifference

Plaintiff alleges that Sgt. Connors and Nurse Dugan were deliberately indifferent to his medical needs after he was allegedly assaulted on December 23, 2014. Am. Compl. at ¶¶ 7 & 11. Defendant seeks summary judgment as to this claim on the ground that Plaintiff was provided appropriate medical treatment following this incident. Defs.' Am. Mem. of Law at pp. 24-28.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (*quoting Estelle v. Gamble*, 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin* ("*Hathaway I*"), 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer* v. *Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) ). Here, a court must make two inquiries. First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (*quoting McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) ).

**\*12** The second prong of the Eighth Amendment analysis is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (*citing Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support

an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (*quoting Hathaway v. Coughlin* ("*Hathaway II*"), 99 F.3d 550, 553 (2d Cir. 1996) ); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

For purposes of this Motion the Court presumes that there are at least questions of fact regarding the objective prong of this analysis. Medical records show that only relatively minor injuries were observed at the time Plaintiff was first seen in the Special Housing Unit. Dugan Aff., Exs. A & B. Plaintiff, however, alleges much more serious injuries. *See, e.g.*, Am. Compl. at ¶ 5 (alleging dislocated shoulder) & 11 (alleging lacerations and breathing difficulties). This dispute should not and need not be resolved on this Motion because it is clear that with respect to the subjective prong summary judgment is appropriate for Defendants.

### 1. Sgt. Connors

Plaintiff's medical claim against Sgt. Connors alleges that he was indifferent to Plaintiff's needs by taking Plaintiff directly to the Special Housing Unit rather than the medical unit on December 23, 2014. Pl.'s 10/24/16 Dep. at pp. 96-98. Sgt. Connors arrived after a use of force incident involving Plaintiff and several other officers. Connors Decl. at ¶ 6. Connors, along with others, then escorted Plaintiff to the SHU. *Id.*

In order for a prison official to be liable for medical indifference "the official must 'know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal alternations omitted) (quoting *Farmer v. Brennan*, 511 U.S. at 837). The record establishes that while Plaintiff was being escorted Sgt. Connors observed "no bleeding or other visible injuries." Connors Decl. at ¶ 6. Plaintiff did request medical treatment during the escort. *Id.*; Pl.'s 10/24/16 Dep. at p. 98. Connors knew that Plaintiff would be seen by medical staff upon arriving at the Special Housing Unit. Connors Decl. at ¶ 6. Given these facts, Connors felt

there was no need to transport Plaintiff to a medical unit first rather than SHU. *Id.*

As Connors had indicated he would be, Plaintiff was seen by several different medical professionals within minutes of arriving at the Special Housing Unit. He was examined, had x-rays performed, and was given pain medication. Dkt. No. 214. Rather than demonstrating an indifference to Plaintiff's health, this evidence, which is not refuted by Plaintiff, *see* Pl.'s 10/24/16 Dep. at pp. 113-24, shows that Connors was aware of Plaintiff's request for medical attention, considered his medical state, and acted in a manner consistent with addressing those concerns. *Butler v. Smith*, 2008 WL 4186338, at *6 (N.D.N.Y. Sept. 10, 2008) (dismissing medical indifference claim against Sergeant who was not a medical professional and had no reason to believe actions taken regarding plaintiff were inadequate). As such, Plaintiff cannot establish the subjective prong of his Eighth Amendment claim as to Defendant Connors.

### 2. Nurse Dugan

**\*13** Plaintiff alleges that Nurse Dugan was deliberately indifferent because she failed to give Plaintiff a meaningful assessment upon his admission to SHU. Am. Compl. at ¶ 11; Dkt. No. 210-2 at p. 2; Dkt. No. 241 at p. 5. There is no question that Dugan examined Plaintiff when he arrived in SHU on December 23rd. Pl.'s 10/24/16 Dep. at pp. 118-19; Dugan Aff. at ¶ 5. Plaintiff also concedes that he conducted an assessment of him on that date. Pl.'s 10/24/16 Dep. at p. 118. At that time Plaintiff complained to Dugan about pain in his left shoulder and throat. *Id.* Dugan documented both of those complaints in the medical records. Dkt. No. 214 at p. 5. She also documented left arm pain and a problem moving the left arm and shoulder. *Id.* Dugan further documented that there were no obvious deformities on the arm or shoulder and that Plaintiff had no obvious injury or redness in his throat. *Id.* Dugan then referred Plaintiff to be seen by a doctor. Dugan Decl. at ¶ 5. Within ten minutes of seeing Nurse Dugan, Plaintiff was seen in SHU by Dr. Cincotta. *Id.* at ¶ 6; Pl.'s 10/24/16 Dep. at pp. 120 & 124. The doctor examined Plaintiff and ordered x-rays of his shoulder which came back normal. Pl.'s 10/24/16 Dep. at p. 122; Dkt. No. 214 at p. 6.

The fact that Plaintiff may feel that he "did not get the level of medical attention he deserved" is insufficient to establish an Eighth Amendment claim. *Jenkins v. Trachtman*, 2017 WL 7163935, at *4 (N.D.N.Y. Dec. 22, 2017), *report and recommendation adopted*, *Jenkins v. Trachtman*, 2018 WL 626303 (N.D.N.Y. Jan. 30, 2018). Plaintiff's claims that the assessment provided by Nurse Dugan was incomplete or insufficient essentially amount to a disagreement over treatment which cannot be a basis for an Eighth Amendment claim. *Solar v. Lennox*, 2012 WL 3929936, at *19 (N.D.N.Y. July 16, 2012), *report and recommendation adopted*, 2012 WL 3929958 (N.D.N.Y. Sept. 10, 2012) (citing *Chance v. Armstrong*, 143 F.3d at 703); *Irby v. Frisnia*, 119 F. Supp. 2d 130, 132 (N.D.N.Y. 2000) (no deliberate indifference where, at most, defendant might be liable for negligence "in failing to initially diagnose [plaintiff's] injury").

Plaintiff's position that the presence of a bruising five days after the incident supports his claim that Dugan was indifferent to his needs is also without merit. There is no evidence to suggest that Plaintiff complained of such an injury when admitted to SHU. *See* Pl.'s 10/24/16 Dep. at pp. 113-124 (discussing claim against Dugan). "At worse then, [Dugan] failed to identify an injury that Plaintiff himself had not felt the effects of at the time of [Dugan's] assessment." *Harris v. Morton*, 2008 WL 596891, at *4 (N.D.N.Y. Feb. 29, 2008) (finding no deliberate indifference when injury was discovered after initial assessment).

Defendant Dugan's conduct, examining and documenting an inmate's complaints after a use of force incident and referring him for treatment is far from indifferent to Plaintiff's needs. *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, 2016 WL 5394752, at *15 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's medical indifference claims.

### F. Supervisory Claims

Plaintiff's claims against Annucci and Koenigsmann allege that they were deliberately indifferent to issues he raised through letters written to them. The basis of the deliberate indifference appears to be that those letters were

then referred to other people who in turn responded to Plaintiff. *See, e.g.,* Am. Compl. at ¶ 20; Dkt. No. 220-6. Defendants Annucci and Koenigsmann seek summary judgment on the ground that they were not personally involved in any constitutional violation. *See* Defs.' Am. Mem. of Law, pp. 28-30.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) ). A supervisory official "may not be held liable for damages merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996). Moreover, "the doctrine of *respondeat superior* cannot be applied to *section 1983* actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985) ); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

**\*14** The Second Circuit has held that the personal involvement of a supervisory official may be established if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates

> by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted). [8]

The record establishes that Plaintiff did write numerous letters to both Annucci and Koenigsmann and that those letters were generally forwarded to other DOCCS personnel with responses then being sent to Plaintiff. Dkt. No. 220-6 at pp. 3-11; Pl.'s 10/24/16 at pp. 146-48 & 162. The law is clear, however, that such actions are insufficient to establish personal involvement. "It is within the purview of a superior officer to delegate responsibility to others." *Scott v. Koenigsmann,* 2016 WL 1057051, at *7 (N.D.N.Y. Mar. 14, 2016). "Prison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint." *Vega v. Artus,* 610 F.Supp.2d 185, 199 n. 13 (N.D.N.Y. 2009); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir. 1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoner to advise him of the subordinates decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official); *Josey v. Rock,* 2013 WL 1500435, *11 (N.D.N.Y. 2013), report and recommendation adopted,* 2013 WL 1501029 (N.D.N.Y. 2013) ("A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement"); *Walker v. Fischer,* 2011 WL 4369116, at *6 (N.D.N.Y. July 25, 2011), *report and recommendation adopted,* 2011 WL 4369096 (N.D.N.Y. Sept. 19, 2011), *aff'd,* 523 Fed. Appx. 43 (2d Cir. 2013) ("The 'mere receipt of letters from an inmate by a [supervisory official] regarding a medical claim is insufficient to constitute personal liability.' ")

**\*15** None of the other *Colon* factors are implicated here. There is no allegation that either of these supervisory Defendants were directly involved in any of the incidents at issue here, that a policy or custom of their creation was at issue, or that either of these high-ranking officials had a role in supervising any of the other Defendants in a manner that could impose liability upon them.

Accordingly, Plaintiff's claims of indifference against Annucci and Koenigsmann should be dismissed for lack of personal involvement.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 213) be **GRANTED** [9] and this case be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days [10] within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Slip Copy, 2018 WL 4190140

---

Footnotes

1    For ease of reference, Plaintiff's various filings are referred to here simply by Docket Number.

2    Under Local Rule 7.1(a)(3), on a motion for summary judgment a non-movant must respond to the movant's statement of material facts "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and "set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3). "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.* Plaintiff has not filed a responsive Rule 7.1 Statement, but makes numerous factual assertions contradicting the facts set forth by Defendants in his various submissions. In deference to Plaintiff's *pro se* status the Court has opted to review the entire summary judgment record in order to ascertain the undisputed material facts. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting court's "broad discretion to determine whether to overlook a party's failure to comply with local court rules").

3    Page references to the exhibits to the Chuttey Declaration are to those assigned by the Court's CM/ECF system.

4    Exhibits A and B to the Dugan Declaration are docketed as Docket Number 214.

5    In addition to Nurse Dugan, Sgt Connors is named as a Defendant as to this claim. Though Defendant Connors is not specifically named in the grievance, a grievance need not identify each and every potential defendant in a grievance for it to sufficiently exhaust a claim. *Jones v. Bock*, 549 U.S. 199, 219 (2007).

6    The failure to exhaust is the only basis presented in this motion for dismissal of the excessive force claim against Defendants Abate, Thomas, Hickey, Venditti, and Gilfus.

7    Defendants Hickey and Venditti offer as an additional argument in support of summary judgment that they would have taken the same action even in the absence of any protected activity and so judgment is appropriate under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Defs.' Am. Mem. of Law at pp. 14-15. Given that one part of the action allegedly taken was the excessive use of force, which is plainly unlawful, Defendants' argument in this regard is not an independent basis for relief.

8    The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) upon the categories of supervisory liability under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *See Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. Appx. 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role. *See, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340,

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    13

347 (S.D.N.Y. 2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five factor *Colon* test.

9    Because the Court recommends that summary judgment be granted based on the failure to exhaust and those merits arguments raised by Defendants, it does not reach the alternative argument regarding Defendants' entitlement to qualified immunity.

10    If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    14

Grant v. Fischer, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 161 of 329

2017 WL 1180866

2017 WL 1180866
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William T. GRANT, Plaintiff,

v.

Brian FISCHER, Commissioner, New York State
Department of Corrections and Community
Supervision; D. Venettozi, Acting Director,
Special Housing, Inmate Disciplinary Program;
R. Boissy, Senior Correctional Counselor, Great
Meadow Correctional Facility; and Winney,
formerly known as Atkinson, Defendants.

9:14-CV-1382 (MAD/DJS)
|
Filed 03/29/2017

**Attorneys and Law Firms**

WILLIAM T. GRANT, 95-A-3324, Green Haven
Correctional Facility, P.O. Box 4000, Stormville, New
York 12582, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL Litigation Bureau, The Capitol, OF
COUNSEL: ORIANA L. CARRAVETTA, AAG,
Albany, New York 12224, Attorneys for Defendants.

### MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge

### I. INTRODUCTION

**\*1** Plaintiff, an inmate in the custody of the New
York State Department of Corrections and Community
Supervision ("DOCCS"), brought this civil rights action
pursuant to 42 U.S.C. § 1983, alleging that Defendants
violated his constitutional rights while he was incarcerated
at Great Meadow Correctional Facility ("Great Meadow
C.F."). See Dkt. No. 23. Specifically, Plaintiff challenges
the due process he was afforded in connection with a
disciplinary hearing he received as a result of being issued
a misbehavior report. See id.

On May 6, 2016, Defendants moved for summary
judgment. See Dkt. No. 44. In their motion, Defendants
contend that Plaintiff was not deprived of a liberty interest
as a result of the October 17, 2011 disciplinary hearing
and, even if he was, his claim still fails because he was
afforded all process due to him. See Dkt. No. 44-2
at 7-20. On March 10, 2017, Magistrate Judge Stewart
issued a Report-Recommendation and Order in which he
recommended that the Court grant Defendants' motion
and dismiss this case. See Dkt. No. 62. Specifically,
Magistrate Judge Stewart found that, although questions
of fact exist as to whether Plaintiff was deprived of
a liberty interest, summary judgment is nevertheless
appropriate because Plaintiff was afforded all process due
to him. See id. at 9-16.

Currently before the Court are Defendants' motion
for summary judgment and Magistrate Judge Stewart's
Report-Recommendation and Order.

### II. BACKGROUND

Since neither party objected to Magistrate Judge Stewart's
recitation of the relevant background facts, and because
it is consistent with the record, the Court adopts the
factual background set forth in Magistrate Judge Stewart's
Report-Recommendation and Order. See Dkt. No. 62 at
4-7.

### III. DISCUSSION

**A. Standard**

A court may grant a motion for summary judgment only if
it determines that there is no genuine issue of material
fact to be tried and that the facts as to which there is no
such issue warrant judgment for the movant as a matter
of law. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d
29, 36 (2d Cir. 1994) (citations omitted). When analyzing
a summary judgment motion, the court "cannot try issues
of fact; it can only determine whether there are issues
to be tried." Id. at 36-37 (quotation and other citation
omitted). Moreover, it is well-settled that a party opposing
a motion for summary judgment may not simply rely on
the assertions in its pleadings. See Celotex Corp. v. Catrett,
477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

Grant v. Fischer, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 162 of 329

2017 WL 1180866

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L.Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*2** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L.Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error.

*O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the report" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

## B. Due Process

In his amended complaint, Plaintiff challenges the adequacy of the assistance he received from Defendant Winney prior to the disciplinary hearing and that Defendant Boissy, the hearing officer, was biased. Moreover, Plaintiff asserts claims against Defendants Fischer and Venettozi for their roles in denying his appeal from the disciplinary hearing. Magistrate Judge Stewart recommended that the Court grant Defendants' motion as to all claims. The Court will address each in turn.

### 1. Employee Assistant

"Although inmates are not entitled to retained or appointed counsel in prison disciplinary hearings, '[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges.' " *Moore v. Peters*, 92 F. Supp. 3d 109, 125-26 (W.D.N.Y. 2015) (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). "New York's regulations entitle a prisoner to an employee assistant to help him prepare

Grant v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 1180866

for a disciplinary hearing." *Id.* (citing 7 N.Y.C.R.R. §§ 251-4.1, 251-4.2). "The assistant 'need only perform what the plaintiff would have done but need not go beyond the inmate's instructions.' " *Id.* (quotation and other citation omitted).

**\*3** As noted by Magistrate Judge Stewart, Plaintiff's claim focuses on Defendant Winney's failure to provide Plaintiff with all of the items he requested and her failure to explain the charges to him. *See* Dkt. No. 23 at ¶¶ 18-19. As to Plaintiff's allegation that Defendant Winney failed to explain the charges to him, the law is clear that an inmate assistant is not required to act as the inmate's advocate or counsel. *See Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). Therefore, Defendant Winney was not required to explain the charges to Plaintiff.

As to the claim that Defendant Winney failed to provide Plaintiff with all items he requested, Magistrate Judge Stewart correctly determined that Defendant Winney fulfilled her obligations. When Plaintiff met with Defendant Winney prior to the hearing, he provided her with an itemized list of ten requests. *See* Dkt. No. 44-4 at 10. Defendant Winney provided Plaintiff with five of the requested items and, with respect to the remaining items, informed Plaintiff that they were either not available, not alleged, or did not exist. *See id.* For example, as to Plaintiff's request for tapes and transcripts of each telephone call in question, Defendant Winney informed Plaintiff that the tape will be available for Plaintiff to review at the hearing. *See id.* Further, Defendant Winney explained that she did not provide Plaintiff with attendance sheets form his assigned programs on October 5 and 6, 2011 because he was keeplocked on those dates. *See id.*

As the record makes clear, Defendant Winney provided Plaintiff with meaningful assistance ahead of his disciplinary hearing. The undisputed facts clearly demonstrate that Defendant Winney did not violate Plaintiff's due process rights. Accordingly, the Court grants Defendants' motion for summary judgment as to this claim.

### 2. Impartial Hearing Officer

In amended complaint, Plaintiff contends that Defendant Boissy violated his due process rights by failing to rule on his objections, in failing to explain the charges to him, in denying him the right to call or recall a

witness, and in rendering a guilty disposition based on insufficient evidence. *See* Dkt. No. 23 at ¶¶ 27-28, 33, 38(2), 38(4) & 38(5). In his Report-Recommendation and Order, Magistrate Judge Stewart found that Plaintiff's claim against Defendant Boissy is without merit and recommended granting Defendants' motion for summary judgment. *See* Dkt. No. 62 at 15-17.

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing cases). Nevertheless, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* (citing cases). In addition to the greater flexibility accorded prison disciplinary hearing officers, the due process impartiality standard is satisfied if "some evidence" in the record supports the decision of the prison disciplinary proceeding. *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985).

As Magistrate Judge Stewart correctly determined, Plaintiff's claim against Defendant Boissy is without merit. Defendant Boissy noted each of Plaintiff's objections for the record and ruled on them as they arose. *See* Dkt. No. 44-5 at 13-14. The hearing transcript makes clear that Defendant Boissy heard Plaintiff's testimony and accepted evidence on his behalf. *See id.* at 14-16. Moreover, when Plaintiff did not seek to call any witnesses, Defendant Boissy called the author of the misbehavior report, Inspector Klose, who testified by telephone to the veracity of the report. *See id.* at 16-18. Moreover, Inspector Klose clarified that the date in question in his report, September 10, 2011, was a facility family visiting weekend, which explained why Plaintiff did not have any visitors listed on a visitor log. *See id.* When Plaintiff declined the opportunity to ask Inspector Klose any questions, Defendant Boissy directed that the audio recording of the telephone call be played. *See id.* at 17-19. After listening to the recording, Defendant Boissy offered Plaintiff the opportunity to present more evidence and endeavored to explain to Plaintiff in further detail the charges against him. *See id.* at 19-21.

**\*4** At no time before or after listening to the recording did Plaintiff seek an adjournment so that he could gather further evidence. It is clear from the record, including

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 164 of 329

Grant v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 1180866

the hearing transcript, that Defendant Boissy maintained his impartiality by accepting Plaintiff's evidence and testimony, noting his objections, and soliciting further evidence regarding the alleged misbehavior. Plaintiff's conclusory allegations regarding Defendant Boissy are entirely belied by the record. In his written disposition, Defendant Boissy listed the seven different items upon which he relied. This evidence, which included documents provided by Plaintiff, unquestionably satisfied the "some evidence" standard.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Defendant Boissy.

### 3. Defendants Fischer and Venettozi

Plaintiff asserts claims against Defendants Fischer and Venettozi for their roles in denying his appeal from the disciplinary hearing. As Magistrate Judge Stewart correctly determined, since the Court has found that no due process violation has occurred, there is no basis upon which to find that Defendants Fischer and Venettozi for their respective roles in denying Plaintiff's appeal of the disciplinary decision. Accordingly, the Court grants Defendants' motion for summary judgment as to Defendants Fischer and Venettozi.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, Magistrate Judge Stewart's Report-Recommendation and Order and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Stewart's Report-Recommendation and Order (Dkt. No. 62) is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 44) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1180866

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 190512
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

William T. GRANT Plaintiff-Appellant,

v.

Brian S. FISCHER, Commissioner, New
York State Department of Corrections and
Community Supervision, Donald Venettozi,
(Acting) Director, Special Housing Inmate
Disciplinary Program, Robert Boissy, Senior
Correctional Counselor, Great Meadow
Correctional Facility, Jennifer Winney, FKA
Jennifer Atkinson,[*] Defendants-Appellees.

17-1283-pr
|
January 15, 2019

**Synopsis**
**Background:** Prisoner, proceeding pro se, brought suit
against several corrections officers and prison officials
under § 1983, alleging due process violations related to
his prison disciplinary hearing and subsequent enhanced
confinement. The United States District Court for the
Northern District of New York, Mae A. D'Agostino, J.,
granted summary judgment to corrections officers and
prison officials, and prisoner appealed.

**Holdings:** The Court of Appeals held that:

[1] any error in prison disciplinary proceedings was
harmless, and

[2] to extent that prisoner claimed he was denied access
to transcript and audio recording of phone calls, he could
claim no prejudice.

Affirmed.

West Headnotes (2)

[1]    **Prisons**
       
       Any error in prison disciplinary proceedings
       was harmless since prisoner failed to identify
       any witness or defense he would have offered
       had the assistance he received, or the hearing
       officer's conduct, been different.

       Cases that cite this headnote

[2]    **Prisons**
       
       To extent that prisoner claimed he was denied
       access to transcript and audio recording of
       phone calls, he could claim no prejudice since
       any lack of access did not prevent prisoner
       from presenting facts essential to justify
       his opposition to corrections' officers' and
       prison officials' summary judgment motion
       in prisoner's § 1983 action; prisoner had
       opportunity to listen to the entire recording
       at his hearing and had already obtained copy
       of the partial transcript during his Article 78
       proceeding in New York court. 42 U.S.C.A. §
       1983.

       Cases that cite this headnote

Appeal from the March 29, 2017 judgment of the United
States District Court for the Northern District of New
York (Mae A. D'Agostino, *Judge*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court be and hereby is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: William T. Grant, pro se, Stormville, NY.

FOR DEFENDANTS-APPELLEES: Patrick Arthur Woods, Esq., Assistant Solicitor General, for Barbara D. Underwood, Attorney General, State of New York, Albany, NY.

PRESENT: José A. Cabranes, Christopher F. Droney, Richard J. Sullivan, Circuit Judges.

## SUMMARY ORDER

**\*1** Plaintiff-Appellant William T. Grant ("Grant"), proceeding *pro se,* brought suit against several corrections officers and prison officials under 42 U.S.C. § 1983. Grant alleges due process violations related to his prison disciplinary hearing and subsequent enhanced confinement. The District Court granted summary judgment to the defendants, reasoning that while Grant was transferred to "atypical and significant conditions" implicating his due process rights, *see Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Grant received constitutionally adequate process.

On appeal, Grant argues that summary judgment was improper for three reasons. First, he argues that the District Court adopted the report and recommendations of the Magistrate Judge ("the R&R") without considering his timely objections. Second, he argues that genuine issues of material fact remained that should have been tried by a jury. Third, he argues that the District Court granted summary judgment before the completion of discovery. We reject all three arguments.

We assume the parties' general familiarity with the underlying facts, the procedural history of the case, and the issues on appeal. We review orders granting summary judgment *de novo. Sousa v. Marquez,* 702 F.3d 124, 127 (2d Cir. 2012) (internal citations omitted).

First, Grant argues that the District Court should have reviewed his objections to the R&R *de novo* despite their apparent untimeliness. He argues that because he prepared his objections to the R&R in a timely fashion, he should not be prejudiced by fact that they were not filed with the District Court until after the seventeen-day deadline. *See* FED. R. CIV. P. 6(d), 72.

We need not consider the legal aspect of this claim, *i.e.,* "whether the prison mailbox rule applies in the context of objections to a report and recommendation." *See Mannix v. Phillips,* 619 F.3d 187, 196 (2d Cir. 2010) (declining to "specifically decide" this question). Here, the record is clear that the District Court chose to conduct a *de novo* review of the R&R regardless of the timeliness of Grant's objections. Dist. Ct. Dckt. no. 65.

Second, Grant argues that genuine issues of material fact remain regarding (i) whether his assigned assistant offered inadequate assistance prior to the disciplinary hearing, and (ii) whether Grant's hearing officer's conduct and conclusions met constitutional requirements. *See Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (listing constitutional requirements for inmate disciplinary hearings). We disagree, for substantially the reasons offered by the District Court in its March 29, 2017 Opinion and Order, App'x at 18-21, and the Magistrate Judge in his March 10, 2017 Report and Recommendation, App'x at 35-40.

**[1]** Moreover, any violation of a prisoner's "qualified right" to assistance in "marshaling evidence and presenting a defense" at a prison disciplinary hearing is reviewed for "harmless error." *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009). In this case, defendant failed to identify any witness or defense he would have offered had the assistance he received, or the hearing officer's conduct, been different. Any error in the disciplinary proceedings was therefore harmless.

**\*2** Third, contrary to Grant's claim, the District Court did not decide defendants' summary judgment motion while discovery was pending. Rather, the Magistrate Judge resolved Grant's motion to compel discovery over a month prior to issuing the R&R. In his February 3, 2017 order, he directed the defendants to file the audio recording of the calls at issue (and a written transcript of the same) with the District Court and to provide them to Grant as well. Dist. Ct. Dckt. no. 59. The defendants

complied within two weeks, Dist. Ct. Dckt. no. 62, well before the Magistrate Judge issued his R&R on March 10.

**[2]** Finally, to the extent that Grant claims he was denied access to the transcript and audio recording of the phone calls, he can claim no prejudice. Grant had the opportunity to listen to the entire recording at his hearing and had already obtained a copy of the partial transcript during his Article 78 proceeding in New York State Supreme Court. In fact, Grant included a copy of that transcript in his own papers opposing summary judgment. Dist. Ct. Dckt. no. 48-1 at 39–46. Moreover, the Magistrate Judge "listened to the subject recordings at length," Dist. Ct. Dckt. no. 62 at 17, and now this Court has done so as well. Accordingly, any lack of

access to this recording has not prevented Grant from "present[ing] facts essential to justify his opposition." *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989).

## CONCLUSION

We have reviewed all of the arguments raised by Grant on appeal and find them to be without merit. The March 29, 2017 judgment of the District Court is **AFFIRMED.**

## All Citations

--- Fed.Appx. ----, 2019 WL 190512

Footnotes

*      The Clerk of the Court is directed to amend the official caption to reflect names of the defendants in full.

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4627120

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Samuels v. Fischer, S.D.N.Y., March 2, 2016

2014 WL 4627120
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leonard HINTON, Plaintiff,
v.
A. PRACK, et al., Defendants.

No. 9:12−CV−1844 (LEK/RFT).
|
Signed Sept. 10, 2014.
|
Filed Sept. 11, 2014.

**Attorneys and Law Firms**

Leonard Hinton, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Joshua E. Mcmahon, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE KAHN, District Judge.

**I. INTRODUCTION**

 *1  This *pro se* action under 42 U.S.C. § 1983 comes before the Court following a Report–Recommendation filed on August 14, 2014, by United States Magistrate Judge Randolph F. Treece, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). Dkt. No. 59 ("Report–Recommendation"). Judge Treece recommends that all of Plaintiff Leonard Hinton's ("Plaintiff") claims be dismissed, except that he be awarded nominal damages for violation of his due process rights by Defendant Uhler. Report–Rec. at 31–32. Plaintiff timely filed Objections. Dkt. Nos. 62 ("Objections"); 63 ("Addendum"). For the following reasons, the Report–Recommendation is adopted in its entirety.

**II. STANDARD OF REVIEW**

When a party makes a timely objection to a Report–Recommendation, it is the duty of the Court to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). Where, however, an objecting "party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted); *see also Brown v. Peters,* No. 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

**III. DISCUSSION**

**A. First Disciplinary Hearing**
Plaintiff argues that the evidence presented at his first disciplinary hearing was not "reliable evidence" sufficient to support the hearing officer's determination that Plaintiff was guilty of the alleged conduct. Objs. at 1. Specifically, Plaintiff argues that the evidence was insufficient because there was no independent credibility assessment of, or written statements by, the confidential informant or alleged victim to corroborate Sergeant Gower's testimony. *Id.* at 1–2.

Plaintiff already raised this argument in great detail in his Motion for summary judgment, *see* Dkt. No. 39 at 19–22, and Judge Treece explicitly addressed it in the Report–Recommendation, Report–Rec. at 12–15. Because Plaintiff's argument is "a mere reiteration of an argument made to the magistrate judge," *Dove v. Smith,* No. 13–CV–1411, 2014 WL 1340061, at *1 (N.D.N.Y. Apr. 3, 2014) (Kahn, J.) the Court reviews Plaintiff's objection only for clear error, *see Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011)). The Court finds that Judge Treece committed no clear error in determining that Sergeant Gower's testimony was sufficiently corroborated by his written report and other evidence in the record. *See* Report–Rec. at 12–15; *see also Kotler v. Daby,* No. 10–CV–0136, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted "reliable evidence" under the "some evidence" standard, and that an independent assessment of the witnesses' credibility was not required).

2014 WL 4627120

**B. Second Disciplinary Hearing**

**\*2** Plaintiff argues that his due process rights were violated at his second disciplinary hearing because Defendant Haug, who conducted the disciplinary hearing, failed to interview or make available four of Plaintiff's requested witnesses. Objs. at 2. Specifically, Plaintiff asserts that he was prejudiced by his inability to question Captain Scarafile ("Scarafile") and Deputy Superintendent Kinderman ("Kinderman") because they "ascertained the facts of th[e] incident, and would have testified [sic] those facts." *Id.* Moreover, corrections officer Ruggerio ("Ruggerio") and inmate Burton ("Burton") both had relevant, first-hand knowledge of the circumstances of the alleged fight. *See id.; see also* Addendum at 2.

To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). In his Objections, Plaintiff states that "[c]learly there is relevance of every witness that Plaintiff requested to testify on his behalf." Objs. at 2. However, Plaintiff fails to advance any specific arguments as to *how* these witnesses' testimonies would have affected the outcome of his disciplinary hearing.

Indeed, as Judge Treece points out, Kinderman and Scarafile were merely supervisors who were informed of the incident after it had already transpired. Report–Rec. at 19. Thus, they did not have first-hand knowledge of the events, and there is no indication that they would have testified favorably to Plaintiff. *See id.* Moreover, Ruggerio did not arrive until after the incident occurred, and his misbehavior report was virtually identical to that of Officer Betti, who testified at the hearing. *Id.* Thus, there is no indication that Ruggerio's testimony would have affected the outcome of the hearing. Finally, although Burton presumably could have offered relevant testimony, as he was the alleged victim of Plaintiff's attack, Plaintiff has not demonstrated how Burton's testimony would have affected the outcome of his hearing. To the contrary, as indicated in Sergeant Betti's Fight Investigation Report, Burton stated that Plaintiff began yelling at him for no reason and Plaintiff then hit him in the head with a frying pan. Report–Rec. at 20. Thus, Plaintiff's arguments that these witnesses' testimonies would have affected the

outcome of his hearing are entirely speculative, and do not warrant finding a constitutional violation. *See* Report–Rec. at 2; *see also Grossman v. Bruce,* 447 F.3d 801, 805 (10th Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.").

**C. Third Disciplinary Hearing**

Plaintiff next argues that he has established an actual injury in connection with his third disciplinary hearing because he was confined in the Special Housing Unit ("SHU") "as a result of the constitutional violations." Objs. at 2. Plaintiff is correct that his constitutional rights were violated by Defendants' failure to timely provide Plaintiff with a copy of the disciplinary hearing determination. *See* Report–Rec. at 25–26. However, the copy of the hearing determination was merely the means by which to inform Plaintiff of the penalty to be imposed. Thus, Defendants' failure to provide Plaintiff with a copy of the hearing decision did not affect the actual determination, because the determination had already been made. In other words, Defendants' failure to provide Plaintiff with the hearing decision did not *cause* him to be confined in SHU—the penalty had already been imposed and was entirely independent of the failure to serve Plaintiff with a written confirmation of the penalty. *See McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (noting that failure to provide a copy of a hearing determination occurs after the decision has been rendered). Therefore, Plaintiff has failed to show actual injury in relation to his third disciplinary hearing.

**D. Qualified Immunity**

**\*3** Plaintiff's final objection is that Defendants are not entitled to qualified immunity. Objs. at 3. However, Judge Treece did not find that any Defendants were entitled to qualified immunity. Therefore, Plaintiff's argument is irrelevant.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 59) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Plaintiffs' Motion (Dkt. No. 39) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Defendant's Cross–Motion (Dkt. No. 42) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Plaintiff be awarded nominal damages in the amount of one dollar ($1.00); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

LEONARD HINTON, Plaintiff,

-v-

**A. PRACK,** *Commissioner's Designee,* **D. VENETTOZZI,** *Commissioner's Designee,* **S. BULLIS,** *Hearing Officer,* **D. HAUG,** *Hearing Officer,* **D. ROCK,** *Superintendent; Upstate Correctional Facility,* **UHLER,** *Deputy Superintendent of Security; Upstate Correctional Facility,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Leonard Hinton brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his right to due process at three separate disciplinary hearings. *See* Dkt. No. 1, Compl. Plaintiff has moved for summary judgment. Dkt. No. 39. Defendants oppose that Motion, and Cross–Move for Summary Judgment. Dkt. No. 42. Plaintiff opposes Defendants' Cross–Motion. Dkt. Nos. 44, Pl.'s Opp'n, & 45, Pl.'s Supp. Opp'n. For the reasons that follow, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED,** Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this action be **DISMISSED.**

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of

2014 WL 4627120

material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d at 1461.

## II. DISCUSSION

### A. Due Process

**\*5** Plaintiff alleges that Defendants violated his right to due process at three separate disciplinary hearings. *See generally* Compl.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty

interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement

may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F .3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F .3d at 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*6** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476).

With these principles in tow, we discuss the process that was provided at each of the disciplinary hearings at issue *seriatim.*

### 1. Liberty Interest

Defendants concede that, in the aggregate, the amount of time Plaintiff spent in the solitary housing unit ("SHU"), as a result of the three disciplinary hearings at issue, was sufficient to implicate a protected liberty interest. [1] Dkt. No. 42–7, Defs.' Mem. of Law, at p. 11; *see also* Dkt. No. 42–4, Steven Bullis Decl., dated Dec. 26, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "1st Hr'g Tr."), dated Oct. 13–18, 2010, at p. 1; Dkt. No. 42–5, Donald Haug Decl., dated Dec. 24, 2013, at Ex. A, Disciplinary Hr'g Report, dated Sept. 7–13, 2010; [2] Dkt. No. 42–6, Donald Uhler Decl., dated Dec. 27, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "3rd Hr'g Tr."), dated February 2–3, 2011, at p. 1. Accordingly, we need only determine whether Plaintiff was deprived of any of the minimum requirements of due process during any of the disciplinary hearings at issue. [3]

### 2. First Disciplinary Hearing

The following facts are undisputed.

On July 25, 2010, Sgt. Gower [4] issued a misbehavior report charging Plaintiff with extortion, soliciting a sexual act, and making a third party call. Defendant Bullis found Plaintiff guilty of all three violations, and sentenced him to six months in the SHU as well as six months loss of packages, commissary, phone, and good time credits. Dkt. No. 39–3, App. to Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s App."), Sec. 1, at Ex. A, Misbehavior Rep., dated July 25, 2010 (hereinafter "1st Misbehavior Rep."); 1st Hr'g Tr. at p. 1. Plaintiff appealed the decision; but his appeal was denied by Defendant Prack, the Director of the Special Housing/ Inmate Disciplinary Program, on December 20, 2010. *See* Pl.'s App., Sec. 1, at Exs. E, Appeal Form, dated Oct. 18, 2010; & F, Appeal Dec., dated Dec. 20, 2010. Subsequently, Plaintiff challenged the disciplinary determination, in State Court, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). *Id.* at Ex. G, Pl.'s Art. 78 Pet., dated Dec. 29, 2010. The New York State Appellate Division, Fourth Department, denied Plaintiff's petition, and unanimously upheld Defendant Bullis's disciplinary determination. *Id.* at Ex. I, Dec., dated Nov. 9, 2012.

**\*7** Plaintiff now argues that he is entitled to summary judgment as to his claims against Defendants Bullis and Prack for violations of his right to due process

2014 WL 4627120

in conjunction with this hearing, because Defendants lacked any credible evidence to support the decision or its subsequent affirmation. *See, e.g.,* Dkt. No. 44–1, Pl.'s Opp'n at p. 2. [5] Defendants argue that they are entitled to summary judgement as to this claim because Plaintiff was provided all of the process that was due. Dkt. No. 42–7, Defs.' Mem. of Law, at pp. 13–16.

### a. Notice

It is undisputed that Plaintiff was served with a copy of the misbehavior report on October 6, 2010. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition. Accordingly, Plaintiff received notice, as required, more than twenty-four hours prior to his hearing. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564 for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Moreover, the misbehavior report noted, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. Such notice was adequate to inform Plaintiff of the nature of the offenses for which he was charged. *See Sira v. Morton,* 380 F.3d at 70 (quoting *Taylor v. Rodriguez,* 238 F.3d at 193, for the proposition that "due process requires more than a conclusory charge; an inmate must receive notice of at least some specific facts underlying the accusation such that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.") (internal quotation marks omitted). [6]

### b. Opportunity to be Heard

The record clearly establishes that Plaintiff was present at the hearing, able to question witnesses, and present rebuttal evidence. *See generally* 1st Hr'g Tr. This remains true notwithstanding the fact that four of the witnesses Plaintiff called refused to testify. *See id.* at p. 10. Crucially, "it is well settled that [a]n inmate does not

possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings." *Fernandez v. Callens,* 2010 WL 4320362, at *11 (W.D.N.Y. Oct. 29, 2010) (citing *Wolff v. McDonnell,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); & *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). The fact that these witnesses refused to testify on Plaintiff's behalf does not alter the fact that he was given the opportunity to call witnesses. *See Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y.2010) (finding no due process violation where two witnesses called by inmate refused to testify); *see also Edmonson v. Coughlin,* 1996 WL 622626, at *8 (W.D.N.Y. Oct. 4, 1996) (citing *Wolff v. McDonnell,* 418 U.S. at 568–69 for the proposition that "*Wolff* specifically recognized the discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify, or witnesses who know nothing of the underlying events"); *Jamison v. Fischer,* 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) (citing cases for the proposition that "if a requested witness refuses to testify at a disciplinary hearing, the hearing officer is not constitutionally required to compel the witness to testify."). Moreover, in such situations, all that is required of the hearing officer is that he provide the inmate with notice of the fact that witnesses are being withheld and explain the reasons why. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a) ("If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."). Here, Defendant Bullis explained at the hearing that:

> **\*8** Mr. Hinton, on your assistant form you requested four potential witnesses. It is written down that they all refused to testify and in the file there are four refusal forms, one by inmate Maida ... refuses to testify he does not want to be involved. Inmate King ... states he does not want to be involved with any of this, he doesn't want to get involved with any of this don't call me again as stated on the form. The next is from inmate Woods ... stating he does not want to be involved as he stated on the form. The next is for inmate Veach ... stating he does not want to

be involved he claimed he does not know anything about this incident on 7/28/2010.

1st Hr'g Tr. at p. 10.

Thus, we can find no evidence of any constitutional deficiency in Plaintiff's opportunity to appear, call witnesses, or present rebuttal evidence at the first disciplinary hearing. *See Wolff v. McDonnell,* 418 U.S. at 564–66.

### c. Written Decision

It is clear from the record that at 11:15 a.m., on October 8, 2010, Plaintiff received a written statement as to the evidence relied upon and the reasons for the disciplinary action that was taken. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition Form.

Therefore, under *Wolf v. McDonnell,* Plaintiff received all of the process due to him. 418 U.S. at 564–66.

### d. Remaining Arguments

Plaintiff also argues that there was no credible evidence to support Defendant Bullis's disciplinary determination. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges; it is true that he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.,* 472 U.S. at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d at 488).

Here, Defendant Bullis's determination was supported by ample reliable evidence, chiefly, the testimony and misbehavior report of Sgt. Gower. *See* Pl.'s App., Sec. I at Ex. C.

As noted above, the misbehavior report stated, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. At the hearing, Sgt. Gower explained, in sum and substance, that on the morning of July 25, 2010, an unidentified inmate told him that Plaintiff had attempted to solicit sex from Inmate Veach. As a result, Sgt. Gower conducted an investigation during which he interviewed Inmate Veach, who reported that "approximately 2 weeks before that he got two packs of tobacco from [Plaintiff] he was unable to pay him so [Plaintiff] had requested he perform sexual acts for approximately ten days to pay him for the tobacco." 1st Hr'g Tr. at p. 6. Veach also informed Sgt. Gower that Plaintiff had attempted to pull him into a toilet stall but stopped when Inmate Moody walked into the bathroom area. Gower verified with Inmate Moody that he saw Veach and Hinton in the bathroom at the same time; however, Moody did not see Hinton pulling Veach into the stall. Gower ordered that Veach be examined by medical, and no evidence of sexual misconduct was found. Gower also testified that Veach informed him that Plaintiff and Inmate McGee had set up a three-way call in an attempt to extort fifteen dollars from Inmate Veach's sister for the tobacco. Gower reported that he verified this with inmate McGee who admitted to helping to orchestrate the three-way call. *Id.* at pp. 6–8.

**\*9** Standing alone, the unidentified inmate's claims that Plaintiff solicited sex from Inmate Veach would be insufficient to satisfy the "some evidence" standard applicable to prison disciplinary hearings. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 611 (S.D.N .Y.2009) (citing *Sira v. Morton,* 380 F.3d at 78, for the proposition that "if any confidential informant's testimony was based solely on hearsay, a greater inquiry into the reliability of this hearsay information is required."); *Howard v. Wilkerson,* 768 F.Supp. 1002, 1007 (S.D.N.Y.1991) (citing *Vasquez v. Coughlin,* 726 F.Supp. 466, 471 (S.D.N.Y.1989), for the proposition that "[s]ince *[Superintendent v.] Hill,* [472 U.S. 445 (1985) ] it has been held that hearsay

evidence does not constitute 'some evidence' "). However, here, Defendant Bullis's determination was supported by Gower's misbehavior report. More importantly, Gower testified at the hearing that prior to issuing the misbehavior report he independently corroborated the statements made to him by the unidentified inmate and the victim. Gower's investigation, report, and testimony were all valid bases from which Defendant Bullis could conclude that the information was reliable. *See Sira v. Morton*, 380 F.3d at 78 ("Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence."). Since Defendant Bullis found Gower's testimony to be reliable, Bullis Decl. at ¶ 17, we need not conduct an independent assessment of Gower's credibility. *Kotler v. Daby*, 2013 WL 1294282, at * 10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted some evidence, and that an independent assessment of the charging officer's credibility is neither required nor encouraged); *Thomas v. Connolly*, 2012 WL 3776698, at *23 (S.D.N.Y. Apr. 10, 2012) (finding that disciplinary determination supported by the investigating officer's report was sufficient to satisfy the some evidence requirement). Thus, we conclude that no reasonable juror could conclude that Plaintiff's disciplinary conviction was not based on some reliable evidence. [7]

Furthermore, Plaintiff's argument that Inmate Veach's statements to Sgt. Gower during his investigation are unreliable in light of the fact that Inmate Veach subsequently refused to testify at Plaintiff's hearing—reportedly, on the grounds that he knew nothing about the alleged incident—are also unavailing. *See* Pl.'s Mem. of Law at pp. 17–20; Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010; *see also Louis v. Ricks*, 2002 WL 31051633, at *13 (S.D.N.Y. Sept. 13, 2002) (surveying cases for the proposition that no due process violation occurred where the hearing assistant relied on testimony from the alleged victim which the victim later recanted). [8]

**\*10** Accordingly, having determined that Plaintiff received all of the process that was due to him with regard to his first disciplinary hearing, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to this claim, that Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this claim be **DISMISSED.**

*e. Defendant Prack*

Plaintiff alleges that Defendant Prack was liable in his supervisory capacity for Defendant Bullis's alleged due process violation because he knew of but failed to remedy the violation when he affirmed Defendant Bullis's disciplinary determination. Pl.'s Mem. of Law at p. 25. An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

However, having failed to find any evidence of an underlying constitutional violation, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claim against Defendant Prack arising out of his affirmation of Defendant Bullis's disciplinary determination. *See Elek v. Inc. Vill. of Monroe*, 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because Plaintiff has not established

any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability"). Furthermore, we also recommend that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### 3. Second Disciplinary Hearing

The following facts are undisputed.

On August 11, 2010, Plaintiff was charged with violent conduct, assault on an inmate, and fighting by Sergeant Betti, and violent conduct, creating a disturbance, and fighting by Corrections Officer Ruggerio. [9] According to Sergeant Betti's report "inmate Hinton admitted to [her] that he had a verbal argument with inmate Burton over some missing food items. He said the argument ended with him picking up a frying pan and hitting inmate Burton once over the head with it." Haug Decl., Ex. A, Betti Misbehavior Rep., dated Aug. 11, 2010. According to Officer Ruggerio, on August 11, he heard a crashing noise in the room near the kitchen, and upon responding "observed inmate Hinton lying on his left side ... near his overturned wheelchair.... [He] also observed Inmate Burton standing over Hinton with a clinched fist. There was also a medium sized stainless steel frying pan lying near [Hinton's wheelchair]." *Id.,* Ex. A, Ruggerrio Misbehavior Rep., dated Aug. 11, 2010.

**\*11** Defendant Haug conducted a disciplinary hearing between September 7 and 13, 2010, and found Plaintiff guilty of all six violations. Decl., Ex. A, Hr'g Disposition, dated Sept. 13, 2010. On November 12, 2010, Defendant D. Venettozzi, the Acting Director of the Special Housing/ Inmate Disciplinary Program, affirmed the disciplinary determination. *Id.* at Ex. C, Appeal Dec., dated Nov. 12, 2010. However, as a result of an Article 78 proceeding brought by Petitioner before the Fourth Department, the determination was overturned and vacated because "the hearing officer's effective denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman [10] as witnesses, without [ ] stated good faith reasons, constituted a clear constitutional violation[.]" *Id.* at Ex. C, Dec. & J., dated May 27, 2011. As a result, Plaintiff's September 13 disciplinary decision was administratively reversed on August 4, 2011. *Id.* at Ex. B, App. Dec., dated Aug. 4, 2011.

In his Motion, Plaintiff claims he is entitled to summary judgment as to his due process claims against Defendant Haug because he was improperly denied the right to call witnesses on his behalf, and against Defendant Venettozzi for affirming Defendant Haug's disciplinary determination. *See* Pl.'s Opp'n at p. 5. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at his second disciplinary hearing. Defs.' Mem. of Law at pp. 17–19.

### a. Notice

It is uncontested that Plaintiff received a copy of the misbehavior reports at issue on August 12, 2010. Haug Decl. at ¶ 9 & Ex. A, Tier III Data Sheet, dated Aug. 22, 2010. Furthermore, each report contained a detailed factual account of the basis of the charges, the names of those involved, and the date of the relevant events. *Id.* at Ex A, Misbehavior Reports, dated Aug. 11, 2010. Accordingly, Plaintiff clearly received constitutionally sufficient notice.

### b. Opportunity to be Heard

According to the Fourth Department, the "denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman as witnesses, without a stated good faith reason[ ], constituted a clear constitutional violation." *Id.* at Ex. B, Dec. & J. at p. 5. As a result of the Fourth Department's decision, Plaintiff's disciplinary determination was subsequently administratively overturned. However, neither of these facts is dispositive for purposes of the instant action. *Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (citing cases for the proposition that collateral estoppel does not preclude defendants from re-litigating due process violations decided in an Article 78 proceeding in a subsequent 1983 case because, *inter alia,* "appellees could not have been held personally liable in such a proceeding, they did not have the same incentive to litigate that state court action as they did the federal § 1983 action[,]" and "the defenses of absolute or qualified immunity, or lack of personal involvement, were not available to appellees"); *see also LaTorres v. Selsky,* 2011

WL 7629515, *6 n. 10 (N.D.N.Y. Aug. 1, 2011) (citing *Guitierrez v. Coughlin* ).

**\*12** Moreover, Plaintiff's claim is subject to review for harmless error. *Sims v. Artuz,* 103 F. App'x 434, 436 (2d Cir.2004) (upholding magistrate's determination applying harmless error to defendant's undisputed failure to provide a reason for refusing to call witnesses during a disciplinary hearing); *Clark v. Dannheim,* 590 F.Supp.2d 426, 431 (W.D.N.Y.2008) (same); *Colantuono v. Hockeborn,* 801 F.Supp.2d 110, 115 (W.D.N.Y.2011) (citing *Clark v. Dannheim,* 590 F.Supp.2d 426, (W.D.N.Y.2008), for the proposition that "dismissing state prisoner's due process claim based on the hearing officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result"); *cf. Powell v. Coughlin,* 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

Here, notwithstanding the fact that a denial of the right to call witnesses without an explanation is a violation of New York's prison disciplinary regulations, N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a), Defendant Haug's decision to deny, without reason, Plaintiff's request to call as witnesses Deputy Superintendent Geoghegan, Captain Scarafile, and Officer Rugerio did not rise to the level of a due process violation because Plaintiff failed to allege, in any fashion, how he was prejudiced. Indeed, it is undisputed that Deputy Superintendent Geoghegan and Captain Scarafile had no personal knowledge of the event; their only involvement was that they were informed about the alleged fight after the fact. Haug Aff. at ¶ 18 & Ex. A, Unusual Incident Report, dated Aug. 19, 2010, at p. 2. Similarly, Officer Ruggerio's misbehavior report confirms that he arrived on scene after the event, and the details of his report are nearly identical to those provided by Officer Betti, who testified at the hearing. *Id.* at ¶¶ 10 & 16–17, & Ex. A, Misbehavior Reports. Accordingly, their testimony was at best cumulative, and quite possibly irrelevant. *See Hamilton v. Fischer,* 2013 WL 3784153, at *10 (W.D.N.Y. July 18, 2013) (dismissing due process claims based on a hearing officer's failure to call witness who were not present for the incident at issue because the error was harmless).

Likewise, the record in this case compels us to reach a similar conclusion with regard to the fourth witness, Inmate Burton, although by a slightly different route. With respect to his decision to deny Plaintiff's request to call Inmate Burton, Defendant Haug avers that "I have no recollection of who that inmate was or why his testimony would have had any bearing on whether or not Plaintiff Hinton hit another inmate with a frying pan. Had I believed that this inmate had information that was pertinent to Plaintiff Hinton's defense, I would have requested his testimony." *Id.* at ¶ 19. It cannot seriously be argued that Inmate Burton, the inmate Plaintiff allegedly hit over the head with the frying pan, did not have any relevant information with regard to the incident at issue.

**\*13** However, nothing in Plaintiff's papers [11] nor the many documents submitted by Defendants indicates that had Inmate Burton been called his testimony would have altered the course of the hearing. Rather, based on the record before us, we can only conclude the opposite. In the Fight Investigation Rep., dated August 11, 2010, Sergeant Betti reported that "Burton stated [that] Hinton approached him in the day room and was yelling at him for no reason. Hinton hit him with a pan in the head." Haug Decl., Ex. A. Crucially, Burton's statement was relied upon by Defendant Haug. *Id.,* Ex. A, Hr'g Disposition Report, dated Sep. 13, 2010, at p. 2.

Given the lack of any indication in the record that Inmate Burton would have testified favorably, as well as his own admissions to Sergeant Betti that he struck Inmate Burton with the pan, Plaintiff has failed to establish that he was prejudiced by Defendant Haug's refusal to call Inmate Burton as a witness. *See Clark v. Dannheim,* 590 F.Supp.2d at 430–31 (concluding, after examining the record, that failure to call a witness who had clearly relevant information was non-prejudicial because "there [wa]s no indication or reason to believe that his testimony would have been helpful to plaintiff"); *see also Sims v. Artuz,* 103 F. App'x at 436 (upholding magistrate's determination that exclusion of witnesses from disciplinary hearing was harmless error where plaintiff "ha [d] not shown that he was prejudiced in any way"); *Tafari v. Rock,* 2012 WL 1340799 (W.D.N.Y. Apr. 18, 2012) ("A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation.").

### c. Written Decision

It is undisputed that Plaintiff received a copy of the notice of decision including the evidence that was relied upon, as well as an explanation of the reasons for the punishment assigned. *Id.* at Ex. A, Hr'g Disposition Form, dated Sep. 13, 2010, at p. 2.

Accordingly, we recommend that Plaintiff's Motion be **DENIED** as to his due process claim against Defendant Haug arising out of the second disciplinary hearing, that Defendants' Cross‐Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### d. Defendant Venettozzi

Having established the absence of any underlying constitutional violation, Plaintiff cannot maintain a cause of action against Defendant Venettozzi based on supervisory liability for affirming Defendant Haug's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d at 808.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** with respect to his claim against Defendant Venetozzi for affirming Defendant Haug's disciplinary determination, that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to the same, and that this claim be **DISMISSED.**

### 4. Third Disciplinary Hearing

The following facts are undisputed.

On January 19, 2011, Plaintiff was charged with two counts of possessing unauthorized medication and smuggling. 3rd Hr'g Tr. at p. 1. On February 2–3, 2011, Defendant Uhler conducted a Tier III disciplinary hearing, from which Plaintiff was excluded. *See generally id.* Plaintiff was convicted of all three offenses and sentenced to thirty-six months in SHU as well as thirty-six months loss of packages, commissary, phone, and good time credits. *Id.* at p. 1. On February 3, 2011, Plaintiff appealed Defendant Uhler's disciplinary determination. Compl. at p. 6. On March 29, 2011, Defendant Venettozzi modified Plaintiff's punishment to eighteen

months SHU and corresponding loss of privileges. Uhler Decl., Ex. B, Appeal Dec., dated Mar. 29, 2011. On June 21, 2011, Defendant D. Rock, Superintendent of Upstate Correctional facility, refused Plaintiff's request for discretionary review of his disciplinary determination. *Id.* at Ex. C, Lt., dated June 21, 2011.

**\*14** On June 30, 2011, Plaintiff filed an Article 78 petition challenging the disciplinary determination. On December 2, 2012, the Honorable S. Peter Feldstein, Acting Supreme Court Justice in Franklin County, New York, determined that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." Pl.'s App. at Sec. III, Ex. A, at p. 4. However, Judge Feldstein found that Plaintiff "must prevail" as to his argument that "he did not receive a copy of the written hearing disposition sheet, including the statement of evidence relied upon by the hearing officer, and the statement of reason(s) for the disposition imposed." *Id.* at pp. 5–6. Judge Feldstein further noted that prison officials should "process any additional administrative appeal from the results and disposition of the Tier III Superintendent's Hearing concluded February 3, 2011 that petitioner files within 30 days service" of his decision. *Id.* at p. 6.

Plaintiff contends that he is entitled to summary judgment against Defendant Uhler because he held the third disciplinary hearing in Plaintiff's absence and because he failed to provide Plaintiff with written notice of the disciplinary determination and the evidence on which it was based. Pl.'s Mem. of Law at pp. 25–27. Plaintiff further claims that Defendants Venettozzi, Prack, and Rock were personally involved in depriving him of his due process right because they affirmed Defendant Uhler's determination. Pl's Opp'n at ¶ 53. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at the subsequent disciplinary hearing. Defs.' Mem. of Law at pp. 20–24.

### a. Notice

Plaintiff concedes that he "receive[d] advance notice of the charges, by service of the misbehavior report." Dkt. No. 39–2, Pl.'s Mem. of Law, at ¶ 34.

### b. *Opportunity to be Heard*

Originally, Plaintiff contended that Defendant Uhler violated his right to due process by unlawfully excluding him from attending the third disciplinary hearing. Pl.'s Mem. of Law at pp. 25–27. However, Plaintiff has since conceded that he is barred from re-litigating this issue in the instant matter by the doctrine of collateral estoppel. [12]

A review of Judge Feldstein's decision reveals that he indeed already considered the issue of whether "the Tier III Superintendent's Hearing was unlawfully conducted in his absence" in Plaintiff's Article 78 action. Pl.'s App. at Sec. III, Ex. A, at p. 3. Judge Feldstein noted that, "an inmate has a fundamental right to be present at a Superintendent's Hearing unless he or she refused to attend, or is excluded for reasons of institutional safety or correctional goals." *Id.* (internal quotations, alterations, and citations omitted). After considering the evidence before him, including a transcript of the hearing conducted in Plaintiff's absence—containing on-the-record testimony from multiple prison officials stating, in sum and substance, that they made every effort to bring Plaintiff to his disciplinary hearing but Plaintiff refused to comply with prison handcuffing procedures—Judge Feldstein concluded that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." *Id.* at pp. 3–6.

**\*15** Crucially, and in keeping with the standard applied by Judge Feldstein, it is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 380 (N.D.N.Y.2010) (citing *Howard v. Wilkerson,* 768 F.Supp. 1002, 1006 (S.D.N.Y.1991)). Accordingly, Judge Feldstein's conclusion that Plaintiff's own actions justified holding the hearing in his absence is entitled to preclusive effect in the instant action. [13] *See Williams v. Pepin,* 2011 WL 7637552, \*6 (N.D.N.Y. Dec. 23, 2011) (holding that plaintiff's due process claims which were rejected in an earlier Article 78 action were precluded from being re-litigated in a subsequent § 1983 action under the doctrine of collateral estoppel).

Accordingly, Plaintiff's due process rights were not violated when his third disciplinary hearing was held in his absence.

### c. *Some Evidence*

It is clear that Defendant Uhler's disciplinary determination was supported by sufficient reliable evidence. Specifically, Defendant Uhler read the following into the record:

> The first report is by Officer Gravlin.... On 1/19/11 at approximately 9:45 AM, I conducted a pat frisk of inmate Hinton ... on 11 A 1 Gallery.... Inmate Hinton had a total of 29 pills in his front right pocket. The block nurse identified the pills as neurontin, baclofen. Both are prescription medication given to the inmate on medication rounds.... The second Report [states] ... January 19th, 2011 10:20 A.M.... On the above date and time I CO Bogardus ... was helping give inmate Hinton his level one property after being transferred from eleven building to ten building. As I was going through the letters I noticed envelopes with no addresses with objects in them sealed. I opened the envelopes and found pills. After opening all the envelopes I took the pills to the block Nurse Holmes identified them and counted them which is what came up with [sic] 319 neurontin 600 milligram, 205 baclofen 10 milligram, 100 amlodipine 5.

3rd Disciplinary Hr'g Tr. at p. 4.

Given the specificity of these reports as well as the fact that they were authored by officers with first hand knowledge of the events, no rational juror could conclude that Defendant Uhler lacked sufficient reliable evidence to support his determination. *See Thomas v. Connolly,*

2012 WL 3776698, at *23; *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214–15 (W.D.N.Y.2010) (finding disciplinary determination relying on misbehavior report was sufficient for purposes of "some evidence" standard where "the misbehavior report was made by the officer personally involved in the ... incident, and is based on his first hand observation, and contains a detailed account of that incident, including the time, place, circumstances, and names of participants").

### d. Written Decision

It is undisputed that Plaintiff did not receive a formal written statement of the third disciplinary determination "until at least six months after the hearing was actually held." Pl.'s Opp'n at Ex. A, Hinton Aff. [14]

**\*16** It is clear that Plaintiff's due process rights were violated by Defendants' failure to provide him with a copy of this statement. *See Lunney v. Brureton,* 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007) (surveying cases for the proposition that "the right to receive a written statement of the disposition is a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell"* ) (internal quotation marks, alterations, and citations omitted). However, notwithstanding this violation, Plaintiff is not entitled to anything other than nominal damages in the instant case because he has failed to establish an actual injury. *See McCann v.. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus,* 435 U.S. 247, 266–67 (1978), for the proposition that "[i]t is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury"); *Thomas v. Annucci,* 2008 WL 3884371, at *5 (N.D.N.Y. Aug. 19, 2008) (citing, *inter alia, McCann v. Coughlin* for the same proposition).

Here, notwithstanding the fact that Plaintiff's constitutional rights were violated, he cannot establish actual injury. To begin with, Plaintiff cannot argue that the failure to provide him with a written notice of the determination caused him to be sentenced to a term of SHU imprisonment; indeed, that determination was made before the duty to provide Plaintiff with a copy of the notice even arose. *Cf. McCann v. Coughlin,* 698 F.2d at 126 (noting that "the failure to provide McCann

with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision."). Thus, in order to establish that the Defendants' failure to provide him with a copy of the notice caused him actual injury, Plaintiff would have to show that because he did not have access to the information contained in the notice, he was unable to mount a meritorious appeal, and therefore, was forced to remain in SHU longer than necessary. *Cf. Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d at 126, for the proposition that "[i]n this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages.... It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed.").

Yet, despite the fact that he ultimately received a copy of the notice prior to commencing the instant action, Plaintiff fails to allege that had he known the evidentiary basis for his conviction as contained in the notice earlier, he would have been able to successfully appeal the determination. Indeed, according to his Complaint, despite the fact that Judge Feldstein explicitly granted him the right to file additional appeals after he had obtained a copy of the notice, his subsequent attempts were unsuccessful. *See* Compl. at p. 6; *see also* Pl.'s App. at Sec. III, Ex. A, at pp. 5–6. [15] Thus, Plaintiff's claim fails because he cannot establish that the failure to provide him with a copy of the hearing disposition in a timely manner caused him to suffer any actual injury. [16]

**\*17** Moreover, Plaintiff is not entitled to punitive damages in the instant action. "Courts may award punitive damages in situations where a defendant's conduct is 'willful or malicious,' or where defendants have demonstrated 'reckless intent' or 'callous indifference.' " *Giano v. Kelly,* 2000 WL 876855, at *26 (W.D.N.Y. May 16, 2000) (quoting *Memphis Comty. School Dist. v. Stachura,* 447 U.S. 299, 306 (1986)). Here, nothing in the record establishes that Defendant Uhler acted maliciously or willfully with regard to his failure to provide Plaintiff with a copy of the notice. Therefore, the court recommends **DENYING** plaintiff's request for punitive damages.

Having failed to establish any actual injury, Plaintiff is only entitled to receive nominal damages in the amount of one dollar. *McCann v. Coughlin,* 698 F.2d at 126. Accordingly, we recommend that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully excluded from the third disciplinary hearing and **DENIED** as to Plaintiff's claim that he was not provided with a copy of the hearing disposition in a timely manner. We further recommend that Plaintiff's Motion for Summary Judgment be **GRANTED** with respect to his claim that Defendants failed to provide him with a written disposition of the third disciplinary hearing, and that, in full satisfaction of his constitutional deprivation, he be awarded the sum of one dollar in nominal damages.

### e. Defendants Venettozzi, Prack, and Rock

Plaintiff claims that "[s]ince Venettozzi, Prack[,] and Rock all had [a] hand in affirming the [third disciplinary] decision, they as well are liable." Pl.'s Mem. of Law at p. 27. Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regards to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to make a single non-conclusory allegation from which a reasonable juror could conclude that Defendants Venettozzi, Prack, and Rock did anything other than rubberstamp Plaintiff's disciplinary determination.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment as to his claims against Defendants Venettozzi, Prack, and Rock, for affirming the third disciplinary disposition be **DENIED,** and that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### B. Qualified Immunity

**\*18** Defendants argue that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 23–24. However, given that we have recommended dismissing all of Plaintiff's claims except his claim against Defendant Uhler, we do not discuss whether any of the other Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, some limited discussion is necessary with regard to Plaintiff's due process claim against Defendant Uhler for the failure to provide Plaintiff with a written copy of the disposition.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194 at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the

2014 WL 4627120

[Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff [ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

**\*19** As discussed *supra,* the right to receive a written copy of the hearing disposition, including the evidence relied upon and the reasons for the sentence, has been clearly established since *Wolff v. McDonnell. Lunney v. Brureton,* 2007 WL 1544629, at *28. Moreover, no rational juror could conclude that it was objectively reasonable for Defendant Uhler not to provide Plaintiff with a copy of his third disciplinary hearing disposition. Accordingly, Defendant Uhler is not entitled to qualified immunity with respect to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Plaintiff's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part as follows:

1. **GRANTED** to the extent that Plaintiff is entitled to summary judgment as to the issue of whether Defendant Uhler violated his right to due process by failing to provide him with a copy of the hearing

disposition from his third disciplinary hearing, **HOWEVER,** in light of Plaintiff's inability to establish actual injury, we further recommend that he be awarded nominal damages in the amount of one dollar; and

2. **DENIED** in all other respects; and it is further

**RECOMMENDED,** that Defendants Cross–Motion for Summary Judgment (Dkt. No. 42) be **GRANTED** in part and **DENIED** in part as follows:

1. **DENIED** with respect to Plaintiff's due process claim against Defendant Uhler for his failure to provide Plaintiff with a copy of his hearing disposition from the third disciplinary hearing; and

2. **GRANTED,** with respect to all of Plaintiff's other claims, which should be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court **TERMINATE** Sgt. Gower from this action; [17] and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 14, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4627120

---

Footnotes

1  We agree. In the instant case, Plaintiff has alleged that he spent a total of 910 consecutive days in SHU as a result of the three disciplinary hearings at issue. Dkt. No. 39–2, Pl.'s Mem. of Law, dated Nov. 8, 2013, at p. 2. The Second Circuit has held that "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky,* 292 F. App'x 120, 122 (2d Cir.2008) (citing

*Sims v. Artuz,* 230 F.3d 14, 23–24 (2d Cir.2000)); *see also Koehl v. Bernstein,* 2011 WL 2436817, at \*7 (S.D.N.Y. June 17, 2011) (citing *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), for the proposition that "the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality.").

2    A transcript of the September 7–13 disciplinary hearing was not provided to the Court as part of his disciplinary record.

3    In addition to time in SHU, Plaintiff also lost several months of good time credits as a result of his disciplinary hearings. *See* 1st Hr'g Tr. at p. 1; Haug Decl., Ex. A, Disciplinary Hr'g Report; 3rd Hr'g Tr. at p. 1. Ordinarily, a prisoner cannot seek monetary damages for a due process violation arising out of a prison disciplinary hearing where the loss of good time credits affects the overall length of the plaintiff's sentence without first seeking a reversal or expungement of the disciplinary conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)) (holding "that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."). However, in the instant case, Plaintiff is serving a life sentence, and accordingly, the loss of good time credits neither affects the overall length of his sentence nor prevents him from filing the instant action. *See* New York State Inmate Lookup for Inmate DIN # 96–A–0837, Leonard Hinton, http://nysdoccslookup.doccsny.gov (last checked July 31, 2014); *see also Holmes v. Grant,* 2006 WL 851753, at \*18 (S.D.N.Y. Mar. 31, 2006) (surveying cases in support of the proposition that "*Heck* [v. Humphrey] does not apply [w]here, ... plaintiff is serving a life sentence, [because] the loss of good time credits ... has no effect on the length of his sentence"); N.Y. CORR. LAW § 803(1)(a) (noting that inmates serving a maximum life sentence are not eligible for reduced sentence based on good behavior).

4    Sgt. Gower was dismissed from this action by the Honorable Lawrence E. Kahn, Senior United States District Judge, during the Court's initial review on March 7, 2013. *See* Dkt. No. 4, Dec. & Order, dated Mar. 7, 2013, at p. 5. Nonetheless, Sgt. Gower was served with process and joined in Defendants' Answer. *See* Dkt. Nos. 7 & 23. In light of his earlier dismissal and notwithstanding the subsequent errors which occurred, the Clerk of the Court is ordered to terminate Sgt. Gower from this action.

5    Document Number 42–1 is listed as Plaintiff's Affidavit. However, this document contains both sworn statements and legal arguments, in non-sequentially numbered paragraphs. Accordingly, we make reference to the page numbers assigned by Plaintiff.

6    In his Article 78 proceeding, Plaintiff challenged the sufficiency of the notice on the grounds that it omitted the specific dates of the events in question. *See generally* Pl.'s App., Sec. I, Ex. H. While it does not appear that Plaintiff intended to re-raise that issue here, to the extent that he may have intended to do so, such an argument would be unavailing. Although the date of the misbehavior report was actually the date Sgt. Gower conducted his investigation rather than the date that the actual events giving rise to the report occurred, this omission was by no means fatal given the specific nature of the charges against Plaintiff. Indeed, it is clear that Plaintiff was able to understand the nature of the charges against him and to prepare a defense. *See id.* (finding that "the report provided adequate detail to apprise [Plaintiff] of the charges and afford him the opportunity to prepare his defense") (internal quotations and citation omitted); *see also Sira v. Morton,* 380 F.3d at 71 (citing *Quinones v. Ricks,* 288 A.D.2d 568, 568–69 (N.Y.App. Div.2d Dep't 2001), for the proposition that "failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense"); *Cepeda v. Urban,* 2014 WL 2587746, at \*6 (W.D.N.Y. June 10, 2014) (reaching similar conclusion).

7    Indeed, the New York State Appellate Division, Fourth Department, held that the evidence adduced at Plaintiff's disciplinary hearing was sufficiently adequate to meet the "substantial evidence" standard; a burden which is much higher than the "some evidence" standard applicable to the instant action. *See* Pl.'s App., Sec. I, Exs. H, Dec. & Order, dated Oct. 26, 2011; & I, Order, dated Nov. 9, 2012; *Smith v. Fischer,* 2010 WL 145292, at \*8 (N.D.N.Y. Jan. 11, 2010) (citing *Sira v. Morton,* 380 F.3d at 76 n. 9, for the proposition that the substantial evidence " 'requirement is sterner than the 'some evidence' standard necessary to afford due process' ").

8    It is also worth noting that it is not entirely clear that Inmate Veach's refusal to testify was actually a recantation of his earlier statements to Sgt. Gower. Inmate Veach stated in his refusal form that he knew nothing about any incident which occurred on July 25, 2010. Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010. However, July 25, 2010 was the day that Sgt. Gower was informed about the alleged violations, not the dates that the alleged violations occurred. *See supra* Note 6. Thus, this statement is not necessarily at odds with Veach's earlier statements to Sgt. Gower.

Hinton v. Prack, Not Reported in F.Supp.3d (2014)

2014 WL 4627120

**9**    Neither Sergeant Betti nor Corrections Officer Ruggerio are Defendants in this action.

**10**    These individuals are not Defendants in the instant action.

**11**    It is clear from Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment that Plaintiff was aware of Defendants' claim that he failed to identify how he was prejudiced by Defendant Haug's failure to call these witnesses. *See* Pl.'s Opp'n at pp. 6–7. However, rather than explain how he was prejudiced, Plaintiff argued that the Article 78 determination constituted "law of the case" and that Defendants' reliance on the harmless error standard was misplaced. *Id.*

**12**    On July 18, 2014, we stayed the parties pending Cross–Motions for Summary Judgment and ordered them to brief the Court as to whether Judge Feldstein's prior conclusion in Plaintiff's Article 78 action, that Plaintiff was properly excluded from his disciplinary hearing based on his failure to conform to facility security protocols, precluded him from arguing in the instant case that he was unlawfully excluded from attending the third disciplinary hearing. Dkt. No. 54, Order, dated July 18, 2014. In his Reply to the Defendants' Letter–Brief, Plaintiff conceded that Judge Feldstein's determination in this regard does preclude him from re-raising this issue in the instant matter. *See* Dkt. Nos. 55, Defs.' Lt.-Br., dated July 21, 2014, & 56, Pl.'s Reply Lt.-Br., dated July 25, 2014.

**13**    Moreover, even if the issue were not precluded, it is unlikely that Plaintiff's claim would have succeeded because Plaintiff fails to allege any resulting prejudice from this alleged error. *See Lunney v. Brureton,* 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007) (citing *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) for the proposition that "[p]rison disciplinary hearings are subject to a harmless error analysis."). Indeed, Plaintiff fails to allege that had he been offered the opportunity, he would have presented evidence or called witnesses on his own behalf, let alone that such evidence would have been likely to affect the outcome of his disciplinary determination.

**14**    Defendants fail to adequately contest Plaintiff's contention that he was not served a written copy of the determination; indeed, with the exception of their unsupported statement that they "[d]eny information and belief about when plaintiff received a copy of the hearing determination," they fail to address the issue whatsoever. *See* Dkt. No. 42–1, Defs.' Reply to Pl.'s 7.1 Statement, at ¶ 35; *see also Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (finding that mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment).

**15**    Plaintiff also claims that he initially appealed his disciplinary determination on February 3, 2011, the day that it was imposed. Compl. at p. 6. However, he provides conflicting and wholly inadequate explanations for the type and content of the notice he received. *See id.* at p. 8 n. 3; *see also* Pl.'s Opp'n at Ex. A, Hinton Aff. And, although it is unclear what the bases of Plaintiff's February 3 appeal were, it is axiomatic that Plaintiff would have known at that time that he was excluded from the hearing and had not received proper notice, and accordingly, the lack of notice did not prevent him from raising either of these grounds at that time. Moreover, as a result of this appeal, Plaintiff's disciplinary determination was modified, and his sentence was reduced from thirty-six months SHU to eighteen months. Pl.'s Mem. of Law at p. 26; Uhler Decl. at Ex. B, Review of Sup't Hr'g, dated Mar. 29, 2011.

**16**    To be sure, we are not positing that the relief Plaintiff received from his Article 78 action somehow extinguished any due process violation that he may have suffered between the time that violation accrued, and the time the Article 78 Petition was granted in his favor. Rather, we are merely noting the fact that Plaintiff was unable to file a successful administrative grievance appeal at the prison once he was provided with a copy of the formal notice as evidence that nothing within the notice provided Plaintiff with a meritorious ground for appeal. Therefore, the fact that he did not receive the formal notice sooner did not prejudice him. *Compare Bogle v. Murphy,* 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003) (noting that once a due process violation accrues, a subsequent Article 78 determination in the plaintiff's favor does not rectify the harm caused); *with Lunney v. Brureton,* 2007 WL 1544629, at *27–29 (dismissing due process claim based on undisputed failure to provide timely written disposition to plaintiff, in part on the basis that after receiving a transcript of the hearing, which included a statement of the evidence relied upon, Plaintiff failed to add any new substantive arguments).

**17**    *See supra* Note 4.

---

**End of Document**            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4178226
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith I. HURST, Plaintiff,
v.
A. MOLLNOW and Eisenschmidt, Defendants.

9:16-cv-1062 (DNH/TWD)
|
Signed 07/20/2018

**Attorneys and Law Firms**

KEITH I. HURST, 105 Hunter Ave., #2, Albany, NY
12206, pro se.

BARBARA D. UNDERWOOD, OF COUNSEL:
MARK G. MITCHELL, ESQ., Attorney General of the
State of New York, The Capitol, Albany, NY 12224,
Attorney for Defendants.

## ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

## I. INTRODUCTION

**\*1** This matter was referred for Report and
Recommendation by the Hon. David N. Hurd, United
States District Judge, pursuant to 28 U.S.C. § 636(b)
and Northern District of New York Local Rule
("L.R.") 72.3(c). *Pro se* Plaintiff Keith I. Hurst, a
former inmate in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS"), has commenced this action pursuant to
42 U.S.C. § 1983 alleging violations of his civil rights
while confined at Washington Correctional Facility
("Washington"). (Dkt. No. 1.) The sole remaining claim
is Plaintiff's Eighth Amendment excessive force claim
against Defendants A. Mollnow, a Corrections Officer
("C.O.") and Eisenschmidt, a Sergeant ("Sgt."). (Dkt.
No. 12.)

Presently pending is Defendants' motion for summary
judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure (Dkt. No. 41) for Plaintiff's failure
to exhaust administrative remedies before commencing

this action. (Dkt. No. 41-11 at 6-13.[1]) Defendants also
contend, to the extent Plaintiff's seeks monetary damages
against them in their official capacities, they are entitled
to Eleventh Amendment immunity. (Dkt. No. 41-11 at
13.) Plaintiff filed a response in opposition to Defendants'
motion. (Dkt. No. 57.) Defendants filed a reply. (Dkt. No.
60.) For reasons that follow, the Court recommends that
Defendants' motion for summary judgment (Dkt. No. 41)
be granted in part and denied in part.

## II. BACKGROUND

### A. July 1, 2016, Incident
Plaintiff alleges that on July 1, 2016, while an inmate
at Washington, he was subjected to excessive force by
C.O. Mollnow and Sgt. Eisenschmidt. (Dkt. No. 1 at
4-5.) On that date, Plaintiff claims he requested to speak
to an "area supervisor" regarding his keeplock status.
*Id.* at 4-5. In response, C.O. Mollnow "pulled the pin
on her walkie talkie" and several officers, including
Sgt. Eisenschmidt responded. *Id.* The officers physically
assaulted Plaintiff, inflicting numerous injuries, while
hurling racial epithets at him. *Id.* Specifically, C.O.
Mollnow kicked Plaintiff in the left side of his face and
spit on him while he was on the ground. (Dkt. Nos. 1
at 5, 41-2 at 86-88.) Sgt. Eisenschmidt punched Plaintiff
in the head, face, and chest, banged his head into the
wall, and choked him. (Dkt. Nos. 1 at 5, 41-2 at 157.)
The assault lasted approximately ten minutes. (Dkt. No.
41-2 at 98-100.) Afterwards, Plaintiff was taken by bus
to Sgt. Eisenschmidt's office. *Id.* There, Sgt. Eisenschmidt
punched, kicked, and choked Plaintiff, and slammed his
head against a wall. *Id.* at 103-104. Plaintiff was then sent
to the Special Housing Unit ("SHU"). *Id.*

### B. Plaintiff's Inmate Misbehavior Reports
On July 1, 2016, C.O. Mollnow issued Plaintiff two
inmate misbehavior reports for creating a disturbance,
harassment, refusing a direct order, making threats, and
being out of place. (Dkt. No. 1 at 9, 11-12.) As described
in those misbehavior reports, at approximately 1:00 p.m.,
Plaintiff was "cube visiting" without permission. (Dkt.
No. 41-4 at 5.) When C.O. Mollnow told Plaintiff that
he was not allowed to cube visit, Plaintiff yelled, "fuck
you" and returned to his cube. *Id.* At Sgt. Eisenschmidt's
direction, C.O. Mollnow told Plaintiff he was keeplocked.
*Id.* Plaintiff argued with C.O. Mollnow about his keeplock
status, but returned to his cube. *Id.* At approximately

1:20 p.m., Plaintiff approached C.O. Mollnow's desk and resumed arguing about his keeplock status. *Id.* at 6. C.O. Mollnow ordered Plaintiff to leave the desk and return to his cube. *Id.* Plaintiff stepped onto the officer's podium in a threatening manner. *Id.* C.O. Mollnow activated her alarm; Plaintiff ran to his cube. *Id.* A response team arrived; Plaintiff was sent to the SHU. *Id.* No physical force was used in the incident. *Id.* at 5, 6.

**\*2** At two Tier III disciplinary hearings conducted on July 11, 2016, Plaintiff pleaded guilty to two counts of creating a disturbance and was found guilty of all other charges. *Id.* at 7; Dkt. No. 41-2 at 122, 125. He was sentenced to 90 days in the SHU, 90 days loss of recreation, and 90 days loss of good time credits, along with 120 days loss of package, commissary, and telephone privileges. (Dkt. No. 41-2 at 126.) The hearing officer's determinations were affirmed on administrative appeal. (Dkt. No. 41-6 at 1.) On July 15, 2016, Plaintiff was transferred to Upstate Correctional Facility ("Upstate"). (Dkt. No. 41-2 at 142.)

### C. Plaintiff's Grievance

In his verified complaint,[2] Plaintiff declares, "I exhausted all of my administrative remedies, grievance, commissioner, governor, inspector general, special litigation of Washington, D.C." (Dkt. No. 1 at 2.) Plaintiff further states, "I filed grievances to the higher authority & never received a response. The facility of Washington never responded to my grievance." *Id.* at 3.

At his deposition, Plaintiff testified that on or about July 14, 2016, while confined in the SHU at Washington, he filed a grievance with Inmate Grievance Resolution Committee ("IGRC") regarding the July 1, 2016, assault:

Q: Did you file an inmate grievance with the IGRC about the incident on July 1, 2016?

A: Yeah.

Q: You did? On what date?

A: July 14th or 13th. It was the -- it was before they packed me up.

Q: And that was at Washington Correctional?

A: Yeah.

Q: All right. Where did you put the grievance?

A: In the mailbox.

Q: What did the grievance say?

A: It was on a -- it was on a regular piece of paper and it says that I was assaulted July 1st by several officers and -- the sergeant.

Q: What else?

A: I don't remember what it says.

Q: All right. And you put that in the mailbox at Washington?

A: Yeah. I know it was about my -- the assault.

(Dkt. No. 41-2 at 141.) The next day, on or about July 15, 2016, Plaintiff was transferred to Upstate. *Id.* at 142. Plaintiff testified he never received a response to his grievance that he filed at Washington:

Q: Did you get a response to that [grievance]?

A: I never got a response from it. I contacted the Upstate box -- Inmate Grievance Program to make sure they got my grievance and they said that they never had received it.

Q: All right. So, you put -- you put this grievance in the mailbox at Washington. And then you were transferred to a different facility?

A: Yes, sir.

Q: What date?

A: On the 15th or 16th. I think it was July 15th, when I was transferred out of -- out of there.

Q: Where did you go?

A: Upstate Correctional Facility.

*Id.* Plaintiff further explained, "I filed a grievance on [the July 1, 2016, assault] and they made it disappear. They said they never got it. I wrote a grievance...." *Id.* at 93-94. Plaintiff testified he wrote the Commissioner, the Governor, and Special Litigations. *Id.* at 94. He "wrote everybody that [ ] could consider a grievance." *Id.*

For example, by letter dated August 14, 2016, Plaintiff sent a letter to the Commissioner, regarding the July 1, 2016, incident:

> I was assaulted by several officers, including a sergeant. I was called racial slurs & repeatedly kicked & punched. The female officer even kicked me in the face, causing my left eye to become blurry & spit on me. They assaulted me for a very long time.... I was beaten on the bus, then I was assaulted in the Sergeant office. He choked me & started banging my head into wall." ... The Sergeant name is "Eisenschmidt" and the female office name is "A. Mollnow.... She also lied on the misbehavior report. I am not letting them get away with this & they should be placed under investigation.... Still heard no response from Inmate Grievance—dated 7.14.16. I hope you could look into this matter & save me from doing unnecessary box time. Do your job.

**\*3** (Dkt. No. 1 at 6.)

Plaintiff testified that he also contacted Upstate's IGRC regarding the status of his grievance:

> Q: What response did you get?
>
> A: That Washington never received no grievances from Hurst.
>
> Q: Did you do an appeal to the superintendent?
>
> A: No -- I don't recall. I don't know. I know I -- I filed my grievance with Albany and the Governor.
>
> Q: So, you sent some letters to the Governor?
>
> A: Yeah. To back up the grievance.
>
> Q: All right. And when you say Albany, what do you mean?
>
> A: The Commissioner and I --.
>
> Q: All right. So, you wrote to the Commissioner and you wrote to the Governor?
>
> A: And I wrote the Inspector General and he came about five months later to see me.

(Dkt. No. 41-2 at 143.) Plaintiff admitted he never appealed to the Central Office Review Committee ("CORC"):

> Q: Did you appeal to the Central Office Review Committee?
>
> A: I'm saying, if they never received it, how could I appeal it?

*Id.* at 144-45.

During his deposition, Plaintiff confirmed that he never filed a grievance at Upstate regarding the July 1, 2016, incident:

> Q: How about when you -- when you got to Upstate on July 15, 2016, did you try putting a grievance in -- filing a grievance there about --
>
> A: No.
>
> Q: -- what had happened at Washington?
>
> A: No. Because I thought it -- my grievance had already -- I thought they already had it. I thought they received it. But after like a month of not hearing nothing from them, I decided to take it upon myself to respond to Upstate grievances, to respond to them because you can't send mail out like that. You got it do it through the Grievance Program.
>
> Q: All right. Am I correct though you could of filed a grievance at Upstate, about something that happened at Washington? Correct?
>
> A: Yes. Because it was -- it was less than twenty-one days that it occurred.
>
> Q: All right. But you didn't -- you didn't do that?
>
> A: No. Because I already did it.
>
> Q: Okay. Do you have a copy of the grievance that you say you filed on July 13 or July 14?
>
> A: No. If I had carbon paper I would of made one, but I didn't have no carbon paper. Usually I do that, but I didn't have carbon paper at the time.
>
> Q: Do you have written proof that you -- you filed that grievance?
>
> A: No. Oh, yeah.
>
> Q: What?

A: I have written proof that I wrote to Albany -- Upstate Inmate Grievance, asking about that grievance and they wrote --

Q: Okay.

A: -- me back saying that they going to contact Washington Correctional Facility and they going to contact me, when they get a response. And when they got a response, they saying that Washington never received a -- a grievance.

*Id.* at 145-47. Plaintiff confirmed he sent a letter to Upstate regarding his grievance:

Q: You're saying that there was a letter from you to Upstate and you said something to the effect, what happened to my grievance at Washington?

A: Yes.

Q: And you said that Upstate wrote back and said we'll look into it?

A: Yeah.

Q: And then eventually, Upstate said there -- nothing was filed?

A: Yeah.

*Id.* at 149. [3]

**\*4** Defendants have submitted evidence in support of their motion establishing Washington has no record of any grievance filed by Plaintiff regarding the alleged July 1, 2016, incident. (Dkt. No. 41-9 at 2-3.) Matthew L. Waters, Inmate Grievance Program ("IGP") Supervisor, is one of the individuals responsible for keeping records of the grievances filed by inmates at Washington. *Id.* at 2. In his declaration, Waters explains he searched the IGP files to determine if Plaintiff filed any grievance at Washington relating to the alleged July 1, 2016, incident. *Id.* Based upon his search, Waters determined Washington has no record of any grievance filed by Plaintiff relating to any issue connected to the alleged use of excessive force incident at Washington in July 2016. *Id.* at 2-3.

Defendants have also submitted evidence establishing CORC has no record of an appeal relating to the alleged July 1, 2016, assault. (Dkt. No. 41-8 at 1-2.) Rachel Seguin is the Assistant Director of the DOCCS IGP. *Id.* at 1. In that capacity, she is the custodian of the records maintained by CORC, which is the body that renders final administrative decisions under DOCCS' three-step IGP. *Id.* In her declaration, Seguin explains she searched CORC records and, based upon her search, determined Plaintiff did not file a grievance appeal with CORC related to any issue involving an alleged use of excessive force incident at Washington in July 2016. *Id.* Seguin has attached a computer printout showing that the only CORC appeal filed by Plaintiff was in 2015, concerning an incident at Downstate, and that there are currently no active CORC appeals pending for Plaintiff. *Id.* at 2.

### III. APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation

marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). [4] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

*5 In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at the point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93

Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## IV. PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). While Plaintiff has opposed Defendants' motion, he has failed to respond to Defendants' statement of material as required under L.R. 7.1(a)(3). [5] (Dkt. No. 57.) His response does not mirror Defendants' statement of material facts, nor does Plaintiff specifically admit or deny the statements therein or cite references to evidence in the record supporting of refuting Defendants' statements. *See id.* Where a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record, [6] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [7] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

*6 This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V. DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendants argue Plaintiff's excessive force claim arising from the July 1, 2016, incident should be dismissed on the ground that he failed to exhaust his administrative remedies.

### 1. Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) ); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. tit. 7 ("7 NYCRR"), § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

**\*7** Grievances claiming employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. *Id.* § 701.8.[8] The superintendent is required to initiate an in-house investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. *Id.* § 701.8(d).

A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent. *Id.* § 701.8(d). The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g).

As set forth above, at each step of the IGP process, a decision must be rendered within a specified time period. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* §§ 701.6(g), 701.8(g). Generally, if a plaintiff fails to follow each of the required three step of the above-described IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to

exhaust his administrative remedies and required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted) ); *see, e.g., Martin, II v. Niagara Cty. Jail*, No. 05-CV-868 (JTC), 2012 WL 3230435, at *6 (W.D.N.Y. Aug. 6, 2012) (inmate who fails to exhaust his administrative remedies is barred from commencing a federal lawsuit).

Because non-exhaustion is an affirmative defense, Defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95.

### 2. Plaintiff's Failure to Exhaust

Plaintiff has averred that on or about July 14, 2016, he submitted a grievance regarding the July 1, 2016, incident while he was in the SHU at Washington. (Dkt. No. 41-2 at 141-43.) The undisputed record evidence establishes there is no record of this grievance have been filed at Washington or appealed to CORC. (Dkt. Nos. 41-9 at ¶ 9; 41-8 at ¶¶ 3, 4; 41-2 at 143-45.) Therefore, the Court finds Defendants have satisfied their burden of showing that Plaintiff failed to satisfy the exhaustion requirements before commencing this action. *See Woodford*, 548 U.S. at 93. [9]

### 3. Availability of the DOCCS IGP

**\*8** A prisoner's failure to exhaust does not end a court's exhaustion review. While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotations and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to

exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and citations omitted).

To guide courts in the "availability" analysis, the Supreme Court has identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. When one of the three circumstances is found, "an inmate's duty to exhaust 'available' remedies does not come into play." *Id.* at 1859. Once a defendant has satisfied the burden of establishing a failure to exhaust, the plaintiff must establish that the IGP was unavailable to him. *See Jones*, 549 U.S. at 216.

The Court finds that the question of availability in this case is governed by *Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016), in which the Second Circuit held that the opacity of 7 NYCRR § 708.1(g) rendered the DOCCS IGP procedure unavailable to the plaintiff inmate and found that the plaintiff had exhausted his administrative remedies by giving his grievance to the corrections officer. Defendants' attempt to distinguish *Williams* from the case at bar is unpersuasive. (*See* Dkt. No. 41-11 at 12.)

As in this case, the inmate plaintiff in *Williams* claimed to have drafted a grievance complaining of an assault by corrections officers. *Williams*, 829 F.3d at 120-21. The plaintiff alleged he gave the grievance to a corrections officer for delivery to the IGP office because he was in the SHU. *Id.* Here, Plaintiff testified he placed the grievance in the mailbox located in the SHU and, in his opposition submission, explains he handed the grievance to a corrections officer to be placed in the SHU mailbox.

(Dkt. Nos. 41-2 at 141-43; 57 at 4, 6. [10] ) Significantly, the plaintiff in *Williams*, like Plaintiff herein, was transferred to another facility before hearing anything regarding the grievance he had attempted to file. *Id.* As in this case, it was undisputed in *Williams* that the inmate plaintiff never received a response to the unfiled grievance and did not appeal the grievance to CORC under 7 NYCRR § 701.8(g). *Id.* at 125.

**\*9** The Second Circuit acknowledged in *Williams* that under the DOCCS regulation relevant in both *Williams* and this case, an inmate may appeal a grievance "to the next step" if he does not receive a timely response from the Superintendent. *Williams, 829 F.3d at 124.* The Court concluded, however, that:

> even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross,* 136 S. Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

*Id.* (alternations in original). Accepting Williams' allegation that the officer to whom he had given the grievance did not file it, the Court found:

> [u]nder that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies. On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ("If the superintendent fails to respond within the required 25 day calendar day time limit the grievant may appeal his/her grievance to CORC.") Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

*Id.* The Court noted in *Williams* that the obscurity of the regulation was compounded by Williams' transfer to another facility approximately two weeks after having given the grievance to the corrections officer. *Id.* at 126.

Here, Defendants contend Plaintiff has failed to sustain his burden of demonstrating unavailability under *Ross* sufficient to raise a material issue of fact. Specifically, Defendants argue Plaintiff has failed to show that the grievance procedure was so opaque as to render it incapable of use because "the regulations contemplate the very situation Plaintiff allegedly believed he was in —a filed grievance that went unanswered." (Dkt. No. 60 at 5.) In support of their motion, Defendants explain the regulations provide that an inmate who receives no response within the time allotted for response may go directly to the next step of the grievance process. *Id.* (citing 7 NYCRR §§ 701.6(g)(2), 701.8(g) ). Thus, after receiving no response from the facility superintendent within 25 days of purportedly submitting his grievance, Plaintiff could have appealed to CORC. *Id.* In short, Defendants argue, "the grievance process provided Plaintiff with a 'clear avenue to proceed.' " *Id.* (quoting *Cicio v. Wenderlich,* 714 F. App'x 96, 97-98 (2d Cir. 2018) (summary order) ("When a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal.") ). [11]

**\*10** However, "*Williams* holds that the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Berman v. Drunkin,* No. 9:13-CV-0136 (LEK/ DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017) (emphasis in original), *report and recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017); *see also Juarbe v. Carnegie,* No. 9:15-CV-01485 (MAD/ DEP), 2016 WL 6901271, at *1 (N.D.N.Y. Oct. 7, 2016) ("In *Williams,* the Second Circuit held that when a plaintiff's grievance is both unfiled and unanswered, the regulations do not clearly outline the process to appeal or otherwise exhaust administrative remedies, and therefore, the administrative remedies are unavailable under *Ross.*"). Therefore, "[a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]" *Juarbe,* 2016 WL 6901271, at *1.

Here, Plaintiff claims he submitted a grievance at Washington, and the next day he was transferred to Upstate. (Dkt. No. 41-2 at 141-42.) The undisputed evidence demonstrates Washington has no record of

Plaintiff's grievance. (Dkt. No. 41-9 at 2-3.) Drawing all inferences in the non-moving party's favor, Plaintiff's grievance was both unfiled and unanswered. In that situation, the Second Circuit has held the procedures "are so opaque and confusing that they were, 'practically speaking, incapable of use.'" *Williams*, 829 F.3d at 126 (quoting *Ross*, 136 S. Ct. at 1859). In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment. *See, e.g., Fann v. Graham*, No. 9:15-CV-1339 (DNH/CFH), 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) (finding issue of fact as to the availability of administrative remedies where the record suggested the plaintiff submitted grievances, which were unfiled and unanswered), *report and recommendation adopted by* 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018).

Therefore, the Court recommends that Defendants' motion for summary judgment on exhaustion grounds be denied without prejudice and with the opportunity to renew by way of an exhaustion hearing should Defendants request such a hearing.

### B. Official Capacity Claims

The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted to the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state, *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006), and, unless waived, bars all money damage claims against state officials acting in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (observing that an inmate-plaintiff's claims for damages against individual corrections department employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity).

Therefore, to the extent Plaintiff seeks monetary damages from C.O. Mollnow and Sgt. Eisenschmidt in their official capacities (*see* Dkt. No. 1 at 2, 15), the Court agrees with Defendants that such claims must be dismissed on Eleventh Amendment grounds. (*See* Dkt. No. 41-11 at 13.)

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be **GRANTED in part and DENIED in part**; and it is further

 *11 **RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants in their official capacities, the motion be **GRANTED**; and it is further

**RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants on exhaustion grounds, the motion be **DENIED without prejudice** to Defendants renewing this argument and requesting an exhaustion hearing, and it is further

 *12 **ORDERED** that the Clerk shall provide Plaintiff with a copy of this Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

 *13 Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [12] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1) (Supp. 2013); *Fed. R. Civ. P. 72*, 6(a).

**All Citations**

Slip Copy, 2018 WL 4178226

---

Footnotes

1    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

2   The Court finds Plaintiff's complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 1.)

3   Plaintiff did not have a copy of the letters with him at the September 13, 2017, deposition. (Dkt. No. 41-2 at 147.) Plaintiff indicated he would provide copies of the letters to Defendants, provided they were not destroyed in his sister's house fire. *Id.* at 147-48.

4   The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

5   L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

6   L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, see *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

7   Plaintiff was notified of the consequences of his failure to respond to Defendants' summary judgment motion pursuant to L.R. 56.2. (Dkt. No. 43.)

8   Section 701.8 has been found applicable to claims of excessive force. *See Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

9   To the extent Plaintiff suggests he "exhausted" his administrative remedies by contacting the Commissioner, Governor, and Inspector General, among others, regarding the July 1, 2016, incident, "[t]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, Nos. 14-CV-6606 RJS, 14-CV-6857 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Salmon v. Bellinger*, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), *report-recommendation adopted by*, 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) (collecting cases); *see also Geer v. Chapman*, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."). Thus, Plaintiff's informal complaints, whether written or verbal, outside of the grievance process, are insufficient to exhaust his administrative remedies. *See also Jones*, 549 U.S. at 218 (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

10  In his opposition submission, Plaintiff states, "Plaintiff is 100% positive that he gave the on duty officer, that was working the special housing unit on July 14, 2016, the inmate grievance envelope to be placed into the facility out-going mailbox. (Dkt. No. 57 at 6.) The Court notes that according to the regulations, inmates in the SHU are instructed to file grievances by giving them to a corrections officer to file on behalf of the inmate. *See* 7 NYCRR § 701.7.

11  In *Cicio*, the Second Circuit found that the grievance process in Cicio's case was not so opaque that it became "incapable of use." *Cicio*, 714 F. App'x at 97-98 (citing *Ross*, 136 S. Ct. at 1859). In so holding, the Court compared and distinguished Cicio's situation from that of the plaintiff in *Williams. See id.* (*cf. Williams v. Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (finding that appellate process was too opaque in circumstances where inmate alleged that a prison guard did not file his grievance and the inmate had since been transferred) ). Here, by contrast, the Court finds Plaintiff's circumstances more closely resemble that of the plaintiff in *Williams*. Thus, for the same reasons, Defendants' reliance on recent rulings by summary order by the Second Circuit are easily distinguishable and inapposite. (*See* Dkt. No. 41-11 at 12.)

12  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2018 WL 4153926
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith I. HURST, Plaintiff,

v.

A. MOLLNOW, Correctional Officer, Washington
Correctional Facility; and Eisenschmidt, Sergeant,
Washington Correctional Facility, Defendants.

9:16-CV-1062 (DNH/TWD)
|
Signed August 29, 2018
|
Filed 08/30/2018

**Attorneys and Law Firms**

KEITH I. HURST, 105 Hunter Avenue, #2, Albany, NY
12206, pro se.

BARBARA D. UNDERWOOD, OF COUNSEL:
MARK G. MITCHELL, ESQ., Ass't Attorney General,
Attorney General for the State of New York, The Capitol,
Albany, NY 12224, Attorney for Defendants.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Keith I. Hurst brought this civil
rights action pursuant to 42 U.S.C. § 1983. On July 20,
2018, the Honorable Thérèse Wiley Dancks, United States
Magistrate Judge, advised by Report-Recommendation

that defendants' motion for summary judgment be granted
in part and denied in part. No objections to the Report-
Recommendation were filed.

Based upon a careful review of the Report-
Recommendation, the Report-Recommendation is
accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Defendants' motion for summary judgment dismissing
plaintiff's Eighth Amendment excessive force claim
against defendants in their official capacities is
GRANTED and those claims are DISMISSED;

3. Defendants' motion for summary judgment dismissing
plaintiff's Eighth Amendment excessive force claim based
on non-exhaustion is DENIED without prejudice to
defendants renewing this argument and requesting an
exhaustion hearing; and

4. Trial is scheduled for February 5, 2019 in Utica, New
York.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 4153926

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

2016 WL 8732798
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jose JUARBE, Plaintiff,
v.
Corrections Officer John
CARNEGIE, et al., Defendants.

Civil Action No. 9:15-CV-1485 (MAD/DEP)
|
Filed 10/07/2016

**Attorneys and Law Firms**

JOSE JUARBE, 14-A-5209, Southport Correctional
Facility, P.O. Box 2000, Pine City, NY 14871, Pro se.

FOR DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
OF COUNSEL: HELENA LYNCH, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 **\*1** This is a civil rights action brought by *pro se* plaintiff
Jose Juarbe, a New York State prison inmate, against
three corrections officers employed at the correctional
facility in which he was confined at the relevant times
pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff
alleges that he was assaulted by four corrections officers
and, as a result, suffered significant injuries. In his
complaint, Juarbe requests recovery of damages in the
amount of $5 million.

Currently pending before the court are cross-motions
for summary judgment. In lieu of answering plaintiff's
complaint, defendants initiated the motion process by
requesting the entry of summary judgment dismissing
plaintiff's complaint, arguing that his claims are
procedurally barred based upon his failure to exhaust
the available administrative remedies before filing suit.
Plaintiff opposes that motion and has cross-moved for
the entry of summary judgment in his favor on the merits.

For the reasons set forth below, I recommend that both
motions be denied.

I. BACKGROUND [1]
Plaintiff is a prison inmate currently being held in
the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS").
*See generally* Dkt. No. 1. While he is currently
incarcerated elsewhere, he was confined in the Mid-State
Correctional Facility located in Marcy, New York, at the
time of the events forming the basis of his claims in this
action. *Id.*

According to plaintiff, late in the evening on June 24,
2015, he was taken from his cube by defendant Tolman, a
corrections officer, and escorted to the dayroom at Mid-
State, where he was thrown against the wall. Dkt. No. 1
at 3; DKt. No. 28-1 at 2. Defendants Hart and Carnegie,
who are also corrections officers, and a fourth unidentified
officer subsequently arrived at the housing unit and took
plaintiff into the hallway, where he was allegedly beaten.
Dkt. No. 1 at 3-4; Dkt. No. 28-1 at 2. Plaintiff was
taken to the ground, at which point the officers continued
to assault him, kicking him in the face and body, and
dragging him across the floor. Dkt. No. 1 at 4; Dkt. No.
28-1 at 2.

Following the incident, plaintiff was examined at the Mid-
State infirmary. Dkt. No. 28-1 at 2; Dkt. No. 29 at 1-3.
Various injuries were noted in plaintiff's medical records
based on that examination, including minor swelling on
the left side of his forehead, a red scuff mark on the right
side of his eye, reddened streak marks on both sides of
his neck, a scrape on his left shoulder, a minor scratch,
swelling on his right upper shin, an abrasion to his right
knee, and complaints of pain in his right shoulder. Dkt.
No. 28-1 at 2; Dkt. No. 29 at 1-3. Photographs were taken
of plaintiff depicting his injuries. Dkt. No. 29 at 4-12.

 **\*2** According to plaintiff, he was transferred into the
Auburn Correctional Facility ("Auburn") the morning
after the alleged assault, where he was placed into a special
housing unit ("SHU") cell. Dkt. No. 26-2 at 2; Dkt. No.
28 at 2; Dkt. No. 28-2 at 9. Plaintiff alleges that he filed
two grievances at Auburn concerning the assault at Mid-
State but never received any response or decision. Dkt.
No. 1 at 2, 5; Dkt. No. 26-2 at 2; Dkt. No. 28-2 at 8-9.
When he asked a sergeant at Auburn about the status of

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 197 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

his grievances, he was told that there was nothing that could be done at Auburn concerning the matter because the offending officers work at Mid-State, and Mid-State "still owned [him]." Dkt. No. 26-2 at 3; *see also* Dkt. No. 1 at 5; Dkt. No. 28-2 at 9.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about December 16, 2015, and sought both leave to proceed *in forma pauperis* ("IFP") and appointment of *pro bono* counsel. Dkt. Nos. 1-4. Plaintiff's IFP application was granted, but his application for appointment of counsel was denied, without prejudice, by order issued on December 21, 2015. Dkt. No. 5. Named as defendants in plaintiff's complaint are Corrections Officers John Carnegie, Robert Hart, and Mark Tolman. [2] Dkt. No. 1.

On March 7, 2016, in lieu of answering, defendants moved for the entry of summary judgment dismissing plaintiff's complaint based upon his alleged failure to exhaust the available administrative remedies before commencing suit. [3] Dkt. No. 20. Plaintiff has opposed that motion, Dkt. Nos. 26, 30, 33, and defendants have since submitted a reply memorandum in further support of their motion, Dkt. No. 27.

**\*3** On April 8, 2016, plaintiff moved for the entry of summary judgment in his favor on the issue of liability. Dkt. Nos. 28, 29. Defendants have since responded in opposition to plaintiff's motion. Dkt. No. 36.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where the parties have filed cross-motions for summary judgment, "a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Boy Scouts of Am. V. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003) (quotation marks omitted).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1917e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, —– Fed.Appx. —–, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016).[4] "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[5]

**\*4** In New York, state prison inmates have available to them a grievance procedure, which is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[6] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[7] *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* at § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[8] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 199 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*5** Shortly after the Supreme Court issued its decision in *Ross,* the Second Circuit had occasion to determine whether a plaintiff's complaint should be dismissed for failure to exhaust administrative remedies where the plaintiff alleged that he had submitted a grievance concerning misconduct by corrections officers, but the grievance was allegedly never actually processed and filed, and plaintiff received no response and took no further action with respect to it. *Williams v. Priatno,* 829 F.3d 118 (2d Cir. 2016). In *Williams,* the plaintiff alleged that in December 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items, including his legal papers, were searched, and he was assaulted by corrections officers. *Williams,* 829 F.3d at 120. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in a special housing unit ("SHU"), he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* at 120-21. One week later, while the superintendent of the facility was making rounds, the plaintiff inquired into the status of the grievance because he had not yet received a response. *Id.* at 121. The superintendent promised the plaintiff she "would look into it." *Id.* Shortly after that conversation, the plaintiff was transferred to another facility. *Id.* He never received a response to the grievance, nor did he ever appeal to the superintendent and/or the CORC. *Id.* The Second Circuit credited plaintiff's allegation, at the motion-to-dismiss stage, that the corrections officer to whom plaintiff gave his grievance never filed it. *Id.* at 124.

After discussing the Supreme Court's decision in *Ross,* the Second Circuit in *Williams* reversed the district court's dismissal of the plaintiff's complaint, concluding that the pertinent provisions of the IGP, which purportedly provided recourse in situations such as those presented, were opaque, therefore making the IGP functionally unavailable to the plaintiff. *Williams,* 829 F.3d at 124. Although not the centerpiece of its decision in *Williams,* the Second Circuit also noted that the ambiguity

associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by the plaintiff's transfer to a different facility, and concluded that the governing regulatory scheme "do[es] not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* at 126.

The facts of the case now before the court are similar to those that confronted the Second Circuit in *Williams.* Plaintiff Juarbe alleged that he was transferred out of the facility in which the relevant events the day after the incident occurred.[9] Dkt. No. 1 at 2, 5. While the plaintiff in *Williams* filed his grievance at the facility in which the incident of which he complained occurred and then was transferred to a different facility before receiving a response, plaintiff Juarbe claims to have attempted to file his grievances at the new facility. *Id.*

Defendants contend that the IGP required plaintiff Juarbe to file his grievances at Mid-State because that is where the incident of which he complained occurred. *See* Dkt. No. 20-1 at 11 ("[F]iling a grievance at the facility other than where the alleged conduct occurred does not satisfy the exhaustion requirements."). For this proposition, defendants cite *Richardson v. N. Y. State Dep't of Corrs.,* No. 13-CV-6189, 2014 WL 3928785, at \*5 (S.D.N.Y. Aug. 11, 2014), and *Finger v. McGinnis,* No. 99-CV-9870, 2004 WL 1367506, at \*4 (S.D.N.Y. June 16, 2004). *Id. Richardson* does not support defendants' position,[10] and defendants misconstrue *Finger.* The court in *Finger* merely concluded that the relevant regulations require that an IGRC hearing occur at the facility in which the incident occurred. *Finger,* 2004 WL 1367506, at \*4 (quoting 7 N.Y.C.R.R. § 701.3(k)(2)). Even if the holding in *Finger* remains viable,[11] however, defendants in this case have failed to square their argument with the regulation within the IGP that requires inmates to file their grievances "only ... at the facility where [they are] housed even if it pertains to another facility." 7 N.Y.C.R.R. § 701.5(a)(1).

**\*6** Plaintiff alleges that, although he did file two grievances at Auburn, he did not receive a response to either of them from any DOCCS official. Dkt. No. 26-2 at 2-3. According to plaintiff, when he inquired of a sergeant at Auburn regarding the status of his grievances after not receiving a response, the sergeant told him that, because the incident occurred at Mid-State, "there was

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 200 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

not much that could be done" and that "Mid-State ... still owned [him]." *Id.* at 3. Defendants neither confirm nor deny that plaintiff filed those grievances, arguing only that there is no record of plaintiff filing a grievance at Mid-State or appealing a grievance to the CORC. Dkt. No. 20-3 at 2; Dkt. No. 20-4 at 2. Viewing the facts in the light most favorable to plaintiff, I find that the record evidence does not conclusively reflect that plaintiff's grievances were actually recorded as having been filed at Auburn. While plaintiff alleges, in no uncertain terms, that he did file them, the sergeant's response to plaintiff's inquiry regarding their status raises a suspicion as to whether officials at Auburn actually received them such that plaintiff's "filing" became complete. [12] Under the IGP regulations, once a grievance is "filed," the grievance clerk numbers and logs it. 7 N.Y.C.R.R. § 701.5(a)(2); *see also Williams* 829 F.3d at 119. Because defendants have provided no evidence that any Auburn official, including the grievance clerk, received plaintiff's grievances, provided them with numbers, or logged them, the factual circumstances in this case are, at least when drawing all inferences in favor of plaintiff, identical to those in *Williams*, where the plaintiff's grievances were both unfiled and unanswered. Under those exact facts, the Second Circuit concluded that the "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." [13] *Williams*, 829 F.3d at 126; *see also id.* ("In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed.").

**\*7** In light of *Williams*, which underscored the confusion inherent to the IGP under factual circumstances similar to those experienced by plaintiff Juarbe, and mindful of my obligation to draw all reasonable inferences regarding defendants' exhaustion argument in the favor of the non-moving party, I recommend that defendants' motion for summary judgment dismissing plaintiff's complaint on the basis of his alleged failure to exhaust the available administrative remedies be denied, without prejudice.

### C. Plaintiff's Cross-Motion for Summary Judgment

In his cross-motion, plaintiff contends that no reasonable factfinder could conclude that unconstitutionally excessive force was not used against him on June 24, 2015, and that he is therefore entitled to summary judgment at least on the question of liability. Dkt. No. 28-2. Defendants oppose plaintiff's motion, arguing that there

are genuine disputes of material fact that must be resolved before a determination can be made with regard to plaintiff's excessive force claim. Dkt. No. 36.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson*, 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

finding of wantonness. [14] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

**\*8** "The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

It should be noted that on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal of the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). The converse is equally true: if a reasonable factfinder could conclude that corrections officers did not use force maliciously and sadistically, then the grant of summary judgment in plaintiff's favor is also inappropriate.

In his complaint and declaration submitted in support of his motion, plaintiff alleges that on June 24, 2015, he was removed from his cube, at which point defendant Carnegie punched him in the ribs and smashed his head into the wall. Dkt. No. 1 at 4; Dkt. No. 28-1 at 2. He further claims that thereafter defendants Tolman and Hart, as well as another unnamed corrections officer, joined the assault, punching his face and body. *Id.* During the incident, defendant Carnegie allegedly struck plaintiff with his baton, which resulted in plaintiff falling to the ground. *Id.*

In their opposition to plaintiff's motion, defendants contest his version of the relevant events and offer a different account. According to the defendants, on the night in question, defendant Tolman observed plaintiff in the bathroom acting suspiciously. Dkt. No. 36-4 at 2. When defendant Tolman observed plaintiff's furtive behavior, including placing his right hand into his right front pants pocket, the officer ordered plaintiff to turn over the item from his pocket. *Id.* Plaintiff disobeyed, however, and continued to walk toward the toilet with his hand behind his back. *Id.* Plaintiff then refused to obey a second order to cooperate and flushed an item down the toilet. *Id.* Defendant Tolman then radioed for assistance, and defendants Hart and Carnegie responded. *Id.*

Following the arrival of the additional officers, plaintiff was escorted into the hallway and was instructed to place his hands on the wall. Dkt. No. 36-4 at 2; Dkt. No. 36-5 at 2; Dkt. No. 36-6 at 2; Dkt. No. 36-7 at 2. Plaintiff allegedly struck defendant Carnegie in the face with his elbow when Carnegie attempted to place hand restraints on plaintiff. *Id.* Plaintiff then turned and punched defendants Tolman and Hart several times. *Id.* Plaintiff was ordered to return to the wall, but refused and attempted to grab defendant Carnegie's baton. *Id.* When defendant Carnegie pulled his baton back, plaintiff fell and was restrained. *Id.* As a result of the incident, defendant Carnegie suffered injuries, including a broken nose and several broken ribs, that required medical attention at the Mid-State infirmary and later at an outside hospital. Dkt. No. 36-6 at 2; *see also* Dkt. No. 36-9 at 15.

**\*9** These starkly contrasting versions of the relevant events underscore the existence of genuine disputes of fact that can only be resolved by a jury, including whether the use and extent of the force applied was justified given plaintiff's alleged failure to comply with defendants' seemingly legitimate directives. In light of the existence

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

of these pivotal issues of material fact, I recommend that plaintiff's summary judgment motion be denied. [15]

## IV. SUMMARY AND RECOMMENDATION

Based upon the foregoing, I recommend that both cross-motions for summary judgment currently pending before the court be denied. Addressing defendants' motion, I conclude that there are issues of fact surrounding whether administrative remedies were available to plaintiff at the relevant times, thus precluding a determination of whether he should be excused from fulfilling all three steps of the IGP. With respect to plaintiff's motion, I conclude that there are genuine disputes of material fact as to whether the use of force incident occurred as alleged by plaintiff, and whether the extent of the force that was administered was reasonable.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 20) be DENIED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 28) similarly be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk amend the court's records to reflect that the full names of the named defendants are John Carnegie, Robert Hart, and Mark Tolman; and it is further hereby

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8732798

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In this case, in light of the parties' cross-motions for summary judgment, the court draws "all factual inferences ... against the party whose motion is under consideration." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted).

2    Plaintiff's complaint identified these individuals by only their last names. Dkt. No. 1 at 1-2. In plaintiff's statement of undisputed material facts submitted in support of his motion for summary judgment, however, those individuals are identified by both their first and last names. Dkt. No. 28. The clerk of the court is respectfully directed to amend the court's docket sheet to reflect the defendants' full names.

3    While a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure automatically extends the time under which a defendant must file an answer, there is no similar rule governing a defendant's obligation to answer a complaint when he files a pre-answer motion for summary judgment pursuant to Rule 56. *Compare* Fed. R. Civ. P. 12(a)(4) *with* Fed. R. Civ. P. 56; *see also* 10A Alan Wright *et al.*, *Federal Practice & Procedure* § 2718 (4th ed.). Most courts that have determined that Rule 12(a)(4) operates by analogy to a defendant that has filed a pre-answer summary judgment motion and, therefore, have declined to find a defendant in default by failing to file an answer until after disposition of the motion. *See Rashidi v. Albright*, 818 F. Supp. 1354, 1356 (D. Nev. 1993) ("Although Rule 12 does not specifically allow for a summary judgment motion to toll the running of the period within which a responsive pleading must be filed, by analogy the language would seem to apply[.]"); *but see Poe v. Cristina Copper Mines, Inc.*, 15 F.R.D. 85, 87 (D. Del. 1953) (finding that the "extension of time to file a response pleading until determination of a motion for summary judgment is not a definite and fixed right but a matter to be granted or denied under Rule 6(b)"). In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until fourteen days after a final determination is issued with respect to the parties' motions, in the event that the action survives. *Snyder v. Goord*, 05-CV-1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M.J.).

4    All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff.

Case 9:17-cv-00234-MAD-DEP Document 87 Filed 03/22/19 Page 203 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

**5**    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

**6**    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

**7**    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

**8**    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

**9**    Defendants admit that plaintiff was eventually transferred to Auburn after the alleged assault, but deny that the transfer occurred the morning after the assault. Dkt. No. 36-1 at 1. As support for their denial, defendants cite the fact that plaintiff signed a Protective Custody Waiver Form at Mid-State on June 25, 2015. Dkt. No. 36-3 at 2. In my view, the form does not conclusively establish that plaintiff was not transferred to Auburn on June 25, 2012. Instead, the form merely gives rise to a genuine dispute of material fact regarding whether plaintiff was transferred to Auburn on June 25, 2015. Mindful of my of obligation to view the facts regarding defendants' summary judgment motion in the light most favorable to plaintiff, I have operated under the assumption that plaintiff was transferred to Auburn on June 25, 2015, the day immediately following the alleged assault.

**10**    *Richardson* simply states that an inmate initiates the grievance procedure "by filing a complaint with the facility's [IGRC]"; it does not specify that "the facility" to which it refers is the facility at which the allegedly offending conduct occurred. *Richardson*, 2014 WL 3928785, at *5.

**11**    It is not clear that the IGP continues to include this rule because 7 N.Y.C.R.R. § 701.3, the provision cited to by the court in *Finger*, has been amended since the decision was issued and no longer includes the provision on which the court relied.

**12**    Although plaintiff does not provide the court with any information regarding the mechanism he used to file his grievances, according to the IGP, inmates housed in the SHU are instructed to file their grievances by giving them to a corrections officer to file for them. 7 N.Y.C.R.R. § 701.7; *see also Williams*, 829 F.3d at 119.

**13**    It is worth noting that, if the court is or becomes satisfied that plaintiff's grievances were, in fact, filed at Auburn, *Williams* may not control. Under those circumstances, plaintiff Juarbe's grievances would only be "unanswered," rather than both "unfiled *and* unanswered" (emphasis added). The IGP clearly permits an inmate to file an appeal with either the superintendent or the CORC when he does not receive a response "within the time limits" outlined in section 701.5. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."). Prior to *Williams*, courts in this circuit have determined that, even where a grievance goes unanswered, in order to properly exhaust administrative remedies, the inmate *must* avail himself of the permissive appeal outlined in section 701.(g)(2). *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.) (collecting cases).

Indeed, *Williams* suggests that there is a distinction to be drawn between an "unfiled and unanswered" grievance and simply an "unanswered" grievance because the unfiled grievance does not trigger a response from the IGRC, superintendent, or the CORC. *Williams*, 829 F.3d at 124. In that scenario, "the regulations give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* On the other hand, where a grievance was filed but the inmate simply never received a response, the Second Circuit seemingly acknowledged that "[t]he regulations ... provide that an inmate may appeal a grievance 'to the next step[.]' " *Id.* (quoting 7 N.Y.C.R.R. § 701.6(g)(2)).

Whether or not an appeal is actually "available" to an inmate where he does not receive a response to a grievance that was actually filed, however, is a question that remains outstanding after *Williams*. Section 701.6(g)(2) does not provide guidance regarding the mechanism an inmate may or must use to file his permissive appeal when he does not receive a response to his grievance. 7 N.Y.C.R.R. § 701.6(g)(2). Under normal circumstances, where the inmate does receive a response to his grievance from the IGRC and/or superintendent, the regulations state that "he or she *must* complete and sign" the form provided by the IGRC and/or superintendent to effectuate the appeal. *Id.* at §§ 701.5(c)(1), 701.5(d)(1)(i) (emphasis added). In the absence of a written decision from either the IGRC or superintendent, it would be impossible for the inmate to file an appeal utilizing the mechanisms set forth in section 701.5.

This problem was loosely addressed in *Williams*, where the defendants argued that the plaintiff could have appealed the untimely response to his grievance after he was transferred to a different facility. *Williams*, 829 F.3d at 126. As support, the defendants cited section 701.6(h)(2), which provides that "[i]f the transferred grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally

2016 WL 8732798

filed[.]" 7 N.Y.C.R.R. § 701.6(h)(2). The Second Circuit, however, dismissed this argument finding that section 701.6(h)(2) "presumes not only that the grievance was actually filed, but *also that the inmate received an appeal form that he can sign and mail back.*" *Williams,* 829 F.3d at 126 (emphasis added). The court's focus on the procedural mechanism for appealing at least suggests that, if that identified mechanism is absent because the grievance was never responded to, the appeal is, in fact, unavailable to the inmate.

In this case, because I find that the record is not clear as to whether plaintiff's grievances were actually filed, however, I perceive no reason to address whether plaintiff should have filed an appeal after not receiving a response in order to properly exhaust administrative remedies.

14    Courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10 (quotation marks omitted).

15    As a result of the incident, plaintiff was indicted by an Oneida County grand jury and charged with two counts of second-degree assault based upon the injuries sustained by defendant Carnegie. Dkt. No. 36-8. On February 29, 2016, plaintiff entered a plea of guilty to one count of second-degree of assault in satisfaction of the charges set forth in that indictment. Dkt. No. 36-9; Dkt. No. 36-10. In his reply in further support of his motion, plaintiff admits that he pleaded guilty to assault, but correctly insists that the salient issue for the court is whether defendants used excessive force as prohibited by the Eighth Amendment, not whether plaintiff used force against them. Dkt. No. 41 at 6, 12.

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 205 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)
2016 WL 8732798

2016 WL 8732798
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jose JUARBE, Plaintiff,
v.
Corrections Officer John
CARNEGIE, et al., Defendants.

Civil Action No. 9:15-CV-1485 (MAD/DEP)
|
Filed 10/07/2016

**Attorneys and Law Firms**

JOSE JUARBE, 14-A-5209, Southport Correctional
Facility, P.O. Box 2000, Pine City, NY 14871, Pro se.

FOR DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
OF COUNSEL: HELENA LYNCH, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 **\*1** This is a civil rights action brought by *pro se* plaintiff
Jose Juarbe, a New York State prison inmate, against
three corrections officers employed at the correctional
facility in which he was confined at the relevant times
pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff
alleges that he was assaulted by four corrections officers
and, as a result, suffered significant injuries. In his
complaint, Juarbe requests recovery of damages in the
amount of $5 million.

Currently pending before the court are cross-motions
for summary judgment. In lieu of answering plaintiff's
complaint, defendants initiated the motion process by
requesting the entry of summary judgment dismissing
plaintiff's complaint, arguing that his claims are
procedurally barred based upon his failure to exhaust
the available administrative remedies before filing suit.
Plaintiff opposes that motion and has cross-moved for
the entry of summary judgment in his favor on the merits.

For the reasons set forth below, I recommend that both
motions be denied.

I. BACKGROUND [1]
Plaintiff is a prison inmate currently being held in
the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS").
*See generally* Dkt. No. 1. While he is currently
incarcerated elsewhere, he was confined in the Mid-State
Correctional Facility located in Marcy, New York, at the
time of the events forming the basis of his claims in this
action. *Id.*

According to plaintiff, late in the evening on June 24,
2015, he was taken from his cube by defendant Tolman, a
corrections officer, and escorted to the dayroom at Mid-
State, where he was thrown against the wall. Dkt. No. 1
at 3; DKt. No. 28-1 at 2. Defendants Hart and Carnegie,
who are also corrections officers, and a fourth unidentified
officer subsequently arrived at the housing unit and took
plaintiff into the hallway, where he was allegedly beaten.
Dkt. No. 1 at 3-4; Dkt. No. 28-1 at 2. Plaintiff was
taken to the ground, at which point the officers continued
to assault him, kicking him in the face and body, and
dragging him across the floor. Dkt. No. 1 at 4; Dkt. No.
28-1 at 2.

Following the incident, plaintiff was examined at the Mid-
State infirmary. Dkt. No. 28-1 at 2; Dkt. No. 29 at 1-3.
Various injuries were noted in plaintiff's medical records
based on that examination, including minor swelling on
the left side of his forehead, a red scuff mark on the right
side of his eye, reddened streak marks on both sides of
his neck, a scrape on his left shoulder, a minor scratch,
swelling on his right upper shin, an abrasion to his right
knee, and complaints of pain in his right shoulder. Dkt.
No. 28-1 at 2; Dkt. No. 29 at 1-3. Photographs were taken
of plaintiff depicting his injuries. Dkt. No. 29 at 4-12.

 **\*2** According to plaintiff, he was transferred into the
Auburn Correctional Facility ("Auburn") the morning
after the alleged assault, where he was placed into a special
housing unit ("SHU") cell. Dkt. No. 26-2 at 2; Dkt. No.
28 at 2; Dkt. No. 28-2 at 9. Plaintiff alleges that he filed
two grievances at Auburn concerning the assault at Mid-
State but never received any response or decision. Dkt.
No. 1 at 2, 5; Dkt. No. 26-2 at 2; Dkt. No. 28-2 at 8-9.
When he asked a sergeant at Auburn about the status of

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 206 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

his grievances, he was told that there was nothing that could be done at Auburn concerning the matter because the offending officers work at Mid-State, and Mid-State "still owned [him]." Dkt. No. 26-2 at 3; *see also* Dkt. No. 1 at 5; Dkt. No. 28-2 at 9.

## II. PROCEDUAL HISTORY

Plaintiff commenced this action on or about December 16, 2015, and sought both leave to proceed *in forma pauperis* ("IFP") and appointment of *pro bono* counsel. Dkt. Nos. 1-4. Plaintiff's IFP application was granted, but his application for appointment of counsel was denied, without prejudice, by order issued on December 21, 2015. Dkt. No. 5. Named as defendants in plaintiff's complaint are Corrections Officers John Carnegie, Robert Hart, and Mark Tolman. [2] Dkt. No. 1.

On March 7, 2016, in lieu of answering, defendants moved for the entry of summary judgment dismissing plaintiff's complaint based upon his alleged failure to exhaust the available administrative remedies before commencing suit. [3] Dkt. No. 20. Plaintiff has opposed that motion, Dkt. Nos. 26, 30, 33, and defendants have since submitted a reply memorandum in further support of their motion, Dkt. No. 27.

**\*3** On April 8, 2016, plaintiff moved for the entry of summary judgment in his favor on the issue of liability. Dkt. Nos. 28, 29. Defendants have since responded in opposition to plaintiff's motion. Dkt. No. 36.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where the parties have filed cross-motions for summary judgment, "a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Boy Scouts of Am. V. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003) (quotation marks omitted).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 207 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1917e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, — Fed.Appx. —, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). [4] "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). [5]

**\*4** In New York, state prison inmates have available to them a grievance procedure, which is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [6] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [7] *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* at § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [8] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically

Case 9:17-cv-00234-MAD-DEP  Document 87  Filed 03/22/19  Page 208 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*5** Shortly after the Supreme Court issued its decision in *Ross*, the Second Circuit had occasion to determine whether a plaintiff's complaint should be dismissed for failure to exhaust administrative remedies where the plaintiff alleged that he had submitted a grievance concerning misconduct by corrections officers, but the grievance was allegedly never actually processed and filed, and plaintiff received no response and took no further action with respect to it. *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, the plaintiff alleged that in December 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items, including his legal papers, were searched, and he was assaulted by corrections officers. *Williams*, 829 F.3d at 120. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in a special housing unit ("SHU"), he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* at 120-21. One week later, while the superintendent of the facility was making rounds, the plaintiff inquired into the status of the grievance because he had not yet received a response. *Id.* at 121. The superintendent promised the plaintiff she "would look into it." *Id.* Shortly after that conversation, the plaintiff was transferred to another facility. *Id.* He never received a response to the grievance, nor did he ever appeal to the superintendent and/or the CORC. *Id.* The Second Circuit credited plaintiff's allegation, at the motion-to-dismiss stage, that the corrections officer to whom plaintiff gave his grievance never filed it. *Id.* at 124.

After discussing the Supreme Court's decision in *Ross*, the Second Circuit in *Williams* reversed the district court's dismissal of the plaintiff's complaint, concluding that the pertinent provisions of the IGP, which purportedly provided recourse in situations such as those presented, were opaque, therefore making the IGP functionally unavailable to the plaintiff. *Williams*, 829 F.3d at 124. Although not the centerpiece of its decision in *Williams*, the Second Circuit also noted that the ambiguity

associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by the plaintiff's transfer to a different facility, and concluded that the governing regulatory scheme "do[es] not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* at 126.

The facts of the case now before the court are similar to those that confronted the Second Circuit in *Williams*. Plaintiff Juarbe alleged that he was transferred out of the facility in which the relevant events the day after the incident occurred.[9] Dkt. No. 1 at 2, 5. While the plaintiff in *Williams* filed his grievance at the facility in which the incident of which he complained occurred and then was transferred to a different facility before receiving a response, plaintiff Juarbe claims to have attempted to file his grievances at the new facility. *Id.*

Defendants contend that the IGP required plaintiff Juarbe to file his grievances at Mid-State because that is where the incident of which he complained occurred. *See* Dkt. No. 20-1 at 11 ("[F]iling a grievance at the facility other than where the alleged conduct occurred does not satisfy the exhaustion requirements."). For this proposition, defendants cite *Richardson v. N. Y. State Dep't of Corrs.*, No. 13-CV-6189, 2014 WL 3928785, at \*5 (S.D.N.Y. Aug. 11, 2014), and *Finger v. McGinnis*, No. 99-CV-9870, 2004 WL 1367506, at \*4 (S.D.N.Y. June 16, 2004). *Id. Richardson* does not support defendants' position,[10] and defendants misconstrue *Finger*. The court in *Finger* merely concluded that the relevant regulations require that an IGRC hearing occur at the facility in which the incident occurred. *Finger*, 2004 WL 1367506, at \*4 (quoting 7 N.Y.C.R.R. § 701.3(k)(2)). Even if the holding in *Finger* remains viable,[11] however, defendants in this case have failed to square their argument with the regulation within the IGP that requires inmates to file their grievances "only ... at the facility where [they are] housed even if it pertains to another facility." 7 N.Y.C.R.R. § 701.5(a)(1).

**\*6** Plaintiff alleges that, although he did file two grievances at Auburn, he did not receive a response to either of them from any DOCCS official. Dkt. No. 26-2 at 2-3. According to plaintiff, when he inquired of a sergeant at Auburn regarding the status of his grievances after not receiving a response, the sergeant told him that, because the incident occurred at Mid-State, "there was

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

not much that could be done" and that "Mid-State ... still owned [him]." *Id.* at 3. Defendants neither confirm nor deny that plaintiff filed those grievances, arguing only that there is no record of plaintiff filing a grievance at Mid-State or appealing a grievance to the CORC. Dkt. No. 20-3 at 2; Dkt. No. 20-4 at 2. Viewing the facts in the light most favorable to plaintiff, I find that the record evidence does not conclusively reflect that plaintiff's grievances were actually recorded as having been filed at Auburn. While plaintiff alleges, in no uncertain terms, that he did file them, the sergeant's response to plaintiff's inquiry regarding their status raises a suspicion as to whether officials at Auburn actually received them such that plaintiff's "filing" became complete. [12] Under the IGP regulations, once a grievance is "filed," the grievance clerk numbers and logs it. 7 N.Y.C.R.R. § 701.5(a)(2); *see also Williams* 829 F.3d at 119. Because defendants have provided no evidence that any Auburn official, including the grievance clerk, received plaintiff's grievances, provided them with numbers, or logged them, the factual circumstances in this case are, at least when drawing all inferences in favor of plaintiff, identical to those in *Williams*, where the plaintiff's grievances were both unfiled and unanswered. Under those exact facts, the Second Circuit concluded that the "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." [13] *Williams*, 829 F.3d at 126; *see also id.* ("In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed.").

**\*7** In light of *Williams*, which underscored the confusion inherent to the IGP under factual circumstances similar to those experienced by plaintiff Juarbe, and mindful of my obligation to draw all reasonable inferences regarding defendants' exhaustion argument in the favor of the non-moving party, I recommend that defendants' motion for summary judgment dismissing plaintiff's complaint on the basis of his alleged failure to exhaust the available administrative remedies be denied, without prejudice.

### C. Plaintiff's Cross-Motion for Summary Judgment

In his cross-motion, plaintiff contends that no reasonable factfinder could conclude that unconstitutionally excessive force was not used against him on June 24, 2015, and that he is therefore entitled to summary judgment at least on the question of liability. Dkt. No. 28-2. Defendants oppose plaintiff's motion, arguing that there

are genuine disputes of material fact that must be resolved before a determination can be made with regard to plaintiff's excessive force claim. Dkt. No. 36.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson*, 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 210 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

finding of wantonness. [14] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

**\*8** "The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

It should be noted that on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal of the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury" (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). The converse is equally true: if a reasonable factfinder could conclude that corrections officers did not use force maliciously and sadistically, then the grant of summary judgment in plaintiff's favor is also inappropriate.

In his complaint and declaration submitted in support of his motion, plaintiff alleges that on June 24, 2015, he was removed from his cube, at which point defendant Carnegie punched him in the ribs and smashed his head into the wall. Dkt. No. 1 at 4; Dkt. No. 28-1 at 2. He further claims that thereafter defendants Tolman and Hart, as well as another unnamed corrections officer, joined the assault, punching his face and body. *Id.* During the incident, defendant Carnegie allegedly struck plaintiff with his baton, which resulted in plaintiff falling to the ground. *Id.*

In their opposition to plaintiff's motion, defendants contest his version of the relevant events and offer a different account. According to the defendants, on the night in question, defendant Tolman observed plaintiff in the bathroom acting suspiciously. Dkt. No. 36-4 at 2. When defendant Tolman observed plaintiff's furtive behavior, including placing his right hand into his right front pants pocket, the officer ordered plaintiff to turn over the item from his pocket. *Id.* Plaintiff disobeyed, however, and continued to walk toward the toilet with his hand behind his back. *Id.* Plaintiff then refused to obey a second order to cooperate and flushed an item down the toilet. *Id.* Defendant Tolman then radioed for assistance, and defendants Hart and Carnegie responded. *Id.*

Following the arrival of the additional officers, plaintiff was escorted into the hallway and was instructed to place his hands on the wall. Dkt. No. 36-4 at 2; Dkt. No. 36-5 at 2; Dkt. No. 36-6 at 2; Dkt. No. 36-7 at 2. Plaintiff allegedly struck defendant Carnegie in the face with his elbow when Carnegie attempted to place hand restraints on plaintiff. *Id.* Plaintiff then turned and punched defendants Tolman and Hart several times. *Id.* Plaintiff was ordered to return to the wall, but refused and attempted to grab defendant Carnegie's baton. *Id.* When defendant Carnegie pulled his baton back, plaintiff fell and was restrained. *Id.* As a result of the incident, defendant Carnegie suffered injuries, including a broken nose and several broken ribs, that required medical attention at the Mid-State infirmary and later at an outside hospital. Dkt. No. 36-6 at 2; *see also* Dkt. No. 36-9 at 15.

**\*9** These starkly contrasting versions of the relevant events underscore the existence of genuine disputes of fact that can only be resolved by a jury, including whether the use and extent of the force applied was justified given plaintiff's alleged failure to comply with defendants' seemingly legitimate directives. In light of the existence

Case 9:17-cv-00234-MAD-DEP Document 87 Filed 03/22/19 Page 211 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

of these pivotal issues of material fact, I recommend that plaintiff's summary judgment motion be denied. [15]

IV. SUMMARY AND RECOMMENDATION

Based upon the foregoing, I recommend that both cross-motions for summary judgment currently pending before the court be denied. Addressing defendants' motion, I conclude that there are issues of fact surrounding whether administrative remedies were available to plaintiff at the relevant times, thus precluding a determination of whether he should be excused from fulfilling all three steps of the IGP. With respect to plaintiff's motion, I conclude that there are genuine disputes of material fact as to whether the use of force incident occurred as alleged by plaintiff, and whether the extent of the force that was administered was reasonable.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 20) be DENIED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 28) similarly be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk amend the court's records to reflect that the full names of the named defendants are John Carnegie, Robert Hart, and Mark Tolman; and it is further hereby

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8732798

Footnotes

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In this case, in light of the parties' cross-motions for summary judgment, the court draws "all factual inferences ... against the party whose motion is under consideration." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted).

2   Plaintiff's complaint identified these individuals by only their last names. Dkt. No. 1 at 1-2. In plaintiff's statement of undisputed material facts submitted in support of his motion for summary judgment, however, those individuals are identified by both their first and last names. Dkt. No. 28. The clerk of the court is respectfully directed to amend the court's docket sheet to reflect the defendants' full names.

3   While a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure automatically extends the time under which a defendant must file an answer, there is no similar rule governing a defendant's obligation to answer a complaint when he files a pre-answer motion for summary judgment pursuant to Rule 56. *Compare* Fed. R. Civ. P. 12(a)(4) *with* Fed. R. Civ. P. 56; *see also* 10A Alan Wright *et al.*, *Federal Practice & Procedure* § 2718 (4th ed.). Most courts that have determined that Rule 12(a)(4) operates by analogy to a defendant that has filed a pre-answer summary judgment motion and, therefore, have declined to find a defendant in default by failing to file an answer until after disposition of the motion. *See Rashidi v. Albright*, 818 F. Supp. 1354, 1356 (D. Nev. 1993) ("Although Rule 12 does not specifically allow for a summary judgment motion to toll the running of the period within which a responsive pleading must be filed, by analogy the language would seem to apply[.]"); *but see Poe v. Cristina Copper Mines, Inc.*, 15 F.R.D. 85, 87 (D. Del. 1953) (finding that the "extension of time to file a response pleading until determination of a motion for summary judgment is not a definite and fixed right but a matter to be granted or denied under Rule 6(b)"). In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until fourteen days after a final determination is issued with respect to the parties' motions, in the event that the action survives. *Snyder v. Goord*, 05-CV-1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M.J.).

4   All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff.

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 212 of 329

Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)

2016 WL 8732798

5    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

6    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

7    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

8    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

9    Defendants admit that plaintiff was eventually transferred to Auburn after the alleged assault, but deny that the transfer occurred the morning after the assault. Dkt. No. 36-1 at 1. As support for their denial, defendants cite the fact that plaintiff signed a Protective Custody Waiver Form at Mid-State on June 25, 2015. Dkt. No. 36-3 at 2. In my view, the form does not conclusively establish that plaintiff was not transferred to Auburn on June 25, 2012. Instead, the form merely gives rise to a genuine dispute of material fact regarding whether plaintiff was transferred to Auburn on June 25, 2015. Mindful of my of obligation to view the facts regarding defendants' summary judgment motion in the light most favorable to plaintiff, I have operated under the assumption that plaintiff was transferred to Auburn on June 25, 2015, the day immediately following the alleged assault.

10    *Richardson* simply states that an inmate initiates the grievance procedure "by filing a complaint with the facility's [IGRC]"; it does not specify that "the facility" to which it refers is the facility at which the allegedly offending conduct occurred. *Richardson*, 2014 WL 3928785, at *5.

11    It is not clear that the IGP continues to include this rule because 7 N.Y.C.R.R. § 701.3, the provision cited to by the court in *Finger*, has been amended since the decision was issued and no longer includes the provision on which the court relied.

12    Although plaintiff does not provide the court with any information regarding the mechanism he used to file his grievances, according to the IGP, inmates housed in the SHU are instructed to file their grievances by giving them to a corrections officer to file for them. 7 N.Y.C.R.R. § 701.7; *see also Williams*, 829 F.3d at 119.

13    It is worth noting that, if the court is or becomes satisfied that plaintiff's grievances were, in fact, filed at Auburn, *Williams* may not control. Under those circumstances, plaintiff Juarbe's grievances would only be "unanswered," rather than both "unfiled *and* unanswered." *Williams*, 829 F.3d at 126 (emphasis added). The IGP clearly permits an inmate to file an appeal with either the superintendent or the CORC when he does not receive a response "within the time limits" outlined in section 701.5. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."). Prior to *Williams*, courts in this circuit have determined that, even where a grievance goes unanswered, in order to properly exhaust administrative remedies, the inmate *must* avail himself of the permissive appeal outlined in section 701.(g)(2). *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.) (collecting cases).

Indeed, *Williams* suggests that there is a distinction to be drawn between an "unfiled and unanswered" grievance and simply an "unanswered" grievance because the unfiled grievance does not trigger a response from the IGRC, superintendent, or the CORC. *Williams*, 829 F.3d at 124. In that scenario, "the regulations give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* On the other hand, where a grievance was filed but the inmate simply never received a response, the Second Circuit seemingly acknowledged that "[t]he regulations ... provide that an inmate may appeal a grievance 'to the next step[.]' " *Id.* (quoting 7 N.Y.C.R.R. § 701.6(g)(2)).

Whether or not an appeal is actually "available" to an inmate where he does not receive a response to a grievance that was actually filed, however, is a question that remains outstanding after *Williams*. Section 701.6(g)(2) does not provide guidance regarding the mechanism an inmate may or must use to file his permissive appeal when he does not receive a response to his grievance. 7 N.Y.C.R.R. § 701.6(g)(2). Under normal circumstances, where the inmate does receive a response to his grievance from the IGRC and/or superintendent, the regulations state that "he or she *must* complete and sign" the form provided by the IGRC and/or superintendent to effectuate the appeal. *Id.* at §§ 701.5(c)(1), 701.5(d)(1)(i) (emphasis added). In the absence of a written decision from either the IGRC or superintendent, it would be impossible for the inmate to file an appeal utilizing the mechanisms set forth in section 701.5.

This problem was loosely addressed in *Williams*, where the defendants argued that the plaintiff could have appealed the untimely response to his grievance after he was transferred to a different facility. *Williams*, 829 F.3d at 126. As support, the defendants cited section 701.6(h)(2), which provides that "[i]f the transferred grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 213 of 329

**Juarbe v. Carnegie, Not Reported in Fed. Supp. (2016)**

2016 WL 8732798

filed[.]" 7 N.Y.C.R.R. § 701.6(h)(2). The Second Circuit, however, dismissed this argument finding that section 701.6(h)(2) "presumes not only that the grievance was actually filed, but *also that the inmate received an appeal form that he can sign and mail back*." *Williams*, 829 F.3d at 126 (emphasis added). The court's focus on the procedural mechanism for appealing at least suggests that, if that identified mechanism is absent because the grievance was never responded to, the appeal is, in fact, unavailable to the inmate.

In this case, because I find that the record is not clear as to whether plaintiff's grievances were actually filed, however, I perceive no reason to address whether plaintiff should have filed an appeal after not receiving a response in order to properly exhaust administrative remedies.

14    Courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

15    As a result of the incident, plaintiff was indicted by an Oneida County grand jury and charged with two counts of second-degree assault based upon the injuries sustained by defendant Carnegie. Dkt. No. 36-8. On February 29, 2016, plaintiff entered a plea of guilty to one count of second-degree of assault in satisfaction of the charges set forth in that indictment. Dkt. No. 36-9; Dkt. No. 36-10. In his reply in further support of his motion, plaintiff admits that he pleaded guilty to assault, but correctly insists that the salient issue for the court is whether defendants used excessive force as prohibited by the Eighth Amendment, not whether plaintiff used force against them. Dkt. No. 41 at 6, 12.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by *Tamez v. Manthey,* S.D.Tex., September 18, 2008

2001 WL 1658245
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,

v.

Philip COOMBE, Jr., Wayne Strack,
and Donald Selsky, Defendants.

No. 95 CIV 2617(DLC).
|
Dec. 26, 2001.

**Attorneys and Law Firms**

Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

 **\*1** On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals
for the Second Circuit vacated in part the November 25,
1996 decision, and remanded LaBounty's procedural due
process claim for further development. [1] This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

BACKGROUND

LaBounty's allegations against the defendants are fully
described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. *LaBounty v. Coombe,
et al.,* No. 95 Civ. 2616, 1996 WL 684168 (S.D.N.Y.
Nov. 25, 1996). Here, the Court only describes those facts
necessary for the purposes of this motion. [2]

By Order dated February 13, 2001, the Court described
the issues remanded by the Court of Appeals for further
development as follows:

1. The plaintiff's procedural due process claim that
the disciplinary hearing held on January 23 and 27,
1995 was delayed, that witnesses at that hearing
were examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and
head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening;
and

(h) the censorship or destruction of his mail, legal
documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472
(1995) and its progeny, the plaintiff has a liberty interest
sufficient to bring the due process claims described in
items 1 and 2.

The parties were ordered to inform the Court if they had
any other understanding of the Court of Appeals' Order
of remand.

By letter dated February 27, 2001, the defendants agreed
that the February 13, 2001 Order correctly described the

remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

### Tier III Hearing

On January 23 and 27, 1995, hearing officer Joseph Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

### SHU Conditions

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the

medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

### Plaintiff's Experience in SHU

While in SHU, LaBounty was deprived of all of the pain medication which had been prescribed for "constant severe pain related to his spinal condition," [4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his

writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields,-* F.3d-, 2001 WL 457767, at \*7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,-*F.3d-, 2001 WL 457767, at \*7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).

### *Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population,

but of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

 **\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships. There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of

SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*
 **\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt* 's description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at \*7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at \*8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999).

The regulations further explain the manner in which the Tier III hearings must be conducted.

> Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:
>
> (a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.
>
> (b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.
>
> (c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at 585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

## B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable

for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[8] *Wolff v. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

## C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[9]

## D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider

> the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must

demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**\*8** SO ORDERED:

### All Citations

Not Reported in F.Supp.2d, 2001 WL 1658245

## Footnotes

1    The claims brought by the plaintiff that survived summary judgment were tried before a jury on October 4, 1998. On October 6, 1998, the jury returned a verdict for LaBounty on his claim that Nurse Millie Rivera had been deliberately indifferent to his serious medical needs and awarded him $1 in nominal damages. The Second Circuit denied the appeals from the trial and the summary judgment opinion, but reversed the dismissal of the due process claim at issue here. *LaBounty v. Kinkhabwala,* No. 99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

2    To the extent that the plaintiff reiterates in his opposition claims that have been previously dismissed or makes new claims unrelated to the issues which have been remanded, those claims are not properly before this Court and the Court does not consider them here.

3    Tier III hearings are held for " 'the most serious violations of institutional rules." ' *Colon v. Howard,* 215 F.3d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

4    Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

5    A porter is an inmate who is also serving a sentence in SHU.

6    Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

7    The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

8    The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

9    The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims of
medical indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment
on plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force claims
against defendant Reyell are subject to dismissal for lack
of personal involvement. (Dkt. No. 61). Plaintiff does not
object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. *See Brown v. Peters,* 1997 WL 599355, \*2–3
(N.D.N.Y.), *af'd without op., 175 F.3d 1007 (2d Cir.1999);
see also Batista v. Walker,* 1995 WL 453299, at \*1
(S.D.N.Y.1995) (when a party makes no objection to a
portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

**I. Local Rule 7.1(a)(3)**

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

 **\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

 Q. ... Have you read the complaint?

 A. Yes, ma'am.

 Q. So, you are aware of its contents?

 A. Yes, ma'am.

 Q. Did anyone help you prepare the complaint?

 A. No, ma'am.

 Q. Are there any statements contained in the complaint that you now wish to change or modify?

 A. I'm not sure.

 Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

 A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

 **\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006)

(citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

> Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

> A. I think he asked me how am I feeling, how did this happen?

> Q. And what did you say?

> A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

> Q. What did you say?

> A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

> Q. Which was—

> A. —and that I started this.

> Q. And is that the truth?

> A. No.

> Q. Why did you tell the nurse that?

> A. Because I was being forced to.

> Q. Forced to how?

> A. By the officers that [sic] was there.

> Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

> A. Yes, ma'am.

> Q. Why did you do that?

> A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able

Latouche v. Tompkins, Not Reported in F.Supp.2d (2011)
Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 223 of 329
2011 WL 1103045

to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

Latouche v. Tompkins, Not Reported in F.Supp.2d (2011)

2011 WL 1103045

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

[T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may

ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

---

Footnotes

1    Local Rule 7.1(a)(3) provides:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2    While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3    Officer Rock is not a defendant herein.

---

**End of Document**                                                       © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3785771
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.

No. 9:08–CV–482 (TJM/ATB).
|
Aug. 5, 2010.

**Attorneys and Law Firms**

Marc Lewis, pro se.

Christina L. Roberts–Ryba, Asst. Attorney General, for Defendants.

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred by Senior U.S. District Judge Thomas J. McAvoy, for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). The case was transferred to me on January 4, 2010, following the retirement of U.S. Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 125).

While an inmate in the custody of the Department of Correctional Services ("DOCS"), plaintiff filed his complaint, pursuant to 42 U .S.C. § 1983, regarding incidents that occurred during his incarceration at Franklin Correctional Facility ("Franklin") and Upstate Correctional Facility ("Upstate"). Liberally construed, plaintiff's amended complaint[1] (Dkt. No. 40) makes several claims against 14 defendants[2] relating to events in 2006 and 2007. He alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers at Franklin on or about June 15, 2006, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation.[3] Plaintiff claims that defendants Secore and Favro violated his Eighth Amendment rights by assaulting him on June 19, 2006,

and that defendant Norcross failed to intervene. He also alleges that he was a victim of another unconstitutional assault on June 24, 2006, by defendant Reardon and other unnamed officers. Plaintiff claims that, over the following days and weeks, nurses Davenport, Volpe, Walsh, and Chesbrough, and physician assistant ("PA") Tichenor all denied him constitutionally-adequate medical care, by failing to properly treat him for the various injuries he suffered as a result of the two "assaults." He states that defendant Demars violated his due process rights, while presiding at the disciplinary hearing on the charges brought by defendant Johnson, which resulted in plaintiff's confinement in a Special Housing Unit ("SHU") until the charges were reversed by DOCS in June 2007. Finally, plaintiff suggests that defendants McCasland and Hoffnagle violated plaintiff's First Amendment rights by improperly handling his legal mail in January 2007. Plaintiff seeks substantial monetary damages from the defendants.

Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 110). Plaintiff has responded in opposition to the motion. (Dkt.Nos.123, 124). Defendants filed a reply (Dkt. No. 128), and plaintiff submitted a sur-reply (Dkt.Nos.129, 130). For the following reasons, this court recommends that defendants' motion be granted in part and denied in part. I particular, this court recommends that summary judgment be denied with respect to the Eighth Amendment excessive force or failure-to-intervene claims against defendants Secore, Favro, Norcross, and Reardon. Dismissal is recommended with respect to the plaintiff's other causes of action.

## DISCUSSION

### I. *Facts*

**\*2** Plaintiff authored and signed a letter dated June 15, 2006, complaining to the Superintendent of Franklin and other DOCS officials about the alleged assault of another inmate by at least four correction officers that evening. (Pl.'s Decl., Ex. A, Dkt. No. 124–3). Plaintiff spoke to the Superintendent in the mess hall about the letter on Saturday, June 17th, and the Superintendent said he would look for the letter and get back to the plaintiff. (Pl.'s Deposition ("Dep.") at 18–19, Dkt. No. 110–3). The letter was stamped as received in the administrative office

at Franklin, on June 20, 2006 at 12:42 p.m. (Pl.'s Decl., Ex. A).

**A. The Misbehavior Report Filed by Defendant Johnson**

On June 19, 2006, the administration at Franklin received a number of anonymous notes from inmates indicating that violence toward the facility staff was imminent because of prior staff actions involving inmates. Defendant Johnson, who was assigned to investigate these letters, was advised that the plaintiff had approached the Superintendent with "similar concerns" on June 17th. Lt. Johnson obtained samples of plaintiff's handwriting from his guidance folder and compared them to the anonymous, threatening notes. (Johnson Decl. ¶ 5, Dkt. No. 110–8).[4] He concluded that plaintiff's known handwriting was similar to the writing on four of the anonymous letters, including one of the most threatening ones. (*Id.* ¶¶ 5, 6). Based on that and other investigation conducted by several officers, Lt. Johnson filed a misbehavior report on June 19th, accusing plaintiff of authoring some of the threatening letters. (*Id.* ¶ 6 & Ex. A, Dkt. No. 110–8 at 6). He directed that plaintiff be confined in the SHU pending the disciplinary hearing (*Id.,* Ex. A), which is permitted by DOCS directives governing inmate discipline (DOCS Directive 4932, Parts 251–1.6 & 251–1.7, *Id.,* Ex. C, Dkt. No. 110–8 at 21–22).

A disciplinary hearing regarding these charges, for which defendant Demars served as the hearing officer, was conducted over several days. Plaintiff and several other witnesses, including Lt. Johnson and the Franklin Superintendent testified. (Disc. Hearing Transcript at 1–67). Plaintiff was found guilty of the charges and was sentenced, on July 5, 2006, to serve nine months in SHU with corresponding loss of privileges. (Disc. Hearing Transcript at 66; Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 4). After various levels of appeal and review, the guilty disposition was administratively reversed by DOCS on June 19, 2007 because the hearing officer (defendant Demars) did not conduct an independent review of the handwriting comparisons about which Lt. Johnson testified. (Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 6, 13).[5] On or about July 2, 2007, plaintiff was ordered released from the SHU at Upstate. (*Id.,* Dkt. No. 124–4 at 14).

**B. The First "Assault" on June 19, 2005**

Plaintiff alleges that defendant Gardner, then a sergeant at Franklin, was involved in plaintiff's transfer to the SHU on June 19, 2005, following the filing of the disciplinary charges relating to the threat letters. (Amended Complaint ("AC"), Statement of Facts, ¶¶ 3–4, Dkt. No. 40 at 9–10; [6] Gardner Decl. ¶¶ 2–7, Dkt. No. 110–10). Plaintiff alleges that, during the transfer, Sgt. Gardner told defendants Secore and Favro that the plaintiff "needed to be taught the policies and procedures of the Franklin Correctional Facility because the plaintiff liked to make threats at correctional staff and write them up." [7] (AC ¶ 4).

**\*3** Plaintiff claims that defendants Secore and Favro then escorted him into the main foyer of the SHU where they struck him on the back of the head and on the jaw. (AC ¶¶ 6–8). Plaintiff alleges these two plaintiffs then dragged him into the "strip frisk room" where these two correction officers tripped plaintiff and then repeatedly punched and kicked him while he was handcuffed on the floor. (AC ¶¶ 9–10). Plaintiff claims further that defendant Norcross was in the strip frisk room while this assault was going on, and failed to intervene. (AC ¶ 11). While there are some minor discrepancies in their accounts, defendants Secore, Favro, and Norcross all state that, during the strip frisk procedure at the SHU, plaintiff raised a fist and then struggled when the officers moved to restrain him. The officers assert that they used the minimum force necessary to bring plaintiff under control, and that he was not "assaulted." (Secore Decl., Dkt. No. 110–11; Favro Decl., Dkt. No. 110–12; Norcross Decl., Dkt. No. 110–18).[8]

Plaintiff claims that, as a result of the assault, he suffered injuries to his rib cage and a dislocated jaw. He alleges that, in the hours and days following the incident, Nurse Davenport and Nurse Volpe refused to examine him and treat his injuries. (AC ¶¶ 13–17). Both nurses state that they spoke with and examined plaintiff between June 19 and 22, and found no evidence that he was injured. (Davenport Decl., Dkt. No. 110–19; Volpe Decl., Dkt. No. 110–14). The nurses completed an Inmate Injury Report and/or medical records, which documented their examinations of plaintiff. (*Id.;* Secore Decl., Ex. B, Dkt. No. 110–11 at 8, 15, 18–19, 22–25; Medical Records [9] at 34–36). Plaintiff claims that these records were fabricated and false. (AC ¶ 15; Pl.'s Decl., Dkt. No. 124–2 at 4–6).

**C. The Second "Assault" on June 24, 2005**

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3785771

Plaintiff alleges that, on June 24, 2005, defendant Reardon assaulted him in his cell in the presence of other unnamed correction officers. Plaintiff alleges that defendant Reardon "took the plaintiffs [sic] left arm and pulled all the way back into a 90 ° degree angle while having him in a body lock ..." (AC ¶ 20). Plaintiff claims that, as a result of this assault, he suffered a torn tendon to his left armpit. (AC ¶ 23).

Officer Reardon acknowledged having contact with plaintiff in the Franklin SHU on June 20 and 24, 2006; he issued inmate misbehavior reports against the plaintiff on both dates. (Reardon Decl. ¶¶ 3–4, 10–12, Dkt. No. 110–13). Defendant Reardon denies assaulting plaintiff and notes that, on June 29th, at the disciplinary hearing regarding the June 20th misbehavior report, plaintiff said nothing about the alleged assault five days earlier. (*Id.* ¶¶ 5–8, 14). Plaintiff did, however, complain of the alleged assault in a grievance dated June 25th. (Pl.'s Decl., Ex. C, Dkt. No. 124–5 at 39–41). As a result of the grievance, plaintiff was eventually transferred to the SHU at Upstate. (*Id.*).

### D. Further Issues Regarding Medical Treatment

**\*4** Plaintiff claims that, upon his admission to Upstate on July 12, 2006, Nurse Walsh refused to examine plaintiff for injuries relating to the two prior assaults, advising him to request sick call. He alleges further that Nurse Chesbrough refused to provide him with treatment the next day because this defendant thought the plaintiff was lying about not being treated earlier at Franklin. (AC ¶¶ 23–24). After reviewing the relevant medical records, defendants Walsh and Chesbrough both concluded that Nurse Chesbrough examined plaintiff both on July 12th and 13th, and concluded that he had no apparent medical problems. (Walsh Decl. ¶¶ 6–7, Dkt. No. 110–15; Chesbrough Decl. ¶¶ 6–9, Dkt. No. 110–16).

Plaintiff also complains that PA Tichenor examined him several months after the alleged assaults, mis-diagnosed his left arm injury, and refused to examine his rib cage and jaw despite claims of continuing pain in those areas. (AC ¶ 25). Based on her review of plaintiff's medical records, defendant Tichenor stated that she examined and treated plaintiff conservatively for various medical conditions, including back and shoulder pain, on September 6, 2006 and several times thereafter. (Tichenor Decl., ¶¶ 6–11, Dkt. No. 110–17).

### E. Issues Regarding Legal Mail

Plaintiff alleges that, on January 22 and 23, 2007, defendants McCasland and Hoffnagle attempted to deliver two pieces of legal mail that had been opened outside of plaintiff's presence, contrary to DOCS procedures. Plaintiff refused to accept the opened mail on two occasions, and claims that defendant Hoffnagle then lost or destroyed the two parcels, which should have been returned to the sender. (Dep. 66–71, AC ¶¶ 31–33). Plaintiff does not document that he was prejudiced in any particular legal proceedings as a result of the alleged mishandling of his mail.

Defendant McCasland stated that he opened the two parcels of legal mail in plaintiff's presence on January 22nd, but that plaintiff refused the mail because he was upset that another parcel was returned to plaintiff for insufficient postage. (McCasland Decl. ¶¶ 6–9, Dkt. No. 110–20). Defendant Hoffnagle states that, when plaintiff refused the two open parcels the next day, he returned them to the mail room. (Hoffnagle Decl., ¶¶ 4–10, Dkt. No. 110–21). Based on a grievance filed by plaintiff, DOCS found no evidence that the defendants mishandled plaintiff's legal mail, although one report found that the mail officers did not properly document their handling of the parcels. (McCasland Decl., Ex. B, Dkt. No. 110–20 at 44).

### II. *Summary Judgment—Legal Standards*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*5** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the

nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

### III. *Excessive Force/Failure to Intervene*

#### A. Legal Standards

#### 1. Eighth Amendment–Excessive Force
Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*6** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

#### 2. Failure to Intervene
A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Cicio v. Graham,* No. 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy,* No. 9:07–CV654 (DNH/GHL), 2010 WL 2044705, at*8 (N.D.N.Y. May 24, 2010) . [10] A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.* [11] In order to establish liability under this theory, a plaintiff must prove that the defendant

in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

### B. Application

Plaintiff has adequately alleged that the named correction officers either participated in, or were present for and failed to intervene in, the application of excessive force. While plaintiff's excessive force claims have weak evidentiary support, he has established that there are genuine issues of material fact that should be resolved by a jury.

### 1. The "Assault" on June 19, 2010

Defendants Secore and Favro admittedly used force to subdue plaintiff on June 19, 2010. In his amended complaint (Dkt. No. 40), deposition (Dep. at 31–38, and pleadings in opposition to the summary judgment motion, plaintiff consistently alleged details of an assault which, if believed, would amount to a "malicious use of force to cause harm" that constitutes a *per se* Eighth Amendment violation regardless of the seriousness of his injuries. *Blyden,* 186 F.3d at 263. Plaintiff claims he was struck in the head or face by each defendant, dragged to another room, tripped, and repeatedly punched and kicked while he was lying handcuffed on the floor. Although plaintiff admits that he kicked at the correction officers to try to defend himself from their blows once he was on the floor (Dep. at 33–34), this did not justify the alleged prior application of excessive force. As described by plaintiff, the incident involved more than a *de minimis* use of force and a malicious and wanton attempt to cause harm. *Sims,* 230 F.3d at 22; *Hudson,* 503 U.S. at 7.

**\*7** The correction officers and Sgt. Norcross all vehemently deny that more than the minimum amount of force required to restrain the plaintiff was used, and the medical evidence does not corroborate plaintiff's claims of significant injuries to his rib cage and jaw. [12] However, given that issues of credibility should not be resolved on a summary judgment motion, this court cannot conclude that no rational juror could find that defendants Secore and Favro violated plaintiff's Eighth

Amendment rights on June 19, 2006. *See, e.g., Griffin v. Crippen,* 193 F.3d 89, 90–92 (2d Cir.1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz,* 103 Fed. Appx. 434, 437 (2d Cir.2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries, [13] were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore,* 9:06–CV–1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora,* 9:08–CV–431 (GLS/DEP), 2010 WL 1063875, at *7–8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise).

Plaintiff alleges that he saw that Sgt. Norcross was present while he was being kicked and punched on the floor of the strip frisk room and told plaintiff to "calm down." (Dep. at 36–38). Defendant Norcross admits he was in the room with plaintiff and defendants Secore and Favro, although he denies that any excessive force was applied. (Norcross Decl. ¶¶ 4–9, Dkt. No. 110–18). Given plaintiff's allegations about the nature and duration of the beating he received while in Sgt. Norcross's presence, it would have been clear to this defendant that excessive force was being applied, and he would have had an opportunity to intervene to stop the assault by his subordinates. While there are obviously issues of credibility that may ultimately be resolved against the plaintiff, he has established that there are issues of fact regarding defendant Norcross's culpability that should be addressed at trial.

**\*8** To the extent that plaintiff is alleging that defendants Gardner and Davenport were personally involved in the application of excessive force by defendants Secore and Favro, this court recommends dismissal of those claims. [14] Neither defendant was present during the alleged assault and thus did not have a realistic opportunity to intervene. There is no allegation that Nurse Davenport had any reason to anticipate the alleged assault, or any knowledge of the incident until it was over. In any event, she lacked the authority to intervene while correction officers were using force on an inmate, even if she were present. [15]

Even if then Sgt. Gardner made the comment to defendants Secore and Favro that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," that alone would not suggest the state of mind required to establish his responsibility, under the Eighth Amendment, for a subsequent assault by the other correction officers. *Cf. Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, at \*5 (S.D.N.Y. Apr. 6, 2009) (to establish officer's liability, under Section 1983, for the assault of plaintiff by other inmates, plaintiff needed to allege more than the fact that the officer spread rumors that plaintiff was a "snitch" and a homosexual; plaintiff needed to allege facts establishing that the officer intended to incite an assault or knowingly disregarded that he had created an environment that generated a significant risk of harm). [16] A comment that plaintiff needed to be taught the rules of the prison, as he was being transported to the SHU because of a disciplinary charge, is subject to a completely benign interpretation. Plaintiff's bare allegation that defendant Gardner made that statement does not establish a viable cause of action that Gardner induced the other defendants to commit assault.

### 2. The "Assault" on June 24, 2006

Plaintiff alleges that, during a cell search on June 24, 2006, defendant Reardon pulled plaintiff's arm back at almost a 90 degree angle while holding him up against a wall. Plaintiff asserts that defendant Reardon was talking "tough stuff" during the incident and was either trying to break plaintiff's arm or cause him pain. (Dep. at 64). Plaintiff claims that he suffered a tear to the tendon under his left arm, which caused lasting limitations in function. (Pl.'s Memo. of Law at 24–25, Dkt. No. 124–1; Dep. at 80). Some months later, PA Tichenor diagnosed plaintiff

with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶ 10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008, he detected a slight defect in plaintiff's "left bicep [?] tendon" that was, by that time, "functionally insignificant." (Medical Records at 11; Dep. at 80).

Officer Reardon admittedly interacted with plaintiff on June 24th, when he issued a misbehavior report to him, but denies that he applied any physical force. (Reardon Decl. ¶¶ 10–14). Defense counsel argues that plaintiff failed to mention the alleged assault on June 24th during a subsequent disciplinary hearing on a prior charge defendant Reardon filed on June 20th, indicating that the incident never happened. However, as noted, plaintiff filed a grievance on June 25th describing the assault. His allegations, although largely unsupported, are sufficient to create an issue of fact regarding what force, if any, defendant Reardon applied during the incident on June 24th.

**\*9** Defendants also argue that any use of force on plaintiff on June 24th was *de minimis* and not sufficient to support an Eighth Amendment claim. The alleged use of force described by plaintiff exceeded what was reasonable and necessary under the circumstances—a cell inspection with no suggestion that plaintiff physically resisted or posed any threat to the safety of the officers. [17] While the alleged use of force on plaintiff's left arm was brief, plaintiff has alleged that it was intense and caused a significant and lasting injury, for which he has provided some, albeit marginal, supporting medical documentation. [18]

Plaintiff's allegations regarding defendant Reardon's state of mind are fairly conclusory; however, he does claim that the defendant was talking "tough" under circumstances which could provoke a malicious use of force. [19] While plaintiff's claim of excessive force against defendant Reardon is very thin, this court finds that there are genuine and material issues of fact that require credibility assessments, which should not be made in the context of a summary judgment motion. *See, e.g., Mitchell v. Keane,* 974 F.Supp. 332, 340–41 (S.D.N.Y.1997) (allegation that officers twisted baton in the chain of the inmate's shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 232 of 329
Lewis v. Johnson, Not Reported in F.Supp.2d (2010)
2010 WL 3785771

objective and subjective elements of Hudson test, so as to preclude dismissal); *Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (finding plaintiff's allegations that defendants "pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall" sufficient to state a claim for excessive force); *Reyes v. McGinnis,* 00–CV–6352, 2003 WL 23101781, at *1, 6 (W.D.N .Y. Apr. 10, 2003) (denying summary judgment motion on excessive force claim against correction officer who, *inter alia,* allegedly applied handcuffs too tightly, and lifted plaintiff from the floor by his handcuffs, causing nerve damage in his wrists and a possible ganglion cyst). *Cf. Robison v. Via,* 821 F.2d 913, 924–25 (2d Cir.1987) (sustaining excessive force claim where the arresting officer twisted the plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising).

## IV. *Due Process*

Plaintiff claims that defendant Demars violated his due process rights in presiding over the disciplinary hearing on the charges initiated by defendant Johnson. For the reasons set forth below, this court finds that the due process claim is not viable and that, in any event, defendant Demars would be protected by qualified immunity for his conduct as a hearing officer.

### A. Applicable Law

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Defendants apparently concede that the disposition of the most serious disciplinary charge against plaintiff, which resulted in a sentence of nine months in the SHU, implicated a liberty interest, the deprivation of which required due process safeguards. [20]

**\*10** In *Wolff v. McDonnell,* 418 U.S. 539, 563–64 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present

documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation). [21]

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

### B. Application

In his amended complaint and Memorandum of Law, plaintiff sets forth several ways in which he alleges that defendant Demars, the hearing officer determining whether plaintiff wrote several anonymous threatening letters, denied him due process in conducting the hearing. [22] Plaintiff alleges first that there was no evidence to support the allegations on which defendant Demars found him guilty. (AC ¶ 19). Plaintiff argues further that the hearing officer failed to make an independent assessment of the handwriting comparison evidence, which was the basis on which his guilty disposition was eventually overturned by DOCS. (Pl.'s Memo. of Law at 32; Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 13). Finally plaintiff claims that his right to assistance in handling his disciplinary hearing was violated in several ways, in part because the hearing officer, not another DOCS employee or inmate, provided the assistance. (Pl.'s Memo. of Law at 30). [23]

### 1. "Some" Evidence

In finding plaintiff guilty of two charges relating to the anonymous, threatening letters, defendant Demars stated that he relied primarily upon the inmate misbehavior report and Lt. Johnson's testimony regarding the similarities that he observed in the handwriting of several of the threat letters and known samples of plaintiff's writing. (Disc. Hearing Transcript at 66). [24] The anonymous letters, which were exhibits at the hearing, threatened physical retaliation against the corrections staff if there was another beating of an inmate, following an alleged assault of an inmate by officers in G-dorm at Franklin. (Johnson Decl., Ex. B, Dkt. No. 110–8 at 8–14). Defendant Johnson's misbehavior report noted that plaintiff had expressed "similar concerns" to the Superintendent two days before the threat letters were received. (Johnson Decl., Ex. B, Dkt. No. 110–8 at 6). During his testimony at the disciplinary hearing, Lt. Johnson set forth his prior experience in handwriting comparison and explained, in some detail, the similarities he observed between the threat letters and the samples of plaintiff's writing from his guidance folder, which were also exhibits. (Disc. Hearing Transcript at 21–22).

**\*11** While meager, the proof relied upon by defendant Demars constituted "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e .g., Monier v. Holt,* 4:CV–05–2062, 2005 WL 3531369, at \*2 (M.D.Pa. Dec. 21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at \*3 (W.D.N.C. Apr. 2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* ––– U.S. ––––, 128 S.Ct. 2960 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at \*2 (E.D.Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of

plaintiff's writing satisfied due process standards). While DOCS ultimately determined, as a matter of equity or state law, that the hearing examiner should have made an independent handwriting comparison, his apparent failure to do so did not violate the federal due process rights of the plaintiff. *See, e.g ., Monier v. Holt,* 2005 WL 3531369, at \*2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at \*2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at \*3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed). [25]

### 2. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was clearly entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). On the first day of the hearing, defendant Demars noted that plaintiff had not signed the form served on him with the formal charges by which he could request assistance in connection with the hearing. (Disc. Hearing Transcript at 1). [26] Dep. Sup. Demars offered assistance to plaintiff in securing witnesses and documents for the hearing, and plaintiff accepted. Plaintiff explained what help he needed and, before the hearing was adjourned for several days, stated that he was satisfied with the assistance that the hearing officer provided. (Disc. Hearing Transcript at 1–7).

**\*12** Ultimately, defendant Demars arranged for the testimony of all of the witnesses that plaintiff deemed critical, including the Superintendent of Franklin, although Dep. Sup. Demars was dubious about why plaintiff needed the Superintendent. (Disc. Hearing Transcript at 10–19, 25–29, 39, 41–42, 44–45, 53, 61). The hearing officer procured copies of most of the documents that plaintiff requested, although the facility was unable to locate one "pass" which plaintiff requested. Defendant Demars turned down plaintiff's request for DNA testing of the anonymous, threatening letters that prompted the charges. (Disc. Hearing Transcript at 9–10, 29). While

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 234 of 329

plaintiff raised numerous "objections" at the end of the hearing, he did not object to any deficiencies in the assistance he received from defendant Demars. (Disc. Hearing Transcript at 64–65) . [27]

Plaintiff cites a 1995 opinion of then-District Judge Sotomayor for the proposition that a hearing examiner who purports to provide assistance to the charged inmate cannot be "impartial" and violates the due process rights of the accused *per se. Lee v. Coughlin,* 902 F.Supp. 424, 433–34 (S.D.N.Y.1995). However, the plaintiff in *Lee* specifically requested assistance from individuals other than the hearing officer. In this case, plaintiff waived any objection to having the hearing officer also provide him assistance in procuring documents and witnesses, by his failure to complete and submit the form requesting assistance from another source, and his statement expressing his satisfaction with the alternative arrangement offered by defendant Demars. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (the courts in this circuit have established that an inmate's silence can constitute waiver of his right to assistance at a disciplinary hearing) (citing, *inter alia, Murray v. Dixon,* 107 F.3d 3 (table), 1997 WL 73152, at *2 (2d Cir.1997) (affirming hearing officer's determination that inmate waived his right to assistance because the inmate "admits that he refused to sign the required request for employee assistance presented to him when he was served with the misbehavior report, and he does not allege that he requested assistance between his refusal and the hearing")).

Moreover, the *Lee* court found that the hearing officer, in fact, provided assistance that was deficient in several substantial respects. *Id.* In a 1998 decision, the Second Circuit held that, when an inmate agrees to accept assistance from a hearing officer who thereafter does nothing to assist, the inmate's due process rights are violated. *Ayers v. Ryan,* 152 F.3d at 81. While the Second Circuit characterized it as possibly "odd or irregular" for a hearing officer to offer to serve as an assistant and for the inmate to accept that offer, it did not characterize this arrangement as a *per se* due process violation. *Id.* At least one subsequent district court in this circuit has held that, where the hearing officer actually provided adequate assistance to an inmate, the fact that the hearing officer also served as the assistant does not violate due process. *Clyde v. Bellnier,* 9:08–CV–909, 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (Singleton, J.).

**\*13** As discussed above, defendant Demars actually provided reasonable and adequate assistance to plaintiff in connection with his disciplinary hearing. *See, e.g., Jackson v. Johnson,* 30 F.Supp.2d at 619 (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier,* 2010 WL 1489897, at *6 (no due process violation arose when the hearing officer/assistant failed to provide documents that did not exist or that were not relevant to the defense) [28]; *Brown v. Dotson,* 2007 WL 1033359, at *3 (inmate facing disciplinary charges for writing a threatening note was not constitutionally entitled to DNA tests in connection with the hearing). This court concludes that, based on the Second Circuit's holding in *Ayers v. Ryan,* defendant Demars did not violate plaintiff's due process rights in connection with his rendering of assistance in connection with the hearing. In any event, Dep. Sup. Demars would be entitled to qualified immunity because he could not have reasonably understood, based on the uncertain controlling law in 2006, that his role in providing reasonable and adequate assistance to plaintiff, while serving as the hearing officer, violated plaintiff's due process rights.

## V. *Alleged Mail Tampering*

The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d. Cir.1997). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351–52 (1996).

Prior to the Supreme Court's decision in Lewis, the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts

Lewis v. Johnson, Not Reported in F.Supp.2d (2010)

2010 WL 3785771

was chilled .... " *Washington v. James,* 782 F.2d 1134, 1139 (2d. Cir.1986) (citation omitted). *Lewis* also suggests that the actual harm must be to direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

**\*14** Although the amended complaint alleges generally that plaintiff's mail was obstructed while he was in Franklin and Upstate, [29] his only focused claim of tampering with legal mail relates to an incident at Upstate in January 2007 involving defendants McCasland and Hoffnagle. (AC ¶¶ 29–33). During his deposition, plaintiff acknowledged that only two pieces of legal mail were opened outside of his presence, and that they may well have been opened by mistake or accident. (Dep. at 67, 74). Although the incident left Plaintiff "a little upset," he did not articulate how the opening and eventual loss [30] of the two items interfered with any pending legal matter. (Dep. at 71–75). Even accepting plaintiff's allegations as true, which the defendants dispute (McCasland Decl., Hoffnagle Decl.), the claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff was prejudiced in a legal proceeding, does not support a viable First Amendment claim. *See, e.g., Morgan v. Montanye,* 516 F.2d 1367, 1370–71 (2d Cir.1975) (inmate's showing of only a single instance where clearly marked legal mail was opened out of his presence, in absence of any indication that the incident affected the correspondence between the inmate and his attorney concerning prisoner's criminal appeal or any other legal matter, was insufficient to survive summary judgment).

## VI. *Retaliation Claims*

Plaintiff alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. Plaintiff characterizes, as retaliation, the subsequent "assaults" involving defendants Secore, Favro, Norcross, and Reardon; the conduct of the disciplinary hearing by

defendant Demars; and the alleged mail tampering by defendants McCasland and Hoffnagle. For the reasons set forth below, this court will recommend that plaintiff's retaliation claims be dismissed, either on the merits or on qualified-immunity grounds.

### A. Applicable Law

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

**\*15** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d

949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### B. Application

#### 1. First Amendment Protection

The plaintiff alleges that various acts of retaliation resulted from a letter he wrote and signed, complaining about the assault of another inmate by correction officers. It is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim. *See, e.g., Smith v. Greene,* 9:06–CV–0505, 2010 WL 985388, at *3 (N.D.N.Y. Mar. 16, 2010) (it is far from certain whether the First Amendment protected an inmate's letter to the New York State Inspector General complaining about the use of force against a fellow inmate) (citing *Nevares v. Morrisey,* 95–CV–1135, 1991 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 339 (W.D.N.Y.2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d 470, 478–79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate). We will assume, for sake of argument, that plaintiff's complaint letter in this case was protected by the First Amendment. However, as discussed below, the defendants who allegedly took adverse actions against plaintiff based on this letter would be protected by qualified immunity because it was not clear under controlling law, in 2006 and 2007, that such conduct would violate plaintiff's First Amendment rights.

#### 2. Connection Between "Speech" and Alleged Adverse Actions

**\*16** Plaintiff has alleged that the actions of nine different defendants between June 19, 2006 and January 2007 were carried out in retaliation for his letter of June 15, 2006. With two possible exceptions, plaintiff provides no support for the conclusory claim that these defendants were even aware of his letter when they allegedly took adverse action against the plaintiff. It is unlikely that defendants Gardner, Secore, Favro, and Norcross, who were merely involved in plaintiff's move to the Franklin SHU on June 19th, were aware of plaintiff's letter, which was not received in the administrative office at Franklin until the following day. (Pl.'s Decl., Ex. A; Disc. Hearing at 52–53). To the extent these defendants were motivated to take some adverse action [31] against plaintiff, which they deny, the fact that plaintiff was just charged with creating some of the anonymous letters threatening the Franklin staff, would be a much more likely trigger.

Plaintiff provides no support for the suggestion that defendant Reardon was aware of or motivated by plaintiff's June 15th letter when he allegedly used excessive force on June 24th. In fact, plaintiff provides a more plausible explanation for why defendant Reardon and the other SHU officers might be inclined to "assault" him on June 24th—plaintiff was refusing meals and generally acting like a "knucklehead" toward the staff. (Dep. at 63, 65). There is certainly no indication that defendants McCasland and Hoffnagle, correction officers at Upstate who allegedly tampered with plaintiff's mail in January 2007, knew of or were influenced by plaintiff's June 15, 2006 letter to officials at Franklin.

When he filed the disciplinary action against plaintiff on the afternoon of June 19th, defendant Johnson may not have seen plaintiff's letter, which was not received by the administrative office until the following day. However, Lt. Johnson's inmate misbehavior report confirms that he was advised about plaintiff's prior contact with the Superintendent on June 17th, so there is some corroboration he was aware of at least the general contents of plaintiff's letter. Defendant Demars, the hearing officer at plaintiff's disciplinary hearing, was clearly aware of the June 15th letter, because plaintiff asked that it be made an exhibit.

However, plaintiff provides no information other than the temporal proximity between his June 15th letter and the conduct of defendants Johnson and Demars to suggest that the letter substantially motivated the

alleged adverse actions by the prison officials. There is no indication of any contact between plaintiff and Lt. Johnson before the disciplinary charges were filed, and no evidence of any statements or prior conduct suggesting a retaliatory animosity on the part of either defendant. (Dep. at 19; Johnson Decl. ¶ 4). It is clear that plaintiff was identified as a possible suspect in the investigation of the anonymous threat letters because he expressed "similar concerns" to the Superintendent and in his June 15th letter. However, the disciplinary hearing transcript indicates that defendants Johnson and Demars were motivated by the goal of determining if plaintiff generated some of the anonymous threat letters, not the desire to retaliate against plaintiff for drafting and signing the June 15th letter (which contained complaints, but no threats). Given the record developed in connection with the pending summary judgment motion, plaintiff's conclusory allegations are not sufficient to establish that any of the nine defendants were substantially motivated by his June 15, 2006 letter in taking the actions they took. *See, e.g., Ayers v. Stewart,* 101 F.3d 687 (table), 1996 WL 346049, at *1 (2d Cir.1996) (given the weakness of his retaliation claim, plaintiff's reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 305 (W.D.N.Y.2006) (because plaintiff offers nothing more than speculation that the moving defendants did what they did because he had filed a grievance, the temporal proximity between the protected activity and the adverse action is not enough to give rise to a genuine issue of material fact); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment).

## VII. *Deliberate Indifference to Medical Needs*

### A. Legal Standards
**\*17** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d

Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184.

### 1. Objective Element
In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Subjective Element
The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide

adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

**\*18** In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims

of malpractice, or disagreement with treatment are not actionable under Section 1983.

### B. Application

#### 1. "Seriousness" of Plaintiff's Medical Condition and any Alleged Deprivation

Plaintiff claims that, as a result of the alleged assaults on June 19 and 24, 2006, he suffered a "possible" fractured rib cage, dislocated jaw, and a torn tendon in his left armpit. (AC ¶¶ 14, 23). At his deposition in June 2009, plaintiff complained of continuing physical limitations because of a "torn ligament" in his armpit, as well as discomfort from a lump on his rib cage and a prior injury to his jaw. (Dep. at 80–81).

The record of the medical examinations of plaintiff by several health care providers over the days and weeks following the alleged assaults did not document the injuries claimed by plaintiff. (Secore Decl., Ex. B, Dkt. No. 110–11 at 8, 15, 18–19, 22–25; Medical Records at 25–36). In September and October 2006, PA Tichenor evaluated plaintiff's claims of back, shoulder, and knee pain, and diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶¶ 8–10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008 regarding complaints of problems with his knees, feet, and arm,[32] the physician detected a slight defect in plaintiff's "left bicep [?] tendon" that was "functionally insignificant" and did not effect his range of motion or strength. (Medical Records at 11; Dep. at 80). Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in a cell door. (Medical Records at 24). Hence, it is unclear whether the doctor's observations relating to the left arm in 2008 are related to the alleged assaults in June 2006 or the later incident.

**\*19** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important

and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Plaintiff's medical issues in June and July 2006 do not meet the objective standards of a "serious" medical condition. *See, e.g., Ninortey v. Shova,* 05 Civ. 542, 2008 WL 4067107, at *5, 16 (S.D.N.Y. Sept. 2, 2008) (inmates's complaints of bruises, cuts, a twisted ankle, shoulder pain, a bloody mouth and cracked teeth following an alleged assault, much of which was not confirmed by records of frequent medical examinations and treatment, did not constitute a "serious medical condition"); *Evering v. Rielly,* 98 CIV. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (bruises, redness, soreness, a knot on the back, and a cut on the forearm are superficial injuries that require time to heal, but do not satisfy the objective component of the deliberate indifference standard); *Rodriguez v. Mercado,* 00 CIV. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (plaintiff who claimed to sustain bruises to his head, back, and wrist following an excessive force incident did not have a "sufficiently serious" medical condition); *Tafari v. McCarthy,* 2010 WL 2044705, at *20 (bruises and superficial lacerations resulting from an alleged assault did not satisfy the "serious medical condition" test).

Plaintiff complained that prison medical officials refused to examine or treat him for the injuries relating to the alleged assaults, particularly in June and July 2006. He alleges that, in the days following the assaults, his face and jaw were swollen and he was having difficulty breathing as a result of his rib cage; but does not claim he had more serious injuries or substantial, persistent pain. (AC ¶¶ 14, 17). Plaintiff denied any injuries on June 19th. (Davenport Decl., Exs. A & B). The prison medical records document that he was examined on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained. [33] Based on the defendants' declarations and the corroborating medical records, plaintiff's conclusory allegations about his denials of medical care would not, in this court's view, create an issue of fact. *See, e.g., Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record.); *Benitez v. Pecenco,*

92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")). [34]

**\*20** However, plaintiff challenges the prison medical records that contradict his claims of injury and denied treatment, making conclusory allegations that various medical records were falsified and/or that his medical problems were mis-diagnosed. (AC ¶ 15; Pl .'s Memo. of Law at 3–13). It should be noted that the defendants' declarations and supporting medical records indicate that the plaintiff tried to manipulate care providers to document alleged injuries that the nurses did not detect. [35] Plaintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, also be insufficient to sway any rational fact finder. *See, e.g., Benitez v. Mailloux,* No. 9:05–CV–1160, 2009 WL 1953847, at *8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate indifference claim), *report-recommendation rejected, in part, on other grounds,* 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord,* 115 F.Supp.2d 432, 435 (S.D.N.Y.2000) (dismissing conclusory claims that defendants conspired to tamper with and destroy plaintiff's medical records). [36]

Even if plaintiff's conclusory attacks on the reliability of his medical records are not rejected, this court concludes that he did not suffer from a sufficiently "serious" medical condition or suffer a "serious" deprivation of medical care under Eighth Amendment standards. Plaintiff does admit that he received medical attention on several occasions in the months following the alleged assaults in June 2006. (Dep. at 48–57). He does not take issue with the conservative treatment prescribed by PA Tichenor in the Fall of 2006. (Pl.'s Memo. of Law at 11; Tichenor Decl. ¶¶ 9–10). Even crediting only the medical evidence that plaintiff does not claim is

Lewis v. Johnson, Not Reported in F.Supp.2d (2010)

2010 WL 3785771

fabricated, [37] there is no indication that alleged delays in his examination or treatment resulted in any substantial harm or required a dramatic change in the course of his treatment. *See, e.g., Evans v. Manos,* 336 F.Supp.2d 255, 261–62 (W.D.N.Y.2004) (delay in treatment of prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a "serious" disruption of his medical care). *See also Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir.2003) (although demonstrable adverse medical effects may not be required under to establish an Eighth Amendment medical-care claim, the absence of subsequent physical injury will often be probative in assessing the risk of delaying treatment in the past).

The record does not indicate that plaintiff was suffering from a serious medical condition which, even if completely ignored in June and July 2006, would have created a serious risk to his health. Nor does plaintiff's subsequent medical history reveal that the alleged delay or denial of medical treatment had any adverse impact on plaintiff. Accordingly, this court concludes that summary judgment should be granted with respect to the plaintiff's medical care claims because no rational juror would find that plaintiff suffered a sufficiently serious medical condition or deprivation.

### 2. "Deliberate Indifference"

**\*21** The declarations of defendants Davenport, Volpe, Walsh, Chesbrough, and Tichenor, and the supporting medical records, also undercut plaintiff's conclusory allegations that they were deliberately indifferent to his medical needs. Based on the above analysis of plaintiff's medical condition in June and July 2006, plaintiff can not establish that the defendants recognized a serious risk to his health and deliberately ignored it. Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary. However, a few specific observations about two defendants are appropriate.

The only allegation against nurse Walsh in the amended complaint is that she refused to examine plaintiff on the day he was transferred to Upstate–July 12, 2006. (AC ¶ 23). The medical records indicate that nurse Chesbrough conducted plaintiff's intake examination of plaintiff on July 12th and saw him in sick call on July 13th. (Chesbrough Decl. ¶¶ 7–9; Medical Records at 32–34). [38] Even if defendant Walsh "refused" to examine plaintiff on July 12th, she apparently did so with the knowledge that he would be seen that day by another nurse. Such a claim cannot support a viable cause of action for deliberate indifference. [39]

Finally, plaintiff's Eighth Amendment claim against PA Tichenor is that he failed to detect or that he mis-diagnosed plaintiff's alleged injuries. (AC ¶ 25; Dep. at 44–45, 56–57, 80–81). [40] Based on the authority cited above, even if defendant Tichenor negligently mis-diagnosed plaintiff, that would not constitute "deliberate indifference."

### VIII. *Qualified Immunity*

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v.. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's Eighth Amendment claims against defendants Gardner, Davenport, Volpe, Walsh, Chesbrough, and Tichenor because, as discussed above, he has not established those alleged violations of his constitutional rights.

**\*22** Defendant Demars is entitled to qualified immunity with respect to the due process claim relating to his conduct of plaintiff's disciplinary hearing. As discussed above, the Second Circuit's decisions in *Taylor v. Rodriguez,* 238 F.3d at 194 and *Luna v. Pico,* 356 F.3d at 489–90 did not clearly impose a due process requirement that a hearing officer at a prison disciplinary hearing perform independent analysis of lay handwriting comparisons made by a testifying witness. If the controlling authority were subsequently construed to require such independent analysis in the context of this case, this court finds it would not have been clear to defendant Demars in 2006 that his reliance on the witness' handwriting comparisons violated plaintiff's due process rights. [41] Similarly, the court concluded that the controlling authority in this circuit did not clearly prohibit a hearing officer at a prison disciplinary proceeding from also providing required assistance to the charged inmate. *Ayers v. Ryan,* 152 F.3d at 81. Because defendant Demars could not have reasonably understood that he could be violating plaintiff's due process rights by effectively providing assistance at the hearing over which he presided, he is entitled to qualified immunity with respect to that claim.

To the extent a higher court were to determine that any defendant who took adverse action against plaintiff was substantially motivated by plaintiff's June 15, 2006 letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim. As of 2006 and early 2007, the controlling authority in this circuit did not clearly provide First Amendment protection to complaints by one inmate about the alleged mistreatment of another inmate. *See, e.g.,* *Pettus v. McGinnis,* 533 F.Supp.2d at 339 (defendant is entitled to qualified immunity because of the uncertainty as to whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d at 479.

As to plaintiff's excessive force and failure to intervene claims against defendants Secore, Favro, Norcross, and Reardon, it was clearly established, as of the time of the alleged incidents in June 2006, that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9–10. Thus, accepting all of plaintiff's allegations about the two incidents on that day as true, qualified immunity cannot be granted to those defendants, because a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation. *See, e.g., Dallio v. Sanatamore,* 2010 WL 125774, at \*14.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to (1) plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross and (2) the Eighth Amendment claims based on excessive force against defendant Reardon. And, it is further

**\*23** **RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 110) be **GRANTED IN PART,** and that the complaint be dismissed in its entirety as to the remaining claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3785771

Footnotes

1    Plaintiff was granted leave to file an amended complaint on January 26, 2009. (Dkt. No. 39).

2    It is well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). An action against state officers

2010 WL 3785771

in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991). To the extent that the defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

3   Plaintiff characterizes the subsequent actions of defendants Secore, Favro, Norcross, Reardon, Demars, McCasland, and Hoffnagle as retaliation, although he states or implies that their actions constituted separate constitutional violations, as well.

4   Lt. Johnson had prior, on-the-job experience comparing handwriting, but no formal forensic training. (*Id.* ¶ 9; Disc. Hearing Transcript at 21, 23, Dkt. No. 110–8). Citations to the disciplinary hearing transcript will reference the consecutive page numbers on the bottom righthand corner of the pages, not the page numbers in the CM–ECF header.

5   During June 2006, plaintiff received several other misbehavior reports for which he was found guilty and sentenced to additional time in the SHU. Although plaintiff seems to contend that one of these other hearings was reversed, the documentation submitted seems to indicate that only the disciplinary conviction of July 5, 2005 was reversed. (*Id.,* Dkt. No. 124–4 at 4–6, 11–14).

6   Subsequent references to the Amended Complaint will refer only to the paragraph number in the "Statement of Facts," unless the reference is to another section of the pleading.

7   Defendant Gardner did not recall the plaintiff, but states that he would not have made such a statement to an inmate. (Gardner Decl. ¶¶ 5–6).

8   The correction officer's account of the incident was documented in a use-of-force report and a subsequent disciplinary hearing, which resulted in a finding that the officers used reasonable and necessary force, and that the plaintiff engaged in violent conduct and other infractions. (*Id.*).

9   The defendants submitted the plaintiff's medical records *in camera* and they are stamped with sequential page numbers.

10  *See also Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

11  *See also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

12  As discussed below, medical records indicate that plaintiff complained of, and in some cases received treatment for, pain in his back and shoulder in the months following June 2006. Plaintiff may have difficulty establishing that his subsequent medical problems were caused by the alleged incident of excessive force. While that may well be the case, and plaintiff may have few, if any compensable injuries, that does not support dismissal on summary judgment. *See, e.g., Reyes v. McGinnis,* 00–CV–6352, 2003 WL 23101781, at *6 (W.D.N.Y. Apr. 10, 2003) (whether an injury to inmates wrist was caused by trauma resulting from defendant's use of handcuffs was a factual issue for the jury); *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an award of nominal damages at trial).

13  The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate." *Id.*

14  *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

15  *See e.g., Rendely v. Town of Huntington,* No. 2:03–CV–3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (because defendants were civilian government employees, and thus not law enforcement officials, they had no authority or duty to prevent the police officers from taking plaintiff into custody); *Phoenix v. Reddish,* 175 F.Supp.2d 215, 220 (D.Conn.2001) (there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor to intervene to prevent a police officer from conducting an unlawful search and seizure).

16  It should be noted that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. See, e.g., *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

17  Defense counsel construes a comment during plaintiff's deposition as an admission that he "came off the wall" during the cell search. (Def. Memo. of Law at 19–20, Dkt. No. 110–6). This court interprets plaintiff's testimony (Dep. at 62–63) as speculation that multiple guards were present during the cell search in case he came off the wall or otherwise resisted. Defendant Reardon's declaration about his interaction with plaintiff on June 24th, and the misbehavior report

2010 WL 3785771

issued against plaintiff, do not suggest that plaintiff did anything to necessitate the use of force. (Reardon Decl. ¶¶ 10–14 & Ex. D, Dkt. No. 110–13 at 32).

18    Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm allegedly caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in his cell door. (Medical Records at 24). So the extent to which the left arm injuries detected by the doctor in 2008 were caused by the alleged assaults in June 2006 is unclear.

19    During his deposition, plaintiff acknowledged that he was being uncooperative with the guards following his confinement in the SHU—e.g., by refusing meals brought by the officers and acting like a "knucklehead." (Dep. at 63, 65).

20    In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest is infringed. *Palmer v. Richards*, 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards*, 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

21    "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky*, 01CIV.8235, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward*, 458 F.Supp. 624, 627 (S.D.N.Y.1978).

22    Plaintiff claims that he was illegally confined in the SHU from June 19, 2006, when Lt. Johnson's disciplinary charge was filed, until the disciplinary hearing was completed on July 5th. (Pl.'s Memo. of Law at 31, 33). This period of administrative detention in the SHU does not trigger due process protection because it was of such a short duration. *See, e.g., Brown v. Secore*, 9:08–CV–085, 2010 WL 980233, at *5 (N.D.N.Y. March 15, 2010) (The district courts in the Second Circuit, applying *Sandin*, have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.) (collecting cases).

23    Plaintiff claims that defendant Demars violated New York state regulations when he started the hearing on the same day that plaintiff indicated that he wanted assistance in handling the proceeding, without giving plaintiff additional time to prepare. (Pl.'s Memo of Law at 32; DOCS Directive 4932, Part 254.6(a)(1), Dkt. No. 110–8 at 28). However, after defendant Demars ascertained what assistance plaintiff needed on the first day of the hearing (June 22, 2006), he adjourned the hearing for several days (until June 30th) while he made arrangements to procure the documents and witnesses plaintiff requested. (Disc. Hearing Transcript at 6–9). Even if there was a technical violation of the DOCS directive, plaintiff waived any objection on June 22nd (*Id.* at 6–7), and clearly suffered no due process violation because he was given ample time to prepare for the continuation of the hearing.

24    Lt. Johnson also noted that he considered the testimony of plaintiff and the other hearing witnesses in reaching his conclusions. (*Id.*) Capt. Phelix, when called and questioned by plaintiff, corroborated Lt. Johnson's opinion that there were numerous similarities between plaintiff's handwriting and the writing on some of the threat letters. (Disc. Hearing Transcript at 32–33).

25    In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico*, 356 F.3d 481, 489–90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill*, a general requirement that

2010 WL 3785771

officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to crossexamination. If Second Circuit or Supreme Court authority is subsequently construed to require such independent analysis in the context of this case, defendant Demars would be entitled to qualified immunity because it would not have been clear to him, in 2006, that his conduct of the hearing violated plaintiff's due process rights.

26    Plaintiff completed the form requesting independent assistance in connection with another disciplinary hearing that was proceeding in June 2006, so he clearly was aware of his right to assistance and the related DOCS procedures. (Secore Decl., Ex. C, Dkt. No. 110–11 at 28). Plaintiff formally waived his right to any assistance in connection with another hearing that month. (Reardon Decl., Ex. B, Dkt. No. 110–13 at 10).

27    Plaintiff did object that defendant Demars was biased because he was a "Dep.," (presumably referring to his position as a Deputy Superintendent at Franklin); he stated, at the end of the hearing, that "Albany" (presumably DOCS headquarters) should have appointed a hearing officer. (Disc. Hearing Transcript at 65). *See Chavis v. Flagler,* 01–CV–0510, 2005 WL 563055, at *4 (W.D.N.Y. Mar. 8, 2005) (in due process analysis, prison disciplinary hearing officer are not held to the same standards regarding neutrality and conflicts of interests as judges or adjudicators in other contexts, although they may not prejudge the evidence).

28    *See also Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W . D.N.Y.2008) (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

29    The conclusory and general allegations of mail tampering are insufficient to overcome summary judgment, and do not identify particular defendants who were personally involved in the alleged violations. *See, e.g., Gilliam v. Quinlan,* 608 F.Supp. 823, 838 (S.D.N.Y.1985) (conclusory allegations of mail tampering insufficient to withstand summary judgment).

30    Plaintiff refused to accept the "opened" mail twice and then tried to recover it. By that time, the two items could not be located by DOCS, the post office, or the senders of the mail. Plaintiff alleges that defendant Hoffnagle and DOCS failed to return the mail to the sender pursuant to DOCS procedures. After an investigation, DOCS could not document what happened to the mail, but concluded that was no malfeasance of the part of the staff at Upstate. (Pl.'s Decl. ¶¶ 26–32, Ex. D, Dkt. No. 124–5 at 43–61).

31    Defendant Gardner's alleged statement on June 19th that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," would not support a retaliation claim because they would not deter an inmate of ordinary firmness in exercising his constitutional rights. *See, e.g, Davis v. Goord,* 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing, *inter alia, Dawes v. Walker,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation). As noted above, this court rejected plaintiff's conclusory claim that this comment was an actionable incitement of defendants Secore and Favro to assault the plaintiff.

32    Even plaintiff does not relate medical problems beyond his jaw, rib cage, and left arm to the alleged assaults in June 2006 and related claims of deliberate indifference to those injuries. (Pl.'s Memo. of Law at 10–11; Dep. at 80–81). So, plaintiff's later claims of problems with his back, knees, and feet are not relevant to the evaluation of whether plaintiff had a "serious" medical condition to which the defendants were deliberately indifferent.

33    The defendants' Memorandum of Law competently summarizes the conflict between plaintiff's claims and the declarations of the defendants and their contemporaneous medical records. (Defs.' Memo. of Law at 4–10, Dkt. No. 110–6).

34    *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

35    Defendant Chesbrough states that he saw plaintiff on nurse's sick call at Upstate on July 13, 2006. "At that time the plaintiff stated he was injured on June 19th at Franklin and that he was not seen by a nurse. I asked him why he would waiting until now to report it. He stated, 'None of your business, just document it.' I again reviewed the medical record which indicated that the plaintiff was seen by an RN on 6/19/06." (Chesbrough Decl. ¶ 9; Medical Records at 32).

36    *But see Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care. Nonetheless,

2010 WL 3785771

Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512–13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution).

37    Plaintiff credits, for example, the findings of the prison doctor in April 2008. (Dep. at 44–45, 80–81; Pl.'s Sur–Reply, Dkt. No. 129 at 7). As noted, the only injury that the doctor detected that could be related to the assaults in June 2006 was a possible defect in a tendon that was "functionally insignificant" and did not effect plaintiff's range of motion or strength. (Medical Records at 11). The doctor documented no residual evidence of the jaw and rib cage injuries that plaintiff still claimed to be suffering from as of the time of his deposition in June 2009. (Medical Records at 11; Dep. at 80–81). PA Tichenor, who examined plaintiff in 2006, also makes no notation of jaw or rib case issues. With respect to plaintiff's shoulder issues, defendant Tichenor found, in September 2006, that plaintiff's gait, range or motion, strength, and sensation were all normal. (Tichenor Decl. ¶¶ 8–11, Medical Records at 31). When PA Tichenor diagnosed plaintiff with tendinitis in his left arm in October 2006, he found the tendon was "tender but intact." (Medical Records at 27).

38    The plaintiff may be mistaken in his recollection of which nurse performed his intake examination at Upstate on July 12, 2009. (Dep. at 51–53).

39    Even plaintiff's more pointed claims that defendants Davenport, Volpe, and Chesbrough refused to examine or treat him on one or more occasions (Dep. at 41–42, 47, 49–50, 51–53) would not support a claim of deliberate indifference. *See, e.g., Savage v. Brue,* 9:05–CV–857, 2007 WL 3047110 at *9 (N.D.N.Y. Oct. 18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos,* 336 F.Supp.2d at 261–62, 263 (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

40    Plaintiff does dispute the number of times defendant Tichenor treated him, but does acknowledge he saw the physician assistant several times in 2006 and 2007. (Pl.'s Memo. of Law at 10–11).

41    *Cf. Luna v. Pico,* 356 F.3d at 491 (defendant is protected by qualified immunity because a reasonable hearing officer would not have clearly understood from *Taylor* and other then-existing law that an independent review of the credibility of a non-testifying victim was required by due process).

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4299982
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Samuel LOUIS-CHARLES, Plaintiff,

v.

BARKER; Corrections Sergeant, Newton;
Corrections Sergeant, Macilvennie; Corrections
Officer, Frank Seymour; Corrections Officer,
Patterson; Corrections Officer, Defendants.

9:16-cv-1417 (MAD/CFH)
|
Signed 09/10/2018

**Attorneys and Law Firms**

SAMUEL LOUIS-CHARLES, 16-B-2202, Marcy
Correctional Facility, P.O. Box 3600, Marcy, New York
13403, pro se.

BARCLAY DAMON LLP, OF COUNSEL: TERESA
M. BENNET, ESQ., MITCHELL J. KATZ, ESQ., 308
Maltbie Street, Suite 200, Syracuse, New York 13204,
Attorney for Defendants.

**ORDER**

Mae A. D'Agostino, U.S. District Judge

\*1 On November 3, 2016, Plaintiff *pro se* Samuel Louis-
Charles ("Plaintiff") filed a complaint in the Northern
District of New York, pursuant to 42 U.S.C. § 1983,
regarding an alleged assault during his pretrial detention
at Jefferson County Correctional Facility ("JCCF"). *See*
Dkt. No. 1. On January 31, 2018, Defendants filed
a motion for summary judgment. *See* Dkt. No. 50.
Defendants argued, in part, that they are entitled to
summary judgment because Plaintiff failed to exhaust his
available administrative remedies. *See* Dkt. No. 50-25 at
15.[1] On July 30, 2018, Magistrate Judge Christian F.
Hummel issued a Report-Recommendation and Order
recommending that the Court grant summary judgment
for Defendants on the ground that Plaintiff failed to
exhaust his available administrative remedies as required
by the Prison Litigation Reform Act. *See* Dkt. No.
76.[2] On August 16, 2018, Defendants filed objections to
Magistrate Judge Hummel's alternative recommendation.

*See* Dkt. No. 83. Plaintiff has not filed any objections to
the July 30, 2018 Report-Recommendation and Order.

Currently before the Court is Magistrate Judge Hummel's
July 30, 2018 Report-Recommendation and Order
recommending that the Court grant Defendants' motion
for summary judgment. For the following reasons, the
Court adopts Magistrate Judge Hummel's Report-
Recommendation and Order and grants Defendants'
motion for summary judgment.

In reviewing a report and recommendation, a district
court "may accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate
judge." 28 U.S.C. § 636(b)(1)(C). When a party makes
specific objections to a magistrate judge's report, the
district court engages in *de novo* review of the issues
raised in the objections. *See id.; Farid v. Bouey*, 554 F.
Supp. 2d 301, 307 (N.D.N.Y. 2008). When a party fails to
make specific objections, the court reviews the magistrate
judge's report for clear error. *See Farid*, 554 F. Supp. 2d
at 307; *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004
WL 2725126, \*1 (S.D.N.Y. Nov. 29, 2004).

"[I]n a *pro se* case, the court must view the submissions
by a more lenient standard than that accorded to 'formal
pleadings drafted by lawyers.' " *Govan v. Campbell*,
289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting
*Haines v. Kerner*, 404 U.S. 519, 520 (1972) ) (other
citations omitted). "Indeed, the Second Circuit has stated
that '[i]mplicit in the right to self-representation is an
obligation on the part of the court to make reasonable
allowances to protect *pro se* litigants from inadvertent
forfeiture of important rights because of their lack of legal
training.' " *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90,
95 (2d Cir. 1983) ). "This liberal standard, however, does
not excuse a *pro se* litigant from following the procedural
formalities of summary judgment." *Id.* (citing *Showers
v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, \*1
(S.D.N.Y. May 16, 2001) ).

\*2 Plaintiff claimed that Defendant "Newton refused
to accept [his] grievance concerning the incidents that
lead [sic] to this complaint," and that he "verbally
appealed to [Defendant Barker] because [Defendant]
Newton would not accept [his] grievance." Dkt. No. 50-4
at 5. Plaintiff also claimed that he handed Defendant
Newton a grievance, *see* Dkt. No. 50-5 at 2, but testified
at his deposition that he verbally requested a grievance

form from Defendants Newton and Barker, *see* Dkt. No. 60-1 at 60-61, 64-65. Plaintiff subsequently amended his deposition testimony to state that he submitted a verbal grievance "because there [were] no grievance sheets in the cell blocks and the CO's don't issue them without the [sergeant's] permission and they denied [him one]." Dkt. No. 50-8 at 2. Finally, Plaintiff claimed that he was given access to materials in order to send a letter protesting Defendants' conduct to the Jefferson County Sheriff and Deputy Sheriff. *See* Dkt. No. 1 at 6.

In his failure to exhaust analysis, Magistrate Judge Hummel found that Plaintiff failed to exhaust the three-step procedure available to inmates at JCCF, which requires the submission of a written grievance within five days of the complained of conduct. *See* Dkt. No. 76 at 12-13 (citing Dkt. No. 50-20). JCCF had no records of any written grievances submitted by Plaintiff during this time. *See* Dkt. No. 50-12 at ¶¶ 1-2. While Plaintiff claimed that he handed Defendant Newton a grievance, the lack of any record of this grievance and Plaintiff's subsequent claim that he actually made a verbal grievance undermines Plaintiff's assertion that he submitted a written grievance. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005). Further, although Plaintiff wrote letters to the Jefferson County Sheriff protesting the conduct of the JCCF staff, Magistrate Judge Hummel noted that writing "letters to prison or other officials outside the grievance chain of command are insufficient to properly exhaust administrative remedies." Dkt. No. 76 at 13 (citing *Geer v. Chapman*, No. 15-cv-952, 2016 WL 6091699, *5 (N.D.N.Y. Sept. 26, 2016), *report and recommendation adopted*, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (citing *Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007) ) ).

Magistrate Judge Hummel also determined that the grievance process was not inaccessible to Plaintiff. *See id.* at 14; *see also Ross v. Blake*, 136 S. Ct. 1850, 1858-60 (2016) (noting that a failure to exhaust is excused where remedies are unavailable, overtly opaque so they become inaccessible, or thwarted "through machination, misrepresentation, or intimidation"). Even if Plaintiff's claims that Defendants Newton and Barker refused to accept his grievance, Plaintiff acknowledges that the reason he did not reach out to other shift supervisors was due to his desire to have the complaint come from the officers involved in the incident. *See* Dkt. No. 60-1 at 61. Thus, Plaintiff's decision to abandon alternative available

avenues for relief was not the result of Defendants thwarting his access to the grievance process, but due to Plaintiff's desire to antagonize Defendants Barker and Newton.

Plaintiff also claimed that he did not reach out to other officers because he was on the verge of being transferred from JCCF to the Upstate Correctional Facility. *See* Dkt. No. 60-1 at 61. Magistrate Judge Hummel noted that this argument was not persuasive because JCCF's grievance process required Plaintiff to file a grievance within five days of the incident and Plaintiff was not transferred out of JCCF until eight days after the event in question. *See* Dkt. No. 76 at 12, 15.

Magistrate Judge Hummel found that Plaintiff's allegations of retaliation did not constitute "specific threats of retaliation or intimidation by prison officials." *Id.* at 17 (quoting *Grafton v. Hesse*, No. 15-4790, 2017 WL 9487092, *7 (E.D.N.Y. Aug. 25, 2017) ). Plaintiff's allegations that he was placed in an isolated strip room in order to deny him access to the grievance procedure is immaterial because these procedures were implemented due to Plaintiff's involvement in a fight and suspicion that Plaintiff had swallowed contraband in an attempt to evade detection. As the decision to implement these procedures was due to events that occurred prior to the alleged violation, they cannot be causally connected to penalizing Plaintiff for attempting to lodge a grievance.

**\*3** Plaintiff claims that he was denied access to the necessary tools needed to draft a written grievance. Magistrate Judge Hummel, however, found Plaintiff's allegation did not establish a genuine dispute of material fact because the testimony was both internally inconsistent and not supported by any evidence. *See id.* at 19 (quoting *Gizewski v. New York State Dep't of Corr. and Cmty. Supervision*, No. 14-CV-0124, 2016 WL 3661434, *12 (N.D.N.Y. July 5, 2016) (citing *Jeffreys*, 426 F.3d at 555) ). While Plaintiff claimed that he was denied access to paper, a writing utensil or stamps, he also claimed that he handed Defendant Barker a written grievance [3] and that he drafted protest letters to the Jefferson County Sheriff and Deputy Sheriff during this time. Further, other than his own testimony, Plaintiff failed to provide any evidence to support his claims that either he or similarly situated inmates at JCCF were denied access to the materials necessary to file a grievance. Given Plaintiff's shifting stories and lack of supporting

evidence, Magistrate Judge Hummel properly disregarded Plaintiff's testimony regarding access to writing tools. *See* Dkt. No. 76 at 19; *see also Jeffreys*, 426 F.3d at 555. Without this testimony, Magistrate Judge Hummel correctly concluded that Plaintiff had failed to support his allegation that he was denied access to the formal grievance process. *See* Dkt No. 76 at 19.

Having reviewed Magistrate Judge Hummel's July 30, 2018 Report-Recommendation and Order, the record, and the applicable law, the Court concludes that Magistrate Judge Hummel correctly recommended that the Court should grant Defendants' motion for summary judgment.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Hummel's Report and Recommendation (Dkt. No. 76) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 50) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 4299982

---

Footnotes

1    The cited page numbers for docket entries in this Order refer to those assigned by the Court's electronic filing system ("ECF").

2    Magistrate Judge Hummel's Report-Recommendation and Order included an alternative recommendation in the event that the Court rejected his exhaustion finding. As the Court agrees with Magistrate Judge Hummel that Plaintiff failed to exhaust his available administrative remedies, the Court will not address this alternative recommendation.

3    Plaintiff subsequently recanted this claim and instead claimed that he lodged a "verbal grievance."

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by McDonald v. Zerniak, N.D.N.Y., November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

## ORDER

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiffs objections thereto,
*see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections
and Community Supervision, commenced this action
pursuant to 42 U.S.C. § 1983. In his original complaint,
Plaintiff asserted claims against Brian Fischer, Lucien
J. LeClaire, Patricia LeConey, Carol Woughter, and
John and Jane Does. Defendants moved for summary
judgment. *See* Dkt. No. 49. By Report–Recommendation
and Order dated July 6, 2012, Magistrate Judge Homer
recommended that this Court dismiss all claims against
the named individuals and direct Plaintiff to join Harold
Call as a Defendant. *See* Dkt. No. 55. This Court accepted

the Report and Recommendation and Order in its entirety
and directed Plaintiff to file an amended complaint to
"include only one cause of action a procedural due process
claim in connection with his disciplinary hearing and one
Defendant hearing officer Call ." *See* Dkt. No. 58 at 4–5.

Plaintiff thereafter filed his amended complaint and
requested compensatory and punitive damages. *See* Dkt.
No. 64, Amended Complaint at 4. In this amended
complaint, Plaintiff alleged that Defendant violated
his constitutional rights under the First, Eighth and
Fourteenth Amendments. *See* Dkt. No. 64, Amended
Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure. *See* Dkt. No. 74. In a Report–
Recommendation and Order dated October 9, 2014,
Magistrate Judge Hummel recommended that this Court
grant Defendant's motion in part and deny his motion in
part. *See* Dkt. No. 81 at 33. Plaintiff filed objections to
Magistrate Judge Hummel's recommendations. *See* Dkt.
No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See
Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
\*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes
no objections or makes only conclusory or general
objections, however, the court reviews the report and
recommendation for "clear error" only. *See Salmini v.
Astrue,* 3:06–CV–458, 2009 WL 1794741, \*1 (N.D.N.Y.
June 23, 2009) (quotation omitted). After conducting the
appropriate review, a district court may decide to accept,
reject, or modify those recommendations. *See Linares
v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, \*10
(N.D.N.Y. Sept. 29, 2009) (quoting 28 U.S.C. § 636(b)(1)
(C)).

Although Plaintiff's objections are, in most respects,
general or conclusory, given his *pro se* status, the Court
has conducted a *de novo* review of Magistrate Judge
Hummel's Report–Recommendation and Order. Having
completed its review, the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's
October 9, 2014 Report–Recommendation and Order is

ACCEPTED **in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"),[2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil

rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action —a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

### I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU").[3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15[4] (unauthorized exchange) and 180.17 (unauthorized assistance).[5] *Id.;* Am. Compl. ¶ 7.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and

(2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

*4 McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years ...." Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at

74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined

by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for

additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St.,*

*LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or

file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of

rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to

demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister

was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. Procedural Due Process

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

### i. Notice

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his

is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

## ii. **Hearing Officer Bias/Pre-determination of Guilt**

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at *11 (N.D.N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at * 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at *8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at *2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

## iii. **Failure to Investigate**

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 259 of 329

witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony

insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were

his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the

ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at *12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129

(2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."
>
> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925

(2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon —the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform

an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

## IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

    a. dismissing plaintiff's First Amendment claims;

    b. dismissing plaintiff's Eighth Amendment claims;

    c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

    d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

    a. plaintiff's Fourteenth Amendment procedural due process claims;

    b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

3   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4   Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

5   Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

6   All unpublished decisions referenced herein are appended to this report and recommendation.

7   Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   15

2012 WL 4026682
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dennis NELSON, Plaintiff,

v.

Brian DOUGHERTY, RN II, et al., Defendants.

Civil Action No. 9:10–CV–1568 (DNH/DEP).
|
Aug. 13, 2012.

**Attorneys and Law Firms**

Dennis Nelson, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Office of Attorney General,
State of New York Dean J. Higgins, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Dennis Nelson, a prolific inmate
litigant who has been granted leave to proceed *in forma
pauperis* ("IFP"), has commenced this action pursuant
to 42 U.S.C. § 1983 alleging civil rights violations
against two nurses who work at the Marcy Correctional
Facility ("Marcy"), where plaintiff was incarcerated at
the time of filing, and Carl Koenigsmann, who was
then the Regional Medical Director and is presently the
Deputy Commissioner and Chief Medical Officer within
the New York State Department of Corrections and
Community Supervision ("DOCCS"). In his complaint,
Nelson maintains that he has been denied appropriate
medical care and treatment for a longstanding stasis
ulcer on his lower left leg, which he claims needs to
be amputated, and asserts that the denial represents
deliberate indifference to his serious medical needs, in
violation of the Eighth Amendment. Plaintiff's complaint
seeks recovery of $9,999.99 and an order directing his
transfer to one of two other correctional facilities where,
he claims, there are hospitals available that could provide
him with better treatment.

Now that discovery is closed, the defendants have moved
for summary judgment seeking dismissal of plaintiff's
claims on a variety of grounds. Also included within
their motion is an application for revocation of plaintiff's
IFP status based upon the "three strikes" provision
of 28 U.S.C. § 1915(g). Because it is abundantly clear
that plaintiff has accumulated three strikes, within the
meaning of that provision, and based upon the lack of
any palpable showing of circumstances sufficient to meet
the imminent danger exception to the three strikes rule, I
recommend that plaintiff's IFP status be revoked and that
the remaining portions of defendants' motion be held in
abeyance pending plaintiff's payment of the required $350
filing fee.

I. *BACKGROUND* [1]
Plaintiff is a New York State prison inmate confined
under the supervision of the DOCCS. *See generally*
Complaint (Dkt. No. 1). At all times relevant to his
complaint, plaintiff was designated to Marcy, located in
Marcy, New York, where he was incarcerated from May
13 until December 30, 2010. *Id.*

In his complaint, which is lacking in factual detail, plaintiff
merely states that he has commenced this action because
he is in imminent danger of suffering serious physical
injury to his leg, claiming that he was told by the
defendants that nothing further can be done for his leg and
that it will have to be amputated. Complaint (Dkt. No.
1) Statement of Facts. The facts surrounding plaintiff's
claims and his medical condition, however, are more fully
developed in the record now before the court.

When plaintiff arrived at Marcy in May 2010, he
had been suffering from the ulcer to his lower left
leg for eleven years. Defendant's Local Rule 7.1(a)(3)
Statement (Dkt. No. 25–1) ¶¶ 16–18. Upon his transfer
into Marcy, plaintiff was examined by a facility doctor,
and it was noted that plaintiff had cellulitis of the left
lower extremity, which was secondary to self-mutilation. [2]
Plaintiff's Ambulatory Health Record ("AHR") (Dkt.
No. 28–1) p. 713. It was further noted that plaintiff was
prescribed, among other things, a daily xeroform wet-
to-dry dressing change for his leg wound. [3] *Id.* at p.
712. Plaintiff's medical records reveal that medical staff
at Marcy attempted at least daily dressing changes for
plaintiff's left leg condition, which plaintiff often refused
for various reasons, including his preference to sleep or

attend programs. *See* Plaintiff's Deposition Transcript ("Tr.") (Dkt.No.25–7) pp. 26–27; *see also, e.g.,* Plaintiff's AHR (Dkt. No. 29–3) pp. 1134, 1138–39, 1141, 1143–45, 1147,1150,1154, and 1158. The condition of plaintiff's left leg ulcer therefore varied according to plaintiff's level of compliance with the prescribed treatment, and also due to his self mutilation, which included rubbing feces in his wound and picking at it. Dougherty Decl. (Dkt. No. 25–2) ¶ 10.

**\*2** On or about December 3, 2010, in addition to the dressing change, daily whirlpool treatments were prescribed for plaintiff's wound care. Plaintiff's AHR (Dkt. No. 29–3) p. 1118. On December 15, 2010, upon examination by a Marcy medical professional, it was noted that plaintiff's leg wound exhibited less necrosis, and a recommendation was made that whirlpool treatments continue. Plaintiff's AHR (Dkt. No. 27–2) p. 1165.

Upon Nelson's transfer into the Coxsackie Correctional Facility on December 30, 2010, he was examined by a medical professional working at that facility. Plaintiff's left leg wound of eleven years was once again noted, as was his prescribed whirlpool treatments and daily dressing changes. Plaintiff's AHR (Dkt. No. 29) p. 861. No emergent or dangerous medical condition was discerned at that time. See Plaintiff's AHR (Dkt. No. 29–1) pp. 936–37, 940, and 962–963.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 28, 2010, and thereafter was granted leave to proceed IFP.[4] Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Brian Dougherty, a registered nurse at Marcy; Sandra Marin–Karas, the facility's Nurse Administrator; and Carl J. Koenigsmann, formerly the DOCCS Regional Medical Director.

On January 6, 2012, following the completion of discovery, defendants moved for summary judgment seeking dismissal of plaintiff's complaint. Dkt. No. 25. In their motion, defendants request revocation of plaintiff's IFP status based upon 28 U.S.C. § 1915(g). In addition, defendants argue that 1) plaintiff's Eighth Amendment cause of action lacks merit; 2) defendants Martin–Karas and Koenigsmann were not personally involved in the constitutional violations alleged; and 3) plaintiff's request for transfer to a different facility fails to state a cause of

action. Despite having received the requisite notice of the consequences of his failing to respond, plaintiff has not submitted any opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Three Strikes Provision*

In their motion defendants invoke 28 U.S.C. § 1915(g), arguing that under that section plaintiff's litigation history, which includes for greater than three merit-based dismissals, warrants revocation of his IFP status.

Section 1915(g), which was enacted as part of sweeping inmate litigation reform brought about by adoption of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), though engendering far less litigation than some of its PLRA counterparts including, notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a), provides that

> [i]n no event shall a prisoner bring
> a civil action or appeal a judgment
> in a civil action or proceeding under
> this section if the prisoner has, on
> 3 or more prior occasions, while
> incarcerated or detained in any
> facility, brought an action or appeal
> in a court of the United States that
> was dismissed on the grounds that
> it is frivolous, malicious, or fails to
> state a claim upon which relief may
> be granted, unless the prisoner is
> under imminent danger of serious
> physical injury.

**\*3** 28 U.S.C. § 1915(g). The manifest intent of Congress in enacting this "three strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues,* 473 F.3d 440, 443–44 (2d Cir.2007); *Gill v. Pidlychak,* No. 9:02–CV–1460, 2006 WL 3751340, at

*2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. & Treece, M.J.). [5] The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has had three previous strikes to engage in the same cost-benefit analysis that other civil litigants must make before deciding whether to commence suit, accompanied by the filing of the full fee—that is, to assess whether the result to be achieved justifies the filing fee expenditure. *Tafari,* 473 F.3d at 444; *Ibrahim v. District of Columbia,* 463 F.3d 3, 6 (D.C.Cir.2006). As the Second Circuit has noted, in the context of PLRA amendments requiring inmates to authorize prison officials to make deductions from inmate accounts to be applied as partial payments of appellate filing fees for prisoners granted *in forma pauperis* status,

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing law suits. Indeed, the very nature of incarceration—prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials—has fostered a " 'nothing to lose and everything to gain' " environment which allows inmates indiscriminately to file suit at taxpayers' expense.

*Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997), *cert. denied sub nom., Nicholas v. Miller,* 523 U.S. 1126, 118 S.Ct. 1812 (1998) (internal citations omitted); *see also Gill,* 2006 WL 3751340, at *2.

The question of whether the dismissal of a prior action qualifies as a strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such presents a question for the court. [6] *Tafari,* 473 F.3d at 442–43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. *Tafari,* 473 F.3d at 442 (citing *Andrews v. King,* 398 F.3d 1113, 1121 (9th Cir.2005)).

### B. Application of Section 1915(g)

It appears to be firmly established that prior to commencing this action plaintiff had accumulated three or more strikes falling within section 1915(g), and Nelson seemingly does not dispute this fact. Indeed, it

appears that Nelson has now filed fifty-four actions in the district courts which comprise the Second Circuit since 2000. *See* Public Access to Court Electronic Records ("PACER") https://pcl.usco urts.gov/view?rid=7rgHIPlIE8Ofp50RCaL9bCGSC6VUD4JCy7Bw3iWZ & page=1 (last visited July 31, 2001); *see also Nelson v. Warren,* No. 10–CV–990, 2011 WL 7445581, at *1 (N.D.N.Y. Dec. 12, 2011) (Homer, J.) *report and recommendation adopted,* 2012 WL 685755 (N.D.N.Y. Mar. 2, 2012) (Suddaby, J.). [7] As I noted in my previous order granting plaintiff leave to proceed IFP, numerous courts have found that Nelson has accumulated more than "three strikes" for purposes of section 1915(g). [8] *See, e.g., Nelson v. Warren,* No. 10–CV–990, 2011 WL 7445581, at * 1; *Nelson v. Scoggy,* 9:06–CV–1146, 2008 WL 4401874, at *1 (N.D.N.Y. Sept. 24, 2008) (Mordue, C.J.); *Nelson v. Spitzer,* 9:07–CV–1241, 2008 WL 268215, at *1 (N.D.N.Y. Jan. 29, 2008) (McAvoy, J.); *Nelson v. Hamel,* 9:07–CV–0540 (N.D.N.Y. Jul. 26, 2007) (Sharpe, J.). Moreover, as Chief Judge Mordue noted in *Nelson v. Scoggy,* "[p]laintiff does not deny that three or more inmate civil rights actions previously brought by him have been dismissed on the ground that they are frivolous, malicious, or fail to state a claim upon which relief may be granted." *Nelson v. Scoggy,* 2008 WL 4401874, at *1.

**\*4** I therefore conclude that plaintiff had accumulated well in excess of three strikes, within the meaning of section 1915(g), by the time this action was filed.

### C. Imminent Danger Exception

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of section 1915(g). *See* 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562–63 (2d Cir.2002). In accordance with this exception, an inmate who has had three prior "strikes" but nonetheless wishes to commence a new action *in forma pauperis* must show that he or she was under imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes on the basis of past harm. *Malik,* 293 F.3d at 562–63; *see also Chavis,* 618 F.3d at 169. An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of exposure to a "serious physical injury." 28 U.S.C. §

2012 WL 4026682

1915(g). The imminent danger claimed by the inmate, moreover, must be real, and not merely speculative or hypothetical. *Johnson v. Barney,* No. 04 Civ. 10204, 2005 WL 2173950, at *1–2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, does not establish imminent danger).

For a three-strikes litigant to qualify for the imminent danger exception, his or her complaint "must reveal a nexus between the imminent danger it alleges and the claims it asserts." *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009). When determining whether the requisite relationship is present a court must examine "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is *fairly traceable* to unlawful conduct asserted in the complaint and (2) whether a favorable judicial outcome would *redress* that injury." *Id.* at 299 (emphasis in original).

The term "serious physical injury," as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death [.]" *Ibrahim,* 463 F.3d at 7. In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney,* 281 F.3d 709, 710 (8th Cir.2002). Conditions which have been held to rise to a sufficient threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin,* 281 F.3d at 710; denial of adequate treatment for Hepatitis C, a "chronic and potentially fatal disease," *Ibrahim,* 463 F.3d at 6–7; and patterns of harassment from corrections officers, heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini,* 352 F.3d 328, 330–31 (7th Cir.2003) (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

**\*5** Plaintiff's eligibility for IFP status turns on whether he can establish that he faced imminent danger of serious physical injury on December 28, 2010, when this action was filed. *Chavis,* 618 F .3d at 169–70. Any potential claim of imminent danger in this case, however, must be rejected not only because of the rejection of the same claims previously made by plaintiff in this district, but also based upon the record now before the court.

Plaintiff's ongoing left leg condition has been the subject of several lawsuits filed by plaintiff in this district as well as others within the Second Circuit, and a number of courts have now concluded that his leg condition does not rise to the level of imminent danger. As my esteemed colleague Magistrate Judge David E. Homer has observed,

> Nelson's continued complaints of infection in his leg have previously been held insufficient to establish an imminent danger. *See Nelson v. Scoggy,* No. 06–CV–1146 (NAM/DRH), 2009 WL 5216955, at *2–4 (N.D.N.Y.Dec.30, 2009) (dismissing the case since Nelson had received adequate medical care for his leg and the failure of the wound to heal was the result of Nelson's own acts of interference with the treatment provided and his self-mutilation); *see also Cash v. Berstein,* No. 09–CV–1922 (BSJ/HBP), 2010 WL 5185047, at *3 (S.D.N.Y.Oct.26, 2010) *aff'd,* 2010 WL 5222126 (S .D.N.Y. Dec. 12, 2010) (Dkt. No. 18–1 at 6–11). Nelson alleges imminent danger in part because of the inadequate care resulting in a gangrenous condition. As continued complaints of infection and gangrene, in light of the prior dismissal in *Nelson v. Scoggy,* are insufficient to establish imminent danger, such contentions cannot presently be used to help Nelson escape the three-strikes provision.

*Nelson v. Warren,* 2011 WL 7445581, at * 4 (footnote omitted).[9] In that case plaintiff similarly complained of the medical care he received for his leg condition while confined to Marcy and asserted that he was exposed imminent serious physical harm as a result thereof, allegations that were rejected by both Magistrate Judge Homer and Judge Suddaby in revoking plaintiff's IFP status in that case and issuing a bar order.

In *Nelson v. Wright,* No. 9:10–CV–0997 (N.D.N.Y. filed Aug. 18, 2010), filed the very next day after the *Warren* case was commenced, Nelson again complained about the medical treatment he was receiving at Marcy for his left leg ulcer, also alleging that he was in imminent danger of serious physical injury due to infection and deep vein thrombosis of the left leg. *See id.* at Dkt. No. 1. In a report and recommendation relating to the defendants' motion to dismiss the complaint in that action Magistrate Judge Randolph F. Treece, another distinguished colleague, observed that attachments to plaintiff's complaint indicated that

> Mr. Nelson is a diabetic with an ulcer on his lower extremity. He also has a DVT of his lower extremity. Mr. Nelson has received medical evaluation and treatment for these conditions. However, progress toward improvement of these conditions has been hampered by noncompliance with recommended treatments.

> **\*6** DVT is treated with warfarin and regular monitoring of blood work. He has refused these treatments at times. As well, at times he refuses dressing changes for the ulcer on his leg. He has been noted to tamper with the dressing on the ulcer and may be getting external contamination from self inoculation with feces.

> The medical staff at Marcy are attending to Mr. Nelson's medical problems in spite of his noncompliance with treatment recommendations and undermining of his care. He does not have gangrene of the extremity, but he is at risk of such.

*Nelson v. Wright,* 2011 WL 6031392, at \*3. In view of the foregoing, Judge Treece stated that "[a] prisoner who declines medical treatment cannot turn around and sue the medical professional whose judgment the prisoner has questioned and even defied." *Id.* (citing, *inter alia,* Jones v. Smith, 784 F.2d 149, 151–52 (2d Cir.1986) (affirming lower court ruling that a prisoner who declines medical treatment cannot establish an Eighth Amendment claim for medical deliberate indifference)) (other citations omitted). Judge Treece therefore recommended dismissal of plaintiff's amended complaint on this basis, and on the ground that plaintiff failed to demonstrate the personal involvement of the defendant in the alleged constitutional violation, a recommendation that was adopted in full by Chief District Judge Gary L Sharpe. 2011 WL 6030994.

After careful review of the record before the court, I have concluded that there is nothing to suggest that plaintiff's leg ulcer condition had materially deteriorated by the time that he filed this lawsuit, just four months later, and therefore find no basis to disagree with those judges who have previously determined that Nelson's chronic leg wound is insufficient to support the imminent danger exception. Indeed, a review of plaintiff's medical records reveals that during the time that he was housed at Marcy, Nelson received daily medical attention for his left leg ulcer. Although the condition of the wound varied at times, the record shows that the principal cause of such variance was plaintiff's frequent refusal of the prescribed treatment as well as his self mutilation. In the month immediately preceding plaintiff's filing of this action, he was prescribed and received daily whirlpool treatment in addition to the daily change of the wound dressing. Despite plaintiff's refusal of dressing changes on three separate occasions during the month of December 2010, as well as his refusal to fully participate in the prescribed whirlpool treatment on at least three occasions, improvement of the previously observed necrosis was noted in his AHR on December 15, 2010. Although plaintiff's complaint alleges that he was suffering an imminent threat of serious physical harm due to his leg condition, Nelson refused treatment again on December 29, 2010, the day after filing of this lawsuit, and there is no medical condition posing imminent danger to his health noted in his medical chart on December 30, 2010 upon his transfer out of Marcy into another prison facility, or at any time within the following months.

**\*7** In sum, a careful review of the record now before the court, even when viewed in a light most favorable to the plaintiff, discloses no basis for concluding that at the time this action was filed he was exposed to imminent danger of serious physical injury. Plaintiff has therefore failed to demonstrate his entitlement to this narrow exception to the PLRA's three-strike statutory provision.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff, a persistent litigant in this and other courts, brings this action to challenge defendants' failure to provide adequate medical treatment for his chronic left leg condition. A review of the plaintiff's litigation history reveals that without dispute, he has incurred three or more strikes falling within 28 U.S.C. § 1915(g). The record further fails to disclose a basis to conclude that at the time this action was filed he was in imminent danger of

2012 WL 4026682

serious physical injury, even under the arguably relaxed standard announced by the Second Circuit in *Chavis.* A review of plaintiff's litigation history and his conduct during the course of this action makes it clear that to the plaintiff, litigation is a form of recreation of the type which the PLRA's three strikes provision was intended to curb. Plaintiff's repeated filing of actions in this and other courts not only unduly harasses prison officials, but burdens already over-taxed court resources and those of the Office of the Attorney General, which is called upon to defend against such claims.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that plaintiff's *in forma pauperis* status be REVOKED, and he be required to pay the required filing fee within thirty days of the issuance of an order adopting this report and recommendation, and that his complaint be dismissed without further order of the court in the event of his failure to pay the statutory $350 filing fee within that time period; and it is further hereby

RECOMMENDED, that the substantive portions of defendants' summary judgment motion (Dkt. No. 25) be held in abeyance, and that in the event the plaintiff does pay the required filing fee, that the matter be returned to me for consideration of the remaining portions of defendants' motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4026682

Footnotes

1   In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2   Cellulitis is "an acute, diffuse, spreading edematous, suppurative inflammation of the deep subcutaneous tissues, and sometimes muscle, sometimes with abscess formation." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 330 (31st ed.2007).

3   Upon his admission into Marcy it was also noted that plaintiff was prescribed a variety of medications for various other conditions from which he suffered. *See* Plaintiff's AHR (Dkt. No. 28–1) p. 713.

4   In my order dated December 23, 2010, granting plaintiff's IFP application, I addressed a potential three strikes concern and, while finding that Nelson had indeed accumulated far more than three strikes by the time his complaint was filed, concluded that his allegations met the threshold requirement under the Second Circuit's decision in *Chavis v. Chappius,* 618 F.3d 162 (2d Cir.2010) for alleging imminent danger. Order dated February 2, 2011 (Dkt. No. 8). In that initial order, however, I went on to note that plaintiff's IFP status would be revoked if, as the case progressed, the court concluded that he did not face imminent danger of serious physical injury at the time he commenced the action. *Id.* at p. 6.

5   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6   The Second Circuit has expressed its view that the time for determination of "strikes" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that section. *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir.2004); *see also Snider v. Melindez,* 199 F.3d 108, 115 (2d Cir.1999) ("We ... doubt whether the entry of a strike is properly considered at the time an action is dismissed").

7   Plaintiff's claims in *Nelson v. Warren,* which was filed on August 17, 2010, approximately four months before this lawsuit, were similarly related to the alleged failure to treat his leg ulcer while at Marcy. *See Nelson v. Warren,* No. 9:10–CV–0990 (N.D.N.Y. filed Aug. 17, 2010) Dkt. No. 1. In his complaint Nelson alleged that he was in imminent danger of serious physical injury due to a "non-healing" blood clot and deep vein thrombosis. *See id.* at § 6. Recently, District Judge Glen

2012 WL 4026682

T. Suddaby accepted and adopted Magistrate Judge David R. Homer's report in that action, recommending revocation of plaintiff's IFP status based upon his finding that Nelson had failed to show that his leg condition posed an imminent threat of serious physical injury, and further recommending dismissal of the complaint unless plaintiff paid the filing fee. *Nelson v. Warren,* 2012 WL 685755. Additionally, upon Judge Homer's recommendation, Judge Suddaby issued a bar order directing that *"in no event shall* [Nelson], *as a prisoner, bring a future civil action in forma pauperis in this District unless he is under imminent threat of serious physical injury". Id* . at *5 (emphasis added in original).

8    Since that time it appears that plaintiff may have accumulated even more strikes. *See Nelson v. Warren,* 2012 WL 685755; *Nelson v. Wright,* No. 9:10–CV–997, 2011 WL 6031392 (N.D.N.Y. Oct. 20, 2011) (Treece, M.J.), *report and recommendation adopted,* 2011 WL 6030994 (N.D.N.Y. Dec. 5, 2011) (Sharpe, J.).

9    Judge Homer also observed that "[i]t appears that [Nelson] uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint ... the ... DIN[ ] assigned to [plaintiff] by ... [DOCS] is 94–B–0694 ... [which] is [also] assigned to Dennis Nelson." *Nelson v. Warren,* 2011 WL 7445581, at * 4 n. 3 (quoting *Cash v. Berstein,* No. 09–CV–1922 (BSJ/HBP), 2010 WL 5185047, at *3 n. 3 (S.D.N.Y. Oct. 26, 2010)).

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3841551
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Reginald NEREE, Plaintiff,
v.
Lucann O'HARA, et al., Defendants.

No. 9:09–CV–802 (MAD/ATB).
|
July 20, 2011.

**Attorneys and Law Firms**

Reginald Neree, pro se.

Adele M. Taylor–Scott, Ass't Attorney General for Defendant.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to me for Report and Recommendation on September 24, 2010, pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). [1] Plaintiff's *pro se* complaint (Dkt. No. 1) seeks monetary damages and unspecified injunctive relief, under 42 U.S.C. § 1983, for alleged violations of his constitutional rights while he was confined by the New York State Department of Correctional Services ("DOCS"). [2] Although the complaint suggests other alleged constitutional violations, plaintiff primarily claims that he was denied due process in connection with three disciplinary hearings conducted at the Mohawk Correctional Facility ("Mohawk") in 2009.

Presently before this court is defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt. No. 88). Plaintiff filed a response to the defendants' motion, and what purports to be a cross motion for partial summary judgment, seeking a finding that the defendants are liable on the due process claims. (Dkt. No. 89). The defendants thereafter filed a reply in further support of their summary judgment motion and in opposition to plaintiff's cross motion. (Dkt. No. 92). For the reasons set forth below, this court recommends granting defendants' summary judgment motion, denying plaintiff's purported cross motion, and dismissing the complaint.

**I.** *Factual Background*

On or about April 16, 2009, DOCS forwarded a memorandum to all facility superintendents, advising them of emergency rule changes and new procedures that were to be effective immediately. The memorandum discussed a scheme devised by inmates to use the Uniform Commercial Code ("UCC") to file liens against DOCS personnel. The UCC liens were fraudulent, but they could seriously impact the targeted employee's credit, until successfully removed. (Woughter Decl. ¶¶ 4, 5 & Exh. A, Dkt. No. 88–10 at 2, 8–10). [3] In response to this scheme, the Commissioner authorized amendments to DOCS Directive 4421 ("Privileged Correspondence") to require the monitoring and review of all incoming or outgoing mail to or from the Secretary of State—the state agency which generally handles UCC filings. Directive 4422 ("Inmate Correspondence Program") was also amended to prohibit inmates from possessing UCC forms, unless they had prior written authorization from the facility superintendent. The amendment to Directive 4422 also authorized confiscation of UCC forms for review by the superintendent, in consultation with DOCS counsel. (*Id.* ¶ 6 & Exh. A, Dkt. No. 88–10 at 2, 11–12).

The April 16, 2009 memorandum provided that unauthorized UCC materials "shall be deemed contraband," and directed that they were to be confiscated, so that the superintendent, in consultation with DOCS counsel, could determine whether there was a valid reason to authorize the inmate to have the UCC documents. Superintendents were further directed: "When any unauthorized UCC document is found in the possession of an inmate, that inmate will be issued a written direct order that he or she is not to attempt to file UCC Financing Statements, unless the inmate is given prior approval from the Superintendent." (Woughter Decl. ¶¶ 8–9 & Exh. A, Dkt. No. 88–10 at 2–3, 9–10). Upon receipt of the memorandum, defendant Carol Woughter, then the Superintendent of Mohawk Correctional Facility, directed staff to post a "Notice to Inmate Population," announcing the new rules relating to UCC documents, in housing units and the common areas of the facility that were accessible to inmates. (*Id.* ¶¶ 10, 12 & Exh. B, Dkt. No. 88–10 at 3, 13–14).

**\*2** On or about April 20, 2009, the mail room staff at Mohawk intercepted incoming mail to plaintiff from the Department of State in Albany, returning UCC documents he attempted to file. Mail room personnel requested permission of the superintendent to open these items, which was granted on April 21st. (Woughter Decl. ¶ 14 & Exh. C, Dkt. No. 88–10 at 3–4, 15–16). On April 22, 2009, the mail room intercepted an additional piece of incoming correspondence to plaintiff, from the Pennsylvania Department of State, returning another attempted UCC filing. Mail room personnel requested permission to open that item, which Superintendent Woughter granted. (*Id.* ¶ 15 & Exh. D, Dkt. No. 88–10 at 4, 17–18). In accordance with the April 16, 2009 DOCS memorandum, defendant Woughter forwarded the contents of both pieces of UCC-related correspondence to the Deputy Commissioner and Counsel for DOCS. She directed the Mohawk security staff to advise plaintiff that UCC materials were contraband and to give plaintiff a direct order not to be in possession of such materials without written authorization from the superintendent. (*Id.* ¶¶ 16–18 & Exh. E, Dkt. No. 88–10 at 4, 19–20).

On April 22, 2009, defendant Jeffrey Cianciola advised plaintiff that two pieces of his mail, containing UCC documents, were intercepted and confiscated, and that plaintiff would need to request permission from the superintendent to receive those documents. According to Sgt. Cianciola, he gave plaintiff a direct, oral order not to use or be in possession of UCC forms without permission from the superintendent. (Cianciola Decl. ¶¶ 5–7 & Exh. A, Dkt. No. 88–3). As discussed further below, plaintiff disputes defendant Cianciola's characterization of that "order," and he otherwise claims that he did not have proper notice of the change in the DOCS rules relating to UCC documents.

On May 6, 2009, defendant Lucann O'Hara found plaintiff at a photocopier at Mohawk in possession of multiple copies of two blank UCC forms. (O'Hara Decl. ¶ ¶6–12, 19–20, Dkt. No. 88–7). Knowing of the new DOCS rules treating UCC forms as contraband, Counselor O'Hara consulted with her supervisor, defendant Shelley Engresser, and then issued plaintiff a misbehavior report. (*Id.* ¶¶ 13–21 & Exh. A). A Tier III disciplinary hearing on the May 6th misbehavior report was conducted before defendant Jerald T. Steele on May 12, 2009. Defendant Steele found plaintiff guilty of all but one charge of misconduct, and sentenced plaintiff to six months in

the Special Housing Unit ("SHU"), with three months suspended, and a corresponding loss of privileges. (Steele Decl. & Exhs. A, B, Dkt. No. 88–8).

On or about May 19, 2009, Counselor O'Hara found, secreted away in the Transitional Services clerk's office, a UCC–11 form with plaintiff's name and DIN number written on the top, in what she recognized as plaintiff's handwriting. At the bottom of the UCC form was a request for certified copies of UCC financial statements for the Queens County District Attorney, the DOCS Commissioner, and Superintendent Woughter. (O'Hara Decl. ¶¶ 24–29). Defendant O'Hara issued a second misbehavior report against plaintiff dated May 19, 2009 for being in possession of contraband, and for disobeying Sgt. Cianciola's direct order. (*Id.* ¶¶ 30–33 & Exh. C).

**\*3** On May 28, 2009, defendant Ted Fauss conducted a Tier III hearing with respect to the May 19th misbehavior report against plaintiff. Education Supervisor Fauss found plaintiff guilty of both charges and imposed a penalty of six months in the SHU, with a corresponding loss of privileges. This penalty was enhanced by the reinstatement of the three-month penalty suspended in connection with the May 12, 2009 disciplinary hearing, bringing the total penalty period up to nine months. (Fauss Decl. & Exhs. A, B, Dkt. No. 88–6).

On or about May 26, 2009, plaintiff filed a grievance against Counselor O'Hara, claiming, *inter alia,* that her two misbehavior reports were unfounded and "retalatory [sic]." (O'Hara Decl. ¶¶ 34–35; Woughter Decl., Exh. L, Dkt. No. 88–10 at 36–38). Following an investigation, Superintendent Woughter denied the grievance, finding that Counselor O'Hara acted in good faith and that the disciplinary charges against plaintiff had been sustained. (Woughter Decl. ¶¶ 26–30 & Exh. L, Dkt. No. 88–10 at 35, 39–46). Plaintiff admittedly did not complete the appeal of the denial of his grievance. (Pltf. Dep. at 103, Dkt. No. 88–11 at 106; Woughter Decl. ¶ 31).

On May 19, 2009, following several incidents demonstrating plaintiff's involvement with UCC materials, Superintendent Woughter issued a mail watch memorandum, authorizing the mail room staff at Mohawk to open and read all of plaintiff's incoming and outgoing mail for a period of 30 days. (Ciotti Decl. ¶ ¶ 4–8 & Exh. B, Dkt. No. 88–4 at 2, 13–14). On or about May 29, 2009, the mail room staff

intercepted correspondence from plaintiff that was later opened by defendant Gabriel Ciotti, in accordance with Superintendent Woughter's mail watch authorization. The correspondence, addressed to plaintiff's brother, appeared to Lt. Ciotti to contain directions to forward, to third persons, written instructions for filing UCC statements on plaintiff's behalf. (*Id .¶ ¶* 9–14 & Exh. C; St. Louis Decl., Exh. B at 17–18, Dkt. No. 88–9 at 38–39). Upon discovery of the content of this correspondence, Lt. Ciotti confiscated the documents and issued a third misbehavior report against plaintiff. (*Id.* ¶ 16 & Exh. E).

On June 8 and 15, 2009, defendant St. Louis conducted the Tier III disciplinary hearing with respect to plaintiff's May 29th misbehavior report. Capt. St. Louis found plaintiff guilty of all charges and imposed a penalty of twelve more months in the SHU and the related loss of privileges. [4] (St. Louis Decl. & Exhs. A, B).

Plaintiff appealed the results of the three disciplinary hearings, which were affirmed by the DOCS Special Housing and Inmate Disciplinary Programs, directed by Norman Bezio. (Bezio Decl. & Exhs. A–C, Dkt. No. 88–2). However, because of the penalties imposed in connection with the first two disciplinary proceedings, Director Bezio reduced the duration of the penalties on the final misbehavior report from twelve to six months. (*Id.* ¶ 56 & Exh. C, Dkt. No. 88–2 at 12, 37–38). While defendant Bezio calculated the total SHU sentence imposed on plaintiff in connection with the three disciplinary hearings to be 15 months, it appears to the court that the total SHU term imposed, after the reduction on the final misbehavior report, was 18 months—from May 6, 2009 to on or about November 6, 2010. (Steele Decl., Exh. A, Dkt. No. 88–8 at 8; Fauss Decl., Exh. A, Dkt. No. 88–6 at 7; St. Louis Decl., Exh. A, Dkt. No. 88–9 at 7; Bezio Decl., Exh. C, Dkt. No. 88–2 at 37).

## II. *Contents and Summary of Recommendations*

**\*4** Plaintiff's complaint names nine defendants, apparently both in their individual and official capacities [5]—Counselor O'Hara, Director Bezio, former Lt. Ciotti, Educational Supervisor Fauss, Supervising Counselor Engresser, Facility Steward Steele, Capt. St. Louis, Sgt. Cianciola, and former Mohawk Superintendent Woughter. Construed liberally, the plaintiff alleges that he was deprived of due process in connection with the three disciplinary hearings against

him because (1) the amended DOCS directives involving UCC materials, which provided the basis for most of the disciplinary charges, violated his First Amendment rights and were not properly promulgated by DOCS; (2) some of the disciplinary charges against him were based on surveillance of his mail that violated his First Amendment rights; (3) he did not have proper notice of the amended rules relating to UCC materials, on which the disciplinary charges were based; (4) the procedures followed during the disciplinary hearings failed to satisfy applicable due process requirements; and (5) there was not adequate evidentiary support for some of the disciplinary charges on which he was found guilty. The complaint may also suggest a claim that the first two misbehavior reports against him were issued by defendant O'Hara in retaliation for plaintiff's exercise of unspecified, protected First Amendment conduct.

Defendants argue that plaintiff's claims are barred as a result of plaintiff's failure to exhaust his administrative remedies by filing or appealing grievances related to his claims. They assert that the direct orders given to plaintiff regarding the new restrictions on UCC materials overcome his claim of lack of notice of the amended disciplinary rules. Defendants argue that plaintiff was afforded all of the process due in connection with his disciplinary hearings, and that the alleged technical defects in the proceedings fail to establish valid constitutional claims. The defendants assert that plaintiff's retaliation claim lacks any factual basis. Finally, the defendants claim that they are entitled to qualified immunity from plaintiff's various causes of action.

The court finds that, although plaintiff's failure to pursue grievances may bar certain causes of action (including his retaliation claim), plaintiff exhausted his administrative remedies with respect to due process claims relating to his disciplinary hearings by appealing the results of each hearing. The court concludes that the amended DOCS rules regarding UCC materials did not violate the First Amendment rights of plaintiff or other inmates or, in the alternative, that corrections officials who applied the amended rules are entitled to qualified immunity. Plaintiff may not challenge the outcome of his disciplinary hearings based on objections to the legality of the monitoring and confiscation of his mail. The court finds that there is no material issue of fact with respect to whether plaintiff had adequate actual notice of the effect of the new rules relating to UCC materials or, again, in the

Neree v. O'Hara, Not Reported in F.Supp.2d (2011)
Case 9:17-cv-00234-MAD-DEP   Document 87   Filed 03/22/19   Page 274 of 329
2011 WL 3841551

alternative, the defendants who applied those rules to him are protected by qualified immunity. Finally, the court concludes that no reasonable fact finder could conclude that there was inadequate evidentiary support for the disciplinary charges against plaintiff or that the procedures followed in connection with the hearing did not meet the applicable due process standards. Accordingly, the court recommends that defendants' motion for summary judgment be granted and the complaint dismissed, in its entirety. The court further recommends that plaintiff's purported cross motion for partial summary judgment be denied.

### III. *Summary Judgment*

**\*5** Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56[6]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); FED. R. CIV. P. 56(c)(1) (A). If the moving party satisfies its burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co.,*

*Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

"[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). [7] "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### IV. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*6** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines,

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

Defendants allege that plaintiff failed to exhaust his administrative remedies in this case because he filed only one grievance relating to any of the claims in the complaint, and failed to complete the administrative process by appealing the denial of his grievance by the superintendent to the Central Office Review Committee (CORC). The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. Id. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the CORC. Id. § 701.5(d).

Pursuit of a grievance is the appropriate administrative remedy for most complaints by inmates. However, complaints about the handling of a disciplinary hearing by corrections officials are non-grievable under applicable regulations because there is a separate administrative appeal process for disciplinary actions. Id. § 701.3(e)(1); Davis v. Barrett, 576 F.3d 129, 132 (2d Cir.2009). Plaintiff properly exhausted his administrative remedies, at least with respect to his due process claims relating to his disciplinary hearings, by appealing the result of each hearing. Davis v. Barrett, 576 F.3d at 132–33. However, because plaintiff failed to fully pursue grievances with respect to other claims, such as his allegation that defendant O'Hara retaliated against him by filing the first two misbehavior reports, those claims are barred for failure to exhaust administrative remedies. [8]

In Giano v. Goord, the Second Circuit excused an inmate's failure to file a grievance regarding a complaint that a correction officer initiated a retaliatory and unfounded disciplinary charge against the prisoner. The Court held the plaintiff reasonably misinterpreted DOCS regulations to mean that his only administrative recourse with respect to this complaint was to appeal his disciplinary conviction. Giano v. Goord, 380 F.3d at 676, 679 (holding that Giano's failure to exhaust with respect to the retaliation claim was justified). [9]

**\*7** The plaintiff in this case, unlike Giano, actually filed a grievance with respect to his complaint of retaliation by defendant O'Hara, indicating that he understood that this was the proper administrative process to pursue with respect to that complaint. The Superintendent's denial of the grievance, included a notice of plaintiff's right to appeal to CORC. (Woughter Decl., Exh. L, Dkt. No. 88–10 at 35). In later admitting that he did not appeal the denial of his grievance, plaintiff did not claim any confusion about the appropriate administrative remedies or any other special circumstances; he merely stated that the DOCS grievance system is "fruitless." (Pltf. Dep. at 106). In similar circumstances, the Second Circuit has held that an inmate could not rely on Giano to excuse his failure to exhaust the grievance process with respect to a claim that a claim of retaliation against an officer for filing an unfounded disciplinary charge. Reynoso v. Swezey, 238 Fed. Appx. 660, 663 (2d Cir.2007) (where plaintiff filed a grievance with respect to the retaliation claim, but failed to appeal the denial to CORC, his failure to exhaust was not excused in light of evidence of his awareness that the grievance process was the appropriate administrative remedy).

## V. Challenges to Amended DOCS Rules Re: UCC Materials

### A. First Amendment Challenge

Plaintiff claims that the restrictions on UCC materials adopted by DOCS in 2009, on which many of the disciplinary charges against him were based, were invalid because they infringed on his First Amendment rights and those of other inmates. "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir.1995) (quoting Turner v. Safely, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Plaintiff's claims that DOCS' policies regarding UCC materials are invalid on First Amendment grounds must fail because they are reasonably related to legitimate penological interests. Turner v. Safely, 482 U.S. at 89.

The Supreme Court in Turner articulated several factors to guide judicial review of the validity of prison regulations. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Id. Second, courts should assess "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90. Third, courts should consider "the impact

Neree v. O'Hara, Not Reported in F.Supp.2d (2011)

2011 WL 3841551

accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, courts should assess the challenged regulation in relation to proposed alternatives. *Id.* "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.* However, prison administrators are not required to use the least restrictive means possible to further legitimate penological interests. *See Thornburgh v. Abbott,* 490 U.S. 401, 411, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

**\*8** In 2008, the Third Circuit rejected First Amendment and other constitutional challenges to Pennsylvania Department of Corrections ("DOC") regulations, similar to the New York DOCS rules involved here, which restricted inmates' possession and use of UCC materials. *Monroe v. Beard,* 536 F.3d 198, 207–209 (3d Cir.2008); *Edmonds v. Sobina,* 296 Fed. Appx. 214, 217–18 (3d Cir.2008). These cases persuasively documented that such regulations satisfied the *Turner* standards. *Id. Edmonds* dismissed a Section 1983 due process claim relating to prison disciplinary charges brought under the DOC UCC rules. *Edmonds,* 296 Fed. Appx. at 216.

The DOCS restrictions on inmate possession of UCC materials, like those Pennsylvania regulations upheld by the Third Circuit, are "reasonably related to the [corrections agency's] interest in protecting government officials from fraudulent liens." *Edmonds,* 296 Fed. Appx. at 217 (quoting *Monroe,* 536 F.3d at 208). Courts, including some in this Circuit, have recognized the serious problem of prison inmates filing fraudulent and abusive UCC liens against government officials. *See Monroe,* 536 F.3d at 202 n. 2 (citing, *inter alia, United States v. Speight,* 75 Fed. Appx. 802 (2d Cir.2003) (affirming judgment of conviction against defendant-inmates claiming that government officials owed them multi-million dollar debts and filing fraudulent liens to obtain those "debts")); *Bartz v. Van de Graaf,* 1:07–CV–219, 2008 WL 2704882, at \*2 (D.Vt. July 8, 2008) ("[t]he abusive practice of prisoners filing baseless liens and/or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor (almost always a state or federal official involved with securing the prisoner's incarceration) is well documented") (citations omitted).

The DOCS rules relating to UCC materials, like the Pennsylvania regulations upheld in *Monroe* and *Edmonds,* do provide inmates like plaintiff with alternate means of exercising First Amendment rights. The DOCS rules and the Pennsylvania regulations both provided inmates with an opportunity to persuade prison officials that they had a valid and legitimate interest in possessing or using UCC materials. *Monroe,* 536 F.3d at 204, 209. Given that New York inmates are legitimately restricted in engaging in business activities from prison,[10] substantially limiting the circumstances under which the possession of UCC forms would be allowed is reasonable and appropriate.

As the Third Circuit recognized, accommodating the plaintiff's asserted right to use UCC documents would have a substantial negative impact on prison administration and security. "[A]ccommodating the plaintiffs' right to possess these materials may encourage them to harass, intimidate or threaten prison officials ... by threatening to file liens." *Monroe,* 536 F.3d at 209.

As to alternatives to the DOCS rules, plaintiff suggests that confiscation of his UCC materials is unreasonable unless there was evidence that he was in fact, filing fraudulent liens. (Pltf. Dep. at 88). Like the Third Circuit in *Monroe,* this court rejects this alternative. Given the difficulty of removing a fraudulent UCC lien and the very disruptive effect that can have on a government official, DOCS should not be required to wait until a prisoner actually files a fraudulent lien. *Monroe,* 356 F.3d at 209 ("requiring the DOC to accommodate plaintiffs right by adopting a 'wait and see' approach, rather than by the pre-emptive measures they employed in this case, would impose more than a '*de minimis*' cost to prison officials.") There are clear indications that plaintiff's UCC materials were consistent with the fraudulent UCC schemes employed by other inmates,[11] and no reasonable fact finder would credit his patently incredible claims of innocent intentions. (Pltf. Dep. at 66–68, 73–75). Given that prison regulations are not required to employ the "least restrictive means" to further penological purposes, the DOCS regulations are valid under *Turner v. Safely* and were properly relied upon in bringing disciplinary charges against the plaintiff.

**\*9** The Sixth Circuit, in reviewing a preliminary injunction issued against a Michigan prison regulation prohibiting receipt of mail involving certain UCC materials, found that the plaintiff was likely to succeed

on his First Amendment challenge to the regulation. *Jones v. Caruso,* 569 F.3d 258, 266–75 (6th Cir.2009). The *Jones* panel found that the UCC materials did not constitute "legal mail" to which heightened First Amendment scrutiny applied. However, over a strong dissent, Judge Cole found that the Michigan regulation was unlikely to withstand scrutiny under the *Turner v. Safely* standards.

This court is more persuaded by the reasoning of the Third Circuit in *Monroe* and *Edmonds* than by the contrary ruling of the Sixth Circuit. In any event, because of the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed this particular area, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment. Accordingly, as discussed further below, the defendants who applied these rules in the context of the disciplinary actions against plaintiff, would be entitled to qualified immunity, even if it were eventually determined that the rules were constitutionally infirm.

**B. Challenge Based on State's Alleged Delay in Filing Amended Rules**

The plaintiff has claimed that the changes in the DOCS Directives, on which the disciplinary charges against him were largely based, were not filed with the New York Secretary of State until May 16, 2009. (Complaint, Dkt. No. 1–3 at 7; 8/4/09 Addendum, Dkt. No. 16 at 4, Dkt. No. 16–3 at 6). He has argued, based on New York state authority which holds that a DOCS rule must be filed with the Secretary of State before it can be relied upon to support disciplinary charges against an inmate, that the amended rules regarding UCC filings could not have been applied against him for any conduct before May 16, 2009. (8/4/09 Addendum; Dkt. No. 16 at 2–3, citing *Jones v. Smith,* 64 N.Y.2d 1003, 489 N.Y.S.2d 50, 478 N.E.2d 191 (N.Y.1985) (the filing of rules and regulations serves to fulfill the notice component of due process)). Some of the documents submitted or seen by plaintiff indicate that the disciplinary rules applied to plaintiff were, in fact, filed on **April** 16, 2009, before he was disciplined under them. (8/25/09 Addendum, Dkt. No. 27 at 7; Pltf. Dep. at 48–49). In any event, after the New York Court of Appeals decided *Jones v. Smith,* the Second Circuit held that the procedural failure to file a rule or regulation, in violation of New York State law, is not alone sufficient to establish a federal due process violation when an inmate is disciplined under the unfiled rule or regulation. *LaBoy v. Coughlin,* 822 F.2d 3, 4–5 (2d Cir.1987). [12]

**C. Imputed Vagueness Challenge**

Although it is debatable whether plaintiff even alluded to the issue, Second Circuit authority suggests a possible vagueness challenge to the change in DOCS disciplinary policies relating to UCC filings. DOCS implemented the changes by enacting emergency amendments to two DOCS Directives and issuing memoranda/ notices to DOCS staff and inmates about the impact of the amendments. Plaintiff was disciplined under general DOCS disciplinary rules involving contraband and ignoring direct orders, which had not been amended, but whose scope had been purportedly altered by the changes in the DOCS directives and explanatory memoranda.

**\*10** In *Chatin v. Coombe,* the Second Circuit considered whether a DOCS disciplinary rule barring "[r]eligious services, speeches or addresses by inmates other than those approved by the Superintendent" was unconstitutionally vague as applied to silent, individual prayer. 186 F.3d 82, 84 (2d Cir.1999) (quoting DOCS Rule 105.11). The panel found that the rule was vague, rejecting DOCS' argument that the rule's vagueness was cured by an internal DOCS Directive and memorandum from prison staff, which together clarified that silent prayer was covered by the rule. *Id.* at 87–89, 91. *Chatin* held that prisoners are not required to integrate multiple directives in order to divine the rules governing their conduct. *Id.* at 88–89.

In *Farid v. Ellen,* an inmate was charged with violating, *inter alia,* the prison's general ban on contraband (DOCS Rule 113.23) as a result of his possession of a pamphlet criticizing New York's parole policies. 593 F.3d 233, 237–38 (2d Cir.2010). DOCS argued that the pamphlet constituted contraband because it violated the bylaws of the prison-approved organization, which included the plaintiff as a member, and which produced the pamphlet. The Second Circuit agreed with the District Court "that these rules were unconstitutionally vague as applied to Farid, both because they failed to give him adequate notice and because they failed adequately to constrain the discretion of the prison officials who had the power to impose them." *Farid v. Ellen,* 593 F.3d at 241. Relying heavily on *Chatin,* the *Farid* panel reasoned:

There is nothing in the rule indicating that materials which violate a prison organization's internal by-laws are contraband in violation of the prison's rules .... Accordingly, unless [Farid] had other reasons to know that what he did was against *prison* rules, these regulations were improperly applied to him.

*Id.* at 241–42 (emphasis in the original).

*Young v. Goord,* distinguishes *Chatin* and would undermine a vagueness or due process challenge to the application of the amended DOCS policies on UCC materials to the plaintiff under the facts of this case. *Young v. Goord,* 192 Fed. Appx. 31, 33–34 (2d Cir.2006). In 1997, pursuant to the current version of a DOCS directive, Young applied for and received an exemption from DOCS' beard-length policy based on his documented affiliation with the Rastafarian Church. On August 28, 2000, correctional officer Crum gave Young a memorandum indicating that DOCS directives had been revised to reflect a change in federal law, and then ordered Young to trim his beard. When Young refused, he was issued a misbehavior report; but no discipline was imposed because, prior to the encounter with Officer Crum, Young did not know that he was now required to take other steps to become exempt from the beard-length policy. After this hearing, Young twice disobeyed direct orders to trim his beard, and was disciplined under the revised rules. *Id.* at 33.

*11 While the panel did not decide whether the subsequent discipline of Young satisfied the notice requirement of due process, it ruled that the defendants involved with disciplining the inmate after the first misbehavior report was dismissed, were protected by qualified immunity.

Defendants would have been further justified in believing that the first hearing provided Young more than "fair warning of what was proscribed" before he was disciplined, ... because its disposition informed Young personally that DOCS considered his beard

length no longer permissible. These officials could reasonably believe that their actions comported with our decision in *Chatin* because they personally notified Young, before he was disciplined, of the change effected by the revised Directive and an implementing Memorandum; they did not expect Young himself to "reconcil[e] the text" of these different documents. *Chatin,* 186 F.3d at 89.

If Young was entitled to any further process of law before discipline was justified—and on that issue we express no opinion—that right was certainly not "clearly established" by the time of the challenged actions. That being so, the defendant officials are entitled to qualified immunity from suit.

*Young v. Goord,* 192 Fed. Appx. at 34. As discussed further below, no reasonable juror could conclude that the plaintiff in this case did not receive ample actual notice that his possession and use of UCC materials violated prison disciplinary rules, as modified. Accordingly, either the application of these rules to discipline plaintiff would not violate his due process rights; or, at a minimum, the defendants who applied the rules reasonably believed they were not violating any of plaintiff's clearly established rights, and were entitled to qualified immunity. [13]

## VI. Challenge to DOCS' Confiscation and Use of Plaintiff's Mail

The plaintiff has argued that some of the disciplinary charges against him were unlawfully based on mail that was improperly opened and confiscated by DOCS. (Pltf. Cross Motion, Dkt. No. 89–1 at 2–3.) However, even if the confiscation of plaintiff's mail was contrary to DOCS Directives or unconstitutional, plaintiff's letters would not be subject to suppression, and could be considered in the context of a prison disciplinary hearing. *See, e.g., Dillhunt v. Theriault,* 9:07–CV–0412 (GTS/DEP), 2009 WL 4985477, at *15 (N.D.N .Y. Dec. 15, 2009) (the "fruit of the poisonous tree doctrine," which applies to evidence that is unconstitutionally obtained during a criminal investigation, has no applicability to prison disciplinary hearings) (citing *Rabb v. McMaher,* No. 94–CV–614, 1998 WL 214425, at *7 (N.D.N.Y. Apr.24, 1998) (Pooler, J.)). *See also United States v. Green,* No. 92–CR–159C, 1994 WL 187139, at *5–6 (W.D.N.Y. Feb.10, 1994) (Curtin, J.) (in the context of a criminal case, evidence from a mail watch may be introduced even though it was implemented in violation of DOCS Directive 4422).

**\*12** Plaintiff's complaint could be construed as raising a separate First Amendment challenge to the confiscation of his mail by prison officials, pursuant to the amended UCC policies and/or the mail watch subsequently ordered by former Superintendent Woughter. For the reasons discussed above, plaintiff failed to exhaust his administrative remedies with respect to any such claim by failing to pursue a grievance. A general First Amendment challenge to the validity or application of mail policies, as opposed to a due process challenge to the use of confiscated mail in a disciplinary hearing, would not be exhausted by an appeal of the disciplinary hearing.

In any event, as discussed above, the DOCS rules relating to UCC materials, including the provisions relating to the confiscation and review of mail to or from a Secretary of State, do not violate the First Amendment. Moreover, the 30–day mail watch ordered by defendant Woughter would withstand First Amendment scrutiny.

An inmate's right "to the free flow of incoming and outgoing mail" under the First Amendment [14] must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. The Second Circuit has held that " 'where good cause is shown, [even] outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Given the several documented incidents involving plaintiff's possession and mailing of highly suspect UCC materials, the imposition of a mail watch for a limited time was clearly justified under the First Amendment. *See, e.g., Jackson v. Portuondo,* 9:01–CV–00379 (GLS/DEP), 2007 WL 607342, at *6–7, 13 (N .D.N.Y. Feb. 20, 2007) (granting summary judgment on claim challenging mail watch, which was supported by prior evidence that inmate was engaged in mail violations and activities involving

contraband) (citing, *inter alia, United States v. Felipe,* 148 F.3d 101, 107–108 (2d Cir.1998) (knowledge that plaintiff had violated prison regulations related to mail, and had written about the commission of illegal acts constituted reasonable cause to intercept the inmate's correspondence)).

**VII. Due Process Claims Relating to Plaintiff's Disciplinary Hearing**

**A. Legal Standards**

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest [15] include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

**\*13** Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22

(2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is, *e.g.,* confined in SHU, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able. *Id. See also Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases).

### B. The First Disciplinary Hearing

On May 6, 2009, defendant O'Hara observed plaintiff photocopying documents from a copier at the copier for the Transitional Services office at Mohawk, where plaintiff worked. A week before, Counselor O'Hara had been advised by her supervisor, defendant Engresser, to oversee plaintiff's use of the office copy machine more closely. (O'Hara Decl. ¶¶ 4–7, Dkt. No. 88–7). When Counselor O'Hara asked plaintiff what he was copying, he reportedly told her that he was making copies for Transitional Services. Counselor O'Hara looked at the materials in plaintiff's possession and noticed that they appeared to be UCC materials that she did not recognize as part of the Transitional Services curriculum. Counselor O'Hara challenged plaintiff about copying unauthorized materials and confiscated the folder and the documents on the copier. At that point, plaintiff admitted to defendant O'Hara that the UCC forms were his, and that he was replacing his supply because his UCC materials had been confiscated by the superintendent. (*Id.* ¶¶ 8–12).

Counselor O'Hara issued a misbehavior report, endorsed by defendant Engresser, charging plaintiff with disobeying a direct order, in violation of DOCS Rule 106.10; lying, in violation of Rule 107.20; being in possession of documents not authorized by the superintendent, in violation of Rule 113.23; and misuse of state property for making unauthorized photocopies, in violation of Rule 116.10. (O'Hara Decl. ¶ 21 & Exh. A). On May 12, 2009, defendant Steele presided over a Tier III disciplinary hearing relating to the May 6th misbehavior report. (Steele Decl. ¶¶ 10–27 & Exh. B, Dkt. No. 88–8).

**\*14** Prior to the hearing, plaintiff waived his right to inmate assistance, which was offered to him. (Steele Decl. ¶¶ 7, 29, Exh. A, Exh. B at 2, Dkt. No. 88–8 at 3, 6, 10,

23). When plaintiff objected to Sgt. Cianciola's April 22, 2009 memorandum documenting that, on that day, he had been given plaintiff a direct order not to be in possession of UCC documents, defendant Cianciola was called to testify about the oral order. (*Id.* ¶¶ 17–20 & Exh. B at 3, 9–10). Also testifying (by telephone) at the hearing were defendants O'Hara and Engresser. (*Id.* ¶¶ 13, 21–22 & Exh. B at 10–17).

At the hearing, plaintiff admitted possessing UCC documents, without authorization from the superintendent, and intending to make photocopies of them. (Steele Decl. ¶ 15 & Exh. B at 5, 7). However, plaintiff testified that he never actually made copies of the UCC forms, and Counselor O'Hara acknowledged that she did not actually observe plaintiff copying the UCC documents. (*Id.* ¶¶ 15, 21 & Exh. B at 5, 7, 11–12).

Defendant Steele convicted plaintiff of all charges except the misuse of state property charge involving the allegation that he copied UCC forms. (Steele Decl. ¶¶ 25–26). Facility Steward Steele made written findings supporting his rulings and read them in the record at the hearing. (*Id.,* Exh. A & Exh. B at 18, Dkt. No. 88–8 at 9, 39). He sentenced plaintiff to six months in SHU and a corresponding loss of privileges, with three months of the penalty suspended. (*Id.* ¶¶ 27–28 & Exh. A, Dkt. No. 88–8 at 5–6, 8).

As discussed above, plaintiff made several general objections to the three disciplinary actions against him, which are without factual support or legal merit. Plaintiff also asserts that his due process rights were violated, specifically in connection with the first disciplinary hearing against him, because (1) he did not have proper, prior notice of the amendment of the disciplinary rules relating to UCC materials; (2) the misbehavior report did not reference the alleged April 22, 2009 order from defendant Cianciola that plaintiff not possess UCC forms, although that was the order he was convicted of disobeying; and (3) that the evidence at trial, presumably the UCC forms that were seized from plaintiff, were not properly introduced at the hearing. (Complaint, Dkt. No. 1 at 5, 10–14; 7/30/09 Addendum, Dkt. No. 13 at 2–4; 8/6/09 Addendum, Dkt. No. 17 at 2–3). [16] In the absence of any evidence of other due process issues with the first disciplinary hearing, the court will address only the specific objections raised by the plaintiff.

### 1. Notice of the Change in Rules Relating to UCC Materials

Although plaintiff claims that he did not receive proper notice about the change in the DOCS disciplinary rules relating to UCC materials, no reasonable juror could conclude that plaintiff did not have ample, actual notice before the first misbehavior report was issued against him. Sgt. Cianciola testified at the disciplinary hearing that he gave plaintiff a direct, oral order on April 22, 2009 that he was not allowed to possess UCC documents without the permission of the superintendent. (Steele Decl., Exh. B at 9–10). Sgt. Cianciola documented his April 22nd order to plaintiff with a contemporaneous memorandum to his supervisor. (Cianciola Decl. ¶¶ 6–8 & Exh. A, Dkt. No. 88–3). Although plaintiff claimed at the hearing that he had not previously seen Sgt. Cianciola's memorandum, he admitted being advised by defendant Cianciola that the mail room had confiscated documents from the Secretaries of State of New York and Pennsylvania that plaintiff "can't have." (Steele Decl., Exh. B at 3, 8). Plaintiff also admitted writing the superintendent shortly thereafter, seeking permission to correspond with the Secretary of State, which further indicates that he had been advised of the impact of the new DOCS UCC rules. (*Id.* at 8).

**\*15** During his deposition, plaintiff testified inconsistently about what Sgt. Cianciola said to him on April 22, 2011. At first, plaintiff admitted recalling "Sergeant Cianciola giving [him] a direct order, not to be in possession of UCC forms" on or about that date. (Pltf. Dep. at 32, Dkt. No. 88–11). Plaintiff later stated that defendant Cianciola gave him no direct order; he only told plaintiff he could not have his UCC materials that were confiscated from the mail room. (*Id.* at 38, 45).

Superintendent Woughter produced two written requests from plaintiff, dated April 20 and 22, 2009, referencing the memorandum that announced the change in policies regarding UCC materials, and requesting permission to possess such documents. (Woughter Decl, Exh. G, Dkt. No. 88–10 at 23–25). Plaintiff's requests show that he clearly had notice of the amendment of the rules prohibiting possession of UCC documents without the superintendent's permission. Plaintiff acknowledged, in his deposition, that he asked for, but never received, permission from the superintendent to have UCC forms, and that he wasn't "supposed to have them in [his] possession." (Pltf. Dep. at 44).

Based on the defendant Cianciola's sworn declaration and testimony, corroborated by his contemporaneous memorandum and other documentary evidence, plaintiff's utterly inconsistent testimony about what Sgt. Cianciola told him on April 22, 2009 would not, in this court's view, create an issue of fact. *See, e.g., Cooke v. Stern,* 9:07–CV–1292 (GLS/ATB), 2010 WL 3418393, at \*5 (N.D.N.Y. Aug. 2, 2010) (in light of the overwhelming contrary evidence from a sworn affidavit and supporting documents, plaintiff's conclusory allegations of defendant's personal involvement in his job assignment are not sufficient to create a material issue of fact) (Report–Recommendation), adopted, 2010 WL 3418399 (N.D.N.Y. Aug.26, 2010); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")). *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

**\*16** Sgt. Cianciola's April 22, 2009 order is not the only notice plaintiff received of the changes in the DOCS rules regarding UCC materials before he was disciplined. Plaintiff admitted that, on April 28, 2009, he reviewed the April 16th notice regarding the amendment of DOCS Directive 4422, which stated that "inmates should not be in possession of UCC materials." (Pltf. Dep. at 47–49; Complaint, Dkt. No. 1–3 at 13; Woughter Decl., Exh A, Dkt. No. 88–10 at 12). On May 1, 2009, Superintendent Woughter sent plaintiff a memorandum confirming that "UCC correspondence to and form the Department of State is deemed contraband" subject to confiscation. She advised plaintiff she was reviewing, with DOCS counsel, whether he had a valid reason to possess such materials.

(Woughter Decl., Exh. H). Based on the foregoing, this court concludes that no reasonable fact finder could conclude that plaintiff was not given more-than-adequate actual notice of the amended DOCS rules regarding UCC documents and the direct order(s) that he was not to possess such materials without the prior permission of the superintendent. [17]

#### 2. Adequacy of the Misbehavior Report

Plaintiff alleges that defendant O'Hara's misbehavior report provided inadequate notice of the charges because it did not specifically reference the April 22, 2009 order of Sgt. Cianciola as the predicate for the charge of failing to obey a direct order. The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)). However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor's O'Hara's misbehavior report contained considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). While the disciplinary charge did not specifically reference Sgt. Cianciola's April 22, 2009 order, it did note plaintiff's admission that he was trying to replace UCC forms confiscated by the superintendent. The charging document gave plaintiff adequate notice that he was accused of disobeying orders regarding the relatively recent prohibition on possession of UCC documents. At the hearing, when plaintiff claimed that he had not received a copy of Sgt. Cianciola's memorandum documenting his direct order to plaintiff, the hearing officer called defendant Cianciola to testify and gave plaintiff an opportunity to ask questions. (Steele Decl. Exh. B at 3, 9–10). Any deficiency in the notice provided by the misbehavior report did not rise to the level of a due process violation, and plaintiff was not prejudiced in defending the charges at the hearing.

#### 3. Failure to Introduce Contraband UCC Documents

**\*17** Plaintiff complains that he was denied due process because the hearing officer did not introduce the UCC documents confiscated from plaintiff by defendant O'Hara, presumably because the UCC forms were treated as contraband that should not be further circulated among inmates. The transcript of the disciplinary hearing does indicate that the hearing officer introduced the confiscated UCC documents at the hearing. (Steele Decl., Exh. B at 13). In any event, the misbehavior report specifically referenced the names of the two blank UCC forms that were seized from plaintiff and the number of copies of each form taken. (O'Hara Decl., Exh. A). As noted above, plaintiff admitted possessing these documents and clearly demonstrated that he was aware of the nature of the forms that had been confiscated. Even if the seized UCC documents were not physically introduced at the hearing, that would not rise to the level of a due process violation, would have had no impact on the outcome of the hearing, and would constitute harmless error.

### C. The Second Disciplinary Hearing

On or about May 19, 2009, while plaintiff was confined in the SHU, Counselor O'Hara conducted a search of the Transitional Services clerk's office for any other contraband UCC materials. She found, secreted away, a UCC–11 form with plaintiff's name and DIN number written on the top, in what she recognized, by comparison to samples in plaintiff's guidance folder, as his handwriting. At the bottom of the UCC form was a request for certified copies of UCC financial statements for the Queens County District Attorney, the DOCS Commissioner, and Superintendent Woughter. (O'Hara Decl. ¶¶ 24–29). Upon confirming that the plaintiff did not have the superintendent's permission to possess the UCC document, and that Sgt. Cianciola had earlier ordered plaintiff not to possess UCC materials, Counselor O'Hara issued a second misbehavior report against plaintiff, dated May 19, 2009, for being in possession of contraband (DOCS Rule 113.23), and for disobeying Sgt. Cianciola's direct order (DOCS Rule 106.10). (O'Hara Decl. ¶¶ 30–33 & Exh. C).

On May 28, 2009, Education Supervisor Ted Fauss conducted the Tier III disciplinary hearing with respect to the May 19th misbehavior report. (Fauss Decl., Exh. B, Dkt. No. 88–6). Prior to the hearing, plaintiff was offered

Neree v. O'Hara, Not Reported in F.Supp.2d (2011)
2011 WL 3841551
Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 283 of 329

inmate assistance, and he requested only that Counselor O'Hara be called as a witness. (Fauss Decl. ¶ 8 & Exh. A, Dkt. No. 88–6 at 2–3, 9). During the hearing, plaintiff claimed ignorance of who created the confiscated UCC document and objected to Counselor O'Hara's testimony that the document contained plaintiff's handwriting. (*Id.,* Exh. B at 5–6, 8, 11). The hearing officer, as the Education Supervisor, was also familiar with plaintiff's handwriting, and stated, on the record, that he agreed with Counselor O'Hara's assessment of plaintiff's authorship of the seized document. (*Id.* ¶ 13 & Exh. B at 8).

**\*18** Plaintiff objected that document was discovered in the Transitional Services office at a time when he was confined in the SHU. He also argued that the document could have been created before April 17, 2009, when the DOCS rules prohibiting UCC materials came into effect. (Fauss Decl., Exh. B at 5–6, 8). The hearing officer, however, found that there was sufficient evidence on the record to find that the documents belonged to plaintiff, and that he failed to surrender them to prison officials after he was ordered, on April 22, 2009, not to possess UCC materials. (*Id.,* Exh. B at 13–14, 16). Plaintiff was found guilty of both charges, and written reasons for the hearing officer's findings and the evidence relied upon were placed upon the record. (*Id.,* Exh. A, Dkt. No. 88–6 at 8 & Exh. B at 17). Defendant Fauss imposed a penalty of six months in SHU and a corresponding loss of privileges. This penalty was enhanced by the reinstatement of the three months suspended in connection with the May 12, 2009 disciplinary hearing, bringing the total penalty period up to nine months. (*Id.,* Exh. A, Dkt. No. 88–6 at 7).

In addition to the general objections to all three disciplinary proceedings, plaintiff has claimed that the second disciplinary hearing violated his due process rights because (1) the hearing officer was not impartial, because "his mind was made up" (Complaint, Dkt. No. 1–3 at 17); (2) the second misbehavior report issued by defendant O'Hara related to the same conduct as her first disciplinary charge and subjected plaintiff to double jeopardy; (3) the confiscated document was created before the change in DOCS rules relating to UCC materials, so plaintiff was not given notice that his conduct violated disciplinary rules;[18] (4) there was insufficient evidence to establish that plaintiff possessed the confiscated UCC document; and (5) that the hearing officer failed to make a written statement of the evidence supporting his guilty finding.

(Complaint, Dkt. No. 1–3 at 14–17; 8/3/09 Addendum, Dkt. No. 14 at 2–4; 8/4/09 Addendum, Dkt. No. 16–2 at 2–3 & Dkt. No. 16–3 at 2–6).

### 1. Sufficiency of the Evidence

Plaintiff claims that there was not "substantial evidence" supporting defendant Fauss's finding that plaintiff possessed the confiscated UCC document, contrary to direct orders. (Complaint, Dkt. No. 1–3 at 15). Plaintiff misstates the applicable due process standard —that the hearing officer's findings be supported by "some" or "a modicum" of "reliable evidence." Defendant O'Hara's identification of plaintiff's handwriting on the confiscated UCC document, based on a comparison of known samples from his guidance file, was adequate evidence to establish that plaintiff created the document, particularly since her lay opinion was corroborated by that of the hearing officer, who was personally familiar with plaintiff's handwriting. *See, e.g., Lewis v. Johnson,* 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 (N.D.N.Y. Aug. 5, 2010) (the testimony of the complaining officer regarding the similarities that he observed in the handwriting of several threat letters and known samples of plaintiff's writing, even when not independently verified by the hearing officer, constituted "some evidence" that plaintiff authored those letters) (Report–Recommendation), adopted, 2010 WL 3762016 (N.D.N.Y. Sept.20, 2010).[19]

**\*19** The handwriting evidence, indicating that plaintiff created the UCC document, was corroborated by the fact that his name and inmate number were written on the document. Moreover, the document was found concealed in an area where plaintiff worked, shortly after he was found to be actively involved in the use and possession of other UCC forms. Given the discretion of the hearing officer to make credibility determinations, there was at least a "modicum" of evidence supporting his finding that plaintiff constructively possessed the confiscated UCC document. Plaintiff's disingenuous arguments that it was possible that other inmates created and possessed this document,[20] do not alter the fact that defendant Fauss's findings were supported by "some evidence." *See Superintendent v. Hill,* 472 U.S. at 457 ("The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board. Instead, due process in this context

2011 WL 3841551

requires only that there be some evidence to support the findings made in the disciplinary hearing.").

**2. Other Due Process Objections to the Second Hearing**

The plaintiff's other claims do not require extended discussion. His conclusory allegation that defendant Fauss had "his mind made up" is insufficient to create an issue of fact that the hearing officer was not impartial, given that the transcript establishes that plaintiff received a full and fair hearing. [21] The first and second misbehavior reports involved plaintiff's possession of different UCC documents in different places at different times; in any event, double jeopardy protection does not apply to prison disciplinary proceedings. [22]

The hearing officer correctly determined that it was irrelevant when the confiscated UCC document was filled out because the plaintiff was charged and found guilty of continuing to have constructive possession of the document after the DOCS rules on UCC materials were changed and after plaintiff was given a direct order not to possess those documents. Plaintiff's conclusory claim notwithstanding, the hearing officer clearly made a written statement of his findings and the supporting evidence, which were also recited on the record during the hearing. (Fauss Decl., Exh. A, Dkt. No. 88–6 at 8 & Exh. B at 17).

**D. The Third Disciplinary Hearing**

As discussed above, a piece of plaintiff's mail was opened by defendant Ciotti on May 29, 2009, pursuant to a mail watch order previously issued by Superintendent Woughter. The envelope was addressed to plaintiff's brother, but contained letters for forwarding to others, one of which appeared, to Lt. Ciotti, to include written instructions for filing UCC statements on plaintiff's behalf. (Ciotti Decl. ¶¶ 9–14 & Exh. C, Dkt. No. 88–4; St. Louis Decl., Exh. B at 17–18, Dkt. No. 88–9 at 38–39). [23] Based on this correspondence, Lt. Ciotti issued a third misbehavior report against plaintiff, charging him with "kiting" correspondence, [24] in violation of DOCS Rule 180.11; "soliciting" goods and services in violation of Rule 103.20; and failure to obey the Superintendent's May 19, 2009 written order not to possess or attempt to file UCC documents, in violation of Rule 106.10. (Ciotti Decl. ¶ 16 & Exhs. D, E).

*20 On June 8 and June 15, 2009, defendant St. Louis conducted the Tier III disciplinary hearing with respect to the May 29th misbehavior report. At the hearing, plaintiff acknowledged prior receipt of inmate assistance, but asked for three witnesses not previously requested —the hearing officer, Capt. St. Louis; Superintendent Woughter; and Lt. Ciotti. The latter two witnesses were called to testify. Capt. St. Louis declined to call himself as a witness, because he had no firsthand knowledge of the relevant events; however, he agreed to answer any questions plaintiff had of him, as the hearing officer. (St. Louis Decl. ¶ 12 & Exh. B at 2–3, 20).

During the hearing, plaintiff denied his guilt. However, he acknowledged writing the confiscated correspondence and possessing and using various UCC materials for what he claimed were innocent business purposes. (St. Louis Decl., Exh. B at 7–9). Plaintiff admitted receiving the May 19, 2009 memorandum from the superintendent, ordering him not to possess or file UCC documents without prior authorization, and acknowledged seeking, but not receiving, the superintendent's permission to use UCC materials. (St. Louis Decl., Exh. B at 9–10). Plaintiff claimed that he did not require authorization from the superintendent for activities involving the UCC, and he challenged the legitimacy of the revised DOCS rules on UCC materials. The hearing officer advised that he would apply the DOCS rules that were in force, and that, if plaintiff wanted to challenge the rules, he needed to do so outside of the hearing process. (St. Louis Decl., Exh. B at 10–11, 19). At the conclusion of the hearing, Capt. St. Louis found plaintiff guilty of all charges and imposed a penalty of twelve more months in the SHU, with a related loss of privileges, and the loss of 12 months of good time. (St. Louis Decl. ¶¶ 17–18 & Exh. A, Dkt. No. 88–9 at 4, 7). Those penalties were later reduced, on appeal, to six months. (Bezio Decl. ¶ 56 & Exh. C, Dkt. No. 88–2 at 12, 37–38).

Many of plaintiff's claims involving the third disciplinary hearing relate to the alleged impropriety of the interception of his mail and the use of it against him in support of the charges. (Complaint, Dkt. No. 1–3 at 19). As discussed above, even if the confiscation of plaintiff's mail had violated DOCS regulations or federal constitutional standards, that would not have provided a basis for challenging the use of the mail at the disciplinary proceeding. Plaintiff also has argued that his due process rights were violated in connection with the

third disciplinary hearing because (1) the hearing officer was biased and frequently interrupted the plaintiff as he tried to present his defense; (2) the mail clerk, who intercepted the correspondence on which the charges were based, did not testify; (3) plaintiff was not allowed to see, at the hearing, the correspondence that formed the basis of the charges; and (4) the hearing officer did not make a written statement of the evidence supporting his finding of guilt. [25] (Complaint, Dkt. No. 1–3 at 18–22, 36–39; 8/3/2009 Addendum, Dkt. No. 15 at 2–5; 8/4/2009 Addendum, Dkt. No. 16–2 at 2–3).

### 1. Alleged Bias of Hearing Officer

**\*21**  After reviewing the transcript of the disciplinary hearing, the court concludes that Capt. St. Louis displayed remarkable patience and gave the plaintiff considerable latitude in presenting his defense. The plaintiff argued, at length, about extraneous matters, such as the merits of the first two misbehavior reports issued against plaintiff and plaintiff's objections to DOCS policies relating to the UCC, after the hearing officer made clear that he was bound to apply the applicable DOCS policies unless plaintiff was able to challenge them in another forum. (St. Louis Decl., Exh. B at 6–7, 11, 15, 21). Capt. St. Louis appropriately admonished plaintiff when, for example, he claimed bias and threatened to sue after defendant St. Louis explained that plaintiff's questions for witnesses had to be filtered through the hearing officer. [26] (St. Louis Decl., Exh. B at 15–16, 20). [27] Plaintiff's conclusory claim that the hearing officer was biased and impeded the plaintiff as he tried to present his defense, is flatly contradicted by the record of the hearing and is not, based on the authority cited above (in note 21), sufficient to create a disputed issue of material fact.

### 2. Alleged Failure to Call Witness

Plaintiff claims that the hearing officer refused to call, as a witness at the disciplinary hearing, the mail clerk who intercepted the correspondence which Lt. Ciotti read into the record when he testified. The court finds no indication in the transcript of the hearing that plaintiff ever asked that this witness be called. (St. Louis Decl., Exh. B at 3). In any event, the only reasons plaintiff alleges for calling the mail clerk relate to his objection that the seizure of his mail was contrary to DOCS policies. (8/3/2009 Addendum, Dkt. No. 15 at 2). As discussed in section VI., above, the alleged impropriety of the

confiscation of the mail would not support any defense to the related disciplinary charges, and would not be relevant to the hearing. Nonetheless, the hearing officer allowed questioning of Lt. Ciotti on the subject of the justification for opening plaintiff's mail. (St. Louis Decl., Exh. B at 20). Even if plaintiff had requested that the mail clerk testify, the hearing officer could have refused the request, consistently with due process requirements, because the evidence would be irrelevant and cumulative. [28]

### 3. Alleged Failure to Allow Plaintiff to Review Confiscated Mail

Plaintiff claims that he was not allowed to see the confiscated mail that was the basis for the charges against him, and thus, was not able to comment on this evidence. The hearing transcript indicates that plaintiff was shown a copy of the confiscated mail during the hearing and commented on it. (St. Louis Decl., Exh. B at 8–9). When Lt. Ciotti testified, he quoted extensively from the letters, and plaintiff commented further on them. (St. Louis Decl., Exh. B at 17–19). The court finds no indication in the record that plaintiff objected to the manner in which the confiscated letters were introduced at the hearing.

**\*22**  In any event, if plaintiff had not been shown the letters and objected, the hearing officer could have reasonably declined to provide the actual contraband to plaintiff for security reasons. [29] Given that plaintiff was the admitted author of the confiscated correspondence, reading the letters to him gave him an adequate opportunity to confront the evidence. [30]

### VIII. Plaintiff's Cross Motion

To the extent plaintiff has moved for summary judgment on his due process claims, that motion must be denied. For all the reasons outlined above, no reasonable fact finder could conclude, on the basis of the record presented, that the defendants violated plaintiff's due process rights in connection with the three disciplinary hearings.

### IX. Qualified Immunity

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 812, 818, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to most of plaintiff's claims, as to which the court concluded that plaintiff's constitutional rights were not violated.

The court finds that the defendants who applied the amended DOCS policies with respect to UCC materials in connection with the three disciplinary hearings against plaintiff are entitled to qualified immunity, to the extent plaintiff claims those policies were invalid under the First Amendment. As discussed in section V.A. above, in the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed the issue, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment.

**\*23**  Moreover, the defendants who applied the amended DOCS rules to plaintiff would also be entitled to qualified immunity, to the extent plaintiff claims the amendment process denied him adequate notice of what conduct would be subject to discipline, because of the direct, personal notice plaintiff received that his continued possession of UCC materials would be prohibited. Per section V.C. above, it was not clearly established as of 2009, whether direct personal notice of the effect of changes in DOCS disciplinary policies would overcome a vagueness objection to DOCS efforts to revise disciplinary rules by amendments to DOCS directives and the issuance of explanatory memoranda. *Young v. Goord,* 192 Fed. Appx. at 34 (officials who personally notified an inmate, before he was disciplined, of the change effected by a revised directive and an implementing memorandum on a DOCS disciplinary rule, could reasonably believe that their application of the new disciplinary policies was consistent with due process standards articulated by the Second Circuit, because the officials did not expect the inmate himself to reconcile the text of these different documents).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 88) be granted and plaintiff's complaint be dismissed in its entirety; and it is further

**RECOMMENDED,** that plaintiff's cross motion for summary judgment (Dkt. No. 89) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3841551

**Neree v. O'Hara, Not Reported in F.Supp.2d (2011)**

2011 WL 3841551

Footnotes

1    The case was originally assigned to Senior District Judge Thomas J. McAvoy; but, on April 20, 2011, it was re-assigned to District Judge Mae A. D'Agostino.

2    On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

3    The court will refer to page numbers assigned by the courts' Case Management/Electronic Case Filing system to the extent it seems necessary to reference the cited exhibit.

4    Plaintiff was also sentenced to a loss of twelve months of good time, which was later reduced to six months. (St. Louis Decl., Exh. A, Dkt. No. 88–9 at 7; Bezio Decl., Exh. C, Dkt. No. 88–2 at 37). In order to avoid dismissal of certain Section 1983 claims pursuant to *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the plaintiff waived any due process claims relating to the loss of good time. (Dkt. No. 22 at 3–6; Dkt. No. 25). Based on that waiver, Judge McAvoy dismissed all claims in the complaint relating to the loss of good time credits. (Dkt. No. 39 at 2).

5    It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (*citing Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87–88 & n. 1 (2d Cir.1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999). Plaintiff's request for unspecified injunctive relief against DOCS officials at Mohawk was largely mooted by his subsequent transfer to another facility. The Second Circuit has held that an inmate's request for prospective injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. *See, e.g., Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976). In any event, plaintiff's conclusory claim for injunctive relief would be insufficient to survive summary judgment, particularly because the court has found no violation of plaintiff's constitutional rights.

6    Rule 56 was extensively amended, effective December 1, 2010. As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

7    The plaintiff filed at least 15 submissions that purport to "supplement" or support his complaint. (Dkt.Nos.8, 10, 12–20, 27, 31–33). Only one submission was identified as a motion to amend (Dkt. No. 31), and this court ruled that it was not a proper pleading because it sought to add allegations to the complaint, rather than replace it with a complete amended complaint. (Dkt. No. 39 at 5–6). While the court will not treat these various "addendums" as part of the complaint, it will consider them to the extent they clarify allegations in the complaint or are relevant to the determination of whether there are genuine issues of material fact relating to the pending summary judgment motions. The court believes that this approach is consistent with the Second Circuit's standards for construing a *pro se* pleading.

8    In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137. We agree with the defendants that plaintiff's conclusory retaliation claim (7/20/2009 Addendum, Dkt. No. 8 at 1) would not survive summary judgment, even if plaintiff had exhausted his administrative remedies with respect to this claim. Moreover, plaintiff has not identified any protected activity that preceded defendant O'Hara's initiation of the two misbehavior reports. Plaintiff's grievance against defendant O'Hara, which would constitute protected conduct, was filed followed the initiation of both disciplinary charges. As discussed in section V.A. below, plaintiff's activities involving UCC materials are not protected by the First Amendment in the prison setting.

9    At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable

2011 WL 3841551

rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims). Based on these cases, the Second Circuit adopted a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009). Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in several post-*Woodford* cases. *See, e.g., Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007); *Davis v. State of New York,* 311 Fed. Appx. 397, 399 (2d Cir.2009).

10    The Second Circuit found a "valid, rational connection" between DOCS Directive 4422, which allows prior inspection of inmates' commercial mail, and the legitimate governmental interests that the directive was designed to promote. *See Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987). The Second Circuit concluded that Directive 4422 served "to prevent inmates from committing fraud on businesses or from obligating funds beyond their means." *Id.* As such, the regulation promoted the penological objectives of "security, order, and rehabilitation." *Id.* Other courts in this Circuit have similarly rejected a First Amendment challenge to DOCS Rule 103.20, which prohibits inmates from soliciting goods or services from any business without the approval of the superintendent. *Jordan v. Garvin,* 01CIV4393, 2004 WL 302361, at *3–4 (S.D.N.Y. Feb.17, 2004).

11    Plaintiff admitted creating a UCC document which listed the names of various law enforcement or corrections officials, including the Commissioner of DOCS and Superintendent Woughter. (Pltf. Dep. at 53–54; Fauss Decl. ¶ 17). Moreover, in one of his "supplemental" submissions, plaintiff attached copies of UCC documents that were seized in the Mohawk mail room in April 2009. (9/3/09 Addendum, Dkt. No. 32). These documents would clearly serve no legitimate business or other purpose, and, as plaintiff acknowledged (Pltf. Dep. at 67–68), were part of the "redemption" process. Plaintiff's use of straw names in the UCC forms, and his apparent efforts to copyright those names, are consistent with the fraudulent "redemptionist" scheme common among inmates around the country. *See Monroe,* 536 F.3d at 203 n. 4.

12    Due process does require proper notice to an inmate of disciplinary rules in some fashion. *See, e.g., Frazier v. Coughlin,* 850 F.2d 129, 130 (2d Cir.1988). As discussed below, plaintiff did receive ample actual notice of the disciplinary rules applied to him.

13    In *Farid v. Ellen,* the Second Circuit reversed the district court's grant of summary judgment, rejecting the finding of the lower court that the defendants in that case were clearly entitled to qualified immunity. 593 F.3d at 246–47. In doing so, the panel ruled that, "in light of *Chatin,* a jury could very well decide that it is unreasonable for a prison official to act on the belief that violation of a prisoner organization's internal by-laws can properly subject a prisoner to discipline under the prison's rules." *Id.* However, in this case, as in *Young v. Goord,* the plaintiff inmate had actual, personal notice that provided "other reasons to know that what he did was against *prison* rules...." *Farid v. Ellen,* 593 F.3d at 242. Hence, *Farid* and *Chatin* are distinguishable and the defendants in this case are entitled to a grant of summary judgment based on qualified immunity.

14    *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y.2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)).

15    In order to begin a due process analysis, the court must determine, *inter alia,* that plaintiff had a protected liberty interest in remaining free from the confinement that he challenges. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose [ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998). The defendants have assumed, *arguendo,* that the penalties imposed as a result of the three disciplinary hearings—at least 15 months in SHU —were sufficiently substantial to entitle him to due process. (Deft.s' Memorandum of Law at 15, Dkt. No. 88–12 at 15). *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) ( "Confinement in normal SHU conditions for 305 days is in our

2011 WL 3841551

judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin."* )

16    Plaintiff also asserted, with respect to each of the three disciplinary hearings, that defendant Bezio, the Director of the DOCS Special Housing and Inmate Disciplinary Programs, violated his due process rights by not correcting the alleged errors committed during the hearing. Having found no due process violations in connection with any of the hearings, no further discussion of this allegation is required.

17    Plaintiff received further notifications of the import of the revised DOCS rules relating to UCC materials on and after May 6, 2009, but his primary claim is that he was not given proper notice prior to May 6th. On May 6, 2009 (Woughter Decl., Exh. K) and May 19, 2009 (Ciotti Decl., Exh. D, Dkt. No. 88–4), plaintiff was given written orders not to possess or file UCC documents without the prior approval of the superintendent.

18    At the second hearing, plaintiff did not contest the allegation that Sgt. Cianciola gave him a direct order not to possess UCC documents without the superintendent's permission. (Fauss Decl., Exh. B at 14–15).

19    *See also Monier v. Holt,* 4:CV–05–2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec.21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at *3 (W.D.N.C. Apr.2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* 554 U.S. 922, 128 S.Ct. 2960, 171 L.Ed.2d 892 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar.9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).

20    At his deposition in May 2010, plaintiff contradicted his testimony at the disciplinary hearing by admitting that he filled out the seized UCC document. (Pltf. Dep. at 53–56).

21    *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989)).

22    *See, e.g., Porter v. Coughlin,* 421 F.3d 141, 142 (2d Cir.2005) (*Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), does not affect this Circuit's pre-*Hudson* conclusion in *United States v. Hernandez–Fundora,* 58 F.3d 802 (2d Cir.1995), that criminal prosecutions and prison disciplinary proceedings based on the same conduct do not implicate double jeopardy concerns.); *Lisbon v. Goord,* 02 Civ. 3567, 2003 WL 1990291, at *2 (S.D.N.Y. Apr.29, 2003) (holding that double jeopardy protection does not apply in the context of two successive disciplinary hearings allegedly involving some of the same conduct).

23    The copy of plaintiff's mail, attached as Exhibit C to the Ciotti Declaration, does not appear to include anything resembling written instructions regarding UCC forms. However, during the disciplinary hearing, Lt. Ciotti read from the correspondence and quoted additional statements, not reflected in Exhibit C, which do appear to be instructions regarding UCC forms. Plaintiff made did not object to the recitation of the content of his letters at the disciplinary hearing. (St. Louis Decl., Exh. B at 17–18). The court concludes that the copies of the letters provided with defendants' motion are incomplete, and will rely on the transcript of the hearing with respect to the full content of the seized correspondence.

24    "Kiting" mail refers to attempting to surreptitiously forward prohibited correspondence to someone other than the addressee on the envelope, through third parties. (St. Louis Decl. ¶ 6).

25    Plaintiff's last, conclusory claim requires little discussion, as it is completely inconsistent with the written statement of reasons prepared by Capt. St. Louis, which he also read into the record. (St. Louis Decl., Exh. A, Dkt. No. 88–9 at 8 & Exh. B at 23–24).

26    *See Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (inmates are not entitled to the right to confront and cross-examine witnesses at a disciplinary hearing and the hearing officer may rely upon evidence not presented at the hearing).

27    Capt. St. Louis reasonably admonished plaintiff for being "disrespectful" and "defiant," based on several instances where plaintiff refused to answer questions or interrupted the hearing officer. (St. Louis Decl., Exh. B at 17–18, 19–20, 21–22).

28    Although due process includes a right to call witnesses, this right is also not unfettered. *Alicia v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005). This right may be limited for security reasons, to keep a hearing within reasonable limits, or

2011 WL 3841551

on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)).

29  An inmate has a right to call witnesses and present evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. at 566.

30  Plaintiff has also claimed that he requested and was denied a copy of the mail watch order, pursuant to which his mail was seized. (Complaint, Dkt. No. 1–3 at 19). Again, the court finds no indication that plaintiff requested this document at the hearing. (St. Louis Decl., Exh. B at 20). If the document had been requested, it could have been reasonably withheld for security reasons. Moreover, as indicated above, because plaintiff had no legal basis for objecting to evidence at the hearing even if it had been seized pursuant to an invalid mail watch, the mail watch order could have been excluded as irrelevant and unnecessary.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22327110
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony PALMER, Plaintiff

v.

Ronald GOSS, Corrections Officer; William
Connelly, Deputy Superintendent; Paul
Richards, Deputy Superintendent; Donald
Selsky, Director of Special Housing; Defendants.

No. 02 Civ. 5804(HB).
|
Oct. 10, 2003.

**Synopsis**
State prisoner brought pro se civil rights action under
§ 1983 against corrections officer and prison officials,
alleging that officer used excessive force to subdue him in
an altercation that followed a pat-frisk, and that officials
violated his right to due process in course of resulting
disciplinary hearing and grievance. On defendants' motion
for summary judgment, the District Court, Baer, J., held
that: (1) prisoner made reasonable efforts to exhaust
his administrative remedies with respect to excessive
force claim; (2) genuine issue of material facts existed
as to whether prisoner had liberty interest in not
being placed in segregated housing unit, and whether
he received all the process that was purportedly due,
precluding summary judgment on due process claim;
(3) prison superintendent who allegedly tampered with
tape recording of disciplinary hearing was not entitled to
qualified immunity; but (4) officials who merely exercised
their discretion to not intervene in disciplinary hearing
were entitled to qualified immunity.

Motion granted in part, and denied in part.

West Headnotes (5)

**[1]      Civil Rights**
         👉 Criminal Law Enforcement;Prisons

State prisoner made reasonable efforts to
exhaust his administrative remedies with
respect to claim that corrections officer

used excessive force to subdue him in an
altercation that followed a pat-frisk, as
required under the Prison Litigation Reform
Act of 1995 (PLRA) to bring pro se civil rights
action under § 1983 against officer, although
he did not appeal superintendent's adverse
decision on his grievance to administrative
review committee, where he did file grievance
with prison's inmate grievance resolution
committee, and by time grievance was denied,
he was aware that key piece of evidence
which he believed corroborated his version
of events had allegedly been destroyed
under suspicious circumstances. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. §§ 1983; Civil
Rights of Institutionalized Persons Act, §
7(a), as amended, 42 U.S.C.A. § 1997e(a); 7
N.Y.C.R.R. § 701.7.

1 Cases that cite this headnote

**[2]      Federal Civil Procedure**
         👉 Civil Rights Cases in General

Genuine issue of material fact existed as
to whether state prisoner's confinement for
77 days in segregated housing unit was
atypical and significant hardship in relation
to ordinary incidents of prison life sufficient
to implicate a liberty interest, precluding
summary judgment for prison officials on
prisoner's claim under § 1983 that he was
denied due process at disciplinary hearing.
U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §
1983.

11 Cases that cite this headnote

**[3]      Federal Civil Procedure**
         👉 Civil Rights Cases in General

Genuine issue of material fact existed as to
whether state prisoner received all the process
he was due at disciplinary hearing, precluding
summary judgment for prison officials on
prisoner's claim under § 1983 that he was
denied due process at disciplinary hearing.
U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §
1983.

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 292 of 329

1 Cases that cite this headnote

**[4]    Civil Rights**
👉 Prisons, Jails, and Their Officers;Parole and Probation Officers

Prison superintendent who allegedly tampered with tape recording of disciplinary hearing was not entitled to qualified immunity from prisoner's claim under § 1983 that he was denied due process at disciplinary hearing, since alleged tampering was illegal. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[5]    Civil Rights**
👉 Prisons, Jails, and Their Officers;Parole and Probation Officers

Prison officials who merely exercised their discretion to not intervene in disciplinary hearing were entitled to qualified immunity from prisoner's claim under § 1983 that he was denied due process at disciplinary hearing, since their failure to intervene was not a clear violation of clearly established law. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

*OPINION & ORDER*

BAER, J.

**\*1**  Defendants move for summary judgment on plaintiff's claims. For the following reasons, defendant's motion is granted in part and denied in part.

## I. BACKGROUND

### A. Introduction

*Pro se* plaintiff Anthony Palmer's action pursuant to 42 U.S.C. § 1983 stems for an altercation he had with defendant Corrections Officer Ronald Goss ("C.O.Goss")

at Sing Sing Correctional Facility on August 17, 2000. Palmer, who was convicted in 1997 in New York Supreme Court of first-degree robbery and sentenced to 14 years' imprisonment, alleges that on August 17, 2000, C.O. Goss used excessive force in violation of the Eighth Amendment to subdue him in an altercation that followed a pat-frisk. Palmer contends that C.O. Goss assaulted him without justification and that C.O. Goss's actions were retaliatory, because C.O. Goss had charged Palmer a year earlier with a prison infraction that was later expunged. Palmer's due-process claim against defendant Deputy Superintendent Paul Richards ("Dep.Supt.Richards") relates to Palmer's allegation that Dep. Supt. Richards purposefully erased a portion of the tape of a disciplinary hearing that was allegedly favorable to Palmer's version of this incident. He claims that Donald Selsky, the Director of Special Housing/ Inmate Disciplinary Program, improperly affirmed the disposition of the disciplinary hearing, despite the fact that Palmer had apprised him that a portion of the tape of his disciplinary hearing which corroborated Palmer's account was erased. Palmer's claim against Connolly is that he ignored letters that Palmer wrote about the incident. Palmer claims that he lost a tooth as a result of the assault and was improperly placed in a segregated housing unit, which caused him to lose his privilege to participate in a family-reunion program which subsequently led his wife to file for divorce and cease all contact with him.

### B. Facts

Palmer and C.O. Goss tell two markedly different versions of the events between them at around 11 a.m. on August 17, 2000. On the day of the event, C.O. Goss filed an Inmate Misbehavior Report which charged Palmer with disobeying a direct order (Rule Violations 106.10), harassing employees (Rule Violations 107.11), and violent conduct (Rule Violations 104.11). (This report —or "ticket" as Palmer refers to it—was endorsed by C.O. Valentin and C.O. Wyllie.) Meanwhile Palmer filed a grievance with the inmate grievance resolution committee ("IGRC"). (*See* Fleischmann Decl. Ex. T.) Also on August 17, he sent a nearly identical letter to Dept. Supt. Connolly in which he described the event as follows:

> Today I was assaulted by C.O. Goss for no apparent reason. Let me explain. I was on my way back from by program, which is the state shop. (10:52 am) As I was walking on H–Gallery an inmate in H–4 was giving me some cheese doodles. Ten bags to be exact.

I was behind the line and not on his gate. When I got the chips Officer Goss told me to get on the wall and give him my bag. I complied as I was told too. Once the search was completed C.O. Goss took my bag and threw it on the floor at my feet. I looked at him with questioning eyes, (but did not speak) He said "what the fuck are you looking at, I found it on the floor, now go lock in." I proceeded to do as I was told. On my way upstairs on A–Block Bridge, I looked down at him and asked "if you got a problem with me, why don't you get me transferred off the gallery instead of bothering me." He ran up the stairs and said "what the fuck did you say?" I repeated it, and he just punched me in the face. Just like that. I swear on my kids. I was wrestled to the ground by C.O. Wiley [sic] and C.O. Valentin, handcuffed and escorted to E.R. where pictures were taken and the visual procedures. I want you to know that this officer has written me up before and the ticket was dismissed. He also told me he would prevent me from going on my trailer [1] if I wasn't careful. Why he said it, I don't know. I do not say nothing to this officer except to answer him when he comes around doing his "go round." I was scheduled to go on my trailer on 8/22/00—in 5 days. I have not had a ticket in two years and was going to honor block. Sir, I wasn't out of place. I wasn't interfering with this officers duties. I did not threaten him or raise my voice or hand at him. I've been programming steadily. All C.O.s in the receiving room can vouch that I have never been a problem.....

**\*2** (*See* Fleischmann Decl. Ex. V.) Palmer noted in this letter and in his grievance that he was scheduled to participate in the family-reunion program—"going to the trailer," in Palmer's words—on August 22 and requested that he remain eligible for this prized program. (*See* Fleischmann Decl. Ex. V.) Sergeant McNamara conducted an investigation of the incident, which included an interview with Palmer and the submission of memoranda by C.O. Wyllie and C.O. Valentin about what each witnessed. [2]

1. Palmer's disciplinary hearing

In his Inmate Misbehavior Report, C.O. Goss described the incident as follows:

On the above date and approximate time after being pat frisked this inmate began yelling "Fuck you Goss, you had no right to search my bag. Fuck you,

motherfucker" and other statements of this type. I gave the inmate a direct order to go lock in; the inmate dropped the bag from his hand, took a fighting stance and moved toward me, still yelling. Force was used to take control of the inmate.

Fleischmann Decl. Ex. D. [3] On August 21 and 25, Dep. Supt. Richards presided over a hearing on C.O. Goss's charges against Palmer. (*See* Fleischmann Decl. Exs. I and J.) For this hearing, Palmer received assistance from one L. Robles, who spoke with several corrections officers (Wyllie, Valentin, and Busick) and an inmate (Kenyon Baker) prior to the hearing. Palmer testified at the hearing to similar effect as what he stated in his grievance and letter to Dep. Supt. Connolly. At Palmer's request, C.O. Wyllie and inmate Baker also testified. (*See* Richards Aff. ¶ 5; Palmer Dep. 72.) Palmer did not seek to question C.O. Goss, nor was he deprived the opportunity to have any other witness appear. (*See* Richards Aff. ¶ 5; Palmer Dep. 81.) Dep. Supt. Richards found Palmer guilty of the three infractions charged and based this disposition on C.O. Goss's report. (*See* Fleischmann Decl. Ex. J.) Dep. Supt. Richards also stated that he found Kenyon Baker, the inmate witness, to be noncredible. (*See id.*) Dep. Supt. Richards imposed a 90–day keeplock sentence and 90–day loss of packages, commissary, and telephone usage. (*See id.*) Palmer was sent to an administrative segregated housing unit for the 90 days, of which he served 77 days.

On August 25, 2000, Palmer appealed Dep. Supt. Richards's disposition to Director Selsky, the Director of Special Housing/Inmate Disciplinary Program. In this appeal, Palmer contended that C.O. Wyllie's testimony at the hearing was inconsistent with the Inmate Misbehavior Report prepared and signed by C.O. Goss that which C.O. Wyllie endorsed. (*See* Fleischmann Decl. Ex. K.) [4] On August 31, 2000, Palmer wrote Director Selsky a letter in which he stated that the tape of the hearing contained only a small portion of the events at the hearing and that he could not properly appeal this disposition without the complete tape. (*See* Fleischmann Decl. Ex. L.) Palmer wrote Director Selsky again on October 11, 2000 to request the status of his appeal, to which Director Selsky responded on October 17 that Palmer's papers had been received and he would be notified of the results. (*See* Fleischmann Decl. Ex. M.) On October 31, Director Selsky informed Palmer that the Dep. Supt. Richards' decision was affirmed. (*See* Fleischmann Decl. Ex. O.)

**\*3** On October 24, 2000, Palmer submitted a notice of intention to file a claim with the New York Supreme Court, Westchester County. On March 1, 2001, Palmer filed an Article 78 petition to challenge Director Selsky's affirmance on the grounds that 1) the evidence was insufficient to sustain the findings, and 2) Palmer was denied procedural due process because the tape was defective. (*See* Fleischmann Decl. Ex. P.) First Deputy Superintendent W.E. Phillips conducted a discretionary review of the disciplinary hearing. On June 29, 2001, he expunged the records of the hearing because he found the tape of the hearing "defective halfway through the hearing."[5] Palmer's Article 78 proceeding was then dismissed as moot. The court noted "it would not be possible for the Court to properly review the record on the instant petition." (*See* Fleischmann Decl. Ex. S.) On March 6, 2001, Palmer filed a claim with the N.Y. Court of Claims, in which he claimed that New York was negligent with respect to C.O. Goss's use of force. (*See* Fleischmann Decl. Ex. X.) After a trial, Judge Terry Jane Ruderman found that the force used by C.O. Goss under the circumstances was reasonable and dismissed the action on June 5, 2002. (*See* Fleischmann Decl. Ex. Y.)

2. Palmer's grievance

As noted, Palmer filed a grievance against C.O. Goss. In this grievance, Palmer contended that C.O. Goss assaulted him for no reason. Palmer noted that he was scheduled to participate in the family-reunion program on August 22, a fact that in his view reflects both his good behavior as an inmate and his great incentive to stay out of trouble. Palmer again wrote Dep. Supt. Connolly on August 31, 2000 in which he explained that he was unable to file a proper appeal because the hearing tape was defective. Palmer's grievance was eventually denied on November 14, 2000 by the superintendent. (*See* Fleischmann Decl. Ex. U.) The superintendent's decision credited the results of an investigation by Sergeant McNamara who concluded that C.O. Goss did not assault Palmer; he found that C.O. Wyllie and Valentine's statements supported C.O. Goss account of events and also noted that when Palmer was medically evaluated afterwards there were no injuries found. (*See id.*)[6] Palmer did not appeal this disposition, although the form that contained the superintendent's disposition advised the grievant that he must sign below and return the form within 4 days if he wishes to appeal. (*See id.*)

II. DISCUSSION

Defendants move for summary judgment on Palmer's excessive-force claim against C.O. Goss on the basis that Palmer failed to exhaust his administrative remedies. Defendants move for summary judgment on his due-process claim against Dep. Supt. Connolly, Dep. Supt. Richards, and Director Selsky on the grounds that 1) no protected liberty interest was implicated and that he was afforded all the process due, and 2) that these defendants are entitled to qualified immunity.

**\*4** A court may grant a motion for summary judgment if it determines that there is no genuine issue of material fact to be tried. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co .,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). If the moving party meets its burden, the opposing party must then produce admissible evidence sufficient to raise a material question to defeat the motion for summary judgment. *See, e.g., Rivera v. Goord,* 253 F.Supp.2d 735, 745 (S.D.N.Y.2003). Moreover, because Palmer appears pro se, his complaint is read liberally. *See, e.g., Lisbon v. Goord,* No. 02 Civ. 3567(HB), 2003 U.S. Dist. LEXIS 7135, at \*4 (S.D.N.Y. Apr. 29, 2002) (citing *Elliott v. Bronson,* 872 F.2d 20, 21 (2d Cir.1989)).

A. Failure to exhaust administrative remedies

**[1]** The Prison Litigation Reform Act of 1995 ("PLRA") requires that any prisoner who brings a § 1983 action with respect to prison conditions must exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). The Supreme Court has ruled that this exhaustion requirement applies to excessive-force claims, as Palmer raises here. *See Porter v. Nussle,* 534 U.S. 516, 520, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In New York state prisons, there is a three-step grievance procedure. First, an inmate submits a complaint to the institution's

Palmer v. Goss, Not Reported in F.Supp.2d (2003)
Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 295 of 329
2003 WL 22327110

inmate grievance resolution committee ("IGRC"). The IGRC, which consists of five members including two inmates, investigates and reviews the grievance. *See* 7 N.Y.C.R.R. § 701.7; *id.* § 701.7; N.Y. Correct. Law § 139. Second, the inmate then can appeal the IGRC's determination to the superintendent of the facility. *See* 7 N.Y.C.R.R. § 701.7. Finally, the inmate can appeal the superintendent's decision to the Central Office Review Committee ("CORC"), the body that makes the final administrative determination. *See id.*

There is no dispute that Palmer failed to exhaust the administrative remedies available to inmates in New York state prisons. Although he filed a grievance on August 17, the day of the incident, he did not further appeal the adverse decision he received on November 14, 2000 to the Central Office Review Committee, which is the third and final step in the administrative grievance procedure.

As I have noted elsewhere, while *Porter* is clear that excessive-force claims such as Palmer's are within 42 U.S.C. § 1997e(a), *Porter* is less clear as to "the circumstances that may serve to satisfy the requirement of when 'administrative remedies as are available are exhausted.' " *O'Connor v. Featherstone,* No. 01 Civ. 3251(HB), 2002 WL 818085, at *2 (S.D.N.Y. Apr.29, 2002). There, I also noted that courts have denied motions to dismiss on failure-to-exhaust grounds where an inmate has made a reasonable attempt to exhaust his administrative remedies, "especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts." *Id.* (citing cases). This is such a case.

 *5 Although Palmer failed to pursue his grievance against C.O. Goss through all three levels, he did take reasonable steps to vindicate his claim, only—accepting as true his evidence and drawing reasonable inferences in his favor—to desist when it appeared to him that Dep. Supt. Richards had intentionally destroyed evidence that supported his version of the incident and significantly deprived him of any possibility of relief through the grievance procedure. Palmer filed his grievance the day of the incident, but—as far as I can tell from the record before me—there was never any investigation or review by the IGRC into his allegations. When the superintendent denied Palmer's grievance three months later he based his conclusion entirely on Sergeant McNamara's investigation and conclusions. It does not

appear that any investigation was ever performed—as is apparently required—by the five-member panel of the IGRC that includes two inmates. Moreover, Palmer wrote Connolly a letter on August 31 in which he stated that he was unable to file a proper appeal because the hearing tape was defective—a view that was implicitly endorsed by both the prison administration when First Dep. Supt. Phillips expunged the records of the hearing and the New York Supreme Court when it dismissed as moot his Article 78 proceeding and noted that "it would not be possible for the Court to properly review the record on the instant petition." Thus, by the time Palmer's grievance was denied, he was aware that the key piece of evidence which he believed corroborated his version and undermined C.O. Goss's—and thus Dep. Supt. Richards' disposition of his disciplinary hearing—was destroyed under suspicious circumstances. Specifically, Palmer testified at his deposition that after he explained to Dep. Supt. Richards that C.O. Wyllie's testimony supported Palmer's version, Dep. Supt. Richards adjourned for 15 minutes to review the evidence—i.e., the tape—and then ruled against Palmer. Palmer testified that the tape-recording contains in their entirety his testimony, which was at the start of the tape, and inmate Baker's testimony, which was at the end, but that C.O. Wyllie's testimony, which was in the middle, is entirely blank. If, as Palmer alleges, the tape is fine in the beginning and end, but blank in the middle, it is reasonable to conclude that it was intentionally altered.

Under these circumstances, it appears that Palmer has more than made reasonable efforts to exhaust his administrative remedies. Defendants' motion to dismiss Palmer's excessive-use-of-force claim against C.O. Goss is denied.

B. Failure to state a claim for relief
With respect to Palmer's due-process claim, defendants move to dismiss on the ground that there was no deprivation of a protected liberty interest and, moreover, he received all the process due.

To properly state a claim under § 1983 for denial of due process at a disciplinary hearing, Palmer must first identify a liberty interest of which he was deprived and which is protected by the Due Process Clause. *See Lisbon v. Goord,* No. 02 Civ. 3567(HB), 2003 U.S. Dist. LEXIS 7135 (S.D.N.Y. Apr. 29, 2002) (citing *Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999)*). Second, he must show

that "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).* Finally—if he has met these first two requirements—Palmer must show that the defendants' deprivation of that interest occurred without due process of law. *See Taylor v. Rodriguez,* 2398 F.3d 188, 191–92 (2d Cir.2001); *see also Jenkins, 179 F.3d at 28.*

**\*6** **[2]** A inmate's confinement to SHU does not automatically implicate a liberty interest. *See Sandin v. Conner, 515 U.S. 472, 483–86, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).* To prevail on his § 1983 claim, Palmer must establish that the confinement created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sims v. Artuz, 230 F.3d 14, 22–23 (2d Cir.2003); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).* Although there is no bright-line rule for what length of SHU confinement would constitute an "atypical and significant hardship," and although this determination requires a fact-intensive inquiry by the district court, *see Sims, 230 F.3d at 22–23,* the decisions in this Circuit generally require that the duration of SHU confinement be at least 100 days in order to be considered an atypical and significant hardship. *See Sims, 230 F.3d at 23; see also Lisbon v. Goord,* No. 02 Civ. 3567(HB), 2003 U.S. Dist. LEXIS 7135, at \*8 (S .D.N.Y. Apr. 29, 2002) (citing cases and noting that 101 days seems to be the minimum threshold). Although Palmer's punishment—he was sentenced to 90 days of keeplock and served 77 days in a segregated housing unit—was less than this threshold, it is undisputed that Palmer was deprived the privilege of participating in the family-reunion program. While defendant is correct that Palmer has no liberty interest in participation in the family-reunion program, *see Hernandez v. Coughlin, 18 F.3d 133, 137–38 (2d Cir.1994),* this fact, it seems to me, is sufficiently relevant to the determination of whether Palmer's confinement constituted an atypical and significant hardship in relation to the ordinary incidents of prison life sufficient to deny defendant's motion for summary judgment on whether any liberty interest was implicated, especially where there is a plausible suggestion of retaliation by C .O. Goss. *Cf. Colon v. Howard, 215 F.3d 227, 230 (2d Cir.2000)* ("The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes

and then apply the law of atypicality, as instructed by the Court." (citing *Sealey v. Giltner (Sealey II), 197 F.3d 578, 585 (2d Cir.1999));* *Sealey v. Giltner (Sealey I), 116 F.3d 47, 51 (2d Cir.1997)* ("[W]e have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement."). Moreover, Palmer should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh to compensate for its comparative shortness. *See Sealey II, 197 F.3d at 589.*

**[3]** I also disagree with defendants' argument that Palmer was granted all the process he was due. Defendants note that Palmer was provided written notice of his disciplinary hearing, that he was permitted to call any witnesses he chose, and that Dep. Supt. Richards provided a written statement of the evidence relied on and the reason for his decision. Defendants also contend that he has no constitutional right to a tape so "the fact that it was apparently defective does not rise to the level of constitutional deprivation." Defendants' argument here rests on an inappropriate supposition at this stage of the litigation—namely that the tape was defective and not intentionally erased by corrections department employee. Although Dep. Supt. Richards attested that he did not erase the tape, Palmer has presented sufficient evidence that a reasonable jury could conclude otherwise and that the hearing that Richards presided over not only lacked the process due as a result but may have been tainted from the get-go. As noted above, Palmer testified that the tape is blank for the entirety of C.O. Wyllie's testimony but is otherwise fine and that at the end of the hearing he demonstrated to Dep. Supt. Richards that C.O. Wyllie supported Palmer's rather than C.O. Goss's version of the incident.

**\*7** Thus, defendants' contention that Palmer has failed to state a claim for relief is denied.

## C. Qualified immunity [7]

The doctrine of qualified immunity protects state actors sued in their individual capacity from suit for monetary damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Baskerville v. Blot, 224 F.Supp.2d 723, 737 (S.D.N.Y.2002)* (quoting *Harlow*

*v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). These state officials are shielded by qualified immunity for either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001).

**[4]** **[5]** Based on the evidence before the Court, Dep. Supt. Richards is not entitled to qualified immunity. The allegation here is that he intentionally tampered with the tape-recording of a hearing. It is beyond dispute that such an action to destroy evidence was illegal, and defendants do not seriously contest otherwise. Instead, they argue that Richards conducted the hearing in an objectively reasonable manner—but again this seems the very nub of what the factfinder must determine. In contrast, Director Selsky and Dep. Supt. Connolly are entitled to qualified immunity. While Palmer alerted both of them to Dep. Supt. Richards's alleged impropriety, it is clear that their failure to intervene did not constitute a clear violation of clearly established law. Unlike Dep. Supt. Richards, neither Director Selsky or Dep. Supt. Connolly affirmatively violated any law or any duty clearly imposed on them—they merely exercised their discretion to not intervene in the grievance procedure or the disciplinary hearing. *Cf. Sealey I,* 116 F.3d at 51 (affirming dismissal

against prison administrator to whom the inmate who alleged due-process violations had sent two letters).

Thus, defendants' motion to dismiss Palmer's claim on the grounds of qualified immunity is denied with respect to Dep. Supt. Richards but granted with respect to Dep. Supt. Connolly and Director Selsky.

### III. CONCLUSION

For the foregoing reasons, defendant's motion is granted in part and denied in part. Defendants' motion to dismiss Palmer's excessive-force claim against C.O. Goss is denied. Defendants' motion to dismiss Palmer's due-process claim is denied with respect to Dep. Supt. Richards but granted with respect to Dep. Supt. Connolly and Director Selsky. The trial of this matter is scheduled for October 20, 2003 and thus any writs, etc., should be sought forthwith and the Attorney General is directed to cooperate with the plaintiff on this score.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22327110

Footnotes

1   That is, participating in a family reunion program with his wife and children. *See* Palmer Dep. 38.

2   In a memorandum to Sergeant McNamara dated August 17, 2000 C.O. Wyllie stated that he heard yelling and saw C.O. Goss struggling with Palmer and taking him to the floor and that C.O. Goss gave Palmer several orders to stop and not get up, with which Palmer complied. (*See* Fleischmann Decl. Ex. G.) C.O. Valentin described how he heard someone yell "Do you have a problem with me" and "What's your fucking problem?" and that when he arrived at the area he saw C.O. Goss restraining Palmer. C.O. Valentin ordered Palmer to stop resisting, an order with which Palmer complied. (*See* Fleischmann Decl. Ex. H.)

3   He also filed a Use of Force Report in which he described the incident as follows:
    This inmate became loud and abusive after being pat frisked, when ordered to go lock in, the inmate dropped the bag from his hands, took a fighting stance and moved toward me.
    I wrapped both arms around the inmate's upper arms and chest turning the inmate and bringing him to the floor on his back. Handcuffs were supplied by responding staff, when the inmate complied with orders, I place him in handcuffs.
    (Fleischmann Decl. Ex. E.)

4   He explained the reason for his appeal as follows:
    1) C.O. Wyllie's testimony is inconsistent. 2) C.O. Goss's *post* is, on the day in question, the gym door, why was he one flight up on the A–Block Bridge 3) C.O. Wyllie mentions on tape about "seeing us fighting" but there is nothing about "us fighting" on the ticket." He goes on to explain: CO Wyllie and CO Valentin endorsed the ticket as witnessing the incident when CO Wyllie was asked if he heard me use *any* profanity, he states that "I heard statements like if there is a problem" and a lot of shouting. But he didn't say I said one curse word. (107.11) I asked if he seen my "drop my bag and get into a fighting stance" as he endorsed the ticket. "He states when he came down we were already fighting." (There is nothing on the ticket about fighting) I also asked him where was CO Goss and where was I when

2003 WL 22327110

    he heard statements. On the tape he said "CO Goss was on the flats (H–South) and I was on the bridge (one flight up) so why couldn't he hear exactly what came out my mouth? *Plus* how can be say he came when we "were fighting" when he was standing there plainly seeing CO Goss on the flats, which was before the incident actually occured [sic]?

5    In his memorandum, First Deputy Superintendent Phillips stated: "This decision in no way reflects on the findings of the Hearing Officer assigned, nor does it indicate the outcome of this hearing should have been different. Because we do not possess a full recording of the hearing, a complete review cannot be accomplished." (*See* Fleischmann Decl. Ex. Q.)

6    In this memo of September 5, 2000 to a Captain Haubert, Sergeant McNamara stated concluded that Palmer's complaint "was written for the sole purpose of being able to state to the hearing Officer 'I have a grievance against this Office' ' and "I find the allegations to be an effort to influence the outcome of a disciplinary hearing, Which [sic] apparently were unsuccessful since the inmate was found guilty of violent conduct, harassment and direct order in a Tier III hearing on 8/25/00." Palmer notes that he never told Dep. Supt. Richards in the disciplinary hearing about his grievance.

7    Defendants also claim that to the extent that Palmer sues them in their official capacity, rather than their individual capacity, they are shielded by the Eleventh Amendment. However, sovereign immunity and qualified immunity are mutually exclusive. *SeeGan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that such a claim is asserted against the state official in his official capacity, he may assert the state's Eleventh Amendment immunity against suit, but he may not assert a personal official privilege of absolute or qualified immunity. To the extent that such a claim is asserted against him in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment."). Here, it is clear that Palmer is suing these officials in their individual capacities—*i.e.,* to the extent that each was personally and actually involved in denying him due process. *Cf. Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001) (sovereign immunity extends to state officials who are acting on behalf of the state where the state is the "real, substantial party in interest").

---

**End of Document**                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 568875
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jose PIZARRO, Plaintiff,
v.
Joseph PONTE, et al., Defendants.

17 Civ. 4412 (LGS)
|
Signed 02/11/2019

**Attorneys and Law Firms**

Jose Pizarro, Scenectady, NY, pro se.

William Keaupuni Akina, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

**OPINION AND ORDER**

Lorna G. Schofield, United States District Judge

**\*1** Pro se Plaintiff Jose Pizarro brings this action under 42 U.S.C. § 1983 and New York state law against Defendants the City of New York ("the City"), New York City Department of Health and Mental Hygiene ("HMH"), New York City Department of Correction ("DOC"), New York City Board of Correction ("BOC"), Commissioner Cynthia Brann,[1] former Commissioner Joseph Ponte, Captain Morris, Correction Officer ("C.O.") Geradeau, C.O. Overton and C.O. Peters.[2] Defendants move for summary judgment on all claims under Federal Rule of Civil Procedure 56. For the following reasons, Defendants' motion is granted in part and denied in part.[3]

**I. BACKGROUND**

The facts below are drawn from the record and are construed in favor of Plaintiff as the nonmoving party. *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017). Plaintiff's claims arise from events on May 2, 2017, when he was transferred from the Mental Observation unit to General Population at the Anna M. Kross Correctional Facility ("AMKC") on Rikers Island.

From February 2016 until August 2018, Plaintiff was incarcerated by DOC. In April 2017, Plaintiff was housed in the Mental Observation unit.

On May 1, 2017, Plaintiff had a medication follow-up appointment with Aleen Boyd-Mckoy, a nurse practitioner. At this appointment, Plaintiff told Boyd-Mckoy that he was feeling depressed and paranoid. When Boyd-Mckoy asked Plaintiff how he felt living in the Mental Observation unit, he told Boyd-Mckoy that he felt safer there because of the unit's private cells and that he did not want to be moved into General Population. Boyd-Mckoy agreed with Plaintiff and told him not to worry because he would not be moved into General Population any time soon.

**\*2** On May 2, 2017, Dr. Kristila Brace completed a Housing Disposition report for Plaintiff. The report states that Plaintiff was discharged from the Mental Observation unit because his symptoms had stabilized and that observation had "revealed [the] absence of symptoms warranting [Mental Observation] housing."

On May 2, 2017, C.O. Geradeau came to Plaintiff's cell and ordered Plaintiff to submit to a strip search. Geradeau told Plaintiff that if he did not comply with the order, he would be discharged from the Mental Observation unit and rehoused in General Population. Plaintiff told Geradeau that the law required that a doctor approve his discharge and that his doctor, who he had seen the day before, did not say he would be discharged. Geradeau told Plaintiff that HMH had signed him out of the Mental Observation unit. Before leaving Plaintiff's cell, Geradeau told Plaintiff that he would be strip searched and discharged from the mental health dorm "the hard way."[4]

Geradeau returned with C.O. Overton, who opened Plaintiff's cell door and told him to remove his clothing for a strip search so that he could be discharged from the Mental Observation unit and sent to General Population. Plaintiff then removed his clothing, squatted and put his hands on his head.[5] Geradeau and Overton verbally abused him while they waited for Captain Morris to come. When Plaintiff asked them where the legally-required cameras were during this strip search, the C.O.s said that they were the law.

Morris arrived, told Plaintiff that he "shouldn't fuck with her," that he would "get [his]," and ordered him to pack his things while naked. When Plaintiff instead started getting dressed, Morris told him to stop and instructed the officers to go into Plaintiff's cell. Overton threw Plaintiff to the ground,[6] after which Geradeau, Overton and C.O. Peters assaulted Plaintiff with punches. When Plaintiff yelled for help, Overton put him in a chokehold[7] and Peters held his hands down. Plaintiff passed out and awoke to a slap from Peters. Morris -- who was outside or almost in Plaintiff's cell -- told Plaintiff, who was dizzy and in pain, to get dressed. The guards handcuffed Plaintiff and moved him to General Population. During the transfer, Overton twisted Plaintiff's wrist. Plaintiff told Overton to stop twisting his wrist and asked Morris to tell Overton to comply. Plaintiff's medical record from the day of the incident states that his left wrist had mild swelling, redness and a limited range of movement. The "impression" section of Plaintiff's May 3, 2017, x-ray record states "[n]o fracture." As a result of the May 2, 2017, assault, Plaintiff maintains that he suffers nerve damage in his left wrist and mental illnesses including post-traumatic stress disorder, anxiety, depression and insomnia. Plaintiff also has injuries in his right shoulder and left knee.[8]

**\*3** Over the next few days, Plaintiff sent letters to the BOC, Commissioner Joseph Ponte, the Warden of AMKC and the Deputy of Security of AMKC complaining about the May 2, 2017, incident. Plaintiff also submitted a grievance form in which Plaintiff stated that he was strip searched, verbally abused and beaten in his cell. Plaintiff never received a response to his grievance and did not appeal the non-response.

## II. LEGAL PRINCIPLES

### A. Summary Judgment

Summary judgment is appropriate if the record establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Nick's Garage*, 875 F.3d at 113 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ). The evidence is construed in the light most favorable to the nonmoving

party and all reasonable inferences are drawn in the nonmoving party's favor. *See id.*

### B. Pro se Pleadings and Briefs

Where, as here, a party appears pro se, a court must construe "the submissions of a *pro se* litigant ... liberally" and interpret them "to raise the strongest arguments that they *suggest.*" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks omitted) (emphasis in original) (collecting cases); *accord Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015). Pro se status does not, however, "relieve [a non-movant] of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks and citation omitted); *accord O'Callaghan v. Uber Corp. of Cal.*, No. 17 Civ. 2094, 2018 WL 3302179, at \*5 (S.D.N.Y. July 5, 2018).

## III. DISCUSSION

Plaintiff's pleadings are construed to assert claims under § 1983 for denial of procedural due process for moving him from the Mental Observation unit to General Population, and for excessive force; and under state law for assault and battery.[9]

In order to succeed on a claim under § 1983, a plaintiff must establish that "(1) the defendant was a state actor, i.e., acting under color of state law, when he committed the violation and (2) the defendant deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015) (internal quotation marks omitted); *accord Gumora v. City of New York*, No. 17 Civ. 2300, 2018 WL 736018, at \*3 (S.D.N.Y. Feb. 5, 2018). A plaintiff must also establish the personal involvement of each defendant in the alleged constitutional violation. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013); *accord Hansen v. Town of Smithtown*, 342 F. Supp. 3d 275, 294 (E.D.N.Y. 2018).

**\*4** For the following reasons, summary judgment is granted as to all Defendants on all claims, except (1) the excessive force claim against Morris, Geradeau, Overton and Peters, and (2) the assault and battery claim against Geradeau, Overton and Peters.

**A. DOC and BOC**

Defendants DOC and BOC are dismissed from this action because they are not suable entities. The New York City Charter states that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the [C]ity of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Charter Ch. 17, § 396; *see also Moore v. City of New York*, No. 15 Civ. 6600, 2017 WL 35450, at *8 (S.D.N.Y. Jan. 3, 2017) (noting that plaintiff had been "direct[ed] [ ] to name the City of New York as the proper Defendant for his allegations against the DOC"); *Colon-Rodriguez v. N.Y. City Dep't of Corr.*, No. 07 Civ. 8126, 2009 WL 995181, at *5 (S.D.N.Y. Apr. 13, 2009) (dismissing claims against BOC as a non-suable entity). Claims against DOC and BOC are properly brought against the City, which is already a Defendant.

**B. Exhaustion of Administrative Remedies**

**1. Law**

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Failure to exhaust administrative remedies is an affirmative defense under the PLRA...." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). "[D]efendants bear the initial burden of establishing the affirmative defense of non-exhaustion 'by pointing to "legally sufficient sources" such as statutes, regulations, or grievance procedures' which demonstrate that 'a grievance process exists and applies to the underlying dispute.' " *Id.* at 126 n.6 (quoting *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ). Once a defendant has sufficiently established that a grievance process exists, the inmate plaintiff must show that he has properly exhausted his claims, "which means using all steps that the prison grievance system holds out, and doing so properly (so that the prison grievance system addresses the issues on the merits)." *Id.* at 122 (alterations, emphasis and internal quotation marks omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ).

"[T]he PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate." *Hubbs*, 788 F.3d at 59; *accord Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). An inmate's failure to exhaust administrative remedies is excused when the prison's grievance mechanisms are literally or constructively "unavailable" to him. *Priatno*, 829 F.3d at 123; *see, e.g., Ross*, 136 S. Ct. at 1858. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs*, 788 F.3d at 59; *accord Grafton v. Cty. of Nassau*, No. 15 Civ. 4564, 2016 WL 8711072, at *3 (E.D.N.Y. July 15, 2016).

"[P]risoners must complete the administrative review process in accordance with the applicable procedural rules -- rules that are defined not by the PLRA, but by the prison grievance process itself." *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal citation and quotation marks omitted) ); *accord Sanders v. City of New York*, No. 16 Civ. 7246, 2018 WL 3117508, at *4 (S.D.N.Y. June 25, 2018). As a Rikers Island detainee during the relevant period, "Plaintiff's grievance is governed by the Inmate Grievance and Request Program ('IGRP')...." *See Sanders*, 2018 WL 3117508, at *4; *see also Girodes v. City of New York*, No. 17 Civ. 6789, 2018 WL 3597519, at *3 (S.D.N.Y. July 26, 2018) ("The [IGRP] sets out the grievance procedures for inmates at Rikers Island."). The IGRP steps for prisoners are: first, submit a complaint for informal resolution; second, if the inmate "disagree[s] with the proposed resolution, [the inmate has] five business days to appeal and request a formal hearing"; third, if the inmate "disagree[s] with the [Inmate Grievance Resolution Committee]'s disposition, [the inmate has] five business days to appeal to the commanding officer"; fourth, if the inmate disagrees with the commanding officer's disposition, the inmate has "five business days to appeal to the Central Office Review Committee", who "will render a disposition within 15 business days of receiving the appeal." IGRP § IV(D)-(J), Attachment B. [10] "The inmate must take each of the four steps to exhaust the administrative grievance process." *Sanders*, 2018 WL 3117508, at *4 (internal quotation marks omitted); *see* IGRP § II.E ("As a matter of law, an inmate is often required to 'exhaust administrative remedies' such as those available through the IGRP before seeking relief from the judicial system or any other external agency.

Failure to file a grievance or request with the IGRP may prevent an inmate from seeking external relief.").

### 2. Due Process Rehousing Claim

**\*5** Plaintiff failed to exhaust his administrative remedies with regard to the due process rehousing claim, which is subject to the IGRP. *See, e.g., Houston v. Horn*, No. 09 Civ. 801, 2010 WL 1948612, at \*6–8 (S.D.N.Y. May 13, 2010) (noting that housing transfers are "subject to resolution through the IGRP" and granting the defendants summary judgment on the issues for which the defendants raised non-exhaustion). In his deposition, Plaintiff stated that he did not appeal his grievance regarding his May 2, 2017, housing transfer beyond the first step "because it was never answered." Failing to pursue a grievance for which no response is received is not excused. *See Mena v. City of New York*, No. 13 Civ. 2430, 2016 WL 3948100, at \*3 (S.D.N.Y. July 19, 2016) (collecting cases) ("[T]he law is well-settled that an inmate's failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies.") (internal quotation marks omitted). Summary judgment is granted on Plaintiff's claim arising from his transfer from the Mental Observation unit to General Population.

### 3. Excessive Force Claim

The IGRP exempts certain categories of complaints from its own administrative process. These include complaints for the use of force or assault. IGRP § IV.B.2.b ("Inmate allegations of physical or sexual assault or harassment by either staff or inmates are not subject to the IGRP process."). As a result, a prisoner's claims for excessive force and assault are not subject to the affirmative defense of failure to exhaust administrative remedies because he failed to use the IGRP process. *See Taylor v. City of New York*, No. 16 Civ. 7857, 2018 WL 1737626, at \*4 (S.D.N.Y. Mar. 27, 2018) (collecting cases).

Because the IGRP was not available to Plaintiff for the excessive force claim and assault and battery claims, he has not failed to exhaust available administrative remedies. Defendants have not "point[ed] to legally sufficient sources such as statutes, regulations, or grievance procedures which demonstrate that a grievance process exists and applies to the underlying dispute." *Priatno, 829 F.3d at 126 n.6* (internal quotation marks omitted).

In support of their contention that Plaintiff failed to satisfy the PLRA's exhaustion requirement for his excessive force claim, Defendants cite three cases: *Richardson v. New York State Department of Corrections*, No. 13 Civ. 6189, 2014 WL 3928785, at \*5–7 (S.D.N.Y. Aug. 11, 2014), *affirmed*, 633 F. App'x 816 (2d Cir. 2016); *Perez v. City of New York*, No. 14 Civ. 7502, 2015 WL 3652511, at \*2–4 (S.D.N.Y. June 11, 2015); and *Diezcabeza v. Lynch*, 75 F. Supp. 2d 250, 255 (S.D.N.Y. 1999). These cases are distinguishable.

*Richardson* and *Diezcabeza* involved exhaustion in the New York State corrections system, but here Plaintiff was in the custody of -- and subject to the rules of -- the City DOC, not the State. *See, e.g., Kearsey v. Williams*, No. 99 Civ. 8646, 2004 WL 2093548, at \*3–4 (S.D.N.Y. Sept. 20, 2004) (vacating a dismissal based on the defendant's assertion that the State IGP applied when plaintiff was subject to the City's IGRP); *see also Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003) ("Courts should be careful to look at the applicable set of grievance procedures, whether city, state or federal."). *Perez* involved a condition of confinement claim that, unlike allegations of staff-on-inmate assault, is not expressly exempted from the IGRP. *Perez*, 2015 WL 3652511, at \*1; *see* IGRP App. A at 1 (listing "Environmental," "Housing," "Law Library," "Medical (complaints involving Department personnel)," "Personal Hygiene," "Phone," "Property" and "Recreation" as "categories/issues ... subject to the [IGRP] process").

For these reasons, Defendants' failure to exhaust administrative remedies affirmative defense is dismissed as to Plaintiff's excessive force claim.

### C. Excessive Force Claim

Plaintiff's excessive force claim has two components -- the first relates to his handcuffing, and the second relates to the alleged attack. Summary judgment is granted to Defendants on the handcuffing claim, but denied as to the alleged attack.

### 1. Handcuffing

**\*6** "[E]xcessively tight handcuffing that causes injury can constitute excessive force...." *Shamir v. City of New York*, 804 F.3d 553, 557 (2d Cir. 2015); *accord Ali v. Ramos*, No. 16 Civ. 01994, 2018 WL 1353210, at \*5 (S.D.N.Y. Mar. 14, 2018). "Courts apply a separate standard to claims for excessive force in the use of handcuffs. The modified standard reflects the need for a careful balance." *Sullivan v. City of New York*, No. 17 Civ. 3779, 2018 WL 3368706, at \*10 (S.D.N.Y. July 10, 2018) (internal quotation marks and citation omitted). " '[I]n evaluating the reasonableness of handcuffing, courts typically consider evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and (3) the degree of injury to the [plaintiff's] wrists.' " *Rivera v. Samilo*, No. 16 Civ. 1105, 2018 WL 1701935, at \*10 (E.D.N.Y. Mar. 30, 2018) (alterations in original) (quoting *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 724 (S.D.N.Y. 2017) ). "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising. The injuries need not be severe or permanent, but must be more than merely de minimis." *Othman v. City of New York*, No. 13 Civ. 4771, 2018 WL 1701930, at \*7 (E.D.N.Y. Mar. 31, 2018) (internal quotation marks and citation omitted).

Plaintiff's excessive force claim fails because his injuries of mild swelling, redness and limited movement are insufficient to state a constitutional violation as a matter of law. *See Sullivan*, 2018 WL 3368706, at \*10 (collecting cases in which bruising, swelling and contusions are insufficient to support a handcuffing excessive force claim). Plaintiff's medical records from the day of the incident note that his left wrist had mild swelling, redness and a limited range of movement. The x-ray did not reveal a fracture. Although Plaintiff alleges that he suffers nerve damage as a result of the incident, "unsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient to sustain a claim of excessive force from handcuffing." *Cancel v. Kelly*, No. 13 Civ. 6007, 2016 WL 590230, at \*5 (S.D.N.Y. Feb. 11, 2016) (internal quotation marks omitted); *accord Scalpi v. Amorim*, No. 14 Civ. 2126, 2018 WL 1606002, at \*22 (S.D.N.Y. Mar. 29, 2018). Summary judgment is granted to Defendants on the excessive force claim as it relates to handcuffing.

### 2. Physical Attack

Resolving all factual disputes in favor of Plaintiff as the non-moving party, a reasonable fact finder could conclude that, based on the evidence in the record, Defendants Geradeau, Overton and Peters attacked Plaintiff with excessive force.

At the summary judgment stage, a court "may not make credibility determinations or weigh the evidence." *Proctor v. LeClaire*, 846 F.3d 597, 607–608 (2d Cir. 2017) (internal quotation marks omitted). "On a motion for summary judgment, the court is to identify factual issues, not to resolve them." *In re Dana Corp.*, 574 F.3d 129, 156 (2d Cir. 2009); *see also Serrano v. Lopez*, No. 14 Civ. 560, 2015 WL 5305948, at \*5 (S.D.N.Y. Sept. 10, 2015). "[D]istrict courts should not 'engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) ). "If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Jeffreys v. City of New York*, 426 F.3d 549, 555 n.2 (2d Cir. 2005) (alteration omitted); *accord Spizz v. United States*, 291 F.Supp.3d 447, 459 n.9 (S.D.N.Y. 2017).

Here, even though some of the details of Plaintiff's story have changed, the heart of the claim remains the same -- that he was assaulted on May 2, 2017, when he was removed from his cell and transferred from the Mental Observation unit to General Population. Whether or not the assault in fact occurred is an issue of material fact that requires determining Plaintiff's credibility and weighing the evidence -- a role reserved for a jury. *See, e.g., Proctor*, 846 F.3d at 607–608 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotation marks omitted).

**\*7** Defendants assert that, based on the record, no reasonable factfinder could believe Plaintiff's allegation that he was pummeled by officers. This argument is unpersuasive. In excessive force cases, a district

court may grant summary judgment against a plaintiff "where undisputed medical records *directly and irrefutably* contradict a plaintiff's description of his injuries." *See Henry v. Pierce*, No. 11 Civ. 845, 2017 WL 3610507, at *2 (S.D.N.Y. Aug. 21, 2017) (emphasis in original) (internal quotation marks omitted). But the medical records in this case do not directly and irrefutably contradict Plaintiff's description of what happened on May 2, 2017. Of interest, the medical record states that Plaintiff was generally "well-appearing, no acute distress," and that his head was "normocephalic, atraumatic" -- i.e. normal. Although Plaintiff's physical exam does not directly affirm Plaintiff's story, unlike the cases cited by Defendants, it also does not "directly and irrefutably contradict" Plaintiff's version of the May 2, 2017, attack. *Compare, e.g., Jeffreys*, 426 F.3d at 554–55 (unreasonable to believe the plaintiff's allegation that he had been beaten with a flashlight and thrown out a window by a police officer when multiple doctors expressly found no evidence of head trauma and the plaintiff thrice admitted that he had jumped out of a window while fleeing police until, nine months after the incident, he changed his story to allege that he had been thrown out of the window); *Henry v. Brown*, No. 14 Civ. 2828, 2016 WL 3079798, at *3 (E.D.N.Y. May 27, 2016) (unreasonable to believe the plaintiff's allegation that the defendant pushed the plaintiff, causing a leg injury so severe the plaintiff almost lost his leg and a head injury that rendered the plaintiff unconscious in pool of blood for over an hour, where medical records stated that the plaintiff's leg had minor bleeding caused by plaintiff picking an old scab, that plaintiff's head was normal and that plaintiff was ambulatory the day of the incident) *with Burks v. Perrotta*, No. 13 Civ. 5879, 2015 WL 2340641, at *6 (S.D.N.Y. May 15, 2015) (denying summary judgment where there was a plausible explanation for the inconsistencies in the plaintiff's story).

Summary judgment is denied on Plaintiff's claims for excessive force resulting from the alleged assault on May 2, 2017.

### D. The City and HMH [11]

A plaintiff may bring suit against a local government or municipality under § 1983 if the injury complained of resulted from the "execution of a government's policy or custom ... [which] may fairly be said to represent official policy." *Monell v. Department of Social Services*, 436 U.S.

658, 694 (1978). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *accord Corso v. City of New York*, No. 17 Civ. 6096, 2018 WL 4538899, at *12 (S.D.N.Y. Sept. 20, 2018).

The record contains no evidence that the City or HMH had a "policy or custom" to mistreat prisoners upon their transfer from a Mental Observation unit to General Population. *See, e.g., Youngblood v. City of New York*, No. 15 Civ. 3541, 2016 WL 3919650, at *5 (S.D.N.Y. July 27, 2016) ("Without more, [p]laintiff's bare allegations of the existence of a custom and policy and his conclusory assertion that the policy was linked to his constitutional injuries are insufficient to state a *Monell* claim."). Defendants the City and HMH are granted summary judgment on the claims against them.

### E. Official Capacity Claims

"It is settled that suits against officers in their official capacity ... are directed at the office itself." *Annucci*, 895 F.3d at 187 (alteration in original) (internal quotation marks omitted); *see Hafer v. Melo*, 502 U.S. 21, 25 (1991). "In an official capacity suit, 'the real party in interest ... is the governmental entity and not the named official.' " *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (alteration in original) (quoting *Hafer*, 502 U.S. at 25). Because Plaintiff's claims against the City are identical to all his claims against the individual Defendants in their official capacities, the official capacity claims are duplicative and dismissed. *See, e.g., Ball v. N.Y. City Council*, No. 17 Civ. 4828, 2018 WL 4625625, at *2 (S.D.N.Y. Sept. 26, 2018).

### F. Commissioner Ponte

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Spavone*, 719 F.3d at 135 (internal quotation marks omitted). Traditionally, personal involvement can be established in five ways:

> **\*8**  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation

through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (emphasis omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ). [12]

The evidence is insufficient to find Defendant Commissioner Ponte personally liable as a matter of law. A May 4, 2017, letter from Plaintiff to Ponte is the only evidence in the record that relates to him. Ponte's alleged receipt and failure to respond to Plaintiff's letter is insufficient to establish personal liability. *See Morgan v. Dzurenda*, No. 14 Civ. 00966, 2018 WL 4096630, at *9 (D. Conn. Aug. 28, 2018) (an unanswered inmate request form addressed to the Warden was insufficient to establish personal liability); *Inesti v. Hogan*, No. 11 Civ. 2596, 2013 WL 5677046, at *8 (S.D.N.Y. Sept. 30, 2013) (no personal liability because "letter complaints alone do not establish personal involvement"). Summary judgment is granted to Ponte on all claims.

### G. Captain Morris

An officer "is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Othman v. City of New York*, 2018 WL 1701930, at *8 (internal quotation marks omitted); *see also Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) ("A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient

time to act to prevent it."); *Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("Correction officers can be held liable under Section 1983 for not intervening to protect the constitutional rights of inmates from infringement by other officers.").

**\*9** A reasonable fact finder could conclude that Defendant Captain Morris was personally involved in committing the alleged constitutional violation. Morris was present during the incident and did not intervene, even though she arguably could have, given her role as the officers' supervisor and her physical proximity to the scene. Morris is denied summary judgment for Plaintiff's excessive force claim.

### H. State Law Claims -- Assault and Battery

"[W]ith the exception of the state actor requirement, the elements of a Section 1983 excessive force claim and state law assault and battery claims are substantially identical." *Lloyd*, 246 F. Supp. 3d at 729 (internal quotation marks omitted). For the reasons stated above, summary judgment is denied for the state claims of assault and battery against Defendants Geradeau, Overton and Peters. [13] *See, e.g., Christopher olblo N.C. v. City of Mount Vernon*, No. 16 Civ. 00137, 2018 WL 4757963, at *7 (S.D.N.Y. Sept. 28, 2018) (denying summary judgment on an assault and battery claim relying on the analysis used for a § 1983 excessive force claim).

Defendants argue that New York General Municipal Law § 50-k(6) prevents Plaintiff from pursuing state law claims because Plaintiff failed to serve a notice of claim. This argument is unpersuasive. The notice of claim requirement in § 50-k(6) does not apply "when the claim alleges injuries resulting from intentional wrongdoing or recklessness, misconduct for which the City has no obligation to indemnify an employee." *Hardee v. City of New York*, No. 10 Civ. 7743, 2014 WL 4058065, at *8 (S.D.N.Y. Aug. 14, 2014) (internal quotation marks omitted); *see* N.Y. Gen. Mun. Law § 50-k(3) ("[T]he duty to indemnify and save harmless prescribed by this subdivision shall not arise where the injury or damage resulted from intentional wrongdoing or recklessness on the part of the employee."). "Under New York Law, '[a]n "assault" is an intentional placing of another person in fear of imminent harmful or offensive contact.' 'A "battery" is an intentional wrongful physical contact with another person without consent.' " *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir.

2001) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) ); *see Thaw v. N. Shore Univ. Hosp.*, 12 N.Y.S.3d 152, 155 (2d Dep't 2015). "To succeed on an assault or battery claim in the law enforcement context, a plaintiff must demonstrate that defendants' conduct 'was not reasonable within the meaning of the New York statute concerning justification for law enforcement's use of force in the course of performing their duties.' " *Randolph v. Metro. Transportation Auth.*, No. 17 Civ. 1433, 2018 WL 2943744, at *6 (S.D.N.Y. June 12, 2018) (quoting *Nimely v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005) ). To find Defendants Geradeau, Overton and Peters liable for assault or battery, a trier of fact would have to conclude that Defendants acted intentionally and unreasonably -- conduct that falls outside of § 50-k. *See id.* Plaintiff's failure to file a notice of claim does not preclude pursuit of his assault and battery claims against Defendants Geradeau, Overton and Peters.

## IV. CONCLUSION

**\*10** For the foregoing reasons, Defendants' motion for summary judgement is GRANTED in part and DENIED in part. Summary judgment is granted as to all Defendants on all claims *except* the (1) § 1983 excessive force claim against Defendants Morris, Geradeau, Overton and Peters for the alleged May 2, 2017, attack, and (2) assault and battery claim against Defendants Geradeau, Overton and Peters, for which summary judgment is denied. For clarity, the only remaining claims are the (1) § 1983 excessive force claim against Defendants Morris, Geradeau, Overton and Peters for the alleged May 2, 2017, attack (but not the handcuffing), and (2) assault and battery claim against Defendants Geradeau, Overton and Peter.

## All Citations

Slip Copy, 2019 WL 568875

## Footnotes

1   Brann is the current Commissioner of the Department of Correction. Pursuant to Federal Rule of Civil Procedure 25(d), Brann is substituted for former Commissioner Joseph Ponte in the claims against Ponte in his official capacity. *Corr. Officers' Benevolent Ass'n v. City of New York*, No. 17 Civ. 2899, 2018 WL 2435178, n.1 (S.D.N.Y. May 30, 2018).

2   Defendants' names are taken from the Complaint, Amended Complaint and Second Amended Complaint collectively. Captain Goeed was initially named as a Defendant but is dismissed because, at the October 10, 2018, initial pretrial conference, Plaintiff narrowed his claims to those arising out of his May 2, 2017, rehousing, and Goeed was not involved in that incident.

3   Plaintiff did not respond to Defendants' Rule 56.1 statement, which ordinarily would be construed as a concession under Local Rule 56.1. On July 24, 2018, Plaintiff filed a document styled as a motion for summary judgment. Given Plaintiff's pro se status and the instruction that "[t]he submissions of a *pro se* litigant must be construed liberally," *Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018), the failure to respond is excused, *see, e.g., Roland v. Ponte*, No. 17 Civ. 2758, 2018 WL 4609109, at *1 n. 1 (S.D.N.Y. Sept. 25, 2018), and Plaintiff's July 24, 2018, filing is construed as Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

4   During his deposition, Plaintiff asserted that prior to Captain Morris's arrival no one had told Plaintiff he would be transferred, but Plaintiff later stated that Geradeau told Plaintiff he would be moved to General Population if Plaintiff did not remove his clothes.

5   At the October 10, 2017, initial pretrial conference, Plaintiff said he refused the strip search. At his deposition, however, he asserted that he had been strip searched.

6   During his deposition, Plaintiff stated that Overton threw Plaintiff on the bed.

7   During his deposition, Plaintiff maintained that "Officer Overton smothered [him] with a pillow so [he] couldn't breathe," and stated several times that Overton suffocated him.

8   During his deposition, Plaintiff stated that his knee and shoulder injuries stemmed from incidents in 2016.

9   Plaintiff's submissions are not construed to include a denial of medical care claim because no Defendant is a medical professional, and Defendants acted in accordance with the recommendations of a medical professional who cleared Plaintiff for transfer. Even if Plaintiff had claimed that a medical professional denied medical care by approving his transfer, it is unlikely that the claim would rise to the level of constitutional challenge. *See, e.g., Figueroa v. Cty. of Rockland*, No. 16 Civ. 6519, 2018 WL 3315735, at *6 (S.D.N.Y. July 5, 2018) ("Medical malpractice, misdiagnosis and the decision

not to treat based on an erroneous view that the condition is benign or trivial does not rise to the level of deliberate indifference.") (internal quotation marks omitted).

10    The Court takes judicial notice of the IGRP. *See, e.g., Sanders*, 2018 WL 3117508, at *4 n.1 ("It is a common practice in this District to take judicial notice of the version of the IGRP in effect at the time of the events giving rise to [a prisoner's] claim.") (internal quotation marks omitted) (alteration in original).

11    HMH is a suable entity. N.Y.C. Charter Ch. 22, § 564 ("The department may sue and be sued in and by the proper name of 'Department of Health and Mental Hygiene of the City of New York'...."); *accord Rivera v. Bloomberg*, No. 11 Civ. 4325, 2012 WL 3655830, at *11 (S.D.N.Y. Aug. 27, 2012).

12    The Second Circuit has yet to determine how *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), affects *Colon. See Grullon*, 720 F.3d at 139 (recognizing possible conflict among the cases); *Dunham v. City of New York*, 295 F. Supp. 3d 319, 330 n.9 (S.D.N.Y. 2018) ("The continuing validity of *Colon* remains unresolved and the issue continues to be a matter of disagreement among District Judges within the Circuit."). This issue is not presented and need not be addressed in this case because Plaintiff has failed to establish Defendant Ponte's personal involvement under any of the *Colon* categories as a matter of law. *See Ross v. Correct Care Sols. LLC*, No. 11 Civ. 8542, 2013 WL 5018838, at *5 n.10 (S.D.N.Y. Sept. 13, 2013) ("The Supreme Court's decision in *Iqbal*, which found that a supervisor can be held liable only 'through the official's own individual actions,' arguably casts doubt on the continued viability of some of the categories set forth in *Hastings on Hudson* and *Colon*. For the purposes of this case, however, it is not necessary to explore this issue because the complaint fails to plead that [the individual defendants] were personally involved under any of the *Hastings on Hudson* categories.") (internal citations omitted).

13    Unlike the federal claim of excessive force, the state claims of assault and battery do not survive against Defendant Morris because she did not engage in "intentional physical conduct placing [ ] [P]laintiff in imminent apprehension of harmful contact" or otherwise touch Plaintiff, which is required for individual liability on these claims. *See Thaw v. N. Shore Univ. Hosp.*, 12 N.Y.S.3d 152, 155 (2d Dep't 2015).

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 330869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul RAMOS, Plaintiff,

v.

NEW YORK STATE, et al., Defendants.

9:17-CV-0259 (BKS/CFH)
|
Signed 01/25/2019

**Attorneys and Law Firms**

Paul Ramos, 15-B-0310, Clinton Correctional Facility, P.O. Box 2002, Dannemora, NY 12929, Plaintiff, pro se.

Erik Boule Pinsonnault, Esq., Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

 **\*1** Plaintiff Paul Ramos, a New York State inmate, commenced this action under 42 U.S.C. § 1983 alleging that Defendants violated his rights under the Eighth and Fourteenth Amendments by assigning Plaintiff to "Special Watch" status, to be checked for the suspected presence of contraband, at Mid-State Correctional Facility. (Dkt. No. 12). Defendants have moved for summary judgment seeking, *inter alia*, dismissal of the amended complaint because Plaintiff failed to exhaust his administrative remedies before commencing this action. (Dkt. No. 37). The motion has been fully briefed. (Dkt. Nos. 44, 45). This matter was assigned to United States Magistrate Judge Christian F. Hummel who, on December 27, 2018, issued a Report-Recommendation and Order recommending that Defendants' motion for

summary judgment be granted. (Dkt. No. 52). Magistrate Judge Hummel advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (Dkt. No. 52, at 17). No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Report-Recommendation is adopted in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 52) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 37) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's amended complaint (Dkt. No. 12) is **DISMISSED in its entirety, with prejudice**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 330869

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 7133696
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul RAMOS, Plaintiff,
v.
NEW YORK State, et al., Defendants.

No. 9:17-CV-0259 (BKS/CFH)
|
Signed 12/27/2018

**Attorneys and Law Firms**

Paul Ramos, 15-B-0310, Clinton Correctional Facility -
Annex, P.O. Box 2002, Dannemora, New York 12929,
Plaintiff pro se.

Attorney General for the State of New York, OF
COUNSEL: ERIK BOULE PINSONNAULT, ESQ.,
Assistant Attorney General, The Capitol, Albany, New
York 12224, Attorney for defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

*1 Plaintiff pro se Paul Ramos ("plaintiff"), an inmate
who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant to 42
U.S.C. § 1983, alleging that defendants Captain ("Capt.")
Thomas Short, Capt, K.E. Adamik, Capt. L.R. Goppert,
Sergeant ("Sgt.") Steven Walrath, Deputy Superintendent
of Security ("DSS") Joseph Ward, Lieutenant ("Lt.")
Michael Hawk, and Superintendent ("Supt.") John
Colvin — who, at all relevant times, were employed at
Mid-State Correctional Facility ("Mid-State") — violated
his rights under the Eighth and Fourteenth Amendments.
See Dkt. No. 12 ("Am. Compl."). Presently pending
before the Court is defendants' Motion for Summary
Judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 37.
Plaintiff opposed defendants' motion, and defendants
filed a reply. Dkt. Nos. 44, 45. For the following reasons,
it is recommended that defendants' motion be granted.

## I. Background

### A. Plaintiff's Recitations of the Facts

On March 22, 2015, a corrections officer requested that
plaintiff be assigned to a "dry cell" on "special watch"
status at Mid-State to be checked for the suspected
presence of contraband. Am. Compl. at 1-2. A lieutenant
and watch commander authorized plaintiff's placement
on "special watch" status. Id. at 2. Plaintiff remained in
the dry cell from March 22, 2015 until April 16, 2015.
Id. Plaintiff contends that he was unable to address his
personal hygiene while on "special watch" status, and that
he was not properly released from the "dry cell" pursuant
to DOCCS Directive 4910. Id. at 1-2.

### B. Defendants' Recitation of the Facts

In support of this Motion for Summary Judgment,
defendants filed a Statement of Material Facts. [2] Plaintiff
was incarcerated at Mid-State from February 19, 2015
through June 4, 2015. Dkt. No. 37-3 ¶ 5. In the underlying
action, plaintiff contends that defendants violated his
Eighth and Fourteenth Amendment rights when they
confined him in a "dry cell" for twenty-six days while
he was on special watch to confirm the presence of
drugs secreted in his body. Id. ¶ 3. On his arrival,
plaintiff attended an orientation program that included
an explanation on how to utilize the Inmate Grievance
Program ("IGP") to file and appeal grievances. Id. ¶ 6.
On April 27, 2015, plaintiff sent a letter entitled "Inmate
Grievance Request" to Mid-State's Inmate Grievance
Resolution Committee ("IGRC") regarding a Tier III
misbehavior report charging him with destruction of state
property (116.10) and unhygienic acts (118.22). Id. ¶ 7. In
his grievance, plaintiff alleged that non-party corrections
officer ("C.O.") Rose presented a false description of
the incident underlying the March 27, 2015 misbehavior
report. Id. ¶ 8. The grievance did not contain a complaint
that plaintiff had been confined in a dry cell for an
extended period of time or that his drug watch continued
without necessary authorization. Id. This grievance was
the only correspondence Mid-State's IGP supervisor
received from plaintiff. Id. ¶ 9.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

**\*2** On June 4, 2015, plaintiff transferred from Mid-State to Cayuga Correctional Facility ("Cayuga"). Dkt. No. 37-3 ¶ 11. Plaintiff was incarcerated at Cayuga from June 5, 2015 through June 24, 2015. Id. While at Cayuga, plaintiff did not appeal any grievances to CORC prior to March 1, 2018 – the date he commenced this action in federal court. Id. ¶ 14.

Although Supt. Colvin is named in the caption of the amended complaint, plaintiff does not allege that he committed wrongdoing. Dkt. No. 37-3 ¶ 17.

## II. Discussion [3]

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material

fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Exhaustion

**\*3** Defendants argue that plaintiff failed to exhaust his administrative remedies prior to commencing this action. See Dkt. No. 37-1 ("Def. Mem. of Law") at 9-14. Plaintiff contends that he has exhausted his administrative remedies. Dkt. No. 44-1 ("Pl. Opp.") at 7-9. Specifically, plaintiff contends that (1) he did not have access to writing materials while in his dry cell; and (2) he authored grievances concerning the dry cell confinement, but that he failed to receive a response from the Mid-State IGRC. See id.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ─── U.S. ────, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [4]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

## 1. Did Plaintiff Exhaust his Administrative Remedies? [5]

**\*4** There is no dispute that, on April 27, 2015, plaintiff submitted a document to the Mid-State IGRC entitled "Inmate Grievance Request," which challenged a Tier III misbehavior report charging plaintiff with destruction of property (116.10) and unhygienic act (118.22). See Dkt. No. 37-6 ("Tapia Decl.") ¶ 15; Pl. Opp. at 5. This grievance, which the Mid-State IGRC found to be untimely, sought plaintiff's placement back into the general population, as well as the expungement and dismissal of the misbehavior report. Id. at 9. However, this grievance does not challenge the duration of plaintiff's confinement on "special watch," or the conditions of that confinement. See id. Plaintiff filed a second grievance (CAY-17657-15) while housed at Cayuga, alleging that staff had restricted visitation between he and his fiancee. Dkt. No. 37-7 ("Ganey Decl.") ¶ 12. Grievance CAY-17657-15 does not reference any conduct that occurred while plaintiff was housed at Mid-State. See id. at 6. Mid-State IGP Supervisor Christopher Tapia declared that "Mid-State IGP office has no record of any grievance [filed] by plaintiff concerning his [ ] claims in this case, which are based on his continued confinement in a dry cell at Mid-State while on a drug watch." Tapia Decl. ¶ 17. Similarly, Cayuga IGP Supervisor Shawn Ganey declared that plaintiff never made a request to file a late grievance at Cayuga concerning his confinement in a dry cell at Mid-State. Ganey Decl. ¶ 15.

In response, plaintiff contends that he submitted a grievance dated April 26, 2015 concerning the surviving claims in this action. Pl. Opp. at 5. Plaintiff proffers a copy of the alleged grievance, which, in part, challenges the length of his confinement in the dry cell, as well as the conditions of that confinement, including his inability to shower, brush his teeth, or correspond with his friends and family for three and a half weeks. Dkt. No. 44-2 at 4. Plaintiff states that he received one response from the Mid-State IGP on May 5, 2015 stating that he had filed his grievances too late. Pl. Opp. at 5. Plaintiff further claims that when he arrived at Cayuga on June 5, 2015, he "made several attempts in writing to Cayuga's Inmate Grievance Resolution Committee ('IGRC') [i]n reference to his grievance complaint's [sic] that he filed at Mid-State." Id. Plaintiff does not proffer copies of this correspondence. Plaintiff did not receive a response to his alleged attempts at communication. Id.

2018 WL 7133696

Even if the undersigned were to assume that plaintiff properly submitted a grievance challenging the duration and conditions of his confinement in the dry cell from March 22, 2015 until April 16, 2015, and that the Mid-State IGP failed to respond to that grievance, plaintiff's claims still must fail. It is well-settled that where an inmate does not receive a response to a grievance, the inmate must appeal to the next level of review notwithstanding the lack of response at the first level of review. See Khudan v. Lee, No. 12-CV-8147, 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing the plaintiff's complaint where the plaintiff failed to appeal to the next level of review after failing to receive a response on his filed grievance). Thus, even if an inmate suspects that his grievances were discarded, he or she must still appeal the grievance despite the lack of response at the first step of review. Chiarappa v. Meyers, No. 09-CV-607, 2013 WL 6328478, at *5 (W.D.N.Y. Dec. 5, 2013) ("[E]ven if plaintiff attempted unsuccessfully to file a grievance in a timely manner, the lack of a response does not relieve him of the requirement to timely appeal the grievance through all three steps of the grievance process."); Belile v. Griffin, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013), report and recommendation adopted by, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the [Inmate Grievance Program]"). Although plaintiff does not suggest that Mid-State or Cayuga staff discarded or otherwise interfered with his April 26, 2018 grievance and other correspondence concerning the underlying claims, Mid-State and Cayuga IGPs' alleged failures to respond did not excuse plaintiff from completing the grievance process. See id. Plaintiff does not contend, and the record does not indicate, that he filed or attempted to file an appeal to the Superintendent regarding these claims. Thus, plaintiff's allegations that he failed to receive a response from either facility does not excuse his requirement to exhaust his claims. See Arce v. Keane, No. 01 Civ. 2648, 2004 WL 439428, at *2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance").

*5 To the extent that plaintiff contends that he did not have access to writing materials from March 22, 2015 until April 16, 2015 while housed in the dry cell, Mr. Tapia does not dispute that "inmates who are temporarily isolated in dry cell for drug watch do not generally have access to a pen and paper to draft a grievance." Tapia Decl. ¶ 7. However, Mr. Tapia declared that, if plaintiff had informed a staff member that he wanted to file a grievance or speak with him about filing a grievance, that staff member would have relayed the message to ensure that someone from the grievance office met with plaintiff. Id. ¶ 8. Although plaintiff argues that he did not have access to writing materials while in his dry cell in order to file a grievance, he does not claim that he asked for writing materials from defendants and that request was denied. See Pl. opp. at 8. Thus, plaintiff has failed to establish that lack of access to writing materials should excuse him from the exhaustion requirement.

Insofar as plaintiff references the May 5, 2015 letter from Mr. Tapia concerning plaintiff's untimely grievance submission, this letter is in reference to the April 27, 2015 grievance received by Mid-State IGP that challenged a misbehavior report that plaintiff received on March 27, 2015. See Tapia Decl. ¶ 15, at 9; Dkt. No. 44-2 at 12. Such letter does not refer to the alleged April 26, 2015 grievance authored by plaintiff, as defendants argue that Mid-State IGP never received that grievance. See Dkt. No. 45 ("Def. Reply") at 6-7; Tapia Decl. ¶ 17 ("Thus, the Mid-State IGP office has no record of any grievance by plaintiff concerning his surviving claims in this case, which are based on his continued confinement in a dry cell at Mid-State while on a drug watch."). Thus, to the extent that plaintiff references untimeliness as a means to excuse his exhaustion requirement, such argument is misplaced.

Finally, DOCCS Assistant Director of the IGP declared, and DOCCS records confirm, that plaintiff has never appealed any grievance to CORC. See Dkt. No. 37-5 ("Seguin Decl.") ¶ 13, at 7-8. Therefore, it is clear that plaintiff has failed to exhaust his administrative remedies, and fails to provide a sufficient excuse for the exhaustion requirement.

Defendants argue that plaintiff's claims should be dismissed with prejudice as plaintiff's time to exhaust his claim concerning the drug watch has long expired. See Def. Mem. of Law at 13. The undersigned agrees, and recommends that plaintiff's claims should be dismissed

with prejudice as he would be barred by the three-year statute of limitations from reinstating this suit, and "[b]ecause this and any subsequently amended or reinstituted complaint is subject to dismissal for failure to exhaust administrative remedies, it would be futile to grant plaintiff leave to amend or allow him to reinstitute the suit." Baez v. Kahanowicz, 469 F.Supp.2d 171, 180 (S.D.N.Y. 2007); see Bridgeforth v. Bartlett, 686 F.Supp.2d 238, 240 (W.D.N.Y. 2010) ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him[.]").

Accordingly, as defendants have met their burden establishing that plaintiff has failed to exhaust his administrative remedies as to his remaining claims, it is recommended that defendants' motion on this ground be granted.

### C. Personal Involvement

Defendants argue that, "[i]n the event that the Court does not dismiss the complaint in its entirety for the reasons set forth ... above, the Amended Complaint should be dismissed as against Superintendent Colvin for lack of personal involvement." Def. Mem. of Law at 14. Although the undersigned recommends dismissal of plaintiff's claims for failure to exhaust, for the sake of completeness, the undersigned will address defendants' argument. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ). Thus, supervisory officials may not be held liable merely because they held a position of authority. See id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if

*6 (1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986) ).[6] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See, e.g., Brown v. Artus, 647 F.Supp.2d 190, 200 (N.D.N.Y. 2009).

Even construing plaintiff's allegations liberally, the undersigned finds that plaintiff has not adequately demonstrated that Supt. Colvin's involvement in the alleged denial of plaintiff's constitutional rights. Nowhere in his complaint does plaintiff mention what role Supt. Colvin played in the alleged events that would give rise to any personal involvement in the action. In his opposition, plaintiff attempts to argue that Supt. Colvin "failed to provide written approval of [his] continue[d] stay in 'Drug & Special Watches – Temporary Isolation,' after 7 days [ ] [i]n violation with Directive 4910(IV)(J)(4)(e)." Pl. Opp. at 9. However, plaintiff's characterization of Directive 4910 is misplaced. Directive 4910(IV)(J)(4)(e) states, in its relevant part, that "the temporary isolation [of an inmate] may continue for up to 7 days with the written approval of the Superintendent *or his or her designee.*" Directive 4910(IV)(J)(4)(e), Dkt. No. 37-4 at 15 (emphasis added). Plaintiff's amended complaint makes clear that "[e]ach [A]rea Supervisor and Watch Commander who was assigned to Mid[-]State ... from March 23, 2015 through April 16, 2016 ... all authorized the continuance of [p]laintiff in this "Special Watch" status[.]" Am. Compl. at 3. Therefore, as defendants note, a lieutenant and Watch Commander, acting as a designee of the Superintendent, authorized plaintiff's continued confinement on drug watch. See id.; Def. Reply at 11.

*7 Plaintiff alleges that Supt. Colvin "was well aware of the fact that [plaintiff was] in temporary isolation for more than 7 days[ ]" because he made "rounds on numerous occasions" and spoke with him. Pl. Opp. at 9. However, this fails to demonstrate Supt. Colvin's personal involvement as plaintiff fails to specify when his interactions with Supt. Colvin occurred; nor does plaintiff indicate that he informed Supt. Colvin of his

alleged unconstitutional confinement, and Supt. Colvin then failed to remedy that wrong under the second Colon factor. See Colon, 58 F.3d at 873. Further, Supt. Colvin's alleged inaction does not demonstrate that he was grossly negligent in supervising his subordinates under the fourth Colon factor. See id.

Moreover, plaintiff seems to suggest that, in his role as Superintendent, Supt. Colvin is "the supervisor of the entire facility," and thus, is personally involved in the action. Pl. Opp. at 10. However, it is well-settled that supervisory officials may not be held liable merely because they held a position of authority. See Wright, 21 F.3d at 501. Further, as defendants argue, Supt. Colvin, by definition, is not an area supervisor or Watch Commander. See Def. Mem. of Law at 15 (citing inter alia New York State Corr. Officers & Police Benev. Ass'n, Inc. v. Governor's Office of Employee Relations, 105 A.D.3d 1192, 1194, 963 N.Y.S.2d 746 (2013) ("classification standard for the position of correction sergeant provides that such employees 'function primarily in the capacity of an area supervisor or Assistant Watch Commander (assistant to the shift supervisor),' working under the supervision of a correction lieutenant. As an area supervisor, a correction sergeant, among other things, supervises a group of correction officers in an assigned area. The classification standard for a correction lieutenant provides that someone with that title can function as, among other things, a watch commander or shift supervisor, whereby he or she supervises all sergeants and officers on a given shift.") ). Thus, as plaintiff states that an Area Supervisor and/or Watch Commander continued his confinement, and it is clear that Supt. Colvin is not employed as either of those positions, plaintiff's argument must fail. The undersigned agrees with defendants' contention that "plaintiff cannot allege that the other defendants are at fault because they did not have the Superintendent's authorization to keep him on drug watch longer than usual while also arguing that the Superintendent is involved because he did not give the authorization." Def. Reply at 12. Thus, plaintiff has failed to establish that Supt. Colvin was personally involved in his underlying claims.

Accordingly, it is recommended that, in the alternative to dismissal for failure to exhaust, defendants' motion be granted, and all claims against Supt. Colvin be dismissed with prejudice for lack of personal involvement. See Liner v. Goord, 310 F.Supp.2d 550, 554 (W.D.N.Y. 2004) (dismissing the plaintiff's claims against for lack of personal involvement with prejudice).

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby,

**RECOMMENDED**, that defendants' Motion for Summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 37) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff Paul Ramos' amended complaint (Dkt. No. 12) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-

Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [7]

**All Citations**

Slip Copy, 2018 WL 7133696

---

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

3    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

4    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

5    First, the inmate must file a complaint with an IGP clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

6    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F.Supp.2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp.2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

7    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00234-MAD-DEP    Document 87    Filed 03/22/19    Page 316 of 329

Robinson v. Delgado, Not Reported in F.Supp. (1998)

1998 WL 278264

1998 WL 278264
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and
Lieutenant; and Donald Selsky, Director of
Inmate Special Housing Program, Defendants.

No. 96–CV–169 (RSP/DNH).
|
May 22, 1998.

**Attorneys and Law Firms**

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that
they violated his right to due process in the course
of a disciplinary proceeding and subsequent appeal.
On September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived
him of a liberty interest within the meaning of the Due
Process Clause. Plaintiff did not oppose the summary
judgment motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face
of the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear
error on the face of the record. After being warned

by defendants' motion that he must offer proof in
admissible form that his disciplinary confinement imposed
an "atypical and significant hardship on the inmate
in relation to the ordinary incidents of prison life,"
Robinson failed to offer any such proof. *Sandin v. Conner,
515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418
(1995).* Consequently, he cannot maintain a due process
challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it
is further

ORDERED that the Clerk of the Court serve a copy of
this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT—RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local
rules of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth,
and Fourteenth Amendment rights under the United
States Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed R. Civ. P. 56.
However:

> When a motion for summary
> judgment is made and supported as
> provided in this rule, an adverse
> party may not rest upon the mere
> allegations or denials of the adverse
> party's pleading, but the adverse
> party's response, by affidavits or
> as otherwise provided in this rule,
> must set forth specific facts showing
> that there is a genuine issue for

1998 WL 278264

trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report–Recommendation, by regular mail, upon the parties to this action.

**All Citations**

Not Reported in F.Supp., 1998 WL 278264

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3949967
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John Shicobra YOUNG, a/k/
a J. Shicobra Young, Plaintiff,
v.
CHO POLIZZI, Defendant.

No. 9:16-CV-0660 (FJS/CFH)
|
Signed 07/11/2018

**Attorneys and Law Firms**

JOHN SHICOBRA YOUNG, a/k/a J. Shicobra Young,
86-A-2673, Eastern N.Y. Correctional Facility, Box 338,
Napanoch, New York 12458, pro se.

HON. BARBARA D. UNDERWOOD, Acting Attorney
General for the State of New York, OF COUNSEL:
ERIK BOULE PINSONNAULT, ESQ., Assistant
Attorney General, The Capitol, Albany, New York
12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff pro se John Shicobra Young, a/k/a J.
Shicobra Young ("Young" or "Plaintiff"), an inmate who
was, at all relevant times, in the custody of the New York
Department of Corrections and Community Supervision
("DOCCS"), brings this action pursuant to 42 U.S.C. §
1983 and Title II of the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101 et seq. against Defendant
CHO Polizzi ("Defendant" or "Polizzi"). Dkt. No. 16
(Am. Compl.). Additional defendants were named, but
the claims against them have since been dismissed. Dkt.
No. 15. Presently before the undersigned is Defendant's
motion for summary judgment and dismissal of the
Amended Complaint pursuant to Federal Rules of Civil
Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 48. Young did
not oppose the motion. For the following reasons, it is
recommended that Defendant's motion be granted.

# I. FAILURE TO RESPOND

Young failed to oppose Defendant's Motion for Summary
Judgment. Young was notified of the consequences of
failing to respond to a summary judgment motion.
Dkt. No. 49. Given this notice, Young was adequately
apprised of the pendency of Defendant's motion and
the consequences of failing to respond. However, "[t]he
fact that there has been no response to a summary
judgment motion does not ... mean that the motion is
to be granted automatically." Champion v. Artuz, 76
F.3d 483, 486 (2d Cir. 1996). Even in the absence of a
response, Defendant is entitled to judgment only if the
material facts demonstrate his entitlement to judgment
as a matter of law. Id.; FED. R. CIV. P. 56(c). "A
verified complaint is to be treated as an affidavit ...
and [may] be considered in determining whether material
issues of fact exist[.]" See Colon v. Coughlin, 58 F.3d 865,
872 (2d Cir. 1995) (citations omitted). In the Amended
Complaint, Young "declare[d] under penalty of perjury
that the foregoing is true and correct." Am. Compl. at 7,
21. Therefore, as the Amended Complaint is verified, [2]
the undersigned will accept the pleading as an affidavit to
the extent that the statements are based on Young's personal
knowledge or are supported by the record. See Berry
v. Marchinkowski, 137 F. Supp.3d 495, 530 (S.D.N.Y.
2005) (collecting cases to support the proposition that a
court may consider unsworn assertions on a motion for
summary judgment where they are based on the plaintiff's
personal knowledge and in light of special solicitude).
Additionally, Young's deposition transcript was annexed
as an exhibit to Defendant's motion. Dkt. No. 48-2
("Young Dep."). Consequently, the facts set forth in
Defendant's Rule 7.1 Statement of Material Facts [3] are
accepted as true as to those facts that are not disputed by
the facts set forth in the Amended Complaint or Young's
sworn testimony. N.D.N.Y. L.R. 7.1(a)(3) ("The Court
shall deem admitted any properly supported facts set forth
in the Statement of Facts that the opposing party does not
specifically controvert.") (emphasis omitted).

# II. BACKGROUND

## A. Facts

**\*2**  The facts are related herein in the light most favorable to Young as the nonmoving party. See subsection III(A) infra. At the relevant time, Young, a deaf inmate who is able to read and write in English, was housed in the Sensorially Disabled Unit ("SDU") at Eastern Correctional Facility ("Eastern C.F."). Dkt. No. 48-5 ("Gibson Decl.") at ¶ 9; Young Dep. at 12. [4] On December 17, 2015, Sergeant P. Menard ("Menard") prepared a misbehavior report. Dkt. No. 48-4 ("Polizzi Decl.") at 10. In the report, Menard described an incident involving Young and another inmate, identified as Inmate John Doe, as follows:

> On 12/17/15 at approximately 9:45 am.[,] I interviewed Inmate John Doe [ ] in the West Wing SDU unit [sic] in regards to an incident that occurred involving inmate Young. Inmate John Doe states that over the course of the past few days, [I]nmate Young began delivering him hand written love notes, increasing in frequency. On 12/17/15, at approximately 8:00 a.m. Inmate Young placed a personalized Christmas card containing 1 candy cane and additional hand written notes on the cell bars of 32-23, occupied by Inmate John Doe. Inmate Young's increasingly aggressive and sexually suggestive behavior caused Inmate John Doe to feel threatened and fear for his safety. After receiving the most recent correspondence from [I]nmate Young, Inmate John Doe immediately reported to SDU to seek guidance and direction from his Counselor regarding the sexual advances. SDU Counselor Gibson notified me of the above incident and I then, with the assistance of Sign Language Interpreter Gibson, interviewed Inmate Young. Young admitted to writing and delivering

> multiple personalized hand written letters to Inmate John Doe.

Polizzi Decl. at 10.

Menard searched Young's cell and recovered a cartoon-like drawing that was placed in a contraband locker. Polizzi Decl. at 10. Young was charged with a sex offense, stalking, and threats. Id. Young received a copy of the misbehavior report and was transferred to the Special Housing Unit ("SHU"). [5] Young Dep. at 15; Polizzi Decl. at 10.

On December 17, 2015, Young executed a form entitled "Assistant List" and chose six assistants from the facility list, including "Meinecke Jr." Polizzi Decl. at 12; Young Dep. at 23. On December 21, 2015, Polizzi presided over a Tier III disciplinary hearing [6] related to the misbehavior report. [7] Polizzi Decl. at ¶ 6. Young had no previous interactions with Polizzi. Young Dep. at 21. Pursuant to 7 N.Y.C.R.R. § 254.2, [8] Jason Gibson ("Gibson"), a Translator in Manual Communications employed by DOCCS, provided American Sign Language ("ASL") translation services for Young during the hearing. [9] Gibson Decl. at ¶¶ 1, 12; Polizzi Decl. at 27. The hearing was also audio-recorded in accordance with 7 NYCRR § 254.6(a)(2). [10] Polizzi Decl. at ¶ 12, 27.

**\*3**  At the commencement of the hearing, Polizzi asked Young if he met with his "assistant, Officer Meineke Jr. on 12/18/15 at 10:20 a.m." Polizzi Decl. at 27. Young replied, "Yes." [11] Id. Polizzi proceeded to read the misbehavior report into the record Young pled "not guilty." Id. at 28. In response to Polizzi's request for an "explanation," Young stated "I didn't do it sir. It was the other inmate. Regarding the candy, the candy cane was inside the garbage can, I just gave it to him." Polizzi Decl. at 29. Young identified letters, a cartoon, a Christmas card, a check-list of questions, and notes and admitted that he wrote and delivered the documents to Inmate John Doe. Id.

Polizzi asked Young if he had any witnesses to call or documents to submit. Polizzi Decl. at 29. Young responded, "No, nothing, nothing at all." Id.; Young Dep. at 33. Polizzi called Menard to testify, via speaker-

phone, while Young was present. Polizzi Decl. at 30; Young Dep. at 35-36. Menard testified that he interviewed Inmate John Doe as well as Young during the course of his investigation. Polizzi Decl. at 31. Inmate John Doe reported that he felt threatened that he asked Young to stop writing letters. Id. at 31-33. Menard testified that the cartoon drawing of a rabbit, notes, check-list, and cards were "sexual in nature" and considered "active solicitation." Id. Menard concluded that Young was attempting to "lure" Inmate John Doe into a sexual relationship. Id.

After Polizzi completed his questioning, Young was given the opportunity to pose questions to Menard through the hearing officer. Polizzi Decl. at 33-35. Menard testified that Inmate John Doe did not report a sexual attack or assault. Id. at 33. Menard also conceded that he did not personally observe any interaction between Young and Inmate John Doe. Id. at 34.

On December 28, 2015, the disciplinary hearing concluded. [12] Polizzi Decl. at ¶ 6. Polizzi found Young guilty of all charges and sentenced him to 120 days SHU confinement with a corresponding loss of packages, commissary, and telephone privileges. Id. at 21. Polizzi considered the time Young had been confined to the SHU prior to the hearing and listed the "start date" for the sentence as December 17, 2015. Id. at ¶ 41, 21. Polizzi explained his decision on the record and issued a written statement of the disposition, including the evidence relied upon and the reasons for the sentence. Id. at 21-22, 38. On December 28, 2015, Young received the disposition. Young Dep. at 38.

Young appealed the disciplinary determination. Young Dep. at 46. On February 5, 2016, Director of the SHU/Inmate Discipline Program Donald Venettozzi ("Venettozzi") modified the decision and reduced the penalty to ninety days. Dkt. No. 48-7 ("Venettozzi Decl.") at ¶ 42, 11. Young claims that despite the modification, he served the entire four month sentence in SHU. Young Dep. at 40. Venettozzi states that Young was confined to the SHU for ninety days for the offenses related to the December 2015 misbehavior report. Venettozzi Decl. at ¶ 47. Venettozzi further avers that Plaintiff served additional time in the SHU for "other offenses." Id. Young did not file a grievance or written complaint concerning the disciplinary hearing. Young Dep. at 47.

### B. Procedural History [13]

**\*4** Young filed complaints in three separate civil rights actions in the United States District Court for the Southern District of New York. Dkt. No. 12 at 1. Because venue was improper in the Southern District, Chief United States District Judge Loretta A. Preska transferred all three actions to the United States District Court for the Western District of New York ("Western District"). Dkt. No. 4 (the "Transfer Order"); see also 28 U.S.C. § 112(d). In an Order filed on June 3, 2016, United States District Judge David G. Larimer granted Young in forma pauperis status, reviewed the complaints, and consolidated the actions. Dkt. No. 10 ("Western District Order"). After consolidating the actions, Judge Larimer reviewed the allegations and held that claims related to events that allegedly occurred at Wende Correctional Facility were subject to dismissal without prejudice. Id. at 3-4. The Court further noted that the remaining claims involved allegations related to due process at a disciplinary hearing held at Eastern C.F. in 2015. Id. Thus, those claims were transferred to this Court pursuant to 28 U.S.C. § 1406(a). [14] Id. at 4.

In a Decision and Order filed on August 29, 2016 ("August Order"), Senior United States District Judge Frederick J. Scullin reviewed the pleadings and directed the Clerk of the Court to combine copies of the Complaint, see Dkt. No. 2, and the first supplemental Complaint, see Dkt. No. 13, as the Amended Complaint. [15] Dkt. No. 15 at 12. Polizzi was directed to respond to the Fourteenth Amendment due process and ADA claims. Id. In the Amended Complaint, Young seeks monetary damages and injunctive relief ordering Defendant to release him from the SHU. Am. Compl. at 25.

On February 23, 2018, Defendant filed the within motion pursuant to Fed. R. Civ. P. 56 seeking summary judgment and dismissal of the Amended Complaint. Dkt. No. 48. Young did not oppose the motion.

### III. DISCUSSION [16]

In the Amended Complaint, Young alleges that Polizzi (1) violated his Fourteenth Amendment Due Process rights during the disciplinary hearing; and (2) discriminated

against him in violation of Title II of the ADA. [17] See Am. Compl. at 22-25. Defendant contends that Young (1) was not deprived of a protected liberty interest; (2) was afforded due process; and (3) was not denied the opportunity to participate in or benefit from services, programs, or activities based upon his disability. See Dkt. No. 48-1, generally. Alternatively, Defendant claims that Young failed to exhaust his administrative remedies with respect to the ADA claim. See id.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

 **\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se

litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. To set forth a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F.Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### 1. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to

2018 WL 3949967

discretionary confinement.' " Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484). Although not dispositive, the duration of a disciplinary confinement is significant in determining atypicality. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). No firmly established, bright-line rule exists to determine the length or type of sanction that rises to the level of atypical and significant hardship. Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (citations omitted). Instead, the Second Circuit has provided a general guideline: "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days —'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." Palmer v. Richards, 364 F.3d 60, 64-65 (2d Cir. 2004) (quoting Colon, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted).

**\*6** Here, Young alleges that he was confined in the SHU for 120 days,[18] which is within an intermediate disposition. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court must determine if this confinement was atypical and significant by comparing the conditions of Young's SHU confinement with ordinary prison conditions. See Vasquez v. Coughlin, 2 F. Supp.2d 255, 259 (N.D.N.Y. 1998). In this regard, Young was also penalized with a loss of packages, commissary, and telephone privileges and asserts that he had limited access to the services of a sign language interpreter while in SHU. Polizzi Decl. at 21; Young Dep. at 27. Young does not claim, nor does the record support, that he endured any conditions that could be construed as atypical or unusual. See, e.g., Judd v. Guynup, 9:12-CV-58 (NAM/ RFT), 2010 WL 5472113, at \*6 (N.D.N.Y. Oct. 17, 2012), adopted by 2012 WL 5471139 (N.D.N.Y. Nov. 9, 2012) (concluding that the plaintiff did not demonstrate atypical conditions of confinement in SHU by noting that the plaintiff's claim that his SHU confinement included a loss of packages, phone, and commissary was "insufficient to support the inference that these losses were atypical for SHU or general population inmates at Clinton."). Accordingly, the undersigned concludes that Young has failed to establish a protected liberty interest in this period of SHU confinement. See Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996) (explaining that although prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population).

### 2. Procedural Due Process

Even assuming that Young established that he was deprived of a protected liberty interest, he has failed to demonstrate that such deprivation occurred without due process of law. The due process protections afforded an inmate do not equate to " 'the full panoply of rights' due to a defendant in a criminal prosecution." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (quotation omitted).

> Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

Id. (citing Wolff v. McDonnell, 418 U.S. 556, 563-67 (1974) ).

### a. Written Notice

In this case, the issue of written notice is undisputed. An inmate must be provided advance written notice at least twenty-four hours before the hearing commences. Wolff, 418 U.S. at 563-64. On December 17, 2015, Young received the misbehavior report authored by Menard. Young Dep. at 15-16. The disciplinary hearing commenced on December 21, 2015. As such, Young was provided with written advance notice. Sira, 380 F.3d at 69.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

An accused prisoner has the right to a hearing where he is given the reasonable opportunity to call witnesses and present documentary evidence. Sira, 380 F.3d at 69. Young did not indicate to Polizzi or any prison official prior to the hearing, that he intended or sought to call any witnesses or present any documentary evidence. [19] Young Dep. at 25-33. At the commencement of the hearing, Young told Polizzi that he did not have any witnesses to call or documents/evidence to present. Young Dep. at 33; Polizzi Decl. at 29. During the hearing, Sgt. Menard testified, via telephone, in Young's presence. Polizzi Decl. at 13. Young was provided with an opportunity to question Menard, and, in fact, posed a series of questions to Menard. Id. at 33-35. Accordingly, Young was not denied the opportunity to call witnesses and present documentary evidence. Sira, 380 F.3d at 69.

**c. Fair and Impartial Hearing Officer**

Prisoners have a constitutional right to a fair and impartial hearing officer. Sira, 380 F.3d at 69. However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ..." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 487-88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

**\*7** Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." Allen, 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." Washington v. Afify, 968 F. Supp.2d 532, 541 (W.D.N.Y. 2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." Johnson v. Fernandez, No. 09-CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989) ).

Young contends that Polizzi was not fair and impartial and found him guilty with "no evidence." Am. Compl. at 26. Specifically, Young alleges that Polizzi conducted an "off the record" investigation, discriminated against Young due to his race and disability, and failed to consider time already served in SHU when he rendered his decision. Am. Compl. at 22-25; Young Dep. at 48-49. Young's allegations are conclusory and unsubstantiated. The record reveals that Young was afforded a fair and impartial hearing officer. The Tier III hearing transcript demonstrates that Polizzi explained to Young his rights and the hearing officer's obligations, read a copy of the misbehavior report into the record, and gave Young ample time to respond to the allegations in the misbehavior report and call the appropriate witnesses. Polizzi Decl. at 27-39. Additionally, the transcript establishes that Polizzi's determination of guilt was based on the "some evidence" standard set forth in Hill. Polizzi stated that, in making his determination, he relied on Sgt. Menard's misbehavior report dated 12/17/15; Sgt. Menard's testimony; Young's testimony; and documentary evidence including the cartoon, letters, and notes. Id. at ¶¶ 40, 22, 27-39. T he disciplinary hearing transcript does not support a finding that Polizzi was anything other than a fair and impartial hearing officer, as there was ample evidence to support a guilty determination.

Even though Young's guilty determination was modified, there is no clear evidence that Polizzi was not a fair and impartial hearing officer. According to Venettozzi, the determination was modified to afford Young the opportunity to "improve his behavior and to refrain from re-offending." Venettozzi Decl. at ¶ 46. Accordingly, although Polizzi reached a different outcome from what Young may have preferred, the record is clear that there is no question of material fact regarding bias.

**d. Statement of Disposition**

Young voluntarily refused to attend the last day of his disciplinary hearing. Polizzi Decl. at 19, 37-38. The undisputed evidence establishes that Young received a written statement of the evidence relied upon and reasons for the disciplinary action. Young Dep. at 38.

**e. Inmate Assistance**

"An inmate's right to assistance with his disciplinary hearing is limited." Neree v. O'Hara, No. 9:09-CV-802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (citing Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993) ). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. Id. (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. Lewis v. Johnson, No. 08-CV-482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5, 2010) (citing Silva, 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " Clyde v. Schoellkopf, 714 F. Supp.2d 432, 437 (W.D.N.Y. 2010) (citing Pilgrim v. Luther, 571 F.3d 201, 206 (2d Cir. 2009) ).

**\*8** Here, Young was confined in SHU and thus, was entitled to an inmate assistant. At the commencement of the hearing, Polizzi inquired:

> Q. The record also indicates that you meet [sic] with your assistant Officer Meineke Jr. on 12/18/15 at 10:20 a.m., correct?
>
> A. Yes.

Polizzi Decl at 27. At Young's deposition, he testified that he selected an inmate assistant, but that he never met with an assistant. Young Dep. at 23. Young's testimony is contradicted by his hearing testimony and at odds with the documentary evidence in the record. Consequently, Young's conclusory assertions do not create a triable issue of fact with regard to his claims related to assistance. See Olle v. Columbia Univ., 332 F.Supp.2d 599, 612-15 (S.D.N.Y. 2004) (finding that the plaintiff's deposition testimony was insufficient evidence to oppose the defendants' motion for summary judgment where that testimony was unsupported by admissible evidence and inconsistent with the plaintiff's other statements).

Even assuming Young's recent version of events as true, if he were deprived of adequate assistance, such a deprivation was rendered harmless and a factfinder could not conclude that Young was prejudiced as a result. Gallo, 22 F.3d at 1223-24. As discussed supra, Young was able to present a defense and pose questions to Menard that

evinced an understanding of the charges. Polizzi Decl. at 33-35. For example, Young asked Menard whether the victim reported a sexual attack, whether there was "any solicitation other than the letters" or anything threats in the letters. Id. This line of questioning demonstrates that Young had an understanding of the charges against him. Therefore, any shortcomings in the assistance rendered was harmless error and does not rise to the level of a due process violation. Hernandez v. Selsky, 572 F. Supp.2d 446, 455 (S.D.N.Y. 2008) (concluding that the plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and, thus, any alleged inadequate assistance was harmless error not warranting denial of summary judgment).

**f. Interpreter and Recording**

Young claims that Polizzi violated his right to due process when he failed to provide a competent sign language interpreter and failed to video-tape the disciplinary hearing. Am. Compl. at 23-25. The failure to provide interpretive services or assistive devices during disciplinary hearings has been found to be a denial due process. Clarkson v. Coughlin, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995); Bonner v. Arizona Dept. of Corr., 714 F.Supp. 420, 425 (D. Ariz. 1989) (holding that a deaf inmate had a due process liberty interest in a qualified sign language interpreter during disciplinary hearing proceedings). In this case, however, Young does not assert that he was denied interpretive services; rather, he claims that his constitutional right was violated because the services provided were inadequate. In this regard, Young alleges that the sign language interpreter provided for the hearing, Gibson, understands "a little bit" of sign language. Young Dep. at 28.

Although Young claims that he vocalized his objection to Gibson's translation during the hearing, there is no support for this self-serving statement in the record. Polizzi and Gibson state that Young did not object or indicate that he had difficulty with the translation services during the hearing. Gibson Decl. at ¶ 14; Polizzi Decl. at ¶ 46. The hearing transcript, which is attached as an Exhibit to Polizzi's Declaration, supports their claim. Polizzi Decl. at 27. Even assuming Young objected to Gibson's translation, the record before the Court does not demonstrate that Young was unable to understand the charges against him or meaningfully participate in

the hearing to support a due process violation. Gibson is fluent and certified in ASL. Gibson Decl. at ¶ 4, 6. Beginning in June 2015, Gibson provided translation services for Young on "numerous occasions." Id. at ¶ 5. Gibson was present during the disciplinary hearing to provide translation services for Young. Id. at ¶ 12; Young Dep. at 20. During the hearing, through Gibson, Young entered a plea, answered questions posed by the hearing officer, and asked questions of the witness. Polizzi Decl. at 29-37. When the hearing officer presented the cartoon, letters, and cards, Young, who is able to read and write, authenticated the documents. Id. Based upon the record, the Court finds that Young was able to comprehend the hearing, the charges, and present a defense. Thus, Young was provided with sufficient due process with respect to the translation services.

**\*9** With respect to Young's claims regarding the recording of the hearing, Polizzi recorded the entire Tier III disciplinary hearing pursuant to 7 N.Y.C.R.R. § 254.6(a)(2). Polizzi Decl. at ¶ 12, 28. "While New York law requires that an electronic record of a disciplinary hearing be maintained, 7 N.Y.C.R.R. § 254(b), such a record is not constitutionally required." Dixon v. Goord, 224 F. Supp. 2d 739, 744 (S.D.N.Y. 2002) (citation omitted). "[Section] 254.6(a)(2) provides a procedural requirement in excess of that required by federal due process such that the failure to abide by § 254.6(a)(2) does not run afoul of the basic federal due process required for an inmate disciplinary proceeding." Cepeda v. Urban, No. 12-CV-00408, 2014 WL 2587746, at \*10 (W.D.N.Y. June 10, 2014); see also Richardson v. Williams, No. 15-CV-4117, 2017 WL 4286650, at \*7 (S.D.N.Y. Sept. 26, 2017) ("Because the rule that disciplinary hearings be electronically recorded is derived from state law, and is not required as a matter of constitutional procedural due process, plaintiff's claim that the failure to adhere to the recording requirement violated his constitutional rights is baseless."). Thus, the failure to video record the disciplinary hearing does not create a constitutional claim.

In sum, because Young fails to demonstrate that his procedural due process rights were violated during the disciplinary proceedings, as he received notice of the charges against him, a fair and impartial hearing officer, a reasonable opportunity to call witnesses and present documentary evidence, inmate assistance, and a written statement of the disposition, he has failed to demonstrate that he was denied procedural due process. Accordingly,

it is recommended that Defendant's Motion for Summary Judgment and dismissal of the Fourteenth Amendment Due Process claims be granted.

### C. ADA [20]

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity includes "any department, agency ... or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(B). Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016). Title II of the ADA applies to state inmates. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 209-10 (1998); Beckford v. Portuondo, 151 F. Supp.2d 204, 220 (N.D.N.Y. 2001).

To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F.Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

Under the ADA, a "qualified individual with a disability" is an "individual with a disability who, with or without reasonable modifications ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity." 42 U.S.C. § 12131(2). A person is an individual with a disability if he has "a physical or mental impairment ... [that] substantially limits one or more of the major life activities of such individual," there is a "record of such an

impairment," or the person is "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).

### 1. Claim for Monetary Relief

**\*10** Case law provides that an individual cannot be named as a defendant in ADA suits either in their official or representative capacities for monetary damages. See Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); see also McFadden v. Roy, Nos. 9:03-CV-0931 (GTS/DRH), 9:04-CV-0799 (GTS/DRH), 2009 WL 799968, at *21 (Mar. 25, 2009); see also Alster v. Goord, 745 F.2d 317 (S.D.N.Y. 2010) (holding that the appropriate party in interest for a plaintiff's claims against individual defendants in their official capacities is the state itself). Thus, Young's ADA claim for monetary damages against Polizzi should be dismissed.

### 2. Claim for Injunctive Relief

Construing the Amended Complaint liberally, Young seeks an injunction ordering that he be released from the SHU. Am. Compl. at 11, 25. Claims for prospective injunctive relief against state officers in their official capacity may be pursued under Title II of the ADA. See Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003). Even assuming that Young is a qualified individual with a disability under the ADA due to his hearing impairment, Young must establish that he was excluded from participation in, or denied the benefits of, a program.[21]

With respect to the third element of an ADA claim, the Court must determine "whether, a plaintiff with disabilities 'as a practical matter,' was denied 'meaningful access' to services, programs, or activities to which he or she was 'legally entitled.' " Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016) (citing Henrietta D., 331 F.3d at 272). "A reasonable accommodation must provide effective access to prison activities and programs." Id. at 73 (citation omitted). "Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." McElwee v. Cty. of Orange, 700 F.3d 635, 641 (2d Cir. 2012). "[T]he plaintiff bears the initial burdens of both production and persuasion as to the existence of an accommodation" that is "facial[ly] reasonable[ ]." Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Sci., 804 F.3d 178, 190 (2d Cir. 2015).

As discussed supra, in accordance with DOCCS regulations, Gibson was present during the disciplinary hearing to provide translation services, and Polizzi created an audio-recording of the hearing. Polizzi also provided a written disposition, which Young admits that he received. Polizzi Decl. at 21-22, 38; Young Dep. at 38. Young claims that Polizzi denied him reasonable accommodations because he failed to videotape the disciplinary hearing and failed to provide an acceptable, professional sign language interpreter. Am. Compl. at 23. First, the evidence does not establish that Young requested any such accommodations from Polizzi either before or during the hearing. Second, as discussed supra, while Young claims he vocalized his objection to the translation services during the hearing, the competent, admissible evidence does not support that contention. Even so, the evidence does not establish how the failure to videotape the hearing and refusal to provide a professional interpreter, prevented Young from participating in his hearing. Young entered a plea and answered several questions regarding the Christmas card, check-list, cartoon, and notes that he wrote to Inmate John Doe. Polizzi Decl. at 29. Young was also able to pose questions to Menard during the proceeding. Id. at 33-35. The record further establishes that, as a result of a prior request for a "reasonable accommodation," Young had a hearing aid.[22] Young Dep. at 63. Young also testified that he was not precluded from participating in any programs within the facility due to his disability. Id. The record lacks any evidence suggesting that Young was unable to communicate through the sign language interpreter during the disciplinary hearing. Additionally, although the hearing was not video recorded, Young was provided with a written disposition and timely filed an appeal. Venettozzi Decl. at ¶ 42.

**\*11** Although Young may have preferred a different interpreter or means of documenting the hearing, Polizzi did not violate the ADA by failing to provide Young with the accommodations of his choice. See Kearney v. N.Y.S. D.O.C.S., No. 9:11-CV-1281 (GTS/TWD), 2013 WL 5437372, at *8 (N.D.N.Y. Sept. 27, 2013), aff'd sub nom., 581 F. App'x 45 (2d Cir. 2014) (summary order) (holding that DOCCS refusal to grant the plaintiff "the accommodation of his choice" does not subject Defendants to liability for disability discrimination); see

Alster, 745 F. Supp.2d at 340 ("[A]s long as [Defendants] reasonably accommodated [the plaintiff's] disability, they need not provide him with the exact accommodations he demanded.") (citation omitted).

Young summarily claims that Polizzi discriminated against him based upon his race and disability. Am. Compl. at 24-25; Young Dep. at 49. Young's claims are unsupported by the record and contradicted by his own deposition testimony. Young alleged that "all officers" discriminated against him, but admitted that Polizzi did not make any statements that Young considered discriminatory during the course of his disciplinary hearing. Id. at 52.

Ultimately, the record is devoid of evidence indicating that, by reason of his alleged impairment, Young was denied assistance for marshaling his defenses during the disciplinary hearings. Thus, despite his conclusory allegations, Young was provided with reasonable accommodations for any shortcomings that Young felt he faced in the disciplinary hearings. Accordingly, because Young has failed to establish that he was excluded from participation in, or denied access to, a program, or that he was wrongfully denied a reasonable accommodation, it is recommended that Defendant's Motion for Summary Judgment on this ground be granted.[23]

## IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 48) be **GRANTED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 3949967

---

Footnotes

1   This matter was referred to the undersigned for a Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

2   The Amended Complaint was properly verified by declaration under 28 U.S.C. § 1746. Am. Compl. at 7, 21; Young Dep. at 13; LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) (holding that use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

3   Local Rule 7.1(a)(3) states:

   Summary Judgment Motions

   Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorneys' affidavits.

   The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

4    Citations to page numbers within this Report-Recommendation and Order refer to the pagination generated by CM/ECF, located at the header of each page.

5    Polizzi claims that the report was formally served upon Young on December 18, 2015. Polizzi Decl. at ¶ 17. Young testified that he received a copy of the ticket on December 17, 2015. Young Dep. at 15-16.

6    DOCCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. Dkt. No. 48-7 at ¶ 9; see Hynes v. Squillace, 143 F.3d 653, 655 (2d Cir. 1998), cert. denied, 525 U.S. 907 (1998).

7    The transcript from the hearing is annexed as an exhibit to the defendant's motion. See Polizzi Decl. at 27-39.

8    A deaf or hard of hearing inmate who uses sign language to communicate shall receive the assistance of a qualified sign language interpreter who shall be present at the hearing. See N.Y.C.R.R. tit. 7, § 254.2

9    Gibson is fluent and certified in ASL. Gibson Decl. at ¶ 4, 6.

10   The entire superintendent's hearing must be electronically recorded. See NYCRR. tit. 7 § 254.6(a)(2).

11   During Young's deposition, he testified that he did not meet with an assistant prior to the hearing. Young Dep. at 23.

12   Young refused to attend the last day of his hearing. Polizzi Decl. at 37.

13   The procedural history of this action was set forth in a Decision and Order filed on July 27, 2016 (the "July Order") and is summarized herein for purposes of convenience to the parties. Dkt. No. 12.

14   The Clerk of the Northern District obtained copies of the complaints in the three actions and docketed the pleadings as the Complaint (Dkt. No. 2), the first supplemental Complaint (Dkt. No. 13), and the second supplemental Complaint (Dkt. No. 14).

15   The Amended Complaint, Dkt. No. 16, became the operative pleading. Dkt. No. 15 at 12. The Clerk of the Court was directed to strike the second supplemental Complaint (Dkt. No. 14) from the docket. Id.

16   All unpublished opinions cited to by the undersigned in this Report-Recommendation & Order have been provided to plaintiff, unless otherwise indicated.

17   The ADA claim is asserted against Polizzi in his official capacity. See Dkt. No. 15 at 10.

18   As discussed supra, the parties dispute the length of Young's SHU confinement. For the purposes of the within motion, the Court accepts the allegations in the Amended Complaint as true and views all facts most favorably to Young.

19   Young testified that did not make any request related to witnesses until six months after the hearing. Young Dep. at 23-32.

20   Young does not specify what portions of the ADA are triggered. Reading the Amended Complaint liberally, it appears that Young seeks relief under Title II. See Giraldi v. Bd. of Parole, No. 9:04-CV-877 (FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008) (concluding that Title II applies to state inmates).

21   Defendant does not dispute that Young has met the first element as he alleges a physical impairment that substantially limits his ability to hear.

22   Young testified that Gibson provided him with a hearing aid and an alarm. Young Dep. at 63. Young's hearing aid was stolen "three or four weeks" before his deposition. Id. There is no evidence suggesting that Young was not in possession of a hearing aid at the time of the disciplinary hearing.

23   In light of the undersigned's recommendation that Young's ADA claim be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust argument related to this claim.

---

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3949942
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John Shicobra YOUNG also Known
as J. Shicobra Young, Plaintiff

v.

Cho POLIZZI, Defendant.

9:16-CV-660 (FJS/CFH)
|
Signed 08/16/2018

**Attorneys and Law Firms**

JOHN SHICOBRA YOUNG, 86-A-2673, Wende
Correctional Facility, P.O. Box 1187, Alden, New York
14004, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL, OF COUNSEL, ERIK BOULE
PINSONNAULT, AAG, The Capitol, Albany, New
York 12224, Attorneys for Defendant.

## ORDER

Frederick J. Scullin, Jr. Senior United States District
Judge

**\*1** Plaintiff asserts claims against Defendant Polizzi
pursuant to 42 U.S.C. § 1983 and Title II of the Americans
with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*
*See* Dkt. No. 16 ("Amended Complaint").

Pending before the Court is Magistrate Judge Hummel's
July 11, 2018 Report-Recommendation and Order, *see*
Dkt. No. 50, in which he recommended that the Court
grant Defendant's motion for summary judgment, *see*
Dkt. No. 48. Plaintiff did not file a response in opposition
to Defendant's motion nor did he file any objections to
Magistrate Hummel's recommendation.

"When a party does not object to a magistrate judge's
report-recommendation, the court reviews that report-
recommendation for clear error or manifest injustice."
*Ward v. Lee*, No. 9:16-CV-1224, 2018 WL 3574872,
\*1 (N.D.N.Y. July 25, 2018) (citation omitted). "After
conducting this review, 'the Court may "accept, reject,
or modify, in whole or in part, the ... recommendations
made by the magistrate judge.' " " *Id.* (quoting *Linares
v. Mahunik*, No. 9:05-CV-625, 2009 WL 3165660, \*10
(N.D.N.Y. July 16, 2009) (quoting 28 U.S.C. § 636(b)(1)
(C) ) ).

The Court has reviewed Magistrate Judge Hummel's July
11, 2018 Report-Recommendation and Order for clear
error and manifest injustice; and, finding none, the Court
hereby

**ORDERS** that Magistrate Judge Hummel's July 11, 2018
Report-Recommendation and Order is **ACCEPTED in
its entirety** for the reasons stated therein; and the Court
further

**ORDERS** that Defendant's motion for summary
judgment, *see* Dkt. No. 48, is **GRANTED**; and the Court
further

**ORDERS** that the Clerk of the Court shall enter judgment
in favor of Defendant and close this case; and the Court
further

**ORDERS** that the Clerk of the Court shall serve a copy
of this Order on the parties in accordance with the Local
Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 3949942

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.